IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JEFFREY GABBAY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No.1:20-cv-00743-JLH |
| v. | : | |
| | : | |
| BERNARD G. CONAWAY, ESQUIRE | : | JURY TRIAL DEMANDED |
| and CONAWAY-LEGAL LLC, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**APPENDIX TO DEFENDANTS' MEMORANDUM
IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**SEITZ, VAN OGTROP & GREEN, P.A.**

/s/ *R. Karl Hill*
R. Karl Hill, Esquire (2747)
222 Delaware A venue, Suite 1500
Wilmington, DE 19801
Tele: (302) 888-7604
Email: *khill@svglaw.com*

*Attorneys for the Defendants*

Dated:   June 21, 2024

## TABLE OF CONTENTS

Exhibit

Deposition Transcript of Plaintiff Jeffrey Gabbay..........................................................................A

Collection of documents with Bates Prefix "CL"..........................................................................B

Plaintiff's Responses to Defendants' First Requests for Admission ............................................C

Deposition Transcript of Bernard G. Conaway ............................................................................D

Deposition Transcript of Cliff A. Rieders.....................................................................................E

Plaintiff's Responses to Defendants' Second Request for Production .........................................F

# EXHIBIT A

**In the Matter Of:**

*Gabbay vs*

*Conaway*

*JEFFREY GABBAY*

*March 16, 2023*



Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

---

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
 2                      - - -
 3
 4   JEFFREY GABBAY,          : C.A. No.
                              : 1:20-cv-00743-GBW
 5           Plaintiff,       :
                              :
 6   vs.                      :
                              :
 7   BERNARD G. CONAWAY,      :
     ESQUIRE and CONAWAY-     :
 8   LEGAL LLC,              :
                              :
 9           Defendants.      :
10
                        - - -
11           Thursday March 16, 2023
     Remote deposition taken via Zoom Videoconferencing
12                      - - -
13
14           Sworn video deposition of JEFFREY
15   GABBAY was taken pursuant to notice via Zoom
16   Videoconferencing on the above date, beginning
17   at approximately 8:17 a.m., before Stephanie
18   Weldon, Court Reporter and Notary Public for
19   the State of Pennsylvania, there being present
20   remotely.
21                      - - -
22
              LEXITAS LEGAL
23     999 OLD EAGLE SCHOOL ROAD, SUITE 118
              WAYNE, PA 19087
24     888.267.1200 (PH) 267.775.3310 (FAX)
              www.lexitaslegal.com
```

---

**Page 2**

```
 1   APPEARANCES via Zoom Videoconferencing:
 2
     THE POLIQUIN FIRM, LLC
 3   BY:  RONALD POLIQUIN, ESQUIRE
          1475 South Governors Avenue
 4        Dover, Delaware 19904
          (302) 702-5501
 5        ron@poliquinfirm.com
          jeffgabbay@gmail.com
 6        Representing the Plaintiff
 7
     SEITZ, VAN OGTROP & GREEN, P.A.
 8   BY:  R. KARL HILL, ESQUIRE
          222 Delaware Avenue, Suite 1500
 9        Wilmington, Delaware 19801
          (302) 888-7604
10        khill@svglaw.com
          Representing the Defendants
11
12   ALSO PRESENT:
13        Bernard Conaway, Defendant
14
15
16
17
18
19
20
21
22
23
24
```

---

**Page 3**

```
 1                 I N D E X
 2   WITNESS                          PAGE
 3   JEFFREY GABBAY
        (Witness sworn.)
 4
     DIRECT EXAMINATION
 5    BY: Mr. Hill                      4
 6    CROSS-EXAMINATION
      BY: Mr. Poliquin                156
 7
 8
 9
10
11
12                E X H I B I T S
13
14   NO.       DESCRIPTION             PAGE
15   Exhibit-1   E-mail Correspondence   34
16   Exhibit-2   Article               141
17   Exhibit-3   Memorandum            150
18
19
20
21
22
23
24
```

---

**Page 4**

```
 1       (It is agreed by and between
 2   counsel that the sealing, filing, and
 3   certification are hereby waived and all
 4   objections, except as to the form of
 5   the questions, are reserved until the
 6   time of trial.)
 7              - - -
 8       JEFFREY GABBAY, after having
 9   been duly sworn, was examined and
10   testified as follows:
11              - - -
12       DIRECT EXAMINATION
13              - - -
14   BY MR. HILL:
15   Q.    Mr. Gabbay, good morning.  I'm Karl
16   Hill.  I represent Bernie Conaway, and Bernie's
17   law firm in this case that you brought in the
18   District Court of Delaware that brings us
19   together today.  I appreciate your time today in
20   advance.  Okay?
21   A.    Thank you.
22   Q.    Can you hear me okay, Mr. Gabbay?
23   A.    Yes.  Very clearly.
24   Q.    And if I do slip, I may refer to you
```

---

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 5

1   just by your first name.  Is that --
2   A.    Call -- call me Jeff.  It's fine.  Call
3   me Jeff.
4   Q.    Okay.  And likewise, please call me
5   Karl.
6   A.    Okay.
7   Q.    And with --
8         THE COURT REPORTER:  And
9   before -- wait, guys.  I'm sorry.  I
10  have to interrupt.  Please don't speak
11  over each other because I cannot hear
12  because it will cut you guys out.  You
13  don't want holes in the transcript,
14  right?
15        MR. HILL:  Thank you.
16        THE COURT REPORTER:  And it
17  looks like we lost other counsel.
18        THE WITNESS:  We lost the
19  other counsel.
20        MR. HILL:  We lost Ron.
21        THE WITNESS:  Yeah.
22        (Whereupon, a recess was
23  taken.)
24  BY MR. HILL:

Page 6

1   Q.    All right.  Jeff, let's get started.
2   Where are you physically located today for the
3   purposes of this deposition?
4   A.    I am in my home.  Jabotinsky Street,
5   No. 14 in Jerusalem, Israel.
6   Q.    And is there anyone else in the room
7   with you?
8   A.    No.
9   Q.    And I forwarded a document to your
10  attorney yesterday that I'm going to -- that
11  we'll get into later.  Do you have that with
12  you?
13  A.    If it's the one that Ron sent me, yes.
14  Q.    Okay.  It's a series of e-mails?
15  A.    74 pages, correct.
16  Q.    Okay.  Great.  And you have that
17  actually printed out?
18  A.    (Indicating.)
19  Q.    Thank you.  All right.  Let's get
20  started.  I want to give you a couple of ground
21  rules, and Stephanie referred to one of them.
22  And I know you've been deposed one time before.
23  Is that the only time, Jeff, that you've been
24  deposed?

Page 7

1   A.    Yes.
2   Q.    All right.  And you might remember some
3   of these ground rules, but it's probably
4   beneficial to go through a couple.  We can't
5   talk over one another.  So if you'll wait until
6   my question is over to start your answer, I'll
7   do my best to not ask the next question until
8   you're done answering.  Okay?
9   A.    Mm-hmm.  Okay.
10  Q.    The second ground rule is that your
11  responses have to be verbal.  So even though
12  we're on a Zoom platform, I don't think it's
13  being recorded.  So the court reporter's going
14  to need to take down only verbal responses.
15  Okay?
16  A.    Correct.
17  Q.    And the third one is if you need a break
18  for any reason, just let me know, and we'll stop
19  and take a break, and I may, likewise, need to
20  do that as well.  Okay?
21  A.    Okay.
22  Q.    It's not a test.  It's just my
23  opportunity to ask you questions that are
24  pertinent to this dispute.  Okay?

Page 8

1   A.    Yes.
2   Q.    All right.  Where were you born,
3   Mr. Gabbay?
4   A.    I was born in New York City.
5   Q.    And were you raised in -- were you
6   raised in New York?
7   A.    Yes.  I was raised in New York.  I came
8   to Israel at the age of 25 in 1973.
9   Q.    And what's your educational background,
10  sir?
11  A.    My education is first degree textile
12  engineering.  I then studied chemistry and
13  biochemistry, and then I studied pathology.
14  Q.    Pathology, you said?
15  A.    Yes.
16  Q.    And where did you -- did you obtain
17  degrees in each of those disciplines?
18  A.    No.
19  Q.    What degrees --
20  A.    I --
21  Q.    I'm sorry.
22  A.    Yeah.  The system for education in
23  Europe is different than it is in the United
24  States.

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 9

1   Q.     Okay.  Can you --
2   A.     So you get a -- right, it's a
3   completely different system.  You have a
4   certification so that, for example, your
5   studying is primarily hands-on.  It's almost
6   all bench work.  So when I did textile
7   engineering, that was done in a textile
8   factory.  The engineering part were done in
9   classes that were part of the factory.  When I
10  did the biology and the biochemistry, those
11  were done also in laboratories.  And then
12  pathology is -- I'm not qualified to see
13  patients.  I am qualified to understand the
14  nature of a disease.  So you get certification
15  for a baccalaureate system, which would be the
16  equivalent of an American MA or BA or -- and so
17  on.  But I can't say that that's what it is
18  because it's not.  I would not present myself
19  with these degrees if I were in the United
20  States.  In Europe, you can discuss
21  certification.  In America, you can't.
22  Q.     Did I understand you correctly before
23  that you were raised in New York but moved to
24  Israel when you were 25?

Page 10

1   A.     That's correct.  So my studying, I
2   actually did after I came to Israel.  I did --
3   I did two-and-a-half years of university in the
4   United States, and then I moved to Israel.
5   Q.     I see.  Okay.  And are you a resident of
6   Israel now?
7   A.     I am a citizen of the State of Israel,
8   and I carry dual citizenship.
9   Q.     I'm sorry.  You said you're a citizen
10  of?
11  A.     I am a citizen of the State of Israel,
12  and I carry dual citizenship.  I am also an
13  American citizen.
14  Q.     Okay.  Thank you.  And just to ballpark,
15  do you spend time in the U.S. during the year?
16  A.     I have not spent time in the U.S. for
17  the last three years because of COVID.  But
18  before that, I was in America very often.
19  Q.     Very often?
20  A.     Yeah.  I would be in America at
21  least -- the least, six times a year.
22  Q.     Okay.  And maybe this is a good segue.
23  Can you give me a little bit of your work
24  experience in life?

Page 11

1   A.     Sure.  Most of my work has been around
2   the development of technical textiles.  A lot
3   of my work has been for the -- my original
4   work, which was done in the '70s for -- in
5   conjunction with the Ministry of Defense of the
6   State of Israel and with the Department of
7   Defense in the United States.  I was -- I
8   worked on such projects as -- and I'll continue
9   ones that I'm allowed to talk about.  We talked
10  about fireproof fabrics, bulletproof fabrics,
11  radar scattering fabrics, fabrics that are
12  electronically active.  In 1993, I moved from
13  military to medical.
14  Q.     Okay.  And...
15  A.     Okay.  And that actually came because
16  of work that I did on biological warfare.  And
17  my original work during these years was
18  primarily for the control of nosocomial
19  infections, hospital-acquired infections.  This
20  had to do with work that I did, which was
21  published on the source of bacteria in a
22  hospital, and the mode of transmission of that
23  bacteria from patient to patient as a cause for
24  mortality in hospitals.  The number one cause

Page 12

1   of death in hospitals are hospital-acquired
2   infections.
3        Karl, on a personal level, having
4   nothing to do with this deposition, if you can
5   avoid going to a hospital, do so.  Because
6   generally speaking, the bioburden of antibiotic
7   resistant bacteria in a hospital is extremely
8   high, which is why approximately 10 percent of
9   all patients will pick up some kind of a bug.
10  That doesn't mean they'll die, but they'll pick
11  up a bug.  All right?  Normally, you give them
12  an antibiotic and that will take care of it.
13  But what has happened over the last 10 or 15
14  primarily is the prevalence of super bugs.
15  Some --
16  Q.     In the hospital setting?
17  A.     Yeah.  MRSA would be an example of one,
18  the common -- MRSA the most common one.  These are
19  methicillin-resistant staphylococcus aureus,
20  and they will kill a very -- a very high
21  percentage of the people that catch it.  There
22  are many bacteria now that are antibiotics
23  resistant.  Now, just the background.
24  Q.     Yeah.

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 13

1  A.     The primary sources of bacteria was
2  found actually to be the patients themselves.
3  Your body gives off a quarter of a million
4  bacteria every minute.  And the question is,
5  where do they go.  Well normally, the bacteria
6  would stay on your skin and they would die.
7  However, if that bacteria leaves your body and
8  gets to an incubating atmosphere before it
9  dies, then it will proliferate in that
10  incubating atmosphere as if it's in a Petri
11  dish.  And unfortunately, what we found was the
12  most common place for this was actually the
13  textile products in the hospital.
14  Q.     You mean by that, that the clothing
15  that's worn by --
16  A.     The clothing -- the clothing, sheets,
17  towels, nurses' uniforms.  Now, when a nurse
18  changes a sheet or when she moves from room to
19  room, or when the patient gets out of his bed
20  to go to the bathroom or walks around the
21  hallways, or the doctors in their lab coats
22  walk, they're actually transmitting bacteria
23  from room to room.
24          If you remember, there used to be a

Page 14

1  Peanuts character named Pig Pen.  And this was
2  the little boy that would walk around, and
3  every time he walked, there was always this
4  black dust in back of him.  Well, imagine that
5  black dust as bacteria because that's actually
6  what happens.
7  Q.     Okay.
8  A.     And that bacteria oftentimes is
9  antibiotic resistant.  Now, if you take a
10  population, which is primarily
11  immunocompromised to begin with, then they're
12  going to be subjects to receiving those
13  communal infections.  And that's why the number
14  one cause of death in hospitals in the United
15  States are hospital-acquired infections.
16  Q.     And this has nothing to do with the
17  deposition, but my son is a first --
18  A.     It does.
19  Q.     -- year resident.  My son --
20  A.     It actually -- it actually does have to
21  do with the deposition because what I developed
22  was a self-sterilizing textile.
23  Q.     What I was going to say, Jeff, is --
24  what I was going to say has nothing to do with a

Page 15

1  deposition.
2  A.     Oh.
3  Q.     So my son -- my son is a first-year
4  doctor, and I find it very interesting what
5  you're saying about this.
6  A.     So to prevent the prevention, what we
7  want to do is we want to kill the bacteria so
8  that they can't spread around.  Now, the issue
9  that we've always had was how can you kill the
10  bacteria without killing the patients.  Because
11  if you kill one, you're going to kill the
12  other.  That's -- unfortunately, that's how it
13  works, and that's what we figured out, or I
14  figured out.
15  Q.     And I appreciate that and I commend you
16  for that.  Can we put a little more detail on
17  who you were actually working for as you
18  developed these, I don't want to belittle it,
19  but these processes to make the textiles more --
20  A.     I was --
21  Q.     -- resistant to bacteria?
22  A.     I was the -- I was the primary -- the
23  chief technical officer.
24  Q.     For which company?

Page 16

1  A.     This was the one that Bernie was
2  representing with me, was a company called
3  Cupron.
4  Q.     Okay.
5  A.     Where I developed the first generation
6  of these textiles, they weren't as effective as
7  the ones that I've developed now.  But they
8  were highly, highly effective, and they did
9  improve to reduce hospital-acquired infections
10  by more than 30 percent in tests.  That's a
11  huge, huge thing.  And that's where Bernie and
12  I were suing Cupron, who owed me money.
13  Q.     Yeah.  We'll get to that.  So how long,
14  sir, were you with Cupron?
15  A.     From 2000 until 2010, when I sold it to
16  a private group in the United States.
17  Q.     So I take that to mean that you were the
18  owner of Cupron before it was --
19  A.     I was -- that's correct.
20  Q.     The sole owner?
21  A.     No.  I was not the sole owner.  I had
22  some partners, but they were minority partners.
23  Q.     And you said you sold it in 2010?
24  A.     Correct.

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

---

Page 17

1  Q.    And who was it sold to?
2  A.    It was sold to a group in Virginia
3  called the Virginia Healthcare Group, which
4  actually, I don't think, exists anymore.
5  Q.    Okay.
6  A.    But I don't -- you know, I'm not in
7  touch with them since -- you know, since we
8  sued them, so. And...
9  Q.    And -- I'm sorry. I didn't mean to cut
10 you off. But I do have a basic understanding of
11 the lawsuit that you brought in a court chancery
12 relating to Cupron. But can I fairly state that
13 you continue to hold shares in Cupron even after
14 it was sold in 2010?
15 A.    No. I have no shares in Cupron. Zero.
16 Q.    Okay. And how about after 2010?
17 A.    No.
18 Q.    How about your -- where did you go to
19 work after 2010?
20 A.    After 2010, I began to work in a
21 company called Argaman.
22 Q.    Okay.
23 A.    Which I established.
24 Q.    When you say --

---

Page 18

1  A.    Because of --
2  Q.    -- you estab -- I'm sorry. When you say
3  you established, you formed the company?
4  A.    Yes. I formed the company. It was a
5  new company. I formed it with the person who
6  was my CFO in the company. And we -- I --
7  because of my contract with Cupron, I was
8  prohibited from working in the area of
9  antimicrobials until 2013.
10 Q.    And when was Argaman formed?
11 A.    In 2013.
12 Q.    And what's -- what's its state or
13 country of incorporation?
14 A.    Its incorporation is in Israel.
15 Q.    And is that still an active company?
16 A.    It is still an active company, but I am
17 not active in the company anymore. I retired
18 about a year and a half ago. I still own
19 approximately 25 percent of Argaman. It's
20 being run by the majority stockholders. They
21 call me if they need technical advice, which is
22 hardly ever. And I'm hoping that there'll be
23 an exit one day or they'll buy me out or
24 something, you know.

---

Page 19

1  Q.    So what are you doing for the company
2  now, sir?
3  A.    For Argaman?
4  Q.    Yeah.
5  A.    Nothing.
6  Q.    Okay.
7  A.    Nothing.
8  Q.    And are they still, my word, advancing
9  your thoughts and ideas as it relates to the
10 textile --
11 A.    Yes.
12 Q.    -- realm that you were in?
13 A.    Mm-hmm. Yes.
14 Q.    Okay. And a year and a half ago, was
15 that in 2022 or 2021?
16 A.    It was October of '21.
17 Q.    And did you continuously work for
18 Argaman from 2013 when it was formed until
19 October of 2021 when you were retired?
20 A.    Yes.
21 Q.    And what was your title during that time
22 frame?
23 A.    I was chief executive officer and chief
24 technical officer.

---

Page 20

1  Q.    Were there other officers in that
2  company during that time frame?
3  A.    Shareholders.
4  Q.    Were you the only director of the
5  company?
6  A.    I was the -- no. The shareholders were
7  directors as well.
8  Q.    Were you the only officer of the
9  company?
10 A.    Yes.
11 Q.    And how many employees --
12 A.    Oh, no. I'm sorry. That's incorrect.
13 That's incorrect. The CFO was the other
14 officer.
15 Q.    And was that the CFO that --
16 A.    Established the company with me.
17 Q.    And what's his name or her name?
18 A.    His name is Mr. Simcha, S-I-M-C-H-A,
19 Edell, E-D-E-L-L.
20 Q.    And does he still have a role with
21 Argaman?
22 A.    Yes.
23 Q.    And what's the technical name of the
24 corporation?

---

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

### Page 21

1  A.    In Israel, we're a limited liability
2  corporation.
3  Q.    Okay.  And what's the full legal name of
4  the company?
5  A.    Argaman, A-R-G-A-M-A-N, Technologies,
6  Limited.
7  Q.    And where is -- I'm just going to refer
8  to it as Argaman from this point forward.  Okay?
9  A.    Mm-hmm.
10  Q.    Where is Argaman located, sir?
11  A.    It is located now in the industrial
12  area of Migdal, M-I-G-D-A-L, HaEmek,
13  H-A-E-M-E-K, which is in the north of Israel.
14  Q.    Okay.
15  A.    After I retired, they moved the
16  facility to a larger area into an industrial
17  park, where I had -- was basically a very large
18  laboratory when it was here in Jerusalem.
19  Q.    I see.
20  A.    And they're working on the scale up to
21  mass production.
22  Q.    Okay.  And I'm just curious, what
23  products are being made by Argaman incorporating
24  your special sauce, so-to-speak?

### Page 22

1  A.    Fibers, cotton fiber.  These cotton
2  fibers get mixed with regular cotton, converted
3  to yarns, yarns get converted to fabrics.
4  Q.    I see.  This industrial facility, that's
5  the current location of Argaman?
6  A.    Correct.
7  Q.    Do they have any other locations or
8  facilities in the world?
9  A.    The -- part of the technology was moved
10  to Hong Kong.
11  Q.    And when was that?  When was that done?
12  A.    That was at the time that I retired.
13  They --
14  Q.    [Inaudible overlap].
15  A.    -- moved the --
16  Q.    October -- I'm sorry --
17  A.    October.
18  Q.    We're talking over each other.  We have
19  to be more careful.
20  A.    In October 2021, the company had two
21  divisions.  One was a division that treated
22  cotton fibers.  The other was a division that
23  treated polyester fibers.  The cotton fibers
24  were kept in Israel and moved to a larger

### Page 23

1  facility in Migdal HaEmek.  The polyester
2  fibers that technology was moved to Hong Kong.
3  And the reason that that was done was to
4  facility mass production in polyester, which
5  is, at the time, the far east was the primary
6  source of those products.
7  Q.    And is Hong Kong purely a production
8  facility?
9  A.    No.  That is the office.  The
10  production facility is -- it's run by the
11  chairman of the company, is the chairman of a
12  company called T-A-L Apparel.  TAL Apparel has
13  their offices in Hong Kong and their primary
14  manufacturing facility in Vietnam.
15  Q.    Okay.  And the TAL Apparel company you
16  just referenced, what is its legal connection to
17  Argaman?
18  A.    They were the primary stockholders in
19  Argaman.
20  Q.    As of what time frame?
21  A.    2000 and -- well, shortly after I
22  established it.
23  Q.    2013 or so?
24  A.    Yes.  2014 or so.

### Page 24

1  Q.    Okay.
2  A.    In between 2014 and 2021, they invested
3  around $9 million.
4  Q.    Into Argaman?
5  A.    Correct.
6  Q.    Is it fair to say that the relationship
7  with TAL, when it began in 2014 or so, continued
8  all the way through today?
9  A.    Correct.  TAL is the largest
10  manufacturer, if I'm not mistaken, the largest
11  manufacturer of garments -- one of the largest
12  manufacturer of garments in the world, which is
13  why we took him as a partner because he's
14  strategic.
15  Q.    Okay.  And during your tenure there at
16  Argaman, what countries did Argaman do business
17  with?
18  A.    Primarily with the United States.  We
19  did do -- we actually did quite a bit of
20  business in Israel during COVID.  And the
21  reason was we used a self-sterilization
22  technology to produce a mask.  And that mask
23  destroys the virus in less time than the virus
24  can pass through the mask.  So the discussions

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 25

1  I had with the FDA were on a disease prevention
2  product.
3  Q.      Okay.  And did you supply or produce
4  masks or distribution to others?
5  A.      We sold in Israel approximately $4.7
6  million worth of masks.
7  Q.      Did you sell any masks to China?
8  A.      No.
9  Q.      I asked you what countries Argaman did
10  business with, you said the U.S. and Israel.
11  Any other countries?
12  A.       Well, we did a lot of -- remember that
13  Argaman never got to the manufacturing stage.
14  You know, it was a big laboratory.  So the
15  ability to produce enough fiber to produce
16  masks could be done out of the laboratory
17  facility.  But we were limited.  We couldn't do
18  more than what we did.  So the demand for masks
19  -- we did sell masks in America, but not in --
20  you know, we sold to individuals.
21  Q.      Okay.  How about TAL Apparel, they were
22  doing -- what work were they doing for --
23  A.      We sold --
24  Q.      -- Argaman?

Page 26

1  A.       -- materials -- right.  We sold
2  materials to the Hong Kong government, but that
3  was through TAL.  And they were converting
4  those materials into masks.
5  Q.       So in other words, Argaman would sell it
6  to -- sell product to TAL, and then TAL would
7  then provide --
8  A.      They would --
9  Q.      -- it and --
10  A.      -- convert it --
11  Q.      -- sell it --
12  A.      Right.
13  Q.      -- to --
14  A.      Remember, we were in -- we were textile
15  people.  We produced fibers that were converted
16  to textiles.  We were not people that took the
17  textiles and converted it to a sole mask.
18  That's what TAL does.
19  Q.      Okay.  I see.  And did TAL ultimately
20  produce masks for the Chinese people?
21  A.       I don't know who they produced masks
22  for.  I do know we did sell to -- also to
23  Singapore.
24  Q.      Argaman did?

Page 27

1  A.      Yes.
2  Q.      And was TAL the largest, I'll say,
3  customer of Argaman during your tenure?
4  A.       The largest splash of business was the
5  Singapore government.  But remember, we were
6  not really a -- we were a development business.
7  We were shooting for -- you know, aiming a lot
8  higher.  The type of thing we were looking at
9  was, for example, an approach that we received
10  from an extremely well-known America company,
11  who wanted our technology, and probably that
12  relationship, I'm sure, still exists.  But once
13  we go to mass production, there will be
14  somebody who will want to be in that business
15  with us.
16  Q.      Understood.  And let's just focus on
17  Argaman specifically now as it relates to bank
18  accounts.  Where did Argaman keep its bank
19  accounts during your tenure?
20  A.      In Israel.
21  Q.      Any bank accounts in any other country?
22  A.      No.  In this country, it's very
23  difficult, you have to be built for it to do
24  your banking out of the country.  The State of

Page 28

1  Israel controls foreign currency.  Like many
2  countries they -- you know, it's a standard all
3  over the world today.  Israel's no different
4  than any other country.  It's a lot easier to
5  bank locally.
6  Q.      Is Argaman --
7  A.      [Inaudible overlap].
8  Q.      I'm sorry.
9  A.      Everything that we did was based out of
10  here.  So there was no reason for us to have
11  accounts out of the country.
12  Q.      Has Argaman ever had a bank account in
13  China?
14  A.      No.
15  Q.      To your knowledge?
16  A.      No.
17  Q.      How about you, personally?
18  A.      No, never.
19  Q.      And your wife?
20  A.      No, never.  I have never done any
21  banking out of Israel or the United States.
22  Q.      Now, how often would you visit the --
23  let's talk about in the time frame before COVID.
24  Everything's now before COVID or post COVID, it

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 29

1  seems.  So pre COVID -- and I'm just going to
2  define COVID as starting in early 2020.
3  A.      Right.
4  Q.      Prior to that time, how often were you
5  traveling to the United States?
6  A.      I would say somewhere between four --
7  an average of -- yeah, probably four to six
8  times a year as the necessity rose.  And the
9  trips were generally never more than ten days,
10 ever.  And as much as possible, only four days.
11 I'm a sabbath observer, so I try to get home
12 for Friday night, Saturday.
13 Q.      We're talking about China, it just
14 occurred to me.  I put Hong Kong in the bucket
15 of China.
16 A.      Yeah.
17 Q.      Do you as well?
18 A.      Yes.  But you don't need -- if you have
19 an American passport, you don't need a visa for
20 Hong Kong, but you do need a visa for China.
21 Q.      Did Argaman ever have a bank account in
22 Hong Kong?
23 A.      No.  I would have said so if we did.
24 Q.      And the same answer would be true for

Page 30

1  you and your wife as well?
2  A.      Correct.  Absolutely.
3  Q.      Okay.  For the four to six times a year
4  in the United States, was that for business or
5  pleasure or both?
6  A.      Only business.
7  Q.      And when you travelled to the U.S., did
8  you typically bring a laptop to connect to the
9  Argaman server?
10 A.      Yes.  Yes.
11 Q.      I'm going to switch gears now, Jeff, and
12 go into the representation in the Court of
13 Chancery action just briefly.
14 A.      Yes.
15 Q.      Okay?  And you retained Bernie -- I'm
16 going to refer to him as Bernie -- Bernie and
17 his law firm in October of 2017.  Does that
18 sound about right?
19 A.      That sounds about right.
20 Q.      Okay.  And that was to represent you in
21 a case here against Cupron relating to obtaining
22 books and records from him.  Do I have that
23 right?
24 A.      That is correct.

Page 31

1  Q.      Okay.  And as I understand it, Cliff
2  Rieders was involved in some way with that case;
3  is that fair?
4  A.      Yes.
5  Q.      And who is Cliff Rieders?
6  A.      Cliff Rieders is my legal counsel in
7  the United States.
8  Q.      And how long has he been fulfilling that
9  role for you?
10 A.      A lot of years.  Cliff and I go back to
11 childhood.
12 Q.      In New York?
13 A.      Yes.
14 Q.      Were you neighbors or friends or what?
15 A.      We were friends from about the age of
16 eight.
17 Q.      Good for you.  Still friends, I hope.
18 A.      Yeah.  Still.  Very good friends.
19 Q.      You're blessed to have a long-time
20 relationship with that, I'll tell you.
21 A.      It is a blessing, especially somebody
22 with Cliff.
23 Q.      And maybe I should be a little more
24 precise.  When you said he's your legal counsel,

Page 32

1  is that you, personally, or businesswise or
2  both?
3  A.      It was personally.
4  Q.      And Cliff, as I understand it, is
5  located in Williamsport, Pennsylvania, his
6  office at least?
7  A.      That's correct.
8  Q.      And does he live there, do you know?
9  A.      Yes, he does.
10 Q.      Okay.  And what was his role, in your
11 words, in connection with the Chancery Court
12 case that you brought here against Cupron?
13 A.      Cliff was the one who brought me Bernie
14 because Cliff is not authorized to represent me
15 in the State of Delaware.
16 Q.      I should have asked this earlier.  But
17 as far as bank accounts go, did Argaman have any
18 bank accounts in the U.S.?
19 A.      No.
20 Q.      Did you and/or your wife?
21 A.      Yes.
22 Q.      And where were they?
23 A.      The Valley Bank of New York.  I think
24 it's called Valley Bank.  I still have that

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 33

1  account.  And we had set up another account at
2  -- it's called New York Mellon Bank, I believe,
3  yes.  The Bank of New York Mellon, 1 Wall
4  Street.  That was also an account that we had
5  in the United States, which was set up for the
6  purpose of receiving the settlement from
7  Cupron.
8  Q.      And I can tell that you're reading from
9  a document.  Is that from the --
10  A.      That's --
11  Q.      -- stack --
12  A.      Yeah.  It's from the stack.
13  Q.      That I sent?
14  A.      Well, you asked the question, I had to
15  answer it.
16  Q.      Well, I just wanted to make sure I knew
17  that what you were looking at, it wasn't
18  something that I was not familiar with.
19  A.      No, no.  No, no.  I have no documents
20  that you don't have, I'm sure.
21  Q.      I meant in front of you for purposes of
22  the deposition.
23  A.      No.
24  Q.      Right?

Page 34

1  A.      Oh, okay.
2  Q.      All right.  You don't have any other
3  documents in front of you, do you, other than
4  what I marked as Gabbay-1?
5              (Whereupon, Gabbay-1 was
6      marked as of this date and is attached
7      hereto.)
8              THE WITNESS:  That's what I
9      have.
10  BY MR. HILL:
11  Q.      All right.  Thank you.
12          All right.  And do you still -- do you
13  still have funds in the New York Mellon Bank?
14  A.      No.  We never got the funds there.
15  Q.      Okay.
16  A.      I do have -- in the Valley National
17  Bank, we've maintained that bank account, but
18  we never really keep more than one or $2,000 in
19  the account.  That was -- that was just a
20  situation.  I do all my banking in Israel.  The
21  Valley National was a hangover from when we
22  came to Israel in 1973.  So I never shut the
23  account down because I still always wanted to
24  be in a position that if I had to write a small

Page 35

1  check, I would be able to, or if I needed money
2  when I was in the United States, I would be
3  able to draw it out.  But there's no activity
4  in the account.
5  Q.      Okay.  And I'm just going to refer to
6  Mr. Rieders as Cliff, just for sake of ease.
7  Was Cliff the primary connection between you and
8  Bernie in the Chancery case?
9  A.      Yes.
10  Q.      And as I understand it, the case settled
11  sometime in early 2019.  Do I have that right?
12  A.      That is correct.
13  Q.      And the basic settlement was for you --
14  A.      400 --
15  Q.      -- to be -- I'm sorry.
16  A.      It was 400.  After Bernie took his
17  fees, it was $426,000.
18  Q.      Okay.  What did that represent, sir?
19  A.      That represented the money that was due
20  to me by Cupron that they would not pay me
21  until I sued them.  It was money that was due
22  to me.
23  Q.      But it did not relate to your shares in
24  Cupron; do I have that right?

Page 36

1  A.      Yes, it was.  It was the final payment
2  on the final shares.
3  Q.      It was for shares in Cupron?
4  A.      Yes, it was.
5  Q.      Got you?
6  A.      They owed me the money.  They paid me a
7  certain amount of it, and then they decided not
8  to pay it.
9  Q.      Okay.  And the amount of the initial
10  funding of the settlement was over $444,000; do
11  I have that right?
12  A.      That is correct.
13  Q.      And the 420 --
14  A.      And I don't remember the exact amount,
15  but that...
16  Q.      Yeah.  I'm using general numbers.  I'm
17  just using round numbers as well.
18  A.      Yeah.  It was around there.
19  Q.      And ultimately, you authorized the
20  payment from that, let's say gross settlement
21  number, of 444 to Bernie and Cliff's firms for
22  their fees and services; is that right?
23  A.      Yes.  That is correct.
24  Q.      And that's how we get to the 426?

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 37

1   A.      That's correct.  That's the net amount
2   after Bernie took the completion of his
3   payments and after I paid the money that I owed
4   Cliff for his legal service.
5   Q.      Okay.  And we all know that that -- I'm
6   going to call it the gross settlement amount of
7   444 was put into Bernie's law firm's escrow
8   account.  You understood that, right?
9   A.      That's correct.
10  Q.      And you agree that the funds should be
11  put in Bernie's escrow account?
12  A.      I didn't mind having it in Bernie's
13  escrow account.
14  Q.      Okay.  Do you know if Cupron's attorneys
15  insisted that that gross settlement funding be
16  put in Bernie's trust account because he's a
17  Delaware lawyer?
18  A.      No.
19  Q.      You didn't understand that?
20  A.      No.  I think Cupron wanted this case to
21  close because of forensic accounting that we
22  did, that they wanted -- they wanted to make
23  sure I was sent far away very fast.
24  Q.      Okay.  And I'm still focusing now on the

Page 38

1   representation of the Chancery case.  What was
2   the typical way that you would communicate with
3   Bernie during that case?
4   A.      Vast majority via e-mail.
5   Q.      And how many times have you met Bernie
6   in person?
7   A.      Probably half a dozen times.  I really
8   don't know.
9   Q.      Okay.  I take it one of them was your
10  deposition in that case; is that fair?
11  A.      That's correct, yes.
12  Q.      And you were here in Delaware for that?
13  A.      Yes, I was.
14  Q.      Can you think of specifically any other
15  times that you would have been with Bernie --
16  A.      I think the first time -- there were
17  two times, I think.  The first time we met was
18  just to meet.  And then we had dinner one night
19  with a forensic accountant, who was doing the
20  analysis of the Cupron documentation.
21  Q.      That was Mr. Seitz?
22  A.      Yes.  That's correct.
23  Q.      So, do I have two times that you can
24  recall specifically?  Once at the deposition?

Page 39

1   A.      And once at the dinner.
2   Q.      Okay.  So we have two, total.
3   A.      Two -- I'm sure two.  But there may
4   have been a third, but I don't know.
5   Q.      Do you have any specific details on the
6   third one, or can we just agree --
7   A.      If there was a third one, it would have
8   been the first time we met -- I don't remember
9   if the first time -- I just don't remember.
10  Q.      Okay.  That's fair enough.  I told you
11  before it's not a test.  You lived it, I didn't.
12  I'm just trying to figure out...
13  A.      Yeah.
14  Q.      All right.  Was the dinner with
15  Mr. Seitz at the same time that you were having
16  your deposition taken?  In other words, was it
17  during the same visit?
18  A.      I think it was the visit before, but I
19  don't recall.
20  Q.      Okay.
21  A.      I can tell you that it took a long time
22  to get us to the position of deposition.  Was a
23  lot of stalling on their part.  Not on our
24  part.

Page 40

1   Q.      Understand.  Okay.  And during -- I'm
2   calling it the representation, but I'm talking
3   about the representation during the -- during
4   the Chancery case, what e-mail address or
5   addresses did you use?
6   A.      I used for my personal e-mails,
7   jeffgabbay@gmail.  I have a second -- or I had
8   a second e-mail, which was
9   jeff@argamantech.com.
10  Q.      Okay.
11  A.      And always an effort was made to keep
12  the personal separate from the business.  That
13  was generally, but obviously something went
14  wrong.
15  Q.      Understood.  But as a general rule, you
16  would use your -- I'll call it your business
17  e-mail address, when conducting business and
18  your Gmail address for personal purposes; is
19  that --
20  A.      That's correct.  Correct.
21  Q.      And you -- do you still maintain that
22  e-mail or is it --
23  A.      No.
24  Q.      -- after you retired?

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 41

1 A.    After I retired, they maintained it for
2 a little while and I said, take it off, I don't
3 need it.  Generally speaking, if they
4 communicate with me from Argaman, it's usually
5 on a problem concerning chemistry or biology,
6 in which case a phone call is enough to answer
7 their questions.
8 Q.    Did you typically use the Argaman, which
9 I may slip and just call it the business e-mail,
10 but did you typically use that when
11 communicating with Bernie on the case?
12 A.    No.
13 Q.    Why not?
14 A.    No.  Because the case has nothing to do
15 with Argaman.
16 Q.    Can you estim --
17 A.    It's personal.
18 Q.    Did you ever use the Argaman business --
19 A.    No.  I obviously did.  It's -- you
20 know, I obviously did.  But I don't know, and I
21 say this, really, is I don't know how -- how it
22 happened.
23 Q.    Why don't --
24 A.    I don't know how it happened.

Page 42

1 Q.    We'll get to that --
2 A.    I don't know how it happened.  Right.
3 Q.    How many --
4 A.    But obviously...
5 Q.    I'm sorry.  Go ahead.  I don't want to
6 cut --
7 A.    No, that's fine.
8 Q.    Can you estimate how many times you
9 would have used your Argaman account when
10 communicating with Bernie during all this?
11 A.    No, I cannot estimate that.
12 Q.    Can you estimate how many times you
13 would have used the Gmail account during all --
14 A.    Almost every -- almost every time.
15 There were also some phone calls but they were
16 not very common.
17 Q.    They were not what?
18 A.    Very common.  There were some phone
19 calls, which, you know, as being truthful, I
20 must say that there were some phone calls but
21 they were not -- they were very rare, actually.
22 Q.    Right.  By and large --
23 A.    The vast majority -- by and large, it
24 was in writing so that we would have a record

Page 43

1 of it.
2 Q.    And then writing using the e-mail
3 account?
4 A.    Yeah.  That's correct.
5 Q.    If I told you that we believed that
6 there were over 200 e-mails from you using the
7 Argaman account during all of this time, would
8 that -- would that comport with your memory?
9 A.    Probably not, no.  But it could be.  I
10 just don't know.
11 Q.    Got you.
12 A.    I want to mention that, you know, I
13 would send out, in a day, a vast number of
14 e-mails all over.  And normally what would
15 happen is I'd get an e-mail -- I'm very
16 responsive, so I would just do reply.  And so
17 it could have gone on and on and on, but I
18 wouldn't have really noticed it or been aware
19 of it.
20 Q.    Sir, are you familiar with a memo that
21 Cliff did to, what I'll say, the file after he
22 had a lunch meeting, let's say with Bernie in
23 October of 2019?
24 A.    Can you please remind me of it, I don't

Page 44

1 recall.
2 Q.    You don't recall a memo that Cliff
3 wrote?
4 A.    If -- offhand, I'm not recalling it.
5 If you would remind me, I might remember it.
6 Q.    I was trying to do that by referencing
7 the lunch meeting between Cliff and Bernie.  But
8 let's just try something before I pull it up.
9 There's a reference in that memo, I'll represent
10 to you, to Kakadu, K-A-K --
11 A.    Oh, Kakadu.
12 Q.    Kakadu, okay.
13 A.    Yeah.
14 Q.    That's a new one to me.  What is that?
15 A.    They were the company that set up the
16 internet wall for Argaman.  Argaman had a very
17 high level of security because we had a very
18 valuable technology that a lot of people
19 wanted, especially Chinese.
20 Q.    That's your secret sauce relating to
21 these textiles, right?
22 A.    That's correct.
23 Q.    So Kakadu was a third party?
24 A.    Yes.

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 45

1  Q.    That provided the firewall protection,
2  is that it?
3  A.    Yes.  That's correct.
4  Q.    Okay.  And what other security measures
5  are baked in at Argaman to protect the secret
6  sauce and the proprietary technology that you
7  developed?
8  A.    Well, a lot of the technology never
9  went online.  So that it was in lab books.
10 Q.    But Kakadu was providing a --
11 A.    No.  Kakadu had nothing to do with
12 that.  You asked what security.  Well, if you
13 don't put it online, nobody can ever find it.
14 Q.    Okay.  So what was Kak --
15 A.    It was certainly --
16 Q.    Go ahead.  I'm sorry.
17 A.    No.  But there was a lot of
18 correspondence that went back and forth.  It
19 was just, Kakadu was a firewall.
20 Q.    That's set up by this third party called
21 Kakadu?
22 A.    Yes.  That's correct.  They were hired
23 by the person who -- approximately 2021 or
24 2022, I hired a CEO to run the company.  And he

Page 46

1  was the one who set up the firewall.
2  Q.    I'm not following that.  You left in --
3  October --
4  A.    Okay.  I --
5  Q.    You left in --
6  A.    About two years -- maybe two-and-a-half
7  years before I left, we had a -- we brought in
8  a CEO who had a lot of experience in quality
9  control issues.  Because I don't have any
10 experience in that.  And he set up -- we
11 brought Kakadu and set up the firewall.  So I
12 really -- I don't have very much knowledge
13 about it.
14 Q.    Well, let me just ask a couple more, if
15 you don't mind.  So that was, you said, about
16 two-and-a-half years before you left in October
17 of 2021?
18 A.    Yes.  Correct.  Maybe three years.
19 Q.    And Argaman hired CO -- I'm sorry, the
20 Kakadu CEO?
21 A.    No.  We hired somebody who was going to
22 act as the CEO.  I was going to be only CTO.
23 Q.    Okay.
24 A.    And his job was to start setting up the

Page 47

1  factory, putting in the quality control issues,
2  things that had to be done to convert the
3  company to a real company from being just a
4  workshop.
5  Q.    And when did this -- when was the CEO
6  appointed or elected?
7  A.    About approximately three years before
8  I left.
9  Q.    And when did the -- I assume that there
10 was a contract between Argaman and Kakadu, for
11 their service?
12 A.    Yes, there was.  But I was not privy to
13 it.  I didn't care.  It was not, you know.
14 Q.    Well, you cared about the security of
15 the technology, right?
16 A.    Yeah.  Right.
17 Q.    You didn't want your secret sauce
18 exposed to the public, right?
19 A.    Which is why some of the aspects of the
20 secret sauce were not ever put online.  They
21 were in hard copies.
22 Q.    And when do you think Kakadu was hired
23 to perform the services you described?
24 A.    I believe about six months after the

Page 48

1  new CEO came in, they were brought in.  But I
2  really -- Karl, I can't give you an exact
3  answer.  I just don't know.
4  Q.    Okay.
5  A.    If I could, I would.  But I don't know.
6  Q.    I'm just trying.  Again, you lived it
7  and I'm just trying to get...
8  A.    Well, it is a nightmare, so.
9  Q.    To your knowledge, was Kakadu hired --
10 well, let me lay a foundation.  We're going to
11 get into it in a minute, with what kind of
12 brings us here today, which is the hacking of
13 your Argaman account.  Do you agree that that's
14 what we're talking about?
15 A.    Yes.
16 Q.    And as I understand it, that happened
17 in, let's just say, to be safe, July of 2019,
18 agree?
19 A.    Correct.  Yes, I agree.
20 Q.    Okay.  So with that date in mind, was
21 Kakadu hired before or after --
22 A.    Before.
23 Q.    -- July of 2019?
24 A.    Before.

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 49

1  Q.    And the -- was Kakadu hired in response
2  to any particular event that happened with the
3  e-mail or server at Argaman?
4  A.    No, no.
5  Q.    Had Argaman experienced an e-mail hack
6  prior to July of 2019?
7  A.    No.
8  Q.    You're confident of that?
9  A.    Yes.  They were brought on because,
10  remember, we're in a country of high-tech
11  companies, and internet security is always an
12  issue to any high-tech company in this country.
13  So as a matter of course, companies do this.
14  Q.    After the -- I'm going to call it the
15  July hack, for lack of a better word, was there
16  another hack of any Argaman e-mail account?
17  A.    I only --
18        MR. POLIQUIN:  Hold on.
19        THE WITNESS:  -- found out
20  about --
21        MR. POLIQUIN:  Object to the
22  form of the question.
23        You can still answer the
24  question, Jeff.

Page 50

1        THE WITNESS:  I only found out
2  about the hacking after the fact.  I
3  was not part of what was going on,
4  because I didn't know about it.  What
5  my -- you know, I'm not denying, you
6  know, responsibility in the sense that,
7  you know, I had the senior position.
8  But I'm not a computer guy.  And in
9  fact, I'm going to mention that since
10  you printed out and I sent these
11  documents, and I had a chance to review
12  them, and I mentioned this to Ron this
13  morning, this is the first time I --
14        MR. POLIQUIN:  Mr. Gabbay,
15  don't mention any conversations you had
16  with me.
17        THE WITNESS:  No.  What I
18  meant was --
19        MR. POLIQUIN:  Attorney/client
20  privilege.
21        THE WITNESS:  Yeah.  Oh, okay.
22  What I meant was --
23        MR. POLIQUIN:  Just answer the
24  question that Mr. Hill is asking you.

Page 51

1        THE WITNESS:  Okay.  I don't
2  know.  In other words, there -- to the
3  best of my knowledge, there were no
4  other incidents.
5  BY MR. HILL:
6  Q.    Okay.  Maybe my question wasn't all that
7  well structured.  But what I was driving at is,
8  we know there was a hack in July of 2019 of your
9  Argaman account.  So far so good?
10  A.    I...
11  Q.    Not that you knew specifically but that
12  there was a hack.
13  A.    Yes.
14  Q.    Was there a subsequent hack to your
15  Argaman account?
16  A.    Not to my knowledge.
17  Q.    And do you believe that the hack in July
18  of 2019, which brings us together today, was
19  prior to or after Kakadu was hired to provide
20  the firewall?
21  A.    Kakadu provided the firewall before the
22  hack.
23        MR. POLIQUIN:  Hey, Karl, I
24  don't mean to interrupt.  When you

Page 52

1  refer -- and just to make clear for the
2  incident, the Cliff thing you're
3  referring to is the July 2019
4  activities regarding Bernard Conaway
5  and Jeff Gabbay, that exchange of
6  e-mails, when you're referring to the
7  hack?
8        MR. HILL:  I'm just referring
9  to the subject matter of your
10  complaint, which relates to --
11        MR. POLIQUIN:  Okay.  I
12  just --
13        MR. HILL:  -- the hack.
14        MR. POLIQUIN:  -- want to make
15  sure I understood that there's not some
16  separate thing we're talking about.
17  BY MR. HILL:
18  Q.    All right.  I think I'm going to
19  transition now, Jeff, into that exhibit that
20  you've been holding up.
21  A.    Okay.
22  Q.    And I think it's probably wise, and I
23  think I could use a break of about 10 minutes;
24  is that all right with you?

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 53

1  A.    Fine with me.
2            MR. HILL:  Okay.  So let's
3  take a break for 10.
4            MR. POLIQUIN:  Okay.  We'll
5  come back at 9:30, let's say?
6            MR. HILL:  Yeah.  That's
7  perfect.  Thanks, Rob.
8            (Whereupon, a recess was
9  taken.)
10  BY MR. HILL:
11  Q.    We were talking about that, what I refer
12  to as Cliff's memo after the lunch meeting, and
13  I figured I would just bring it up very briefly
14  so that we're on the same page.  I'm going to
15  share my screen now.
16            MR. HILL:  Can everyone see
17  the screen?
18            MR. POLIQUIN:  I have a copy
19  with me.  So mainly, Jeff, can you --
20            THE WITNESS:  Yes.  I can see
21  it.  Yeah.  I can see it.
22  BY MR. HILL:
23  Q.    Okay.  I did not send this to
24  Mr. Poliquin yesterday, and therefore you did

Page 54

1  not get it in advance of today, Mr. Gabbay, so.
2  A.    Yeah.  This is the first time I'm
3  seeing it.
4  Q.    What I'll do is I'll identify it
5  succinctly for the record.  And then if you want
6  to take your time to read the whole thing, I
7  don't have any trouble with that, for sure.
8  A.    I would like to, please.  Yes.
9  Q.    All right.  So I'm what I'm showing is a
10  memorandum to the Gabbay/Cupron file from Cliff
11  Rieders dated on Wednesday, October 2, 2019,
12  "Re:  Meeting with Bernie Conaway."  And I'm
13  only going to ask you about the section on page
14  3.  I don't know why it's showing four pages
15  because the one I have is only three pages of
16  print, Jeff.  So I think it ends on the third
17  page.
18  A.    Yeah.  There's no -- wait.  The fourth
19  page is blank.
20  Q.    So take your time and let me know when
21  you're ready.
22  A.    Can you expand the screen?
23  Q.    Yeah.
24            (Whereupon, a brief discussion

Page 55

1            was held off the record.)
2  BY MR. HILL:
3  Q.    And Jeff, you're going to tell me when
4  to scroll, right?
5  A.    Yes, please.  I will tell you.
6  Q.    Okay.
7  A.    Can you scroll up a bit?  Thank you.
8  That's enough.  Can you scroll, please?  Thank
9  you.  Please scroll.  Thank you.  Can you
10  scroll, please?  Thank you.  Can you scroll up,
11  please?  Okay.
12  Q.    Okay.  Ready?
13  A.    Yes.
14  Q.    This highlighting that we're seeing on
15  this page 3, that's my highlighting, so everyone
16  knows that.  So this is the paragraph I want to
17  talk to you about, Jeff.  Here, would you -- let
18  me read the first sentence.  "I did not get into
19  the Kakadu matter."  I'll stop right there.
20  That's the same Kakadu that you and I were just
21  talking about; is that right?
22  A.    Yes.
23  Q.    "But he brought it up to me that Kakadu
24  apparently dealt with a prior scam in early

Page 56

1  June."  Do you know who Cliff is referring to
2  when he used the pronoun, "he" there?
3  A.    No.
4  Q.    "Kakadu apparently dealt with a prior
5  scam in early June, so he knows about that."  So
6  would you agree with me that Cliff is at least
7  stating that there was a prior scam in June?
8  A.    I honestly do not -- I didn't know that
9  there was one.  If I did, I would have told
10  you.
11  Q.    "Jeff or Zvi apparently told him about
12  that."
13  A.    It certainly wasn't me.  And Zvi is my
14  son who is a lawyer.  And I don't know -- I
15  don't know anything about that.  And my son is
16  not involved in anything that I do on any level
17  with anything that's personal or business.  My
18  son is a -- he's not a litigator.  My son is an
19  expert in corporate law.  He's a partner at a
20  very large firm.  But I don't think -- I do
21  know that Cliff may, and I say "may," have
22  spoken to Zvi, but I don't know how Zvi would
23  have known anything.  And to be honest with
24  you, I do not know that there was any sort of a

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

---

Page 57

1   prior scam in early June. I don't know
2   anything about that.
3   Q.      Okay. Let me -- do you believe that
4   Cliff knew about it and you didn't?
5   A.      I don't know. Karl --
6              MR. POLIQUIN: I'll object to
7       the form of the question.
8   BY MR. HILL:
9   Q.      Okay. Let me re -- I think we have an
10  answer. I'll read the last sentence of this
11  paragraph. "I am not sure we have all the
12  information from that earlier scam and how that
13  was dealt with in early June, but we probably
14  should." Did I read that correctly, Jeff?
15  A.      You read it correctly. But I am not --
16  I just don't know. I -- you know, I don't know
17  anything about this.
18  Q.      Okay. Would -- so would you know if
19  Argaman -- well, let me rephrase it.
20          Do you have any documentation in your
21  own possession that relates to Argaman? Let's
22  start there.
23  A.      No. I have -- when I left the company,
24  all documentation, including my computer, went

---

Page 58

1   back to the company.
2   Q.      Okay. And the -- what about documents
3   for this case? Have you -- do you have
4   documents relating to the Chancery case and also
5   what brings us here today?
6   A.      I have only the documents that were
7   relating to the direct e-mails for which I had
8   hard -- have had hard copies. Plus the
9   information which Ron and Cliff supplied me
10  which you have. That's all I have.
11  Q.      Okay. And you don't have any access to
12  your Argaman e-mail account or that server; is
13  that fair?
14  A.      No. The second I left the company, I
15  actually didn't want it any longer, because
16  that's access to money in the bank. You don't
17  want to be -- either you're in or you're out.
18  Q.      And what documents did Cliff provide to
19  you in connection with this case, meaning, the
20  Kakadu?
21  A.      We filed a complaint afterwards with
22  the Israel Police security department, hoping
23  that maybe they might be able to do something.
24  So every single hard copy of an e-mail which I

---

Page 59

1   had, they were given. I will say that looking
2   over the documentation that you sent, there's
3   e-mails here which I've never seen before of
4   that specifically, everything that came from
5   the hacker, I've never seen before.
6   Q.      And just to -- just to put a bow on
7   that, do you believe that you've produced all
8   the documents that you had or that were provided
9   to you by Cliff to Ron for production in this
10  case?
11  A.      Yes.
12  Q.      Would there be someone still at Argaman
13  that might have information as to when and for
14  what purposes they retained Kakadu?
15  A.      The CFO also is retired. And everybody
16  that's there now was not there at the time of
17  this. I don't even know the people that are
18  there anymore. The one or two people who I do
19  know are not related to this at all there. The
20  person who is involved in design of products,
21  so she certainly wouldn't know. And then
22  there's the new CFO that took over for the
23  retired CFO. But that, he also wouldn't know
24  because that's subsequent. You know, all of

---

Page 60

1   this happened after -- after -- or before the
2   CFO changed.
3   Q.      When you left Argaman in October of
4   2021, was there an existing business
5   relationship with Kakadu?
6   A.      Yes. I believe there -- yes, there
7   was.
8   Q.      And sitting here today, do you know
9   whether Argaman continues to use Kakadu?
10  A.      I do not know.
11  Q.      Were there any other computer or IT
12  companies, Kakadu, that were used by Argaman
13  relating to their computer systems while you
14  were still there?
15  A.      No.
16  Q.      Did Argaman have a person that was
17  specifically responsible in-house for IT and
18  technology?
19  A.      No.
20  Q.      Okay. Now we're going to go into the
21  stack, the big stack that you've been holding
22  up. Okay?
23  A.      Yes.
24  Q.      Now, it's kind of your pleasure, Jeff,

---

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 61

1  or not, I could share the screen with this, if
2  this would be helpful, or we could just go off
3  the pages that we have in front of us.
4          MR. HILL:  Does anyone have a
5      preference?
6          THE WITNESS:  I would
7      appreciate it if you would screen it,
8      because it's quite a lot of
9      documentation here.  And it'd probably
10     be more efficient if you bring up the
11     documents upon which you have
12     questions.
13 BY MR. HILL:
14 Q.     Okay.
15 A.     Again, could you please increase that?
16 Yes.  That's the first document in the pile
17 anyway.
18 Q.     Okay.  There (indicating)?
19 A.     Yes.
20         MR. HILL:  All right.  Let me
21     identify it first.  This is a document
22     that I marked as Gabbay No. 1 to your
23     deposition.
24 BY MR. HILL:

Page 62

1  Q.     And this contains consecutive, what we
2  call, Bates numbers on the bottom.  See the
3  CL0001 on the first page?
4  A.     Yes.
5  Q.     Those are the numbers I'll be referring
6  to as we go.  And this --
7  A.     Okay.
8  Q.     -- composite exhibit is CL001 through
9  68.  And then the last four pages are CL262
10 consecutive through to 268.
11 A.     Okay.  I have everything.
12 Q.     Okay.  And actually, before we get
13 there, it just occurred to me, what specifically
14 was done by Kakadu or at Argaman after learning
15 of the, what I described, the July e-mail hack
16 of your e-mail?
17 A.     A lot of panic, but I don't know more
18 than that.
19 Q.     Who would know or have information as to
20 what response Argaman did or what Kakadu -- let
21 me rephrase -- what response Kakadu did, if any,
22 in connection with that hack?
23 A.     I don't know.  There's nobody -- there
24 would have been the former CEO would have known

Page 63

1  certainly.  But I haven't seen him in a few
2  years.
3  Q.     Okay.  And Jeff, please accept my
4  apologies.  The way my computer's configured, I
5  can't look at you straight, I mean no offense to
6  you.
7  A.     No, no problem.  Don't worry about it.
8  Q.     All right.  We're going to start going
9  through these e-mails.  I'm sure I'm going to
10 get into a rhythm that usually translates to
11 going quicker, and just please tell me to slow
12 down and I'll certainly do that.  All right?
13 A.     Okay.
14 Q.     Okay.  So let's go to page 3.
15 A.     CL0003?
16 Q.     Yes.
17 A.     Yes.
18 Q.     And when I say page, I'll -- I'll
19 probably not reference that prefix.  But you
20 know what I mean?
21 A.     Yes.
22 Q.     All right.  So here we are on 3.  Are
23 you there?
24 A.     Yes.

Page 64

1  Q.     Okay.  And do you see this as an e-mail
2  from Bernie to you with a CC to Cliff on
3  Monday --
4  A.     Yes.
5  Q.     -- June 3rd, 2019?
6  A.     Yes.
7  Q.     And that's to your Argaman tech account?
8  A.     Yes.
9  Q.     Okay.  That's jeff@argamantech.com?
10 A.     Yes.  Yes.
11 Q.     Did you use any other Arga tech e-mail
12 address other than the one I just quoted?
13 A.     No.
14 Q.     Okay.  And here, Bernie is informing
15 you, and Cliff, are informing you that he's
16 holding settlement funds paid by Cupron in his
17 firms' escrow account, right?
18 A.     That is correct.
19 Q.     Now, I'm not sure exactly how to phrase
20 this to make it go easier, but is this a
21 legitimate e-mail?  Or put another way, do you
22 remember seeing this e-mail?
23 A.     Karl, I have to tell you that I don't
24 remember.  But I don't remember, but it looks

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 65

1   like a legitimate e-mail.
2   Q.      All right.  Well, maybe I can spark your
3   memory a little, if you don't mind.  Here,
4   Bernie, if you look at the third paragraph, he
5   writes "Today, Cupron pulled a rabbit out of
6   their" --
7   A.      Yeah.
8   Q.      -- bank, blank, branch, right?
9   A.      Yeah, yeah.
10  Q.      And then, I don't have the full e-mail
11  here, but I can get it for you.  He then
12  identifies options on how to respond to what
13  Cupron was doing.  Do you see that at the
14  bottom?
15  A.      Yes, yes.  Mm-hmm.
16  Q.      Do you remember seeing --
17  A.      I don't -- I don't remember it.  But I
18  will say that in Bernie's -- and I mean this
19  with -- in a nice way, with Bernie's own way of
20  doing things, this would be something, you
21  know, "tell them to go to hell," you know.
22  Q.      Okay.
23  A.      But -- you know, but I see what the
24  dilemma is, but I believe that we resolved it

Page 66

1   because we did receive the money, so.
2   Q.      Okay.  And so Bernie's holding the funds
3   as of June 3, 2019, right?
4   A.      Correct.  Correct.
5   Q.      And do you know when he precisely got
6   the funds into his account?
7   A.      No, I do not.
8   Q.      Okay.  Let's stick with, "We know that
9   if they're in the account on June 3."
10  A.      Yeah.  We know they're in the account
11  on June 3, yes.
12  Q.      All right.  Let's go to CL15.
13  A.      Okay.  Yes.
14  Q.      I'm trying to get there.  Give me a
15  minute.  All right.  Now I'm on page 15, and
16  this is an e-mail string at the top from you on
17  June 11, 2019 at 4:44 p.m., right?
18  A.      Correct.  I do remember telling Bernie
19  to pay Cliff's open invoice.
20  Q.      Okay.  And to also pay Bernie ultimately
21  whatever outstanding fees he had?
22  A.      That's correct.  Right.
23  Q.      And you noticed Jeff on your e-mail to
24  Bernie, "I copied to Cliff," at the top.  It

Page 67

1   says, "Sent from my iPhone"?
2   A.      Very possibly.  Look, I -- just so that
3   you are aware, Karl.  I'm very, very adverse to
4   owing anybody money.  I hate it.  I don't like
5   it at all.  If I would have received something
6   like this, telling -- giving instructions from
7   my iPhone, "Go pay the open invoice," would
8   have been something that I would have done.  If
9   the funds were there, I want that bill paid.
10  Q.      I was more focused, Jeff, on the use of
11  your iPhone to communicate.
12  A.      That would -- an urgency to pay the
13  bill would have been what stimulated the
14  communication.
15  Q.      Would you typically use your iPhone when
16  you did not have ready access to your computer
17  or your laptop?
18  A.      It depends on where I was.  If I was
19  traveling and I knew that I wasn't going to get
20  to my laptop for a day or two, I would have
21  used my phone.  Remember I said previously, I'm
22  highly responsive.
23  Q.      Understood.  And by the way, at Argaman,
24  did you also have a desktop computer?

Page 68

1   A.      No.
2   Q.      It was all laptop?
3   A.      It was all laptop, yeah.
4   Q.      And do you still have that laptop?
5   A.      No.  I rendered the laptop back to the
6   computer -- back to the company.  It was the
7   company's property.  Not mine.
8   Q.      Okay.  How about, how do you communicate
9   now through your Gmail account?
10  A.      If they want something, that's -- I
11  bought a laptop after I left Argaman.
12  Q.      Okay.  I see.  In reference to this
13  iPhone on this page, do you know where you were,
14  like, physically located on June 11th, 2019?
15  A.      I'm sorry.  I don't know.
16  Q.      Do you know where you were in June of
17  2019, as we sit here today?
18  A.      I think there was a trip to America
19  during that time but I don't know.
20  Q.      Okay.  I'm just going to throw it out
21  there, would you have any -- I actually have a
22  date timer here, you can't see, from 2019,
23  because I want to get the dates straight.  Do
24  you happen to have a day timer like that or a

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 69

1  calendar that could tell me with more precision?
2  A.      That would have been in my Argaman
3  laptop, because I had a calendar in my Argaman
4  laptop.
5  Q.      What about your iPhone, did it sync to
6  your laptop?
7  A.      No, no.
8  Q.      Did your iPhone have a calendar?
9  A.      No.  The laptop was an Android, and the
10  iPhone was an iPhone, and they I don't
11  communicate necessarily.
12  Q.      And do you still have that same iPhone?
13  A.      No.
14  Q.      Did you keep a, for lack of a better
15  word, a hard copy of a calendar or did your wife
16  keep a calendar in the drawer, at a desk?
17  A.      No, no.
18  Q.      Figured I would try.  All right.  Let's
19  go to CL19.
20  A.      Okay.  I'm there.
21  Q.      Jeff, my apologies, I forgot to ask you
22  one question on the last one.  We got to go back
23  to 15.
24  A.      No problem.

Page 70

1  Q.      Okay.  There we are.  Your second
2  sentence in your e-mail is, I will get back to
3  you on disbursal.
4  A.      It should be of funds.
5  Q.      Right.
6  A.      Of funds.
7  Q.      Okay.
8  A.      What had transpired was, we went to a
9  financial adviser in this country and we were
10  in the process of setting up an account, and
11  that documentation is in your pile.
12  Q.      Okay.
13  A.      Okay?
14  Q.      And that says --
15  A.      And the money --
16  Q.      -- as of June 11?
17  A.      Yes.  We were in the process of setting
18  it up.  It's not the kind of thing that you can
19  walk in, set up the account and walk out with a
20  number.  What basically happens is, in this
21  country, any transaction that is done by an
22  American citizen, with Israeli citizenship, I
23  don't know, maybe any transactions done by an
24  American citizen, I think, will be -- because

Page 71

1  of the agreement, the tax agreement,
2  automatically both governments' computers are
3  aware of these.  So when you're setting up an
4  account, there's a process, I don't know what
5  the process is, but there is a process involved
6  in setting it up so that you are compliant with
7  whatever laws are out there.
8  Q.      Okay.  And are you saying that this was
9  a new potential relationship with a financial
10  advisor as of June of 2019?
11  A.      Yes.
12  Q.      And who is that financial advisor?
13  A.      The financial advisor, let me give you
14  the name, it's here, it's in the papers which
15  you sent.  Let me find it.  There are -- just
16  as a way of background, there are many people
17  who -- he's a broker that has a registered
18  office in Jerusalem, and there are many people
19  who bank with him because the terms generally
20  of Israel banks are not very favorable.  And so
21  you can get better terms if you are banking in
22  the United States.
23          I'm trying to find it.  Hold on one
24  second.  I'll tell you what the page number is,

Page 72

1  because I saw that it's in your pile of papers
2  as well.
3  Q.      Is it Profile Investment Services?
4  A.      Yes.  Yes.  That's correct.
5  Q.      Page 53, by the way.
6  A.      Okay.  It could be.  I would have found
7  it eventually.  But my wife and I went down
8  there, we signed all the forms, and it took a
9  few days, more than few days.  He said, "It'll
10  take as long as it takes" -- yeah, here it is,
11  Profile Investment Services -- "to get
12  everything set up.  And when it gets set up,
13  we'll send you bank transfer information."  So
14  what you're seeing in 00053 is the wiring
15  instructions for the funds.
16  Q.      And we'll get there.  Don't worry.
17  A.      Yeah.
18  Q.      So I'm just trying to trace the
19  chronology now, Jeff.  I'm not trying to trick
20  you with anything.  Bernie wrote on June 3, "We
21  looked at that one, page 3."  He's looking for
22  instructions on how to deliver the funds.  And
23  then the June 11, which is back on 15, which is
24  in front of us, Bernie, again, eight days later

Page 73

1 is asking in the second sentence, "Let me know
2 how you want to receive this." Do you see that?
3 A.    Yes.
4 Q.    And then this June 11 e-mail that we
5 talked about, your e-mail, this is your first
6 response to him about that issue; is that right?
7 A.    I believe. If I -- but I may be
8 mistaken here, but I have to state it. I
9 believe we had a phone conversation.
10 Q.    When?
11 A.    Somewhere around this time. And I
12 believe that I made Bernie aware of the fact
13 that we were opening up an account and that it
14 would take a few days.
15 Q.    At around the time of this e-mail, June
16 11?
17 A.    Around the time of this e-mail,
18 correct. I don't know if it was a day before
19 or it was a day after, I don't know.
20 Q.    Let's go to 19 again.
21 A.    Okay.
22 Q.    And you'll see -- I don't think you're
23 copied on this string, just to be fair to you,
24 Jeff.

Page 74

1 A.    First time I saw it.
2 Q.    Okay. So CL19 at the bottom, we have
3 Bernie now on June 19, which is eight more days
4 after your e-mail on June 11 where he's telling
5 Cliff, "Will you agree that he still needs
6 instructions from you on how to transfer the
7 settlement"?
8 A.    Yes. That is correct. But again, I
9 verbally, at some point in that time, told
10 Bernie to please be patient because the account
11 was being set up.
12 Q.    Okay. And you said that account would
13 take a few days?
14 A.    Yeah. I didn't know. I don't remember
15 what I told him. But I told him it was being
16 set up.
17 Q.    Okay. And when did it get set up in
18 relation to June 11?
19 A.    You see that on 00053.
20 Q.    That's -- that --
21 A.    May 1st is when it got set up.
22 Q.    You said May 1st.
23 A.    Yeah. In other words, they could only
24 send me the wiring instructions once the

Page 75

1 account was set up and compliant. I don't know
2 what's involved in setting up an account.
3 Q.    All right. Let me just make sure the
4 record's clear, because I thought you said that
5 you were going to set up an account with the
6 advisor on June 11. Did I get that wrong?
7 A.    I believe that we actually started with
8 him earlier than June 11th --
9 Q.    That's what I want to get at. So --
10 A.    No. It would have been -- if it was
11 earlier than June 11th, then it would have been
12 the day before, two days before. There was no
13 such thing as a long period of no
14 communication. There was either communication
15 verbally or orally or through an e-mail. But
16 Bernie didn't want to transfer the money out.
17 Q.    Can you provide more detail on this
18 phone call with Bernie of when that was?
19 A.    No, I can't because I just don't know.
20 Q.    Okay. And in looking at 53 now, the
21 Profile Investment Services?
22 A.    Yes.
23 Q.    And I think you just said it was opened
24 on May 1?

Page 76

1 A.    The date that I received this
2 notification was on May 1.
3 Q.    Okay. And that May 1 is a date using
4 the, what I'll call, the outside of the U.S. way
5 of describing a date. Do you see that?
6 A.    Yes. That is the way everywhere in the
7 world except America. Write day --
8 Q.    So one --
9 A.    -- month, year.
10 Q.    1/5/20 is actually --
11 A.    Is May 1. That's correct.
12 Q.    And at that point, you had established
13 the relationship with your advisor; is that
14 fair?
15 A.    That is correct. We actually
16 established a relationship a number of weeks
17 before. Because when you sit with the advisor,
18 the way the Bank of Israel works is the
19 responsibility for complaints is not on the
20 Bank of Israel. It is on whoever is receiving
21 the money that goes into the system.
22     So if I'm trying to launder money as an
23 example, the responsibility is not -- is done
24 by the local branch or whatever your broker,

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 77

1  he's responsible.  So there's an -- there's an
2  interviewing process and a clearing process to
3  make sure that the money has a legitimate
4  source, and that taxes will be paid on that
5  money.
6  Q.    I'll note the phone call that you recall
7  with Bernie about meeting with this advisor,
8  what phone number would you have called him
9  from?
10  A.    I would have called him from --
11  actually, probably from my cell phone.
12  Q.    Okay.  And what is that number?
13  A.    That is country code 972-544-286287.
14  Q.    And have you maintained that number
15  even --
16  A.    Yes.
17  Q.    -- after you got a new phone?
18  A.    Yeah.  Yeah.  That number I've had for
19  20 years.
20  Q.    All right.  Thank you.  Back to 19.  So
21  you see now, and you see my cursor, Cliff
22  responds to Bernie's e-mail on June 19, and he
23  says, "We -- we talked and I think he is trying
24  to decide the best way to handle."  Do you

Page 78

1  remember talking to Cliff about the best way to
2  handle the distribution of the settlement
3  proceeds?
4  A.    Cliff volunteered to take the funds if
5  I wanted to send them to him.
6  Q.    Mm-hmm.
7  A.    But I didn't see the necessity because
8  I knew that we were about to get the account
9  opened anyway.  So therefore why -- you know,
10  why do it.  In retrospect, it was a mistake.
11  But, you know, Cliff had offered, he says,
12  "Well, you can transfer -- if you want to, you
13  can transfer it to my bank."
14  Q.    And then he wrote, he has been in the
15  U.S. all week for business.  Does that spark a
16  memory that you were in the U.S. --
17  A.    I think I -- I think I was in Los
18  Angeles that week.
19  Q.    On business?
20  A.    Yeah.  I met with Cedars-Sinai
21  Hospital.
22  Q.    And do you remember how long you were in
23  the U.S. that week?
24  A.    Not -- I'm never in the U.S. for any

Page 79

1  length of time.  No.  My purpose of getting on
2  the plane is to get off the plane and get home.
3  So I don't know -- it would not have been a
4  long trip anyway.  Oh, actually, actually, I
5  can tell you that I flew to Los Angeles, then
6  from Los Angeles, I went to Mission Control in
7  Houston, because I work with NASA.  And then I
8  went to a potential customer in North Carolina,
9  and then I went home.
10  Q.    How long do you think you were total in
11  the U.S. for that --
12  A.    Five days.  Five days at the most.  The
13  meeting in Cedars-Sinai -- I had two meetings
14  in Los Angeles, one in the morning, one in the
15  afternoon.  Then I took a night flight to
16  Houston to Mission Control.  I was in Mission
17  Control for a day.  And then early the next
18  morning, I flew to North Carolina.  And what I
19  remember in North Carolina was being told that
20  I should get out as soon as possible because
21  they were afraid that due to a storm or some
22  kind of inclement weather, the airports were
23  going to close.  But I would say that probably
24  happened on 50 percent of the trips I was on

Page 80

1  anyway.
2  Q.    Okay.  Let's go to 22.
3  A.    Okay.  Yes.
4  Q.    Again, you're not copied on this e-mail.
5  But this is between Cliff and Bernie on June 25.
6  You see that?
7  A.    Yes, I see that.
8  Q.    And he -- Cliff wrote, "He told me that
9  he has meeting with whomever he needs to meet
10  with on Tuesday."  That would have been July
11  2nd, based on my review of that calendar?
12  A.    I was probably back in Israel.  And I
13  don't know -- "I sent you a letter or a mail
14  showing that previously.  I understand Jeff's
15  moral dilemma in that regard not withstanding
16  that none of them asked us to represent them."
17  I don't know what that's referring to.
18  Q.    Yeah.  For my purposes, I don't want to
19  even know, but...
20  A.    Yeah.  I don't know what it's referring
21  to.
22  Q.    Do you remember having a meeting on July
23  2nd with your financial advisor?
24  A.    I don't remember.

Page 81

1  Q.    Okay.
2  A.    We met with them twice.  The first time
3  was an introduction.  The second time was about
4  a week later to sign documentation.
5  Q.    Mm-hmm.
6  A.    And then that's the end of it.
7  Q.    Okay.  Let's go to 24.
8  A.    Okay.  All right.  So that's July 1st.
9  So we -- that probably would have meant that I
10  was meeting with the financial advisor on July
11  2nd.  So there must have been a meeting then.
12  Q.    Yeah.  I'm looking at this e-mail on the
13  top.  This is from you at your argamantech.com
14  e-mail.  Do you see that?
15  A.    Yep.
16  Q.    And this is a July 1, 2019 e-mail
17  replying to Bernie's e-mail, right?
18  A.    Yes.
19  Q.    And here we are, you wrote, "We are
20  meeting with out" -- that should be an "our" --
21  A.    With our.  It should be our.
22  Q.    -- "financial advisor tomorrow more
23  back.  To you then, Jeff."  Right?
24  A.    Yeah.  Mm-hmm.

Page 82

1  Q.    Do you have any question that that is an
2  e-mail from you?
3  A.    I don't think it's -- it's -- I don't
4  question it.  But I don't remember it but I
5  don't question it.
6  Q.    Let's go to 26, please.
7  A.    The dates don't make any sense to me,
8  but it'll go further.  Okay.
9  Q.    What do you mean the date --
10  A.    26.
11  Q.    I'm sorry.  What do you mean the dates?
12  A.    In other words, the -- if you look at
13  53, the -- it's May 1.  Okay.  But the --
14  these funds in escrow we're talking about,
15  that's already July 1st.
16  Q.    Yeah.  I was confused by that.
17  A.    I'm confused by it today.  I don't
18  remember.
19  Q.    All right.  Let's try to stay on the
20  same page for now --
21        MR. POLIQUIN:  Mr. Gabbay,
22        just try -- you know, when Mr. Hill's
23        going to just -- just kind of answer
24        the questions.

Page 83

1        THE WITNESS:  Yeah.
2        MR. POLIQUIN:  Let him ask the
3  questions regarding the documents.
4        THE WITNESS:  Yeah.  All
5  right.
6  BY MR. HILL:
7  Q.    All right.  So 26, this is an e-mail at
8  the bottom.  Do you see that?
9  A.    Yes.
10  Q.    And that's from your Gmail account?
11  A.    Yes.
12  Q.    And can I stop right there and say, is
13  there any allegation in this case that your
14  Gmail account was hacked?
15  A.    I don't know.
16  Q.    You don't know?  All right.  Well, can
17  you tell me whether this e-mail, on July 2, 2019
18  on the bottom of this page 26 is your e-mail?
19  A.    I -- it looks like something I would
20  have written.
21  Q.    Sitting here today, Jeff, do you have
22  any reason to contest that this --
23  A.    No.
24  Q.    -- is your e-mail?

Page 84

1  A.    No.  No, I do not.
2  Q.    Okay.  And here you wrote, "Shoshanna,"
3  I take that to mean your wife?
4  A.    Correct.
5  Q.    "And I sat with our financial advisor."
6  That's 8:16 a.m.  Do you see that?
7  A.    Yes.
8  Q.    The e-mail?
9  A.    Yes.
10  Q.    And how many hours ahead would Jerusalem
11  been at that time?
12  A.    Normally seven.
13  Q.    Seven hours?
14  A.    We're now six hours because of the
15  change of the clock.  But normally, it's seven
16  hours.
17  Q.    This might be a tough question but
18  you're a smart guy.  In July of 2019, how many
19  hours would Jerusalem time be ahead?
20  A.    Very likely seven.
21  Q.    So that would take us to --
22  A.    4:16.  No, that would take us to 3:16.
23  Q.    3:16 p.m.
24  A.    Yeah, p.m.

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 85

1  Q.    Jerusalem time?
2  A.    Yes.
3  Q.    And then Bernie writes back at 8:45 --
4  8:44 a.m. Eastern Daylight Time, "Jeff, thank
5  you for the update. As far as needing anything
6  else, I have the love of a good woman so I want
7  for nothing." Do you see that?
8  A.    Yes.
9  Q.    And that's in response to the e-mail
10  below on this thread; is that right?
11  A.    I ask, other than the instructions for
12  transfer, is there anything else you need.
13  Q.    Okay. And here, Bernie, as you did,
14  copied Cliff and Shoshanna?
15  A.    Yes. Normal -- a lot of
16  correspondence. Not always, but when I
17  remember, I cc my wife.
18  Q.    Understood. And when you used your
19  Gmail account, was that your rule --
20  A.    Yeah.
21  Q.    -- at Argaman?
22  A.    Yeah. Yeah. Because I want my wife --
23  my wife handles the finances in the house.
24  Q.    Okay. So I want you to keep this 26 in

Page 86

1  mind and the clue to you is this reference to
2  "good woman." Okay?
3  A.    Mm-hmm.
4  Q.    Just keep that in mind.
5  A.    Okay.
6  Q.    Now let's go to --
7  A.    By the way, I would like to show
8  something on 0027, if you have questions,
9  please ask them.
10  Q.    I'm going to 27 right now.
11  A.    Yeah. Mm-hmm.
12  Q.    All right. So the last e-mail was July
13  2nd, 8:44 a.m. that we looked at --
14  A.    Mm-hmm.
15  Q.    -- from Bernie after you sent him the
16  e-mail prior to that. Now we have CL27 on the
17  screen. It's nothing on the bottom, so I'll
18  leave it there.
19  A.    Mm-hmm.
20  Q.    And this is at 9:49 a.m., about an hour
21  later.
22  A.    Mm-hmm. Correct.
23  Q.    The -- this e-mail is, again, July 2nd,
24  2019, 9:49 a.m. to Bernie, a copy to Cliff, do

Page 87

1  you see that?
2  A.    Yes.
3  Q.    And then it's from
4  jeffgabbay@argamantech.com -- or
5  argamantech.com. Sorry about that.
6  A.    Yes. That's okay.
7  Q.    And here, I'm going to read this:
8  "Bernie, after meeting with our financial
9  advisor today, we agreed to transfer the
10  remaining settlement funds to my affiliated
11  company bank account in Hong Kong. I will
12  forward the appropriate banking details to you
13  soon. Jeff." Right?
14  A.    Yes.
15  Q.    And it is true, based on your own e-mail
16  that we just looked at, that you did meet with
17  your financial advisor on July 2nd, fair enough?
18  A.    Yes. Fair.
19  Q.    Okay. Now, did you send this e-mail,
20  Jeff?
21  A.    For the record, first time I ever saw
22  this e-mail, and so that we do something so
23  that you could see, look what I wrote on here,
24  "Never saw this before."

Page 88

1  Q.    So, can I take that as a "no"?
2  A.    Yes. You can take that as a "no."
3  Q.    All right. Does or did Argaman have a
4  company bank account in Hong Kong?
5  A.    No.
6  Q.    Ever?
7  A.    Ever. For the record, Argaman never
8  had a bank account out of Israel.
9  Q.    Sir, remember when I wanted to make sure
10  that you remembered 24, which is the e-mail on
11  Monday, July 1st?
12  A.    Yes.
13  Q.    I'm going to ask you about 24.
14  Actually, I was looking at 26. Can we go to 24
15  real quick, Jeff?
16  A.    Sure.
17  Q.    Oh, we did look at this one. This is
18  where the made the correction to "out" to "our,"
19  right?
20  A.    Yes.
21  Q.    And do you remember sending this e-mail
22  on your Argaman account?
23  A.    Based on the our, it's very unlikely I
24  would have been in front of my computer, and

Page 89

1  because there -- Bernie wanted to transfer the
2  money and we wanted him to transfer the money,
3  knowing myself, I would have sent them a
4  message from my phone.
5  **Q.      That's why it says, "Sent from my**
6  **iPhone"?**
7  A.     Yeah.  Yeah.
8  **Q.      Okay.  So that's July 1 of 12:10 p.m.,**
9  **and then if we can go back to where we were on**
10  **27.**
11  A.     Correct.
12  **Q.      So, do you believe, based on what you've**
13  **told me about, this e-mail on page 27, that your**
14  **e-mail, again, looking at this with hindsight**
15  **was hacked sometime between July 1, 2019 at**
16  **12:10 and July 2nd at 9:49 a.m.?**
17  A.     I can only say --
18          MR. POLIQUIN:  Objection to
19      the form.
20          You can answer the question.
21          THE WITNESS:  I can only say
22      that I know it was -- I don't know.
23      This is the first time I saw this
24      e-mail.  So obviously I'm assuming that

Page 90

1      the one who sent this was the hacker.
2      But remember, I am not privy to any of
3      this, so I can't respond.
4  BY MR. HILL:
5  **Q.      Okay.  We'll get to that in a minute.  A**
6  **thought just occurred to me.  Do you happen to**
7  **keep your phone records from this time frame?**
8  A.     No.
9  **Q.      How do you get your statements or bills**
10  **for --**
11  A.     Well, in this particular case, my phone
12  bills were paid for by Cupron -- by Argaman.
13  **Q.      Prior to October of 2021?**
14  A.     Yeah.
15  **Q.      Okay.  Do you know if Cup -- I just did**
16  **this.**
17  A.     Yeah.  Argaman, yeah.
18  **Q.      Do you know if Argaman had, while you**
19  **were there, a document retention policy?**
20  A.     I don't know.
21  **Q.      Would you know --**
22  A.     We are not a public -- we are not a
23  public --
24  **Q.      Sorry.**

Page 91

1  A.     We are not a publicly owned company, so
2  it's unlikely that we would have had that.
3  **Q.      Who at Argaman would be the person most**
4  **knowledgeable about the billing at the company?**
5  A.     Well, it would be the CFO.
6  **Q.      Okay.  And is -- is that, as a CFO --**
7  **have you given me his name?**
8  A.     Simcha, S-I-M --
9  **Q.      Okay.**
10  A.     -H-A -- I gave it to you.  E-D --
11  **Q.      Yes.**
12  A.     -- -E-L-L.
13  **Q.      Thank you.  Okay.  Let's go to 28.**
14  A.     Okay.
15  **Q.      Here we have an e-mail at the bottom to**
16  **you and Cliff -- and Cliff is copied from**
17  **Bernie.  It says, "Thank you."  Do you see that?**
18  A.     Yes, I do.
19  **Q.      And now you have an e-mail here on the**
20  **top, which seems to be replying from**
21  **jeffgabbay@argamantech.com.  Do you see that**
22  **one?**
23  A.     Yes, I do.
24  **Q.      July 2nd at 10:09 a.m.  Have you seen**

Page 92

1  **this one before?**
2  A.     No.
3  **Q.      Do you believe this was a fictitious**
4  **e-mail?**
5  A.     Yes.
6  **Q.      Let's go to 31.**
7  A.     Yes.
8  **Q.      When I said fictitious, what I want to**
9  **get at is, you believe that last e-mail was a**
10  **fake; is that right?**
11  A.     That is correct.
12  **Q.      I'm trying to get the right word so that**
13  **we're on the same page.  Let's go to --**
14          MR. POLIQUIN:  Paul, can I
15      take a five-minute break real fast?
16          MR. HILL:  Yeah, sure.
17          MR. POLIQUIN:  All right.
18      Let's come back at, you know, 10:35 or
19      6-ish.  Appreciate it.  Thank you.
20          MR. HILL:  Yeah.  No worries.
21          (Whereupon, a recess was
22      taken.)
23  BY MR. HILL:
24  **Q.      Okay.  Sorry about the slight delay**

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 93

1  there.
2  A.    No problem.
3  Q.    Bernie told me to just plow forward, so
4  I'm going to do that.  So let's keep going on
5  this chronology.  Let's go to 31.
6  A.    Yes.
7  Q.    Here we have an e-mail on the bottom,
8  Tuesday, July 2nd to Jeff Gabbay where Bernie
9  writes, "Today, I received three e-mails from
10 you.  The first telling me that you spoke to
11 your financial advisor."  We looked at that one.
12 Do you remember that, Jeff?
13 A.    Yes.  That was -- that was my e-mail,
14 probably, right?
15 Q.    Yeah.  Exactly.  And then there --
16 typo, "There was a response to my remark about
17 my wife."  And you responded to that one, do you
18 remember?
19 A.    Yes.
20 Q.    And the third asking if I received an
21 e-mail from you about the banking details.
22 A.    Yeah.
23 Q.    We just went through that one.  You
24 believe that one's a fake.

Page 94

1  A.    Once again, please note, and that is,
2  just for the record, I never saw this before.  ------
3  Q.    Now, when you say "that," you're talking
4  about Bernie's e-mail or the e-mail above it?
5  A.    No.  I didn't see Bernie's e-mail and I
6  didn't see the e-mail above it.
7  Q.    Okay.  And the one above it is from, we
8  believe, the hacker; is that right?
9  A.    That is correct.  But I believe that
10 based on -- just, I can't -- look, I'm not
11 qualified to make the statement.  But I don't
12 think that the -- I think that the hacker
13 intercepted Bernie's e-mail.
14 Q.    Through your Argaman account?
15 A.    However he did it.  I don't know.
16 Q.    So we -- I shouldn't say "we."  You --
17 you believe that the e-mail on the top of the
18 screen from jeff@argamantech on July 2nd of 2019
19 at 12:22 is a fake?
20 A.    Yes.
21 Q.    Okay.  And then the next page -- and
22 just so that I'm clear, do you believe that
23 Bernie's e-mail system was broken into or just
24 Argaman's?

Page 95

1  A.    No.  I think Bernie's was broken into
2  as well.  But that's my opinion.  I'm not
3  qualified to give that opinion.
4  Q.    So both?
5  A.    That's -- generally speaking, I asked
6  around.  And what happens -- I mean, it would
7  be logical if -- if you break in then you're
8  going to intercept every conversation.  You're
9  not going to allow a conversation to occur
10 that's going to take away your interest.  Just,
11 again, I'm not qualified to make the statement,
12 just seems to be logical that, you know, a
13 thief is going to cover all of his bases.
14 Q.    And what's your complaint or allegation
15 in this complaint?  Was it that your e-mail
16 account was compromised and infiltrated or yours
17 and Bernie's were?
18 A.    I --
19        MR. POLIQUIN:  I'm going to
20 object to the form of the question.
21        THE WITNESS:  Yeah.
22 BY MR. HILL:
23 Q.    You can answer, Jeff.
24 A.    Look, I'm not qualified to make the

Page 96

1  statement.  So I can't answer your question.
2  But looking at what we see here, I don't know
3  if Bernie was hacked or I was hacked, or I have
4  no way of knowing.  But in my opinion, it seems
5  to me that he got in somehow but I don't know
6  where.
7  Q.    And I'm just trying to trace the
8  chronology.  We just looked at an e-mail
9  Tuesday, July 2nd of 12:22.  Let's go to CL35.
10 A.    Okay.
11 Q.    All right.  The bottom e-mail on this
12 page purports to be an e-mail on July 2, 2019 at
13 1:12 p.m. from jeff@argamantech.com.  "Hi,
14 Bernie, in anticipation of a question that will
15 be asked concerning the source of the Vupron
16 funds" -- should be Cupron -- "we will need to
17 present proof of the origin of the funds.  Can
18 you send me documentation that demonstrates the
19 source of the funds, ie, Cupron's purchase or
20 our sale banks.  Jeff.  Sent from my iPhone."
21        Does that appear to be a legitimate
22 e-mail from you?
23 A.    That, I don't remember the e-mail.  But
24 it would certainly be something that I would

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 97

1  have asked, simply because of the necessity of
2  transparency.
3  Q.    Okay.  So sitting here today, you don't
4  contest that this was an e-mail that you sent?
5  A.    I don't, but I also don't -- I don't
6  remember it.  I'll be honest with you.
7  Q.    Okay.  But just so the record's clear,
8  just sitting here today, you don't contest that
9  you sent it, fair?
10 A.    Yeah.
11 Q.    Yes?
12 A.    But I -- but --
13 Q.    Did you say "yes"?
14 A.    I don't contest that I sent it, but I
15 also don't remember specifically that I sent
16 it.
17 Q.    Okay.  And then we have a reply, looks
18 like, sent on Cliff's iPhone, "Tax authorities
19 won't care where Cupron got the funds from."
20 Right?
21 A.    Yes.
22 Q.    Do you remember getting that reply as we
23 sit here today?
24 A.    No, I do not.  And if you see that,

Page 98

1  that came from Cliff's iPhone.
2  Q.    Mm-hmm.
3  A.    Not -- Cliff really never sent me stuff
4  on his iPhone.  But I don't know.
5  Q.    Are you saying you believed Cliff's --
6  A.    You know, I --
7  Q.    -- e-mails?
8  A.    No, I'm not saying anything.  I'm just
9  saying I don't know.
10 Q.    Okay.  I was going to finish my
11 question.  Do you believe Cliff's e-mail was
12 infiltrated?
13 A.    I don't know.  I know that Cliff's
14 office has a very high level of security.  I
15 don't think -- I don't think it would have
16 happened.  But again, if you got in, you got
17 in.
18 Q.    Okay.  Let's go to CL40 on the bottom.
19 A.    Okay.  One second.  CL40 on the bottom,
20 yes, okay.
21 Q.    And you recall that I wanted to make
22 sure you remembered the I love -- "The love of a
23 good woman" --
24 A.    Woman, right.

Page 99

1  Q.    -- that we saw earlier, right?
2  A.    Yes.  Mm-hmm.
3  Q.    Okay.  And I don't think there was any
4  question that you were -- that was legitimate,
5  you got that e-mail?
6  A.    However, you're going to ask about U.S.
7  or Hong Kong?
8  Q.    No.  I'm going to ask the question I'm
9  going to ask, but just hang -- but just hang in
10 with me as I go through this.
11 A.    Mm-hmm.
12 Q.    Okay.  So the e-mail on the bottom is
13 the e-mail that we looked at before, which is a
14 part of -- on page 26.  And just to refresh your
15 memory, 26 is an e-mail that you sent on
16 jeffgabbay@gmail.com, where you wrote "Shoshanna
17 and I sat with our financial advisor," right?
18 A.    Yes.
19 Q.    And then you also asked, "Other than the
20 instructions were transferred, is there anything
21 else you need?"  Bernie then responds, "Thank
22 you for the update.  As far as needing something
23 else, I have the love of a good woman so I want
24 for nothing."  Okay?

Page 100

1  A.    Yes.
2  Q.    So what I'm getting at is, will you
3  agree that now we're looking at CL40, it's
4  picking up on that same, what I call, a
5  legitimate e-mail string.  You agree with that?
6  A.    First of all -- first of all, I don't
7  -- this is not my e-mail, even it says "Sent
8  from my iPhone," it is not sent from my iPhone
9  and I'll tell you how I know --
10 Q.    Wait a minute.  Wait a minute, sir.  Let
11 me get an answer to my question first.
12 A.    Oh, okay.  Sorry.
13 Q.    Does the e-mails on the top of page 40
14 appear to be a continuation of the string that
15 we looked at on page 26, where you gave the
16 "instructions asked about anything else," and
17 then Bernie said, "good woman"?
18 A.    That is correct.  Yes --
19 Q.    Okay.  Now --
20 A.    Today, yes.
21 Q.    Now, let me get to the -- I'll give you
22 a chance to answer.  I'm trying to learn
23 anything I can.
24 A.    Mm-hmm.

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 101

1  Q.     Okay?
2  A.     Yes, obviously.  Mm-hmm.
3  Q.     All right.  So then you have an e-mail,
4  so that was sent July 2nd, 8:44 a.m. for Bernie.
5  Then, do you see where Cliff responded by
6  e-mail, "U.S. or Hong Kong"?
7  A.     Yes, I see that.
8  Q.     You see that?
9  A.     Yes.
10  Q.     And it's sent from the iPhone.  Now,
11  this says 21:02 is the time, I take that to mean
12  military time or 2:02 p.m., right?
13  A.     21:02 is 9:02 in the evening.
14  Q.     Okay.  Go back to 36, if you don't mind.
15  A.     Okay.  Yes.
16  Q.     There's that same e-mail, right?
17  A.     Yes.
18  Q.     And it looks like it was sent 2:02, 5:57
19  p.m., agreed?
20  A.     Yes.
21  Q.     Okay.  So Bernie wrote at 8:44, Cliff
22  responds, "U.S. or Hong Kong," with his cell
23  phone at 2:02 p.m.  Do you see that?
24  A.     Yes.

Page 102

1  Q.     And do you agree that Cliff here, by
2  using the phrase "U.S. or Hong Kong," was
3  inquiring if funds were going to the U.S. or
4  Hong Kong?
5  A.     Yes.  However, Cliff is fully aware, as
6  my attorney, that I only bank in Israel or the
7  United States.
8  Q.     And you didn't --
9  A.     Therefore --
10  Q.     You knew that as well at that time,
11  right?
12  A.     Yes.  Therefore, I do not think that
13  this is an e-mail that was generated from Cliff
14  or certainly from me.
15  Q.     Let me just make sure I have that right.
16  You believe that the e-mail, "U.S. or Hong
17  Kong," is a fake e-mail?
18  A.     Yes.
19  Q.     But it's an e-mail that you received,
20  did you not, sir?
21  A.     No.
22  Q.     Well, let's --
23  A.     I received -- I received an e-mail.
24  Q.     Let's look at 40.

Page 103

1  A.     That says as far as I'm concerned,
2  right, "I have the love of a good woman."
3  That's the end of it.
4  Q.     Okay?
5  A.     That's end of it.
6  Q.     Well, okay.  How do you square that with
7  the e-mail on top of this, which is a part of
8  the thread on page 40, where it shows on July 2
9  at 3:49 p.m. from your Gmail account, which you
10  told me was not hacked, to Cliff with a copy to
11  Bernie and Shoshanna, who you typically copied
12  on your Gmail communications, right?
13  A.     Yes.
14  Q.     Okay.  And did you not reply to Cliff
15  Rieders' e-mail, "U.S. or Hong Kong" by writing
16  "USA thinks we are all drug dealers working with
17  undeclared cash.  We have to prove we are not."
18  A.     That is not a response to U.S. or Hong
19  Kong.  I believe that that was response to --
20  and I don't -- I can't say this for sure.  USA
21  thinks we're all drug dealers is something I
22  absolutely said.  That's something I would have
23  said.  But I think that U.S. or Hong Kong was
24  inserted.  Why would I ever -- why would Cliff

Page 104

1  ever ask about Hong Kong?
2  Q.     Well, I --
3  A.     He knew I didn't have an account there.
4  Q.     I'm not asking --
5  A.     Okay.
6  Q.     -- about Cliff.
7  A.     Okay.  But I don't know.  I could only
8  tell you that I never banked in Hong Kong in my
9  life.  I never banked any place out of the
10  United States in my life or out of Israel.
11  Q.     Okay.  But how do you account for the
12  fact that there is an e-mail from Cliff on this
13  thread, and then a reply right after that by
14  you, which you just said is legit?
15  A.     I do not account for it.  I don't know.
16  Q.     Okay.  You don't know?
17  A.     I don't know.
18  Q.     But is your testimony today, Jeff, that
19  you did not see this e-mail from Cliff?
20  A.     I do not remember this e-mail from
21  Cliff.
22  Q.     Okay.
23  A.     I may have seen it, I can't tell you
24  that I didn't see it.  I do not remember.  I do

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 105

1  not know. I'm trying to be as honest as I can.
2  **Q.    I'm sorry. I didn't catch the last**
3  **part.**
4  A.    I said I'm trying to be as honest as I
5  possibly can.
6  **Q.    I know you are. And I'm just trying to**
7  **figure out what happened.**
8  A.    Yeah. So am I.
9  **Q.    All right. Now --**
10  A.    To [inaudible] the $26,000.
11  **Q.    By this U.S. or Hong Kong reference,**
12  **just considering the text itself, and I took --**
13  **I took you through this purposely. But Cliff**
14  **had been copied on an e-mail, which is on page**
15  **27. And we can go back there.**
16  A.    No, I know the e-mail. But what I was
17  thinking is, you know, I'm not here to make
18  conspiracy theories. But obviously Cliff had
19  to have been cc'ed by the hacker. And maybe
20  Cliff thought that I had a Hong Kong account.
21  Maybe he did. You know, I don't know what he
22  was thinking. I don't know what he was
23  thinking. So I can't remark about it. But
24  U.S. or Hong Kong, it just doesn't seem to fit.

Page 106

1  **Q.    Why -- why didn't you send a reply**
2  **saying, "What are you smoking about this Hong**
3  **Kong thing"?**
4  A.    Well, that's -- USA thinks we're all
5  drug dealers is a response maybe to that. I
6  mean, you know, it's -- look, it never would
7  occur to me to hide funds or to send funds to,
8  you know, a Swiss account or a Hong Kong
9  account or a Jamaican account. That's not me,
10  Karl. I never do -- ever anything like...
11  **Q.    And I'm not suggesting otherwise, Jeff.**
12  **I'm just --**
13  A.    No, I know that. But I think that
14  people who know me know that I would never do
15  such a thing. I would never -- it's just not
16  something I would do.
17  **Q.    Okay. But you're saying you responded**
18  **to the Hong Kong by saying, "USA thinks we are**
19  **drug dealers."**
20  A.    Yes.
21        MR. POLIQUIN: I'm going to --
22  BY MR. HILL:
23  **Q.    Okay. You can answer.**
24        MR. POLIQUIN: -- object to

Page 107

1        the form of the question.
2        MR. HILL: Thank you. Noted.
3  BY MR. HILL:
4  **Q.    And then, well, why didn't you send an**
5  **e-mail at that time saying, "Wait a minute, red**
6  **flag, Hong Kong"?**
7  A.    I don't know.
8  **Q.    And you and I have may never met each**
9  **other if you had done that, would you agree?**
10  A.    I don't know.
11        MR. POLIQUIN: Object to the
12        form of the question.
13        THE WITNESS: What I do know
14        in my mind was that I had informed
15        Bernie that we were going to open an
16        account for transfer of funds to New
17        York, and that he was aware of it. And
18        as far as I was concerned, that was
19        checked off on the list. I was just
20        waiting for the account to be opened
21        and then I would have gotten the
22        funding.
23  BY MR. HILL:
24  **Q.    Okay. Let's fast forward a little,**

Page 108

1  because it's a little bit out of order to --
2  it's the last page of this packet, please.
3  A.    To which number?
4  **Q.    262 -- or 268. I'm sorry.**
5  A.    68. Okay. One second. Okay. I'm
6  here. Yes.
7  **Q.    Okay. And here you have an exchange**
8  **between Cliff and Bernie. Do you see that?**
9  A.    I'm looking at it now.
10  **Q.    Okay. Take your time.**
11  A.    Yes. I did not see this e-mail
12  previously.
13  **Q.    You mean previously to preparing for**
14  **your --**
15  A.    This was a correspondence between
16  Bernie and Cliff that I was not privy to.
17  **Q.    I understand. All right. Let me ask**
18  **you a couple of questions about it, with that**
19  **understanding. So Bernie writes on July 10 at**
20  **9:11 p.m., second paragraph, "I have heard from**
21  **Jeff. I wired the settlement funds to him last**
22  **Friday. And I looked at the calendar. That was**
23  **Friday, July 5." Hopefully you'll accept that**
24  **representation by me.**

Page 109

1      MR. POLIQUIN:  What number is
2    this?  Bates Number?
3      MR. HILL:  268.  It's the last
4    page of --
5      MR. POLIQUIN:  Got you.
6      MR. HILL:  -- the exhibit.
7      MR. POLIQUIN:  Okay.
8    BY MR. HILL:
9    Q.    And that July 5, by the way, was three
10   days after the "USA or Hong Kong" e-mail thread
11   that we just went through.  And Bernie then
12   says, on Monday, he e-mailed me to say that he
13   hadn't received it.  And more problematic, his
14   Hong Kong bank account was undergoing an audit
15   of some sort.
16   A.    Okay.
17   Q.    The e-mails that Bernie referenced,
18   you're not familiar with writing those e-mails;
19   is that a fair assumption?
20   A.    That is correct.
21   Q.    Okay.  And the Rieder -- Cliff Rieders
22   replies a half hour later at 9:31 p.m., "Oy vey,
23   will you be sending us your fee?"  Do you see
24   that?

Page 110

1    A.    Yes.
2    Q.    And here's Cliff using his iPhone again.
3    Do you see that as well?
4    A.    Yes.
5    Q.    Okay.  So I know in general what that
6    expression means, but can you define what "Oy
7    vey" means?
8    A.    Oh, terrible.
9    Q.    Okay.  And would you agree with me,
10   Jeff, that it appears that Cliff understood at
11   this point given his response to the e-mail that
12   the funds were originally sent to a Hong Kong
13   bank?
14   A.    Yes, I would agree, mm-hmm.
15   Q.    I just have a few more.  Thanks for
16   bearing with me on this.  Let's go to 52.
17   A.    Going backwards.  Okay.
18         MR. POLIQUIN:  I have to take
19   some out of turn.
20         THE WITNESS:  52.  I have
21   until 268.
22   BY MR. HILL:
23   Q.    No. 52, 5-2.
24   A.    Oh, 5-2.  Okay.

Page 111

1    Q.    Yeah.
2    A.    You got me worried.  Okay.  5-2, okay.
3    Let's go back.  Okay.  Yes, I have it.
4    Q.    Okay.  And it just occurred to me when
5    looking at this -- the last e-mail on 268 where
6    Cliff had been sailing in Long Island, do you
7    remember reading that?
8    A.    Yes.
9    Q.    Do you remember if you were in
10   communication with him during this time frame,
11   July 5 to July 10?
12   A.    Definitely not.
13   Q.    And you --
14   A.    It was July 4th weekend.
15   Q.    Okay.  Is that why you're so definitive
16   in responding that you would not have
17   communicated that?
18   A.    Yes.  Yes.  He would have been out on
19   his boat.  And I certainly wouldn't have
20   bothered him about this kind of an issue on his
21   vacation.  Remember, in the back of my mind, as
22   far as I was concerned, Bernie had all of our
23   instructions, and we were just waiting for the
24   transfer.

Page 112

1    Q.    Not by July 10, would you agree with me?
2    A.    You know, I can't -- I can't remark
3    about that.
4    Q.    Okay.
5    A.    I just felt --
6    Q.    Keep going.
7    A.    You know, I just felt -- I sent, you
8    know, the profile e-mail, and I sent all the
9    e-mails to Bernie, and that it would happen.
10   Now, there was a Saturday night because of what
11   basically happens is I'm a sabbath observer,
12   that means that from Friday, late afternoon
13   until Saturday night, I have no communications
14   at all.  We do not use iPhones, we do not use
15   phones, we do not use e-mails, we do not use
16   faxes, which means that for 24- or 25-hour
17   period, I'm not in touch with anybody.  Taking
18   into consideration that Friday afternoon is
19   Friday morning in New York, so therefore, I
20   would not have been in touch with Cliff,
21   because he wouldn't have called me on Friday to
22   say anything.
23   Q.    All right.
24   A.    And then Saturday night, I open up the

Page 113

1  e-mail and I see Bernie's confirming that he
2  sent the money to my Hong Kong account.  And I
3  said, "What Hong Kong account?"
4  Q.     Okay.  We're not quite there yet on the
5  chronology.
6  A.     Okay.  No, but I'm just telling you
7  that as the person being deposed, I was in
8  shock over this.  So...
9  Q.     What you're trying to convey to me,
10  Mr. Gabbay, is that you were still trying to get
11  your ducks in a row as to where the funds were
12  going to be disbursed?
13  A.     The ducks were already in the row.
14  Q.     That's what I don't understand.  So you
15  have -- you have the moneys in Bernie's escrow
16  account in late May or the first couple days of
17  June of 2019, when is it that you finally gave
18  Bernie instructions on how to disburse the
19  remaining funds?
20  A.     According to the profile e-mail, the
21  1st of May.  But I'm trying to figure out why
22  did it take so much longer.
23  Q.     Well, let's go there --
24  A.     And I don't know why.

Page 114

1  Q.     Let's figure it out.
2  A.     Answer it.
3  Q.     Let's figure it out.  Let's go to 52.
4  A.     Okay.
5  Q.     Are you there?
6  A.     Yes.
7         MR. POLIQUIN:  Okay.  You're
8  not showing these on the screen
9  anymore?
10         MR. HILL:  Sorry, Ron.  I had
11  a little brain --
12         MR. POLIQUIN:  That's okay.
13         MR. HILL:  I'm getting there.
14  BY MR. HILL:
15  Q.     Okay.  That's 52 on the screen right
16  now.  Are we all on the same page?
17  A.     Yes, I am.
18         MR. POLIQUIN:  Okay.  When you
19  say "52," what Bates Number is it?
20         MR. HILL:  It's CL005 --
21         MR. POLIQUIN:  Oh, I thought
22  you meant 52 -- 252.  Okay.
23         MR. HILL:  That's the second
24  time that's happened.  I'm looking at

Page 115

1  52 and 53, actually, which I think go
2  together.
3  BY MR. HILL:
4  Q.     All right.  So, Jeff, do you agree that
5  this is an e-mail, a legit e-mail from you on
6  Thursday, July 18 at 6:29 a.m.?
7  A.     You're looking at 0054?
8  Q.     5-2.
9  A.     5-2.
10  Q.     Mm-hmm.
11  A.     It looks like it came from me.  But I
12  don't understand why it would be on Thursday,
13  July 18th.  I don't understand that.
14  Q.     Well, let's see what we can do with
15  this.  Here, you have no reason to contest that
16  you sent this e-mail on your argamantech account
17  on Thursday, July 18 of --
18  A.     There is a question here.  Look at the
19  attachments, Gabbay wire instructions,
20  070920191.  I don't see a reference number like
21  that in the profile, Investment Services
22  reference.
23  Q.     Well, let's take one page at a time.
24  The e-mail, do you have any reason to contest,

Page 116

1  here you wrote, "Hi, Bernie, we finally got the
2  wire instructions for the account.  Kindly
3  transfer all the money in the account to the
4  attached account.  Obviously transfer charges
5  should be reduced from what is being sent,
6  please confirm back to us the exact amount of
7  transfer.  Thanks and best regards."  I read
8  that correctly, right?
9  A.     I'm not contesting that you read it
10  correctly.  I'm contesting that this may not
11  have been from me.  I do not remember that this
12  is from me.  What doesn't jive are the dates.
13  Q.     Mm-hmm.  And is the date -- is the date,
14  that 1/5/20, at the top of page 53 on Profile's
15  letterhead the date that concerns you most?
16  A.     Yes.
17  Q.     Because we know that's a 5 -- that's
18  actually May 1?
19  A.     That's May 1.
20  Q.     2020.
21  A.     Yeah.
22  Q.     What about the rest of the Profile
23  document?  Is that your bank?
24  A.     They wanted everything to go to the

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 117

1  Bank of New York Mellon.
2  Q.    Okay.
3  A.      They opened the account for us in the
4  bank of New York Mellon.  So that when the
5  funds were transferred, they would go into this
6  account.
7  Q.    Do you remember e-mailing these, this
8  Profile instruction document to Bernie at any
9  time?
10 A.      Knowing myself, I would have received
11 it, and within minutes, have forwarded it to
12 him.
13 Q.    Okay.  So how do you, sitting here
14 today, account for the fact that it's dated May
15 1, 2020?
16 A.      I can't account for it, because I just
17 don't know.  There was a correspondence, a
18 whole world of correspondence going on between
19 Bernie and Cliff, or Bernie and the hacker to
20 which I was not privy.
21 Q.    Well in fairness, you agreed that the
22 e-mail on page 52 is your e-mail?
23 A.      I'm not agreeing.
24 Q.    You're not?

Page 118

1  A.      I don't know.  No, I don't know.
2  Q.    Okay.  And this copies your wife
3  Shoshanna, does it not?
4  A.      Yes, it does.
5  Q.    The e-mail -- all right.  Let's try 54.
6  I'm going back to the prior one because I just
7  have things swirling in my brain, honestly.  The
8  hack -- if the e-mail, July 18, which we just
9  went through on page 52 was not yours, why would
10 the hacker be providing information to you and
11 Shoshanna's New York Mellon account for the
12 transfer?
13 A.      I don't know.  Look, this obviously is
14 -- you know, look people that are experts in
15 theft would know -- you know, they would know
16 how to cover their bases.  I don't know, Karl.
17 I can't answer honestly.
18 Q.    Okay.  You agree that it just doesn't
19 make sense, does it?
20 A.      I agree with you that it doesn't make
21 sense.  But as I said, there was a whole world
22 of correspondence going out on between Bernie
23 and the hacker about which I wasn't privy.  And
24 as far as I was concerned, in my mind, I had

Page 119

1  given all of the instructions to Bernie and I
2  was just waiting to get the funds.
3  Q.    But you mean prior to July 18?
4  A.      Yes.
5  Q.    Okay.  And how did you convey those
6  instructions to Bernie?
7  A.      Bernie would have received instructions
8  from me absolutely in writing.  He would have
9  never received it any other way.
10 Q.    Well, I think we've been trying to be
11 careful with having all of the e-mails in the
12 chronology.  I did not see any e-mails from you
13 with written instructions prior to July 18.  Are
14 you saying there are some?
15 A.      I don't have them.  I don't know.  If
16 there's something wrong here, I don't
17 understand myself.  To be honest, Karl, I don't
18 know myself.
19 Q.    That's fair.  But you would have
20 communicated those instructions via e-mail to
21 Bernie if you did, right?
22 A.      That is correct.  Either that or faxed.
23 Q.    Okay.
24 A.      More likely by the way fax.

Page 120

1  Q.    Let's go to --
2  A.      By the way, because there was a thing
3  that whenever we made transfers, we always
4  confirmed it via fax.  So it's possible but I
5  can't state it for sure.  It is possible that
6  Bernie received the Profile Investment Services
7  notification via fax, possibly.  But he would
8  have received it -- he would have received the
9  page that I received.
10 Q.    And your best recollection, it would
11 have been prior to this e-mail on July 18?
12 A.      Yes.  Because I was waiting for the
13 transfer.
14 Q.    Okay.  Let's try out 54.  CL54.
15 A.      Yes.
16 Q.    And I apologize, but at the very -- let
17 me get there.  Hold on.  So you see the bottom
18 of the page here is that same e-mail that we
19 were just looking at in full on page 52?
20 A.      Correct.
21 Q.    And here, on the top e-mail is Jeff --
22 I'm sorry, Bernie at July 18 at 7:15 a.m.
23 sending an e-mail to jeffgabbay@argamantech with
24 a copy to Cliff, where he's saying, "I'm

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 121

1  confused, the settlement proceeds were wired on
2  Tuesday as you directed," right?
3  A.    Yes.  And I never saw that e-mail
4  before.
5  Q.    You never seen that particular e-mail?
6  A.    No.  "I'm confused, the settlement
7  proceeds were wired on Tuesday as you
8  directed."  Why didn't I see the money in my
9  account on Wednesday if that was the case?
10  Q.    Well, so that we're clear, the e-mail
11  that I just referenced on the top of this page
12  from Bernie, that's the e-mail saying that you
13  say you never received?
14  A.    I don't think I received it.  Karl, I
15  can't answer you honestly.  I just don't know.
16  Q.    Okay.  When you sent the instructions --
17  strike that.  Let's go to 55.
18  A.    Yes.
19  Q.    And here I'm picking up on that thread
20  of that last e-mail.  Do you see that?
21  A.    Yes.
22  Q.    And then we have an e-mail on the top of
23  this page, July 18 at 8:34 a.m. from
24  jeff@argamantech to Bernie, cc Cliff.  "Bernie,

Page 122

1  sorry once again, I got the wrong Bernie.  I
2  think I need some vacations to settle down my
3  head.  Too much thinking lately.  So sorry for
4  the confusion." -- misspelled as confussion --
5  "Thanks and best regards, Jeff."
6       Is this a legit e-mail or a fake?
7  A.    Fake.
8  Q.    No question in your mind?
9  A.    No question in my mind.
10  Q.    All right.  Let's go to the next page,
11  56.  Let me know when you had a chance to look
12  at this.
13  A.    I've looked at it.  I've never seen
14  this document before.
15  Q.    Okay.  And that's an e-mail dated July
16  23rd, 2019?
17  A.    Correct.
18  Q.    Do you have any knowledge whatsoever
19  about what this document was?
20  A.    No.
21  Q.    That's attached?
22  A.    No.
23  Q.    And the e-mail on the bottom is not your
24  e-mail.  "This an important document"?

Page 123

1  A.    No.  This is not mine.
2  Q.    And then if you look at the next page,
3  57.  You see here where Bernie writes, "I
4  received this document from you but cannot open
5  it"?
6  A.    I never received that e-mail.
7  Q.    Never received that e-mail.
8  A.    No.
9  Q.    Okay.
10  A.    That would have been a signal.  What
11  document?
12  Q.    What do you mean by that?
13  A.    I would have seen something like this,
14  and he said, "I received this document from you
15  but cannot open it, please advise."  Well, I
16  never saw this e-mail.  And if I had seen the
17  e-mail, my response would have been, "What
18  document?"
19  Q.    Okay.  That's just based on the normal
20  way that you handle things?
21  A.    That is correct.
22  Q.    Okay.  And then we have on July -- I'm
23  sorry, CL59.
24  A.    Okay.

Page 124

1  Q.    Now we're at Tuesday, July 23rd, 2019.
2  And this is -- the e-mail on the bottom is
3  heading with the subject line, "Was the transfer
4  made sent on July 23rd, 2009 from Jeff Gabby --
5  or jeff@arga -- yeah, argamantech"?
6  A.    Mm-hmm.
7  Q.    Do you recognize that e-mail?
8  A.    No, I do not.
9  Q.    Okay.
10  A.    And I would not have written, "Was the
11  transfer made yet."  That's not my English.
12  Q.    Back to the Profile document.  Would it
13  have been customary for you to copy Cliff on a
14  fax or communication regarding the instructions?
15  A.    No.
16  Q.    Prior instructions?
17  A.    No, no, no.  At this point, we felt
18  that everything had been done.  And, you know,
19  maybe I was negligent in not sending him a cc.
20  Q.    Okay.  So on 59, you're certain that you
21  would not have sent the e-mail on the bottom or
22  received a reply by Cliff?
23  A.    I would not -- this was not me.
24  Q.    But you're not contesting that someone

Page 125

1 is using your e-mail address at this time and as
2 we've gone through this chronology; is that
3 fair?
4 A.    That is correct, I think.  In my
5 opinion, yes.
6 Q.    I'm just trying to put myself in your
7 shoes at this time.  And we've now gone through
8 a chronology beginning in January -- I'm sorry,
9 July 1, and now we're through July 23.  Were you
10 routinely getting e-mails, legitimate e-mails,
11 and responding legitimately to e-mails during
12 this time on other matters?
13 A.    Yes.  But having nothing to do with my
14 personal -- nothing like this.  In other words,
15 the -- whoever the hacker was -- was letting a
16 normal e-mail go through.  He didn't stop
17 everything.  He only stopped the ones he wanted
18 to stop, obviously.
19 Q.    All right.  Let's go to -- I only have a
20 few more, by the way.
21 A.    That's all right.  As long as it takes.
22 Q.    The next page, 60.
23 A.    Yes.
24 Q.    Before we get to 59 -- before we get to

Page 126

1 60, if we can go back to 59 for a second.
2 A.    Yes.
3 Q.    And I didn't ask you about this, but it
4 looked -- here, you would you agree Cliff
5 replies to that e-mail from Jeff Gabbay, meaning
6 the e-mail address?
7 A.    That's what -- yeah, that's what it
8 looks like, yeah.
9 Q.    Okay.  And here, would you agree that
10 based on the words he used in his e-mail that he
11 thought the wire had already been transferred?
12 A.    Yes.  That's apparent.
13 Q.    Okay.  Let's go to 60.  This, for the
14 record, e-mail July 15 at 1:24 a.m. from
15 jeffgabbay@gmail.com copied to Bernie and Cliff,
16 it reads, "Hey Bernard, you will receive
17 instructions for transferring via fax this
18 morning with my signature as authorization" --
19 authorization misspelled -- "no files that can't
20 be opened.  Thanks, Jeff.  Sent from my iPhone."
21 Is this for real?
22 A.    No.  First thing is, I wouldn't have
23 called him Bernard.  I would have called him
24 Bernie.

Page 127

1 Q.    So if it's not real, does that mean the
2 hacker now has access to your Gmail account?
3 A.    Yes.
4 Q.    And how -- you investigated the Gmail
5 account and the origin of the hacking here?
6 A.    The police did their research but they
7 couldn't -- they weren't really very helpful.
8 Q.    Okay.  And what makes you conclude in
9 your view that this was not the real you using
10 the Gmail account?
11 A.    Because I wouldn't have called him
12 Bernard.
13 Q.    Okay.
14 A.    Okay?  And the language is wrong.
15 Q.    Mm-hmm.
16 A.    I would have never written a sentence
17 "No files that can't be opened."  That's not
18 me.
19 Q.    And it says, "Sent from my iPhone,"
20 right?
21 A.    Yeah.  Well, you can type that on the
22 bottom of the e-mail.  That's not a problem.
23 Q.    Is that what you think happened here?
24 A.    Oh, yeah.  Yeah.  He's been forging it

Page 128

1 all along.
2 Q.    So now we have potentially this hacker
3 or hackers that have infiltrated the -- your
4 Argaman e-mail account, your Gmail account and
5 potentially Cliff's and Bernie's accounts.  Do I
6 have that right?
7 A.    Yes.
8       MR. POLIQUIN:  I object to the
9   form of the question.
10       MR. HILL:  Okay.  I think we
11   have an answer.
12 BY MR. HILL:
13 Q.    Okay.  Let's go to 66.
14 A.    Yes.
15 Q.    And this is picking up that thread that
16 we've looked at earlier.  And this is an e-mail
17 Saturday, July 27th at 1:46 a.m. from
18 jeffgabbay@gmail to Bernie and copied to Cliff,
19 right?
20 A.    Yes.
21 Q.    And then the responses is what, "Hong
22 Kong bank" --
23 A.    Right.
24 Q.    -- with three question marks?

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 129

1  A.    Right. Yeah.
2  Q.    Okay. And this is a response to an
3  e-mail that Bernie wrote, "I received your fax,
4  however, I'm confused by it. Upon your
5  instructions, I previously wired all of the
6  remaining settlement proceeds to your Hong Kong
7  bank. Hence, I have nothing to wire." Is your
8  response legit here, Jeff?
9  A.    Yes. Absolutely. Boy, do I remember
10  this, yes.
11  Q.    So you wrote "What Hong Kong bank,
12  question mark, iPhone"?
13  A.    That is right.
14  Q.    From your iPhone?
15  A.    Yes. That is -- I remember I was
16  sitting in the kitchen, it was the end of our
17  Shabbat, sabbath. Opened up my phone and I
18  looked at it and I actually broke out in a cold
19  sweat.
20  Q.    And he references the fax. If we could
21  go back to -- back to F-A-X. Bernie referenced
22  it. If we could go back to CL63 -- I'm sorry,
23  61.
24  A.    Yes.

Page 130

1  Q.    Is this -- what is this? Why don't you
2  tell me that.
3  A.    I'm looking at this.
4  Q.    And it's actually --
5  A.    These are -- this is actually a fax
6  that I sent to Bernie on July 26th.
7  Q.    Mm-hmm. Okay. And what is it?
8  A.    I'm looking at -- I'm looking at this,
9  "Dear, Bernard." I don't know. I mean, it's
10  my signature on the bottom. "I hereby
11  authorize you to disperse [sic] the funds
12  you're holding in the escrow from the Cupron
13  settlement" -- okay -- "as the instructions
14  below. You will note that there are two
15  transfers, both domestic. First one, a 15,000
16  payment of --
17  Q.    Can you just slow down? Jeff, you need
18  to slow down for the court reporter. Whenever
19  you --
20  A.    Okay. Sorry. Yes.
21  Q.    Whenever you read something.
22  A.    Oh, okay. So just, Stephanie, I'll
23  reread. July 26th, "Dear Bernard, I hereby
24  authorize you to disperse the funds you are

Page 131

1  holding in escrow from the Cupron settlement at
2  the instructions below. You will note that
3  there are two transfers, both domestic. The
4  first one at $15,000 is for a repayment of a
5  loan for legal fees. The second transfer is
6  for the final settlement money.
7  Please make sure that the $15,000 is
8  net to Mr. Edell and reduce the cost of the
9  transfer from the Cupron settlement money. I
10  am sending this to you via fax and not e-mail
11  to assure computer security. The signature
12  below will be recognized as my signature.
13  Please disperse the funds as follows" --
14  Q.    You don't have to read -- you don't have
15  to read the rest of it.
16  A.    Okay. So what I did was, I took a loan
17  from Simcha Edell to pay legal fees.
18  Q.    Mm-hmm.
19  A.    And so I wanted to pay back Simcha.
20  And the balance of it is the copy of the
21  account from Profile. And that is my
22  signature.
23  Q.    Where is the reference to Pro -- I see,
24  the Profile on the bottom, okay.

Page 132

1  A.    Yeah.
2  Q.    So these are, for lack of a better word,
3  a part of your instructions to Bernard as to the
4  disbursement of the remaining settlement
5  proceeds?
6  A.    Correct.
7  Q.    And I -- the next page is page 2 of the
8  fax. This time it's 15 -- actually, that might
9  be a copy.
10  A.    That's a copy.
11  Q.    Okay. And that's your signature on that
12  page with your address?
13  A.    Correct. That is my address, that is
14  my signature.
15  Q.    And I'm scrolling, page 62, it looks to
16  be a repeat.
17  A.    63 is a repeat.
18  Q.    And 63 --
19  A.    63 was a cc to Cliff.
20  Q.    CC. So you did cc Cliff on the
21  instructions for the wire?
22  A.    That is correct.
23  Q.    And these are your legitimate wire
24  instructions?

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

---

Page 133

1  A.     Yes, they are.
2  Q.     And these are dated July 26th, 2019?
3  A.     That is correct.
4  Q.     And would you agree with me that you did
5  not send, you, the real Jeff Gabbay, did not
6  send wire instructions to Bernie prior to this
7  time?
8  A.     It would --
9  Q.     Now -- now that we've have been through
10 it?
11 A.     Yeah.  It would appear so.  But I don't
12 know.  But it would appear so.
13 Q.     Okay.  And by the way, you use the
14 salutation, Bernard.  So from time to time, you
15 did use Bernard, right?
16 A.     When it was formal.
17 Q.     I see.  And let's go back to "what Hong
18 Kong bank," No. 66.  Okay?
19 A.     Yes.
20 Q.     Is this precisely when you learned that
21 something was amiss relating to your e-mail
22 account?
23 A.     Yes.
24 Q.     No time prior to this time on July 27th

---

Page 135

1  A.     I don't remember that I would have
2  known that.  My problem, Karl, was that I was
3  hacked, but couldn't figure out what had
4  happened, because I never imagined that I would
5  be hacked.  It never occurred to me that I was
6  being hacked.  So I was kind of like all of a
7  sudden, you know, I opened up my e-mail,
8  $426,000 has disappeared and I don't know what
9  happened.
10 Q.     Let me just make sure I have your
11 testimony correct on this.  You don't contest
12 that you sent the e-mail where you wrote, "You
13 received a false e-mail from a hacker"?
14 A.     I don't know -- well, actually, it
15 shows up as 1:47 Eastern Daylight.  That would
16 have been 8:47 at night.  And 8:47 at night,
17 that was one minute after I sent the e-mail
18 that said, "What Hong Kong account?"
19 Q.     Exactly.  So what am I missing here?
20 I'm sorry.  I may be just not understanding
21 this.  But you did, in fact, send this e-mail
22 that we're looking at on page 67?
23 A.     Yeah.  I -- look, I'm not denying that
24 I sent it.  I don't remember.  I can say that

---

Page 134

1  were you aware of that breach, if you will?
2  A.     That is correct.
3  Q.     And let's go to the next page, which is
4  67.
5  A.     Correct.
6  Q.     This is where you write on Saturday, the
7  same day, another response to the same e-mail
8  Bernie wrote at 6 -- on July 27th, 2019,
9  right?
10 A.     Yes.
11 Q.     This is a real e-mail from you where you
12 wrote on July 27 at 1:47 p.m.  "You received a
13 false e-mail from a hacker."
14 A.     Yes.
15 Q.     Right?  And you used your cell phone on
16 that?
17 A.     I don't -- apparently I did.  But I
18 wrote a note on this page saying that I never
19 got this.  I don't recall it.
20 Q.     Wait a minute, wait a minute.  You never
21 got what?
22 A.     No.  It says, "You received a false
23 e-mail from a hacker."
24 Q.     Mm-hmm.

---

Page 136

1  "What Hong Kong bank," definitely I sent.  A
2  minute later, there's another e-mail that says,
3  "You received a false e-mail from a hacker."
4  Q.     And that's from your Gmail account,
5  right?
6  A.     And that doesn't make any sense.  It
7  wouldn't be from my -- no.  Look, it says -- it
8  says Gmail account, then it says "Sent from my
9  iPhone."
10 Q.     Mm-hmm.
11 A.     Well, it could be from my iPhone on my
12 Gmail.  Yeah, it could be.
13 Q.     Well, what am I missing?  Are you just
14 saying you --
15 A.     No, I --
16 Q.     -- didn't know --
17 A.     I just didn't know.  You know, it's
18 sunk in, obviously.  But I just -- I think it
19 sunk in but didn't believe it.
20 Q.     So what, if anything, did you do after
21 learning that the settlement proceeds were
22 confiscated by a bad actor?
23 A.     So the first thing we did the next
24 morning was we contacted Kakadu and we

---

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 137

1  contacted the Israel police.
2  Q.      Contacted -- what was the second party?
3  A.      The Israel police.
4  Q.      I see.  Okay.
5  A.      Our police have a -- it's like the FBI.
6  Q.      And when in relation to that last e-mail
7  did you do that?
8  A.      The next morning, Sunday morning.
9  Q.      Sunday morning.
10  A.      Yeah.
11  Q.      Did you physically go down to the police
12  station?
13  A.      Oh, yeah.  You have to go down
14  physically.
15  Q.      Okay.  And did you fill out a report?
16  A.      Yes.
17  Q.      Do you still have a copy of that?
18  A.      I don't know where it is.  But I
19  believe Cliff -- I sent a copy of it to Cliff
20  and I think I sent a copy of it to Bernie as
21  well.
22  Q.      Okay.  Well, I would ask that --
23  A.      I -- I --
24  Q.      I'll ask from your attorney that you try

Page 138

1  to locate that and produce it.
2  A.      Okay.  I believe Cliff has it, because
3  we did turn to an attorney in Hong Kong.
4  Q.      Okay.  And who was the victim identified
5  on the police report, do you remember?
6  A.      It would have been me.
7  Q.      And did you -- again, I'm just testing
8  your recall, but whatever you can remember on
9  this, do you remember saying that it was your
10  Argaman e-mail account that had been
11  compromised, or what did you describe --
12  A.      I told them -- I gave them everything
13  because I didn't know what was compromised.  So
14  I gave to the police everything.
15  Q.      And what do you mean by "everything"?
16  A.      In other -- I gave them all the
17  correspondence that I had.  I gave them my
18  e-mail address in Cupron, in Argaman, and my
19  e-mail and Gmail address.  I gave them a bank
20  transfer information.
21  Q.      Okay.  So it sounds like you took a file
22  with you down to the police station?
23  A.      Well, it wasn't really very much of a
24  file because it wasn't -- you know, it's a

Page 139

1  correspondence that you have.  The police were
2  not able to do anything.
3  Q.      Okay.  I was going to get there.  But
4  you did provide some documentation to the police
5  in connection with the filing of the police
6  report?
7  A.      Correct.
8  Q.      Okay.  What about within Argaman itself,
9  what did -- what happened there in connection
10  with this?
11  A.      The -- we notified Kakadu.  But I don't
12  -- no action was taken after that.  I think
13  they raised the level of our firewall
14  subsequent to this, but what they did tell me
15  was that once the hacker was in, he was in, and
16  there was no way of knowing that he was in.
17  Q.      Did any other e-mail account at Argaman
18  have this similar or the same problem as yours
19  with the hacking?
20  A.      No, no.  No.
21  Q.      Did you ever ask -- did you ever ask
22  anyone to investigate whether your Gmail account
23  had been compromised?
24  A.      No, I did not.

Page 140

1  Q.      Do you recall anything else, Jeff, as to
2  what Argaman did in-house in connection with
3  this event?
4  A.      The only thing I can say, if I recall
5  correctly but I'm not sure, I believe everybody
6  was told to change their passwords.  And the
7  level of the wall was increased.  But I
8  don't -- and I'm pretty sure that that's what
9  we did.  But I can't --
10  Q.      Nothing else -- I'm sorry.
11  A.      But I can't -- nothing else, no.
12  Q.      Nothing else comes to mind?
13  A.      No.  What did happen was when we went
14  to the police, they kind of, like, you know,
15  they've seen this lots of times before.  And,
16  you know, they said -- they told us what they
17  thought, you know, that it was Chinese.  And if
18  I'm not mistaken, Cliff -- they maybe even
19  identified the hacker, the person who stole the
20  money.
21  Q.      Who did?
22  A.      The police in Hong Kong.  But he's not
23  in Hong Kong, he was in China.
24  Q.      What else did you learn about this

Page 141

1  individual?
2  A.     I didn't learn anything about the
3  individual.  What I learned about was the fact
4  that the Chinese government was very happy
5  about people who stole money from people in the
6  west, because it was just income to the
7  country.  But -- you know, but that was an
8  attitude.
9  Q.     Okay.  I'm going to share one more
10  document, hopefully, and that's it with you,
11  Mr. Gabbay.
12  A.     Whatever you want.  Jeff, call me Jeff.
13  Whatever you want.
14  Q.     Okay.
15  A.     Hold on one second.  We've been here so
16  long that I need to turn some lights on.  It's
17  starting to get dark here.
18  Q.     All right.  What I'm showing you here is
19  what I marked as Exhibit-2 to your deposition.
20           (Whereupon, Exhibit-2 was
21           marked as of this date and is attached
22           hereto.)
23  BY MR. HILL:
24  Q.     And I confess, I looked you up on the

Page 142

1  internet, you're a very impressive person, and I
2  came across this article called the "The Man
3  Behind the Masks."  Do you see that?
4  A.     Yes, I do.  I remember the article.
5  Q.     Do you?
6  A.     Yeah.
7  Q.     And in February of 2020, I guess right
8  when COVID was about to hit, right?
9  A.     Well, it was -- no, COVID had already
10  hit.  What I do remember about the days, I get
11  chemotherapy once a month.  I've had cancer
12  three times, so that was the day that I had my
13  chemo, which is never a good day.
14  Q.     All right.  And have you seen a print
15  copy of this article before?
16  A.     No.  I actually -- I don't think I even
17  read it.
18  Q.     Okay.
19  A.     I'll be honest with you, I don't read
20  this kind of stuff.  You know, if somebody told
21  me about it, I didn't get the magazine.  If the
22  magazine didn't land on my desk, I wouldn't
23  have bothered with it.  There are a lot of
24  things written about me, so it doesn't -- you

Page 143

1  know, what they were -- what they were looking
2  at in the article, I don't know what the
3  article said.
4           But remember, at the very beginning of
5  this conversation, we discussed the issue of
6  the development of a self-sterilizing textile,
7  and my discussions with the FDA were to create
8  a new category of antimicrobial textiles.
9  Textiles is a big issue in the FDA in our
10  world.  They're generally called antimicrobial,
11  which doesn't really very -- mean very much to
12  the scientific community.
13           The issue with a self-sterilizing
14  textile is that you're able to destroy bacteria
15  in less time than bleach.  So any bacteria from
16  this virus that touches the fabric will be
17  destroyed.  Now, if you're wearing a mask that
18  has that technology in it, then you cannot
19  breathe a virus through that mask.
20  Q.     Okay.
21  A.     Okay?  So therefore, the FDA will allow
22  disease prevention claims specifically for a
23  mask that would be made from these fabrics.
24  Q.     Excellent.  Let me -- I'm not going to

Page 144

1  go into this article in detail, I just thought
2  it was interesting and I wanted to mark it.  But
3  I do have one question --
4  A.     Sure.
5  Q.     -- before I let you go.
6  A.     Make it a little -- I can't see it, but
7  make it bigger so I can see what you want --
8  Q.     Yeah.  Let me find what I need.
9  A.     Okay.
10  Q.     Before I ask the question, I just want
11  to orient just for the record.  It appears to be
12  an article written by a Gedalia Guttentag.
13  A.     Yeah, Gedalia Guttentag.  Yes.
14  Q.     Okay.  And dated February 26th, 2020,
15  that's probably the publishing date is my guess.
16  A.     That was a publishing date.  But it was
17  -- the interview was less than a week before
18  then.  I was surprised.
19  Q.     Okay.  Excellent.  So the interview
20  would have been in February then?
21  A.     Oh, yeah.  Yeah, yeah.  It would have
22  been the end of February.  It would have been,
23  you know, February 18th, 19, something like
24  that.

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 145

1  Q.     All right. And then we have -- the one
2  question I have is right here in the middle, and
3  I'm going to get the -- I'm going to get the
4  pronunciation wrong, I apologize. "Unlikely as
5  it sounds in grimy Talpiot --
6  A.     Can you make it bigger, so I can see
7  what they're doing? Just open it -- just make
8  it a little larger, please. Okay.
9  Q.     Okay there?
10  A.     Right. That's fine. "Unlikely as it
11  sounds in grimy Talpiot, Argaman has been the
12  target of an industrial espionage, although
13  Jeff won't say much. 'I see who comes to
14  visit' is all he'll say. But as long as we
15  produce our materials here, you can't reverse
16  engineer them - the process is too complex."
17  All right. So I'm going to tell you what that
18  was referring to.
19  Q.     Well, let me ask the questions.
20  A.     Okay. Go ahead.
21  Q.     Yeah.
22  A.     Because you're going to be surprised
23  when you hear the answer. Go ahead.
24  Q.     All right. Maybe I shouldn't ask the

Page 146

1  question then.
2  A.     Ask the question.
3  Q.     Well, the industrial espionage, is it
4  true that Argaman had been the target of that?
5  A.     For a different project.
6  Q.     It was a different project?
7  A.     It was a different project.
8  Q.     But didn't you tell me earlier today
9  when we first met that people were constantly
10  trying to understand and steal your technology?
11  A.     People were fascinated by the
12  technology. And we were especially --
13  especially at that particular time, this
14  country had an invasion of Chinese investors.
15  We never allowed a Chinese investor to enter
16  our company. But the espionage that was
17  referred to here was for a different project
18  and not -- not from a Chinese.
19  Q.     Let's go down -- that prompted another
20  question. Right here, "So who are the
21  customers." And these are in quotations, "We
22  sent 3 million to Hong Kong with whom I had a
23  business relationship." And then you refer to
24  the TAL Apparel Group, correct?

Page 147

1  A.     That is correct.
2  Q.     And you've talked about them with me
3  earlier today?
4  A.     That is correct.
5  Q.     Is that --
6  A.     We didn't send -- we didn't send 3
7  million masks, we sent them enough textile
8  materials for 3 million masks.
9  Q.     Okay. And how about the next quotation
10  attributed to you, the TAL Apparel Group, based
11  on -- whoop, excuse me.
12  A.     The TAL Apparel Group -
13  Q.     Group based --
14  A.     -- based there --
15  Q.     -- there --
16  A.     -- is Hong Kong.
17  Q.     Right. One of --
18  A.     It's one of the world's --
19  Q.     -- the world's biggest --
20  A.     -- biggest global manufacturers. And
21  they're invested in Argaman. That is correct.
22  Q.     That's a true quote from you?
23  A.     That is correct. And if I'm not
24  mistaken, actually a lot of those fabrics went

Page 148

1  to an American customer called Cintas, but I
2  don't know for sure.
3  Q.     All right. And then the next quote
4  attributed to you is, and I'll read this
5  time, "Singapore wants it too, and the Spanish
6  Embassy was just in contact. We shipped some to
7  Putin, and 2,000 to China's president Xi."
8  A.     Xi, that's correct.
9  Q.     That's a correct quotation?
10  A.     Yeah. We received a request from the
11  Russian embassy to -- they wanted masks
12  specifically for Mr. Putin. Boy, was that a
13  mistake. Should never have sent them. Anyway,
14  so he's -- he wore the masks. And then we got
15  a request to the Chinese Embassy to send 2,000
16  masks to China for president Xi's cronies, I
17  guess.
18  Q.     But they weren't actually masks sent
19  from Argaman --
20  A.     Those were actually masks. Those were
21  actually masks.
22  Q.     -- that were manufactured in Israel?
23  A.     Yeah. Yeah, yeah. We manufactured in
24  Israel. And they paid full price for them.

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 149

1  Q.     Okay.  Well, listen, I appreciate your
2  time.  I'm probably going to need about five
3  minutes just to make sure I didn't miss
4  something, and --
5  A.     No problem.
6           MR. HILL:  -- if we could just
7      take a -- let's take a break until
8      noon, if you don't mind, my time.  And
9      then I'll either be wrapped or I'll be
10     very close.  Okay?
11          THE WITNESS:  Okay.  So I'll
12     you in 10 minutes.
13          MR. HILL:  Okay.  Thank you.
14          THE WITNESS:  Thank you.
15          (Whereupon, a recess was
16     taken.)
17          MR. HILL:  Now, the first
18     thing I want to do is I had referenced
19     and we looked at, through the shared
20     screen, a memo that Cliff Rieders did.
21          And Stephanie, you don't have
22     that but I'll send it to you.  But I
23     think we should mark that as Gabbay
24     Exhibit No. 3.  Okay?

Page 150

1           (Whereupon, Gabbay-3 was
2      marked as of this date and is attached
3      hereto.)
4  BY MR. HILL:
5  Q.     And then, Jeff, I just have a few more
6  for you.  Thank you.  I just want to make sure
7  I'm clear on this.  Is it fair to say that you
8  were using your e-mail account for business
9  purposes during June and July of 2019?
10 A.     Yes.
11 Q.     And did you, while using that -- using
12 that Argaman e-mail account, to your knowledge,
13 ever receive any alerts or warnings or notices
14 about any suspicious activity during the time
15 frame, June to July?
16 A.     I did not receive any notifications or
17 indications at all.
18 Q.     And how often would you look at your
19 e-mail, you know, heck, we use it all the time
20 all day here, but what about you back then?
21 A.     Right, all day, every day, all the
22 time.
23 Q.     And can you -- have you ever told
24 someone at a cocktail party, "I usually get

Page 151

1  about this number of e-mails a day" --
2  A.     No.
3  Q.     -- or ever calculate that?
4  A.     No, I never count -- I never cared.
5  Q.     Would you get many, many e-mails on any
6  given date during the business?
7  A.     No, no.  Not really.  I mean, I would
8  get a -- I don't know what a normal day would
9  be.
10 Q.     Mm-hmm.
11 A.     But remember, a lot of the time, you
12 know, I'm very responsive.  So if I was in the
13 lab and I couldn't get to my desk, if it was
14 something that required my immediate attention,
15 then I would respond in my phone.  But normally
16 during the day, you know, I try to have an
17 empty inbox as much as possible.
18 Q.     Meaning, that you read them fairly
19 quickly and respond --
20 A.     And respond, correct.
21 Q.     And at Argaman, what software did you
22 use for purposes of mail?
23 A.     I don't know.  I don't know enough --
24 I don't know.

Page 152

1  Q.     You might remember you talked about your
2  calendar.  Was it Microsoft or --
3  A.     Oh, it was -- it was a -- maybe it was
4  Microsoft Outlook.
5  Q.     Is that what you think, sitting here
6  today?
7  A.     Yeah, that's what I think.
8  Q.     Okay.  And --
9  A.     You know, I just know that I had a --
10 you know, my -- the purpose I use a computer
11 for is e-mails and -- you know, and writing up
12 notes.  But, you know, I don't need -- you
13 know, I don't need all these programs that they
14 have.  And that's just -- I use correspondence.
15 Q.     Do you remember, as we're sitting here
16 today, which version of the Microsoft software
17 Argaman was using?
18 A.     You're asking me questions way out of
19 my league.
20 Q.     I'll take that as a "no."
21 A.     You know, ask me whether it's gram-
22 positive or gram-negative bacteria, I can
23 answer you, but you know.
24 Q.     Now, we've painstakingly, I think, gone

Page 153

1  through a litany of the chronology of these
2  e-mails.  And I just want to make sure I'm right
3  on this.  For those that you've told me today,
4  and we won't go through them again, that you
5  believe were fake e-mails and not you,
6  Mr. Gabbay, that you testified you did not
7  receive or never saw, did they ever appear into
8  your inbox --
9  A.    No, I would have --
10  Q.    -- to the best of your knowledge?
11  A.    I would have told you if they did.
12  Q.    Mm-hmm.
13  A.    And believe me, I would remember them.
14  That question is completely rhetor -- of course
15  I would have told you if I'd seen them.
16  Q.    Okay.  So do you know an individual by
17  the name of Douglas Goldstein?
18  A.    Yes.  Douglas Goldstein is the guy who
19  was going to be our financial advisor, and he
20  is the head of Profile.  That was the name I
21  couldn't remember.
22  Q.    And did he become your point person,
23  financial advisor of Profile?
24  A.    We never got the money to him.  So the

Page 154

1  account was opened and ready to receive the
2  money, and then I notified them that the money
3  was, you know, stolen.
4  Q.    And did you -- do you remember e-mailing
5  -- or how did you communicate with Mr. Goldstein
6  in connection with him potentially being your
7  financial advisor?
8  A.    Telephone.
9  Q.    Not by e-mail at all?
10  A.    No.  Because his office is just a six
11  -- a five- or six-minute walk from here.  And
12  when I last corresponded with him, I asked him
13  please do not close the account.
14  Q.    But I know --
15  A.    But when I last -- when I last
16  corresponded with him, I asked him, "Please do
17  not close the account," because we were hopeful
18  to get the -- you know, to recover some of the
19  funds.
20  Q.    But just so that I'm clear, you don't
21  remember ever e-mailing Mr. Goldstein in
22  connection with this potential relationship?
23  A.    I probably -- I think no.  I think we
24  did it by phone.  I don't remember.  I don't

Page 155

1  think I e-mailed him.  I think we did it by
2  phone.
3  Q.    And I know you mentioned that you're a
4  multi-time cancer survivor, and God bless you,
5  sir, for that.  But I should ask you, are there
6  any meds that you're taking now that have
7  impaired, in your opinion, your ability to
8  recall past events?
9  A.    Absolutely no.  No, I take what's
10  called a somatostatin, which is an enzyme
11  inhibitor, which stops the possible progress of
12  cancer nodules that I still have, for which
13  there is not even a reaction.  And I take that,
14  say, injection I get once a month.  I'm
15  actually due to get it in about another hour
16  and a half.  And, you know, the joke that I
17  always make here is, what do I have in common
18  with horses, and the answer is the needle.
19  Because it's a big injection and the nurse
20  comes to the house to give it to me.  But I
21  don't have any reactions to it.
22  Q.    Just checking my notes.
23        MR. HILL:  That's all I have
24  for now, Mr. Gabbay.  Thank you for

Page 156

1  your time.  I think your lawyer will
2  explain the process from here if he
3  doesn't have any questions.
4        MR. POLIQUIN:  I just have a
5  few follow-up questions.  It hopefully
6  won't take too long.
7        - - -
8        CROSS-EXAMINATION
9        - - -
10  BY MR. POLIQUIN:
11  Q.    Mr. Gabbay, in his capacity as your
12  attorney, did Mr. Conaway have general knowledge
13  regarding your business associates and your
14  businesses that you were affiliated with?
15  A.    No.  I don't think so.  We haven't
16  really sat and discussed it.
17  Q.    Now, Mr. Hill was talking to you about
18  some e-mails, and he asked you about a string of
19  e-mails.  So if we could go to, I believe it's
20  page 35, I believe it is.  Let's see.  35.
21  A.    I got it.  Okay.
22  Q.    And some of these strings are a little
23  bit confusing, so that's why I think there was a
24  lot of questions on this.  Let's see.  I can get

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 157

1    there.  Oh, well, it looks like under -- this is
2    CL35.  There's an e-mail that you -- I believe
3    you confirmed that you sent that, said in
4    anticipation of a question that will be asked,
5    concerning the source of -- of, I believe --
6    A.    Yeah, that was a typo, yes.  Mm-hmm.
7    Q.    "You'll need to present proof of
8    origin"?
9    A.    Correct.
10   Q.    And Cliff responds, "Tax authorities
11   won't care," apparently in direct response to
12   that, it looks about five minutes later.  Do you
13   see that?
14   A.    Yes, I see it.  But Cliff was referring
15   to tax authorities in the United States.
16   Q.    I understand --
17   A.    I'm referring --
18   Q.    -- I'm not --
19   A.    -- to tax authorities in Israel.
20   Q.    Wait for my questions.  All right?
21   A.    Okay.  Sorry.  Yeah.
22   Q.    Then we go to -- if you go to CL0040,
23   which was -- I mean, Mr. Hill was questioning
24   you on.

Page 158

1    A.    Yes.
2    Q.    It looks like you state -- and this is
3    the same day of those past two e-mails that we
4    just saw where there's a little banter between
5    you and Cliff regarding tax authorities and
6    where's the source of the funds.  And you -- in
7    this e-mail you say, "U.S. thinks we're all drug
8    dealers working for undeclared cash.  We have to
9    prove we're not."  Does that e-mail look like it
10   could have been actually a response to Cliff's
11   e-mail regarding source of funds and your e-mail
12   -- and the string where you talk about source of
13   funds?
14   A.    It could have been --
15              MR. HILL:  Objection to form.
16         Objection to form.
17   BY MR. POLIQUIN:
18   Q.    That's fine.  You can still answer.
19   A.    I can't -- all right.  I can't respond
20   to that.  Because if you look at Bernie's it
21   says, "As far as needing something else, I have
22   the love of a good woman," I would have also
23   responded to --
24   Q.    I understand that.  That's part of the

Page 159

1    chain, too, but that's before those other
2    e-mails regarding the origin of the funds.
3    A.    Yeah.  But --
4    Q.    Doesn't this -- doesn't this response
5    look more in line with talking about where these
6    funds are -- you know, proving --
7    A.    Yes.
8    Q.    -- the origin of funds?
9    A.    It is, it is.
10              MR. HILL:  Objection.
11         Objection to form.
12              MR. POLIQUIN:  That's fine.
13              THE WITNESS:  Yeah.  Your --
14   BY MR. POLIQUIN:
15   Q.    So -- I mean, could it make sense that
16   you just responded to the wrong chain of e-mails
17   and responding to these --
18              MR. HILL:  Same objection.
19         Same objection.
20              MR. POLIQUIN:  That's fine,
21   Mr. Hill.
22              THE WITNESS:  So my answer to
23   that, is that the USA thinks we're all
24   drug dealers could have been the

Page 160

1    response to Bernie, not to Cliff.  It
2    could have been to Bernie.  In other
3    words --
4    BY MR. POLIQUIN:
5    Q.    When you say to Bernie, doesn't it --
6    A.    Take away the U.S. or Hong Kong, my
7    e-mail could have been in response to, as far
8    as, you know, needing something else.
9    Q.    Okay.  Can it also have been the
10   response regarding the -- talking about tax, you
11   know, with origin of funds --
12              MR. HILL:  Same objection.
13              THE WITNESS:  It could have
14   been.  Remember that we don't want any
15   trouble with any tax authorities,
16   whether they're in the United States or
17   in Israel.  And you don't want your
18   money to get to the bank and the bank
19   will not disburse the funds because
20   you're missing documentation.  And
21   that, by the way, happens a lot.
22   BY MR. POLIQUIN:
23   Q.    In this e-mail, you're saying USA thinks
24   we're all drug dealers working with undeclared

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 161

1    cash.  We have to prove we are not.
2    A.    That's correct.
3    Q.    Wouldn't that make sense that you're
4    talking about the origin of the Cupron funds?
5    A.    Yes --
6              MR. HILL:  Objection.
7              THE WITNESS:  -- we're talking
8         about the origin of the Cupron funds.
9    BY MR. POLIQUIN:
10   Q.    Okay.  Have ever -- the funds that were
11   sent by Mr. Conaway where actually it was
12   discussed that it was sent to a Argaman Trading
13   Company.  Do you recall that?
14   A.    I recall that afterwards, that's what
15   came to me, yes, in Hong Kong.
16   Q.    And have you ever discussed with
17   Mr. Conaway being affiliated with a Argaman
18   Trading Company?
19   A.    Absolutely not.  Because I had no
20   association with them.  I didn't know who they
21   were.
22   Q.    And if Mr. Conaway had called you
23   regarding Argaman Trading Company, what would
24   you have told him your affiliation with that --

Page 162

1    A.    No, I --
2              MR. HILL:  Objection.
3              THE WITNESS:  -- would have
4         told him --
5              MR. HILL:  Objection.
6    BY MR. POLIQUIN:
7    Q.    You can still answer it.
8    A.    Okay.  I would have said, "Who are
9    they?  I don't know who they are."
10   Q.    I believe you had testified that you
11   actually had talked to Bernie regarding the
12   transmission of these funds to you over the
13   phone around June 11th?
14   A.    Correct.  I don't know the exact time,
15   but there was one phone call, at least.
16   Q.    Okay.  If you could go to 267.
17   A.    Yes.  Oh, yes, I have it in front of
18   me.
19   Q.    Okay.  That's an e-mail from yourself to
20   Bernie regarding -- excuse me, hold on one
21   second.  Let me get -- getting knocked off my
22   screen.  And it says -- it's a July 2nd, 2019
23   e-mail at 8:16 a.m. --
24   A.    Correct.

Page 163

1    Q.    -- to yourself, where you copy your
2    wife, Shoshanna, and Cliff on it.
3    A.    Correct.
4    Q.    And you say, "Shoshanna and I sat with
5    our financial advisor.  We have signed the
6    necessary forms and you will be receiving from
7    us in the next week or so.  Instructions for the
8    transfer of funds to an account in the USA."
9    A.    That's correct.
10   Q.    Was that e-mail consistent with your
11   phone call to --
12   A.    Yes.
13   Q.    -- Mr. Conaway?
14   A.    Oh, yes.  Absolutely.  Absolutely.  And
15   by the way, that was when I said Shoshanna and
16   I sat with the financial advisor, that was
17   Douglas Goldman [sic].
18             MR. POLIQUIN:  I don't have
19        any further questions.  Thank you.
20             MR. HILL:  Nothing further
21        from me.
22             MR. POLIQUIN:  We would like
23        to read and sign.
24             THE COURT REPORTER:  Mr. Hill,

Page 164

1    do you usually get a full-sized
2    transcript, a mini or both?
3              MR. HILL:  I usually just get
4    the mini.  PDF.  No rush.
5              MR. POLIQUIN:  The PDF,
6    electronically, please.  Mini version's
7    fine.  No rush.
8                   -  -  -
9         (Whereupon, the deposition
10   testimony of JEFFREY GABBAY was
11   concluded at 12:21 p.m.)
12                  -  -  -
13
14
15
16
17
18
19
20
21
22
23
24

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

Page 165

```
 1              - - -
 2       C E R T I F I C A T I O N
 3              - - -
 4
 5
 6    I, Stephanie Weldon, Court Reporter and
 7  Notary Public, do hereby certify that the
 8  proceedings and evidence are contained fully
 9  and accurately in the stenographic notes taken
10  by me on Thursday, March 16, 2023, and that the
11  foregoing testimony was taken in shorthand by
12  myself and reduced to typing under my direction
13  and control and that this is a correct
14  transcript of the same.
15      Stephanie Weld
16    --------------------
      Stephanie Weldon
17    Notary Public
      My Notary Expires
18    September 06, 2025
19
20    (The foregoing certification of this
21  transcript does not apply to any reproduction
22  of the same by any means, unless under the
23  direct control and/or supervision of the
24  certifying reporter.)
```

Page 167

```
 1      ACKNOWLEDGMENT OF DEPONENT
 2
 3      I, [JEFFREY GABBAY], do hereby
 4  certify that I have read the foregoing
 5  pages, and that the same is a correct
 6  transcription of the answers given by me
 7  to the questions therein propounded,
 8  except for the corrections or changes in
 9  form or substance, if any, noted in the
10  attached errata sheet.
11
12  DATE
13    _____
14
15  Subscribed and sworn to before me.
16  My commission expires September 2025.
17
18
19          Stephanie Weldon
20          Notary Public
21
22
23
24
```

Page 166

```
 1       - - - - - - - -
 2       E R R A T A
 3       - - - - - - - -
 4   PAGE    LINE      CHANGE
 5   - - -   - - -   - - - - - - - - - - - -
 6   - - -   - - -   - - - - - - - - - - - -
 7   - - -   - - -   - - - - - - - - - - - -
 8   - - -   - - -   - - - - - - - - - - - -
 9   - - -   - - -   - - - - - - - - - - - -
10   - - -   - - -   - - - - - - - - - - - -
11   - - -   - - -   - - - - - - - - - - - -
12   - - -   - - -   - - - - - - - - - - - -
13   - - -   - - -   - - - - - - - - - - - -
14   - - -   - - -   - - - - - - - - - - - -
15   - - -   - - -   - - - - - - - - - - - -
16   - - -   - - -   - - - - - - - - - - - -
17   - - -   - - -   - - - - - - - - - - - -
18   - - -   - - -   - - - - - - - - - - - -
19   - - -   - - -   - - - - - - - - - - - -
20   - - -   - - -   - - - - - - - - - - - -
21   - - -   - - -   - - - - - - - - - - - -
22   - - -   - - -   - - - - - - - - - - - -
23   - - -   - - -   - - - - - - - - - - - -
24   - - -   - - -   - - - - - - - - - - - -
```

Gabbay vs
Conaway

Jeffrey Gabbay
March 16, 2023

**$**

**$15,000** 131:4,7
**$2,000** 34:18
**$26,000** 105:10
**$4.7** 25:5
**$426,000** 35:17 135:8
**$444,000** 36:10
**$9** 24:3

**-**

**-E-L-L** 91:12
**-H-A** 91:10

**0**

**00053** 72:14 74:19
**0027** 86:8
**0054** 115:7
**070920191** 115:20

**1**

**1** 33:3 61:22 75:24 76:2,3,11 81:16 82:13 89:8,15 116:18,19 117:15 125:9
**1/5/20** 76:10 116:14
**10** 12:8,13 52:23 53:3 108:19 111:11 112:1 149:12
**10:09** 91:24
**10:35** 92:18
**11** 66:17 70:16 72:23 73:4,16 74:4,18 75:6
**11th** 68:14 75:8,11 162:13
**12:10** 89:8,16
**12:22** 94:19 96:9
**14** 6:5
**141** 3:15
**15** 12:13 66:15 69:23 72:23 126:14 132:8
**15,000** 130:15
**150** 3:16

**156** 3:6
**18** 115:6,17 118:8 119:3,13 120:11,22 121:23
**18th** 115:13 144:23
**19** 73:20 74:3 77:20,22 144:23
**1973** 8:8 34:22
**1993** 11:12
**1:12** 96:13
**1:24** 126:14
**1:46** 128:17
**1:47** 134:12 135:15
**1st** 74:21,22 81:8 82:15 88:11 113:21

**2**

**2** 54:11 83:17 96:12 103:8 132:7
**2,000** 148:7,15
**20** 77:19
**200** 43:6
**2000** 16:15 23:21
**2009** 124:4
**2010** 16:15,23 17:14,16,19,20
**2013** 18:9,11 19:18 23:23
**2014** 23:24 24:2,7
**2017** 30:17
**2019** 35:11 43:23 48:17,23 49:6 51:8, 18 52:3 54:11 64:5 66:3,17 68:14,17, 22 71:10 81:16 83:17 84:18 86:24 89:15 94:18 96:12 113:17 122:16 124:1 133:2 134:8 150:9 162:22
**2020** 29:2 116:20 117:15 142:7 144:14
**2021** 19:15,19 22:20 24:2 45:23 46:17 60:4 90:13
**2022** 19:15 45:24
**21** 19:16
**21:02** 101:11,13
**22** 80:2
**23** 125:9
**23rd** 122:16 124:1,4
**24** 81:7 88:10,13,14
**24-** 112:16

**25** 8:8 9:24 18:19 80:5
**25-hour** 112:16
**252** 114:22
**26** 82:6,10 83:7,18 85:24 88:14 99:14, 15 100:15
**262** 108:4
**267** 162:16
**268** 62:10 108:4 109:3 110:21 111:5
**26th** 130:6,23 133:2 144:14
**27** 86:10 89:10,13 105:15 134:12
**27th** 128:17 133:24 134:8
**28** 91:13
**2:02** 101:12,18,23
**2nd** 80:11,23 81:11 86:13,23 87:17 89:16 91:24 93:8 94:18 96:9 101:4 162:22

**3**

**3** 54:14 55:15 63:14,22 66:3,9,11 72:20,21 146:22 147:6,8 149:24
**30** 16:10
**31** 92:6 93:5
**34** 3:14
**35** 156:20
**36** 101:14
**3:16** 84:22,23
**3:49** 103:9
**3rd** 64:5

**4**

**4** 3:5
**40** 100:13 102:24 103:8
**400** 35:14,16
**420** 36:13
**426** 36:24
**444** 36:21 37:7
**4:16** 84:22
**4:44** 66:17
**4th** 111:14

**EXHIBIT B**



EXHIBIT
GABBAY
1

**Subject:** Gabbay v Cupron - Executed Documents/Funding
**Date:** Thursday, May 30, 2019 at 9:42:15 AM Eastern Daylight Time
**From:** Bernard Conaway <bgc@conaway-legal.com>
**To:** Steve Brauerman <SBrauerman@bayardlaw.com>, Jay Moore <tjaymoore3@gmail.com>
**CC:** Cliff Rieders <crieders@riederstravis.com>

Steve/Jay:

I have physical possession of the following documents, each notarized and bearing original signatures:

1. Stock Power and Assignment Separate from Certificate
2. Cupron Stock Certificate No. 2164

I also have possession of the *First Amendment to Confidential Settlement Agreement Including Mutual General Releases* bearing original signatures.

Per the *Confidential Settlement Agreement Including Mutual General Releases*, at paragraphs 3.1 and 3.2, Cupron is to fund the settlement of $444,990.00. Thereafter the documents listed above will be delivered to Steve Brauerman. Settlement funds will be held in my escrow pending delivery to Steve. Once delivered, the settlement funds will be released.

I understand that Cupron will be wiring the money to my Firm's escrow account. Wire information is below:

Wire Instructions
Bank Name:                WSFS
Routing Number:           031100102
Address of Bank:          500 Delaware Ave, Wilm., DE 19801
Creditor's Name:          Conaway-Legal LLC
Creditor's Account No:    211173919

Please confirm when the wire is complete.

As always, thank you.

Bernard G. Conaway, Esquire
CONAWAY-LEGAL LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

**Confidentiality Note**: This email is covered by the Electronic Communications Privacy Act,

**Subject:** Re: Gabbay v Cupron - Executed Documents/Funding
**Date:** Friday, May 31, 2019 at 5:54:53 AM Eastern Daylight Time
**From:** Bernard Conaway <bgc@conaway-legal.com>
**To:** Steve Brauerman <SBrauerman@bayardlaw.com>

Steve:

Confirming receipt of Cupron's wire into my Firm's escrow account. All things considered, I'd like to hand deliver the documents to you. Are you available this afternoon and, if so, when?

Thank you.

Bernard G. Conaway, Esquire
Conaway-Legal LLC

Sent from a remote location.

**From:** Steve Brauerman <SBrauerman@bayardlaw.com>
**Sent:** Thursday, May 30, 2019 10:32:57 AM
**To:** Bernard Conaway; Jay Moore
**Cc:** Cliff Rieders
**Subject:** RE: Gabbay v Cupron - Executed Documents/Funding

Bernie,

    I have received confirmation that the wire has been sent. Please let me know when you receive it.

Steve

Stephen B. Brauerman
Director
BAYARD, P.A.
+1 302-429-4232
sbrauerman@bayardlaw.com
My Bio | V-Card | LinkedIn

**From:** Bernard Conaway <bgc@conaway-legal.com>
**Sent:** Thursday, May 30, 2019 9:42 AM
**To:** Steve Brauerman <SBrauerman@bayardlaw.com>; Jay Moore <tjaymoore3@gmail.com>
**Cc:** Cliff Rieders <crieders@riederstravis.com>
**Subject:** Gabbay v Cupron - Executed Documents/Funding

Steve/Jay:

**Subject:**   Gabbay v. Cupron - Instruction Requested

**Date:**   Monday, June 3, 2019 at 11:28:30 PM Eastern Daylight Time

**From:**   Bernard Conaway <bgc@conaway-legal.com>

**To:**   Jeff Gabbay <Jeff@argamantech.com>

**CC:**   Cliff Rieders <crieders@riederstravis.com>

**Attachments:** Affidavit of Lost Stock Certificate.pdf, Affidavit of Uncertificated Stocks[3].docx

Jeff:

I am currently holding settlement funds paid by Cupron in my Firm's escrow account. I need instructions from you on how/where you want those funds delivered. I wish that this was the only issue remaining.

I did not have time today to discuss any of what follows with Cliff. I apologize to both of you for that.

Today Cupron pulled a new rabbit out of their @$$. They raised an issue relating to your pre-2015 shares (being 15,042 shares). They now request an affidavit that confirms that the stock certificate for those shares is lost, that the shares are not subject to liens or other claims, that you indemnify Cupron if someone makes a claim against those shares, and that the executed affidavit bear attestation. Cupron forwarded the affidavit for your signature. A copy is attached as a PDF. Setting aside the propriety of request, the affidavit itself is rife with factual mistakes, and incorrect presumptions requiring indemnification and attestation.

If some of this sounds familiar - it should. These issues were raised between you, Cliff and I. Initially, I sent an email to you explaining that the pre-2015 shares were uncertified, i.e., a stock certificate was never issued. The email also outlined how those uncertificated shares could be transferred to Cupron. My expectation then was that Cupron would likely ask for indemnification for the uncertificated shares. At the time, I recommend that if liens/encumbrances/etc., were not issue/concern, then indemnification should not be a concern. After that email discourse, on May 13, I emailed Cupron to tell them that the pre-2015 shares were uncertificated. I specifically asked how they wanted to facilitate the transfer of those shares. They responded promptly telling me that the uncertificated shares could be transferred by way of a Stock Powers Agreement that they would forward. The answer surprised me. Nonetheless, based on Cupron's instruction, you were asked to execute the Stock Powers Agreement. Executing and delivering the Stock Powers Agreement and Stock Certificate 2164 (representing the 2015 shares) resulted in the physical and legal transfer of all of your shares to Cupron.

At this point, my view is that you satisfactorily fulfilled the stock transfer obligations imposed by the Settlement Agreement. End of story – sort of. I can only release settlement funds from escrow when Cupron concurs that I can do so.

Here is the dilemma. There are several options. None are perfect.

1. Tell Cupron to go to hell. While I would find a measure of joy doing this, the process remains in limbo.

| | |
|---|---|
| **Subject:** | Gabbay v Cupron - Final Invoice |
| **Date:** | Thursday, June 6, 2019 at 4:49:57 PM Eastern Daylight Time |
| **From:** | Bernard Conaway <bgc@conaway-legal.com> |
| **To:** | Jeffrey Gabbay <jeffgabbay@gmail.com> |
| **CC:** | Cliff Rieders <crieders@riederstravis.com> |
| **Attachments:** | (215) Invoice - Gabbay v. Cupron (6-6-2019).pdf |

Jeff:

Attached is the Firm's final invoice for this matter. Of course, if you have questions about it, please bring them to me to discuss.

A few final notes. This litigation took too long and was too expensive. Much of that was due to Cupron's machinations.

Please know that I worked to lower every bill that I sent to you. I did that in several ways. First, every bill that I send is re-reviewed before the client gets it. That review is to re-evaluate time and billing. That process reduces time and therefore reduce the bill. Second, I never bill clients for piddling events – it's bad business and sours relationships. Third, long ago I decided that once a client retained me, I would not change my hourly rate. In two years working on this case, I never raised my hourly rate. Lastly, I refuse to allow an adversary's unreasonable, litigious conduct to drive my billing. To that end, I do not bill for every event and, as in your case, I stopped billing all together at the end of March.

I hope that you are satisfied with the service that I provided. If not, please let me know.

Finally, I would like your authority to withhold from the settlement proceeds, the amount due in the current invoice. Please confirm, on way or another, that I may do so. Also, I need instructions on where, when and how you would like the settlement funds transferred to you.

As always, thank you.

Bernard G. Conaway, Esquire
CONAWAY-LEGAL LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

**Confidentiality Note:** This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of CONAWAY-LEGAL LLC. Unauthorized use, disclosure or copying of this

# CONAWAY-LEGAL LLC

BERNARD G. CONAWAY, ESQUIRE

1007 NORTH ORANGE STREET, SUITE 400
WILMINGTON, DE 19801
(302) 428-9350
bgc@conaway-legal.com

ADMITTED IN DELAWARE

June 6, 2019

**BY EMAIL ONLY:** *jeffgabbay@gmail.com*
Jeffrey Gabbay

### ~ FINAL INVOICE FOR PROFESSIONAL SERVICES ~
*Books and Records Request - Cupron, Inc.*
*November 1, 2018 to June 6, 2019*

Client/Matter Number     2017.7.1
Statement Number     215

| Date | Description | Time | Amount |
|------|-------------|------|--------|
| 11/3/18 | Review and revise Cupron's document list to note issues, objections and concerns about access and usage limitations. Forward to Cupron's Delaware counsel. | 0.5 | $135.00 |
| 11/13/18 | Teleconference with C Rieders and Cupron's Delaware counsel regarding lack of progress with settlement discussions. Follow-up call with C Rieders. | 0.5 | $135.00 |
| 11/21/18 | Teleconference with Cupron's Delaware counsel regarding document discovery. | 0.3 | $135.00 |
| 12/2/18 | Teleconference with Cupron's Delaware counsel confirming that a new 220 letter need not be filed to secure access to information up to 2018 | 0.3 | $135.00 |
| 12/5/18 | Revise pretrial scheduling order to account for new trial date. Forward same to Cupron's counsel. | 0.2 | $90.00 |
| 12/7/18 | Draft letter to Court conveying revised pretrial scheduling order. | 0.2 | $90.00 |
| 12/10/18 | Teleconference with C Rieders regarding communication with Cupron's communication regarding 2018 information. access and document access. | 0.3 | $135.00 |
| 12/11/18 | Review Cupron's 2018 financials. Forward same to P Seitz requesting his views. | 0.4 | $180.00 |
| 12/15/18 | Review P Seitz's summary of the recently produced Cupron financials. Review multiple communication | 0.2 | $90.00 |

CL-0005

| Date | Description | Hours | Amount |
|---|---|---|---|
| | from C Rieders and J Gabbay regarding same. | | |
| 12/16/18 | Teleconference with C Rieders regard trial prep and related fact issues. | 0.3 | $135.00 |
| 12/26/18 | Respond to inquiry from C Rieders about moving forward strategy. | 0.2 | $90.00 |
| 12/28/18 | Draft outline of potential options moving forward. | 0.8 | $360.00 |
| 1/7/19 | Teleconference with C Rieders regarding J Gabbay's access to Cupron documents as a means of expediting document production. Draft communication to Cupron's Delaware counsel conveying proposal. Review and respond to multiple communications regarding the same. | 0.6 | $270.00 |
| 1/29/19 | Review email from Cupron's counsel threatening Rule 11 sanctions. Telephone call with C Rieders regarding same. | 0.3 | $135.00 |
| 1/29/19 | Review J Cudzik deposition regarding portion designated Highly Confidential. Review J Gabbay's deposition for inquiry related to competition and instructions not to answer. | 1.2 | $540.00 |
| 1/30/19 | Begin draft of Settlement Agreement. | 0.2 | $90.00 |
| 1/30/19 | Review Judge's recent opinions regarding 220 actions. Review recent Supreme Court opinion striking enforceability of limitations on plaintiff's use of documentation recovered in 220 action. | 0.7 | $315.00 |
| 2/4/19 | Complete draft of Settlement Agreement. | 0.5 | $225.00 |
| 2/5/19 | Teleconference with S Brauerman regarding settlement offer and problems with offer to produce records. Review communication from C Rieders regarding questions for the upcoming annual shareholder's meeting. | 0.5 | $225.00 |
| 2/5/19 | Review Cupron's expert's deposition for concession on information requested by P. Seitz. | 0.5 | $225.00 |
| 2/7/19 | Teleconference with P Seitz. | 0.2 | $90.00 |
| 2/11/19 | Draft Joint Exhibit List. Begin draft of Pretrial Stipulation. Review multiple documents in preparation for draft of Pretrial Brief. | 5.5 | $2,475.00 |
| 2/11/19 | Review draft letter to other Cupron shareholders. Review Revised 2016 Convertible Bridge Financing Facility. Review 5th Amended Certificate of Incorporation for reference to preferred stock rights. | 1.0 | $450.00 |
| 2/12/19 | Review 2014, 2015, 2016 and 2017 Consolidated | 2.7 | $1,215.00 |

| | | | |
|---|---|---|---|
| | Financials. Review 2016 Confidential Memoranda relating to Debt Conversion Financing. Respond to Cupron's Delaware counsel regarding settlement and revised draft Settlement Agreement. | 3.0 | $1,350.00 |
| 2/12/19 | Draft Pretrial Stipulation. | 0.3 | $135.00 |
| 2/20/19 | Draft communication to H Katz regarding potential tax issues relating to allocation of settlement consideration. | 0.5 | $225.00 |
| 2/20/19 | Teleconference with C Rieders regarding Cupron's proposed non-compete language.  Teleconference with Cupron's counsel and COB regarding settlement proposal.  Review H Katz's response to settlement allocation. | 0.4 | $180.00 |
| 2/21/19 | Respond to H Katz regarding tax quandary. Draft communication summarizing settlement conference with Cupron's Delaware counsel and TJ Moore. | 0.3 | $135.00 |
| 2/22/19 | Teleconference with P Seitz regarding tax issues, re-issuance of the 1099.  Teleconference with C Rieders regarding same and trial issues. | 0.7 | $315.00 |
| 2/22/19 | Teleconference with Cupron COB and Delaware counsel regarding settlement issues. | 0.2 | $90.00 |
| 2/22/19 | Teleconference with Court and opposing counsel regarding trial date and other obligations. | 1.5 | $675.00 |
| 2/24/19 | Review Cupron's 2014-16 Consolidated Financials. Review IRC 409A and valuation of options.  Draft email explaining to Cupron's counsel and COB why the 2015 option pricing is deficient under 409A. | 0.2 | $90.00 |
| 2/25/19 | Teleconference with P Seitz regarding option valuation, and documentary evidence already reflected in Cupron's records. | 0.2 | $90.00 |
| 2/26/19 | Draft communication to H Katz inquiring about proactive steps to address valuation with the IRS. | 0.3 | $135.00 |
| 2/28/19 | Teleconference with S Brauerman and TJ Moore regarding filing amended 1099. | 0.3 | $135.00 |
| 2/28/19 | Teleconference with C Rieders and H Katz regarding attempt to secure IRS account activity to verify that the 1099 was filed.  Convey substance of teleconference with Cupron regarding the 1099. | 0.2 | $90.00 |
| 3/1/19 | Teleconference with C Rieders regarding problems securing the IRS account activity. | 0.3 | $135.00 |
| 3/3/19 | Teleconference with C Rieders regarding IRS SOL and likelihood that it has passed.  Review 2015 Federal tax return for references to options and filing date. | 0.5 | $225.00 |
| 3/4/19 | Teleconference with C Rieders regarding IRS SOL and that, given the filing date, the FOL has not yet passed. Begin draft od Settlement Agreement. | 1.7 | $765.00 |
| 3/5/19 | Complete draft of Settlement Agreement.  Forward | | |

| | | | |
|---|---|---|---|
| | same to C Rieders for comment. Forward same to Cupron along with comments explaining certain provisions. | | |
| 3/8/19 | Respond to inquiry from L Getz, former IRS District Director, about settlement issues, SOL, Cupron valuation methodology, P Seitz' valuation ad observations. | 0.4 | $180.00 |
| 3/11/19 | Teleconference with C Rieders regarding tax issue and revisions to draft Settlement Agreement. Forward same to Cupron's counsel. | 0.5 | $225.00 |
| 3/12/19 | Review Cupron's draft of modified Settlement Agreement. | 0.3 | $135.00 |
| 3/21/19 | Draft communication to L Getz for input on valuation implications and complications, necessity for additional information from Cupron, or Cupron representations in the Settlement Agreement. | 0.4 | $180.00 |
| 3/22/19 | Teleconference with S Brauerman and T Jay Moore regarding settlement terms, addition of 3.10 language. | 0.8 | $360.00 |
| | **Total Time** | 30.1 | $13,545.00 |

| Timekeeper | Rate |
|---|---|
| Bernard G Conaway (BGC) | $450.00 |

**Expenses**

| | |
|---|---|
| File & Serve Xpress (Statutory Filing Fee – Q1 2019). See attached invoice. | $6.00 |
| File & Serve Xpress (Filing Fees – Mar 2019). See attached invoice. | $23.50 |
| File & Serve Xpress (Filing Fees – June 2019). See attached invoice. | $21.00 |
| **Total Expenses** | $50.50 |

| | |
|---|---|
| Total Time and Expenses | $ 13,595.50 |
| Less Escrow Balance Applied | $896.95 |
| **Final Balance** | $12,698.55 |
| **Less 20% Discount** | $2,537.71 |
| TOTAL DUE | $10,160.84 |

Page 4 of 5

**Retainer/Escrow Accounting**

Beginning Balance: November 1, 2018    $896.95
Ending Balance Due: June 6, 2019    $0.00

Federal EIN: 81-5098811

International Wire
Swift Code:          WSFCUS33
Routing Number:      031100102
Customer's Name:     Conaway-Legal LLC
Customer's Account Number:    210982310

Enclosures (3)

cc:    Clifford A. Rieders, Esquire (by email only *crieders@riederstravis.com*)

BGC/al

Page 5 of 5

Conaway Legal LLC

| | |
|---|---|
| Client ID: | 6107737501 |
| Invoice No: | 201902107737501 |

**File & ServeXpress™**

Please detach this portion and return it with your payment made payable to:

File & ServeXpress
P.O. Box 679058
Dallas, TX 75267-9058

Please Send Correspondence to:

File & ServeXpress
Attn: Accounts Receivable
500 E. John Carpenter Fwy Suite 250
Irving, TX 75062

Conaway Legal LLC

Attn: Bernard Conaway
1007 N Orange St Ste 400
Wilmington, DE  19801

Amount Due (USD):

| | |
|---|---|
| Invoice Date: | 01-Mar-2019 |
| Billing Period: | 201902 |
| Invoice No: | 201902107737501 |
| Customer ID: | 6107737501 |
| Terms: | Payments by check due net 10 days from date of receipt |

### Invoice Summary

Transaction Subtotal:

Adjusted Subtotal:

Sales Tax:

Court Fees / Postage:

Fee for Paper Invoice:

Total Charges:

Thank you for using File & ServeXpress.  If you have any comments or questions about your bill or the services we provide, please contact us at the number listed below.  Questions regarding past invoices must be submitted within 60 days of receipt of the invoice.

Please Note:
An interest charge of 1.5% per month will accrue on unpaid amounts thirty (30) days after the invoice date.In addition to the above charge, Court Fees not paid within thirty (30) days after the invoice date will bear an administrative fee of up to twenty percent (20%) of the outstanding statutory Court Fees

File & ServeXpress Client Support (888) 529-7587 - EIN 32-0506824

**Conaway Legal LLC**
**Client ID:**     6107737501
**Invoice No:**    201902107737501

**File & ServeXpress™**

## Filing / Service Charges

| Court | DE Court of Chancery Civil Action |
|---|---|

| | |
|---|---|
| **Case Number:** | 2017-0660-MTZ |
| **Case Style:** | Jeffrey S. Gabbay v. Cupron Inc. |

| | | **Authorized By:** | Bernard G Conaway |
|---|---|---|---|
| **Transaction ID:** | 62933175 | **Filed By:** | Bernard G Conaway |
| **Billing Ref:** | 2017.7.1 - Gabbay (Scheduling Order) | | 1 Page(s) |
| **Documents:** | Letter to the Honorable Vice Chancellor Morgan Zurn from Bernard G. Conaway Conveying Proposed Pre-Trial Scheduling Stipulated Order and Requesting that the Order be Signed Proposed Pre-Trial Scheduling Order | | 2 Page(s) |

**Parties:**    Gabbay, Jeffrey S (Plaintiff)

**Charges:**

| Product / Service | Date | | Client: | Matter: | |
|---|---|---|---|---|---|
| | | | **Fee** | **Tax** | **Total** |
| Filing | 2/5/2019 | 3:39:58PM | $9.00 | $0.00 | $9.00 |
| Online Service | 2/5/2019 | 3:39:58PM | $12.00 | $0.00 | $12.00 |
| Statutory Filing Fee | 2/5/2019 | 4:53:45PM | $1.25 | $0.00 | $1.25 |
| Statutory Filing Fee | 2/5/2019 | 4:53:45PM | $1.25 | $0.00 | $1.25 |
| **Total:** | | | **$23.50** | **$0.00** | **$23.50** |

| **Summary for Case** | 2017-0660-MTZ | $23.50 | $0.00 | $23.50 |
|---|---|---|---|---|

## Filing / Service Charges

File & Serve *Xpress*

**CHARGES ON ACCOUNT: 01-1077375**

File & Serve*Xpress*
500 E. John Carpenter Freeway / Suite 250
Irving, TX 75062

| Total Due: |
| --- |

## Per Page Statutory Filing Fees Invoice

Account: 01-1077375
Invoice Id: PQ119107737501

Payment term: NET 30
Invoice Date: April 13, 2019

01-1077375
Conaway Legal LLC
1007 N Orange St Ste 400
Wilmington, DE 19801

**Attn.: Bernard Conaway**

e-Invoice Contact e-mail: bgc@conaway-legal.com

This invoice is to bill for Per Page Statutory Filing Fee of every document filed
from 1/1/2019 to 3/31/2019
according to the Rule 3(bb) at the rate $2.00 for every page of the filed document

Please contact **Monica Jones (302) 255-2300** for per page filing-related inquiries

01-1077375

**Court Name: DE Court of Chancery Civil Action**

| Case Number | Case Name | Filing Description | Number of Pages | Fee Amount |
| --- | --- | --- | --- | --- |
| 2017-0660-MTZ | Jeffrey S. Gabbay v. Cupron Inc. | 2017.7.1 - Gabbay (Scheduling Order) | 3page(s) | $6.00 |
| DE Court of Chancery Civil Action Total | | | 3page(s) | $6.00 |
| Q1 2019 Per Page Fees Total | | | 3page(s) | $6.00 |

File & ServeXpress

Click to Print

Organization: **Conaway Legal LLC**
User: **All Users**
Court Name: **All Courts**
Case Name:
Case Number:
For: **June, 2019**

Printed on: 6/6/2019 15:08:48 GMT-0400 (Eastern Daylight Time)

**Billing Information**
**All Fees**

Search Created:
6/6/2019 15:08:48 GMT-0400 (Eastern Daylight Time)

*Itailic Items are Credit Card Transactions and they are not added to your fee totals.Others are part of your monthly billing.*

| Transaction ID / Alert ID | ▲Date | Product / Service | Total | Authorizer / Purchaser / Creator | Submitter | Billing Reference / Alert Name | Court | Case Number | Case Name |
|---|---|---|---|---|---|---|---|---|---|
| 63332876 | 6/6/2019 3:08:16 PM ET | Court Cost Recovery Fee | $0.00 | Bernard G Conaway | Bernard G Conaway | 2017.7.1 - Gabbay (Dismissal Order) | DE Court of Chancery Civil Action | 2017-0660-MTZ | Jeffrey S. Gabbay v. Cupron Inc. |
| 63332876 | 6/6/2019 3:08:16 PM ET | Filing | $9.00 | Bernard G Conaway | Bernard G Conaway | 2017.7.1 - Gabbay (Dismissal Order) | DE Court of Chancery Civil Action | 2017-0660-MTZ | Jeffrey S. Gabbay v. Cupron Inc. |
| 63332876 | 6/6/2019 3:08:16 PM ET | Online Service | $12.00 | Bernard G Conaway | Bernard G Conaway | 2017.7.1 - Gabbay (Dismissal Order) | DE Court of Chancery Civil Action | 2017-0660-MTZ | Jeffrey S. Gabbay v. Cupron Inc. |
| 63332876 | 6/6/2019 3:08:16 PM ET | Processing Fee | $0.00 | Bernard G Conaway | Bernard G Conaway | 2017.7.1 - Gabbay (Dismissal Order) | DE Court of Chancery Civil Action | 2017-0660-MTZ | Jeffrey S. Gabbay v. Cupron Inc. |

Totals: **$21.00**

**4 transactions**

6/6/19, 3:10 PM

CL-00013

**Subject:** Re: Gabbay v Cupron - Final Invoice

**Date:** Friday, June 7, 2019 at 12:01:15 AM Eastern Daylight Time

**From:** Jeffrey Gabbay <jeffgabbay@gmail.com>

**To:** Bernard Conaway <bgc@conaway-legal.com>

**CC:** Cliff Rieders <crieders@riederstravis.com>

Hi Bernie,

For the record, I was COMPLETELY satisfied with your service. I found it a real pleasure working with you and Cliff. I found it a very intellectually stimulating event.

Yes, you have my authority to withhold from the settlement proceeds any funds due you. I would also like all outstanding invoices to be paid to Cliff. I don't think we owe anything to Paul but if we do I would like it also paid.

Please advise the net amount you will forward and I will give you instructions for its transfer.
Thanks,
Jeff

PS My guess is that we will be seeing these people again. At least now I have a war chest with which to defend ourselves!

On 6 Jun 2019, at 23:49, Bernard Conaway <bgc@conaway-legal.com> wrote:

Jeff:

Attached is the Firm's final invoice for this matter. Of course, if you have questions about it, please bring them to me to discuss.

A few final notes. This litigation took too long and was too expensive. Much of that was due to Cupron's machinations.

Please know that I worked to lower every bill that I sent to you. I did that in several ways. First, every bill that I send is re-reviewed before the client gets it. That review is to re-evaluate time and billing. That process reduces time and therefore reduce the bill. Second, I never bill clients for piddling events – it's bad business and sours relationships. Third, long ago I decided that once a client retained me, I would not change my hourly rate. In two years working on this case, I never raised my hourly rate. Lastly, I refuse to allow an adversary's unreasonable, litigious conduct to drive my billing. To that end, I do not bill for every event and, as in your case, I stopped billing all together at the end of March.

I hope that you are satisfied with the service that I provided. If not, please let me know.

Finally, I would like your authority to withhold from the settlement proceeds, the amount due in the current invoice. Please confirm, on way or another, that I may do so. Also, I need instructions on where, when and how you would like the settlement funds transferred to you.

**Subject:** Re: Gabbay enc. Invoice -060619-srb-car - 10191110
**Date:** Tuesday, June 11, 2019 at 4:34:11 PM Eastern Daylight Time
**From:** Jeffrey Gabbay <jeffgabbay@gmail.com>
**To:** Bernard Conaway <bgc@conaway-legal.com>
**CC:** Cliff Rieders <crieders@riederstravis.com>

Please pay Cliff's open invoice.

I will get back to you on dispersal if funds.

Thanks for everything. It's been a fun ride!
Jeff

Sent from my iPhone

On 11 Jun 2019, at 12:38, Bernard Conaway <bgc@conaway-legal.com> wrote:

Jeff:

After deducting fees/expenses due Cliff and I, the remaining balance is $426,100.69.  Please let me know how you want to receive this.

Secondarily, for my records I need your authorization to pay Cliff's bill from the settlement proceeds.

As always, thank you.

Bernard G. Conaway, Esquire
CONAWAY-LEGAL LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

**Confidentiality Note:**  This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521.  It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of CONAWAY-LEGAL LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.

**Circular 230 Disclosure:**  To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and

| | |
|---|---|
| **Subject:** | Cupron |
| **Date:** | Wednesday, June 19, 2019 at 12:49:17 PM Eastern Daylight Time |
| **From:** | Melissa Barnum on behalf of Cliff Rieders <crieders@riederstravis.com> |
| **To:** | Bernard Conaway <bgc@conaway-legal.com> |
| **CC:** | Kim Paulhamus <kpaulhamus@riederstravis.com> |
| **Attachments:** | editdata.mso |

A PARTNERSHIP

# Rieders, Travis, Humphrey, Waters & Dohrmann

ATTORNEYS
FORD A. RIEDERS*
REY C. DOHRMANN
OREY J. MOWREY

SHA B. COFFINER
AN P. GINGERICH
STOPHER S. BRADLEY

PA, NY & DC BARS
ERTIFIED IN CIVIL TRIAL
DVOCACY, N.B.T.A.

PA & NY BARS

ONALD C. TRAVIS
1944-2017

161 WEST THIRD STREET
WILLIAMSPORT, PA 17701
Email: lawoffices@riederstravis.com
www.riederstravis.com
PHONE: (570) 323-8711
FAX: (570) 323-4192

FIRM MANAGER
KIMBERLY A. PAULHAMUS

PARALEGALS
DEBBIE S. BUENO
BECKY BURROWS
LAURIE L. DEUEL
TRACEY L. HARVEY

OF COUNSEL
JOHN M. HUMPHREY
PAMELA L. SHIPMAN
C. SCOTT WATERS

June 19, 2019

Via e-mail:

Bernie Conaway

RE:    Cupron

Dear Bernie:

I spoke to Jeff today who is traveling around the country (and tells me that he is going to Mars) like he was about 25 years old.   Anyway, please let me know if there is anything we can do to help in connection with the distribution.

Very truly yours,

RIEDERS, TRAVIS, HUMPHREY,
WATERS & DOHRMANN

# Cliff Rieders

Clifford A. Rieders, Esquire

CAR/srb

**Subject:** Re: Cupron

**Date:** Wednesday, June 19, 2019 at 3:02:03 PM Eastern Daylight Time

**From:** Bernard Conaway <bgc@conaway-legal.com>

**To:** Cliff Rieders <crieders@riederstravis.com>

**CC:** Kim Paulhamus <kpaulhamus@riederstravis.com>

Cliff:

Unless I missed it, Jeff hasn't given me instructions on how to transfer the settlement proceeds. Please let me know if I missed something.

As always, thank you.

Bernard G. Conaway, Esquire
CONAWAY-LEGAL LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

**Confidentiality Note:** This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of CONAWAY-LEGAL LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.

**Circular 230 Disclosure:** To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**From:** Melissa Barnum <mbarnum@riederstravis.com> on behalf of Cliff Rieders <crieders@riederstravis.com>
**Date:** Wednesday, June 19, 2019 at 12:49 PM
**To:** Bernard G Conaway <bgc@conaway-legal.com>
**Cc:** Kim Paulhamus <kpaulhamus@riederstravis.com>
**Subject:** Cupron

**Subject:** RE: Cupron
**Date:** Wednesday, June 19, 2019 at 5:11:25 PM Eastern Daylight Time
**From:** Cliff Rieders <crieders@riederstravis.com>
**To:** Bernard Conaway <bgc@conaway-legal.com>
**CC:** Kim Paulhamus <kpaulhamus@riederstravis.com>

We talked and I think he is trying to decide the best way to handle
He has been in the US all week for business
I want to give Jeff a bit of boot; can you tell me what date you received it? I don't like to hold money for clients for more than 10 days.

**From:** Bernard Conaway [mailto:bgc@conaway-legal.com]
**Sent:** Wednesday, June 19, 2019 3:02 PM
**To:** Cliff Rieders <crieders@riederstravis.com>
**Cc:** Kim Paulhamus <kpaulhamus@riederstravis.com>
**Subject:** Re: Cupron

Cliff:

Unless I missed it, Jeff hasn't given me instructions on how to transfer the settlement proceeds. Please let me know if I missed something.

As always, thank you.

Bernard G. Conaway, Esquire
CONAWAY-LEGAL LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

**Confidentiality Note:** This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of CONAWAY-LEGAL LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.

**Circular 230 Disclosure:** To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**Subject:** Gabbay

**Date:** Tuesday, June 25, 2019 at 12:16:57 PM Eastern Daylight Time

**From:** Cliff Rieders <crieders@riederstravis.com>

**To:** Bernard Conaway <bgc@conaway-legal.com>

He told me that he is meeting with whomever he needs to meet with on Tuesday

He did ask about the "minor" shareholders which you recall was an offer that we did accept...I sent you the letter or e mail showing that previously. I understand Jeff's moral dilemma in that regard notwithstanding that none of them asked us to represent them.

Sent from my iPad

**Subject:** Gabbay v Cupron - Settlement Proceeds

**Date:** Monday, July 1, 2019 at 10:24:26 AM Eastern Daylight Time

**From:** Bernard Conaway <bgc@conaway-legal.com>

**To:** Jeff Gabbay <Jeff@argamantech.com>

**CC:** Cliff Rieders <crieders@riederstravis.com>

Jeff:

I hope all is well with you.

Please let me know at your earliest convenience what you would like me to do with the remaining settlement funds. Absent client instructions to do otherwise, by rule, I have 60 days to disburse the funds.

As always, thank you.

Bernard G. Conaway, Esquire
CONAWAY-LEGAL LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

**Confidentiality Note:** This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of CONAWAY-LEGAL LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.

**Circular 230 Disclosure:** To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**Subject:** Re: Gabbay v Cupron - Settlement Proceeds
**Date:** Monday, July 1, 2019 at 12:10:17 PM Eastern Daylight Time
**From:** Jeff Gabbay <Jeff@argamantech.com>
**To:** Bernard Conaway <bgc@conaway-legal.com>
**CC:** Cliff Rieders <crieders@riederstravis.com>

We are meeting with out financial advisor tomorrow more. Back to you then.
Jeff

Sent from my iPhone

On 1 Jul 2019, at 17:24, Bernard Conaway <bgc@conaway-legal.com> wrote:

Jeff:

I hope all is well with you.

Please let me know at your earliest convenience what you would like me to do with the remaining settlement funds.  Absent client instructions to do otherwise, by rule, I have 60 days to disburse the funds.

As always, thank you.

Bernard G. Conaway, Esquire
CONAWAY-LEGAL LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

**Confidentiality Note:**  This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521.  It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of CONAWAY-LEGAL LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.

**Circular 230 Disclosure:**  To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**Subject:** Funds in Escrow
**Date:** Tuesday, July 2, 2019 at 8:16:39 AM Eastern Daylight Time
**From:** Jeffrey Gabbay <jeffgabbay@gmail.com>
**To:** Bernard Conaway <bgc@conaway-legal.com>
**CC:** Cliff Rieders <crieders@riederstravis.com>, Shoshana Gabbay <shoshanagabbay@gmail.com>

Hi Bernie,

Shoshana and I sat with our financial advisor. We have signed the necessary forms and you will be receiving from us in the next week or so (July 4th weekend is delaying things) instructions for the transfer of our funds to an account in the USA.

Other than the instructions for transfer is there anything else you need?
Regards,
Jeff

**Subject:** Re: Gabbay v Cupron - Settlement Proceeds
**Date:** Tuesday, July 2, 2019 at 9:49:21 AM Eastern Daylight Time
**From:** Jeff Gabbay <Jeff@argamantech.com>
**To:** Bernard Conaway <bgc@conaway-legal.com>
**CC:** Cliff Rieders <crieders@riederstravis.com>

Bernie,

After meeting with our financial advisor today, we agreed to wire transfer the remaining settlement funds to my affiliated company bank account in Hong Kong.

I will forward the appropriate banking details to you soon.

Jeff

**From:** Bernard Conaway <bgc@conaway-legal.com>
**Sent:** Monday, July 1, 2019 8:34:03 PM
**To:** Jeff Gabbay
**Cc:** Cliff Rieders
**Subject:** Re: Gabbay v Cupron - Settlement Proceeds

Thank you.

Bernard G. Conaway, Esquire
CONAWAY-LEGAL LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

**Confidentiality Note:** This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of CONAWAY-LEGAL LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.

**Circular 230 Disclosure:** To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**Subject:** Re: Gabbay v Cupron - Settlement Proceeds
**Date:** Tuesday, July 2, 2019 at 11:57:47 AM Eastern Daylight Time
**From:** Bernard Conaway <bgc@conaway-legal.com>
**To:** Jeff Gabbay <Jeff@argamantech.com>

Jeff

Today I received three emails from you. The first telling me that you spoke to your financial advisor; the was a response to my remark about my wife; and the third asking if I received an email from you about the banking details.

I did not receive specific directions about your bank.

As always, thank you.
Bernard G. Conaway, Esquire
Conaway-Legal LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

Confidentiality Note: This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of Conaway-Legal LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.

Circular 230 Disclosure: To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**From:** Jeff Gabbay <Jeff@argamantech.com>
**Sent:** Tuesday, July 2, 2019 10:09 AM
**To:** Bernard Conaway
**Subject:** Re: Gabbay v Cupron - Settlement Proceeds

Bernie,

Please confirm the receipt of the e-mail I sent you, I have the banking details now.

**Subject:** Re: Gabbay v Cupron - Settlement Proceeds
**Date:** Tuesday, July 2, 2019 at 12:22:19 PM Eastern Daylight Time
**From:** Jeff Gabbay <Jeff@argamantech.com>
**To:** Bernard Conaway <bgc@conaway-legal.com>
**Attachments:** Jeff affiliated company banking details.pdf

As agreed with my Financial advisor, Please process the remaining settlement funds to my affiliated company account in Hong Kong.

Attached is the wire instruction and also let me know once the funds has been transferred so I can follow up from my end.

Jeff

**From:** Bernard Conaway <bgc@conaway-legal.com>
**Sent:** Tuesday, July 2, 2019 6:57 PM
**To:** Jeff Gabbay
**Subject:** Re: Gabbay v Cupron - Settlement Proceeds

Jeff

Today I received three emails from you. The first telling me that you spoke to your financial advisor; the was a response to my remark about my wife; and the third asking if I received an email from you about the banking details.

I did not receive specific directions about your bank.

As always, thank you.
Bernard G. Conaway, Esquire
Conaway-Legal LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com
Confidentiality Note: This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of Conaway-Legal LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all

CL-00031

# Wiring Instructions

| | |
|---|---|
| Swift Code | HSBCHKHHHKH |
| Beneficiary Bank Address: | HSBC BANK (HONG KONG)<br>142-144B Pau Chung St,<br>Ma Tau Chung, Hong Kong |

*For incoming wires payment for JEFF GABBAY:

| | |
|---|---|
| Beneficiary Name | HK BLISS TRADE LIMITED |
| Address | 28 Queen's Road,<br>Central, Hong Kong |
| Beneficiary Account Number | 023753379838 |

**Subject:** Re: Gabbay v Cupron - Settlement Proceeds
**Date:** Wednesday, July 3, 2019 at 11:49:33 AM Eastern Daylight Time
**From:** Bernard Conaway <bgc@conaway-legal.com>
**To:** Jeff Gabbay <Jeff@argamantech.com>

Jeff:

I am in Washington today. My bank requires that international wires be competed in person, at a local branch. My bank does not have a branch in DC. I return to Delaware early tomorrow morning, however, the back is closed for the Independence Day holiday. I will transfer the funds on Friday morning. Once I have completed it on my end, I will confirm by email.

As always, thank you.

Bernard G. Conaway, Esquire
Conaway-Legal LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

**Confidentiality Note:** This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of Conaway-Legal LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.

**Circular 230 Disclosure:** To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**From:** Jeff Gabbay <Jeff@argamantech.com>
**Date:** Wednesday, July 3, 2019 at 11:07 AM
**To:** Bernard G Conaway <bgc@conaway-legal.com>
**Subject:** Re: Gabbay v Cupron - Settlement Proceeds

Just checking to see maybe the wire transfer for the settlement will go out today to my affiliated company bank account I sent you.

CL-00033

**Subject:** Proof

**Date:**  Tuesday, July 2, 2019 at 1:12:08 PM Eastern Daylight Time

**From:**  Jeff Gabbay <Jeff@argamantech.com>

**To:**  Bernard Conaway <bgc@conaway-legal.com>

**CC:**  Cliff Rieders <crieders@riederstravis.com>

Hi Bernie

In anticipation of a question that will be asked concerning the source of the Vupron funds we will need to present proof of the origin of the funds.

Can you please send me documentation that demonstrates the source of the funds I.e. Cupron's purchase or our sale.

Thanks
Jeff

Sent from my iPhone

**Subject:** Re: Proof
**Date:** Tuesday, July 2, 2019 at 1:17:50 PM Eastern Daylight Time
**From:** Cliff Rieders <crieders@riederstravis.com>
**To:** Jeff Gabbay <Jeff@argamantech.com>
**CC:** Bernard Conaway <bgc@conaway-legal.com>

Tax authorities won't care where Cupron got the funds from

Sent from my iPhone

> On Jul 2, 2019, at 1:12 PM, Jeff Gabbay <Jeff@argamantech.com> wrote:
>
> Hi Bernie
>
> In anticipation of a question that will be asked concerning the source of the Vupron funds we will need to present proof of the origin of the funds.
>
> Can you please send me documentation that demonstrates the source of the funds I.e. Cupron's purchase or our sale.
>
> Thanks
> Jeff
>
> Sent from my iPhone

**Subject:** Re: Funds in Escrow

**Date:** Tuesday, July 2, 2019 at 2:02:57 PM Eastern Daylight Time

**From:** Cliff Rieders <crieders@riederstravis.com>

**To:** Bernard Conaway <bgc@conaway-legal.com>

**CC:** Jeffrey Gabbay <jeffgabbay@gmail.com>, Shoshana Gabbay <shoshanagabbay@gmail.com>

US or Hong Kong?

Sent from my iPhone

On Jul 2, 2019, at 8:44 AM, Bernard Conaway <bgc@conaway-legal.com> wrote:

> Jeff:
>
> Thank you for the update.
>
> As far as needing something else, I have the love of a good women so I want for nothing.
>
> As always, take care.
>
> Bernard G. Conaway
> Conaway-Legal LLC
>
> As always, thank you.
> Bernard G. Conaway, Esquire
> Conaway-Legal LLC
> 1007 North Orange Street, Suite 400
> Wilmington, DE 19801
> (302) 428-9350
> (302) 528-8687 (c)
> (844) 364-0137 (f)
> bgc@conaway-legal.com
> www.conaway-legal.com
> Confidentiality Note: This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of Conaway-Legal LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.
> Circular 230 Disclosure: To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**From:** Jeffrey Gabbay <jeffgabbay@gmail.com>
**Sent:** Tuesday, July 2, 2019 8:16:39 AM
**To:** Bernard Conaway
**Cc:** Cliff Rieders; Shoshana Gabbay
**Subject:** Funds in Escrow

**Subject:** Re: Gabbay v Cupron - Settlement Proceeds
**Date:** Friday, July 5, 2019 at 3:25:41 PM Eastern Daylight Time
**From:** Bernard Conaway <bgc@conaway-legal.com>
**To:** Jeff Gabbay <Jeff@argamantech.com>

Jeff

The wire was completed. I am waiting for the wire confirmation. When I received it, I'll forward it to you.

As always, thank you.
Bernard G. Conaway, Esquire
Conaway-Legal LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com
Confidentiality Note: This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of Conaway-Legal LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.
Circular 230 Disclosure: To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**From:** Jeff Gabbay <Jeff@argamantech.com>
**Sent:** Friday, July 5, 2019 2:55:05 PM
**To:** Bernard Conaway
**Subject:** Re: Gabbay v Cupron - Settlement Proceeds

Bernie,

HAPPY 4TH OF JULY TO YOU, Sorry it's coming late.

Just checking maybe you were able to complete the wire transfer today, Kindly drop me an e-mail as soon as you can.

Regards
Jeff

CL-00037

**Subject:** Re: Gabbay v Cupron - Settlement Proceeds
**Date:** Friday, July 5, 2019 at 4:31:17 PM Eastern Daylight Time
**From:** Bernard Conaway <bgc@conaway-legal.com>
**To:** Jeff Gabbay <Jeff@argamantech.com>
**Attachments:** Wire Confirmation - J Gabbay.pdf

Jeff:

Attached as a PDF is the wire confirmation.

As always, thank you.

Bernard G. Conaway, Esquire
CONAWAY-LEGAL LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

**Confidentiality Note:** This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of CONAWAY-LEGAL LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.

**Circular 230 Disclosure:** To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**From:** Jeff Gabbay <Jeff@argamantech.com>
**Date:** Friday, July 5, 2019 at 3:27 PM
**To:** Bernard G Conaway <bgc@conaway-legal.com>
**Subject:** Re: Gabbay v Cupron - Settlement Proceeds

Noted with thanks

Jeff

07/05/2019                        WSFS BANK                        12:43 PT

                             Wire Journal Report

                                                                  Page 1

                                                                  $ 426,100.69

DB  ACCOUNT:            211173919
    CREATE DATE/TIME:   07/05/2019 / 11:58:18
    MSG TYPE:           1000
    ORIG NAME:          CONAWAY LEGAL LLC
    ORIG ADDR:          1007 N ORANGE ST SUITE 400
    OBI                 FOR JEFF GABBAY
    RFB:                -
    BNF ACCT:           023753379838
    BNF NAME:           HK BLISS TRADE LIMITED
    BNF ADDR:           28 QUEEN'S ROAD
    MSG Ref #:          20191860057800
    STATUS:             COMPLETED

| TOTAL FOR | 211173919 | |
|---|---|---|
| TOTAL DEBITS: | | $ 426,100.69 |
| TOTAL CREDITS: | | $ 0.00 |
| TOTAL REJECTED: | | $ 0.00 |
| NET AMOUNT: | | -$ 426,100.69 |

| TOTAL FOR ALL ACCOUNTS: | |
|---|---|
| TOTAL DEBITS: | $ 426,100.69 |
| TOTAL CREDITS: | $ 0.00 |
| TOTAL REJECTED: | $ 0.00 |
| NET AMOUNT: | -$ 426,100.69 |

Copyright © 2019, D+H Global Transaction Banking Solutions. All Rights Reserved

**Subject:** Re: Funds in Escrow
**Date:** Tuesday, July 2, 2019 at 3:49:10 PM Eastern Daylight Time
**From:** Jeffrey Gabbay <jeffgabbay@gmail.com>
**To:** Cliff Rieders <crieders@riederstravis.com>
**CC:** Bernard Conaway <bgc@conaway-legal.com>, Shoshana Gabbay <shoshanagabbay@gmail.com>

USA thinks we are all drug dealers working with undeclared cash. We have to prove we are not!


On 2 Jul 2019, at 21:02, Cliff Rieders <crieders@riederstravis.com> wrote:

US or Hong Kong?

Sent from my iPhone

On Jul 2, 2019, at 8:44 AM, Bernard Conaway <bgc@conaway-legal.com> wrote:

> Jeff:
>
> Thank you for the update.
>
> As far as needing something else, I have the love of a good women so I want for nothing.
>
> As always, take care.
>
> Bernard G. Conaway
> Conaway-Legal LLC
>
> As always, thank you.
> Bernard G. Conaway, Esquire
> Conaway-Legal LLC
> 1007 North Orange Street, Suite 400
> Wilmington, DE 19801
> (302) 428-9350
> (302) 528-8687 (c)
> (844) 364-0137 (f)
> bgc@conaway-legal.com
> www.conaway-legal.com
> Confidentiality Note: This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of Conaway-Legal LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.
> Circular 230 Disclosure: To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**Subject:** Re: Gabbay v Cupron - Settlement Proceeds

**Date:** Monday, July 8, 2019 at 8:47:49 AM Eastern Daylight Time

**From:** Jeff Gabbay <Jeff@argamantech.com>

**To:** Bernard Conaway <bgc@conaway-legal.com>

Good Morning Bernie,

How was your weekend, Just a head's up regarding the wire transfer you sent on Friday, I'm yet to receive the funds in my account in Hong Kong. I'm not sure why but I was told that the account is under audit at the moment, as a result of this any Incoming payment payment would be delayed or return to sender.

can you please check with your bank today and confirm maybe the funds has been return back to you, Kindly drop me an e-mail as soon as you can.

Thanks
Jeff

**From:** Bernard Conaway <bgc@conaway-legal.com>
**Sent:** Friday, July 5, 2019 10:25 PM
**To:** Jeff Gabbay
**Subject:** Re: Gabbay v Cupron - Settlement Proceeds

Jeff

The wire was completed. I am waiting for the wire confirmation. When I received it, I'll forward it to you.

As always, thank you.
Bernard G. Conaway, Esquire
Conaway-Legal LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

Confidentiality Note: This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of Conaway-Legal LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.

Circular 230 Disclosure: To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**Subject:** Re: Gabbay
**Date:** Wednesday, July 10, 2019 at 9:11:49 PM Eastern Daylight Time
**From:** Bernard Conaway <bgc@conaway-legal.com>
**To:** Cliff Rieders <crieders@icloud.com>

Cliff:

Sounds like a good relaxing ride.  Always good for the soul.

I have heard from Jeff.  I wired the settlement funds to him last Friday.  On Monday he emailed me to say that he hadn't received it and, more problematic, his Hong Kong bank account was undergoing an audit of some sort.  As a result of the audit, no transactions could be processed – including the wire.  The funds were not returned to my account. Nor were they posted to his account.  He's asked that my bank recall the wire.  I spoke to the local branch manager.  She told that a recall was not possible.  As I told Jeff, I was not confident that she was well informed.  I contacted the bank's legal department to confirm, or not, what the branch manager told me.  I've traded 4-5 called and missed each other.  I'll let you know how turns out. In the mean time, keep sailing.

Thanks as always.

Sent from a remote location.

**From:** Cliff Rieders <crieders@icloud.com>
**Sent:** Wednesday, July 10, 2019 6:54:58 AM
**To:** Bernard Conaway
**Subject:** Gabbay

How goes it? I had a terrific time sailing with some friends from Long Island, New Jersey and Delaware to Worton Creek Maryland. It was a nice but short break.
Have you heard anything from Gabbay?

Sent from my iPhone

CL-00043

**Subject:**   Re: Gabbay v Cupron - Settlement Proceeds
**Date:**      Monday, July 15, 2019 at 10:03:00 AM Eastern Daylight Time
**From:**      Jeff Gabbay <Jeff@argamantech.com>
**To:**        Bernard Conaway <bgc@conaway-legal.com>
**Attachments:** Jeff affiliated company banking details.pdf

Bernie,

Attached is the appropriate banking information, I would appreciate if you could please wire transfer the funds today before bank cut off time and also debit the bank charges from my funds.

Kindly drop me an e-mail once the transfer has been completed.

Thanks
Jeff

---

**From:** Bernard Conaway <bgc@conaway-legal.com>
**Sent:** Monday, July 15, 2019 4:24:18 PM
**To:** Jeff Gabbay
**Subject:** Re: Gabbay v Cupron - Settlement Proceeds

Jeff:

The monies were returned to my escrow account - $426,058.55.  The amount returned is $42.14 short of what was wired out.  According to my bank the Hong Kong bank made a service deduction.

Let me know how you want to proceed.

If you have questions, by all means contact me.

Thank you.

Bernard G. Conaway, Esquire
Conaway-Legal LLC

Sent from a remote location.

**From:** Jeff Gabbay <Jeff@argamantech.com>
**Sent:** Thursday, July 11, 2019 9:13:45 AM
**To:** Bernard Conaway
**Subject:** Re: Gabbay v Cupron - Settlement Proceeds

Bernie,

CL-00047

## Wiring Instructions

Swift Code                          BKCHHKHH

Beneficiary Bank                    BANK OF CHINA HONG KONG LTD
Address:                            774 Nathan Road,
                                    Prince Edward, Hong Kong


*For incoming wires payment for JEFF GABBAY:

Beneficiary Name                    KANGMING TRADE LIMITED

Address                             28 Queen's Road,
                                    Central, Hong Kong


Beneficiary Account Number   01287820093306

**Subject:** Re: Gabbay v Cupron - Settlement Proceeds
**Date:** Tuesday, July 16, 2019 at 12:43:57 PM Eastern Daylight Time
**From:** Bernard Conaway <bgc@conaway-legal.com>
**To:** Jeff Gabbay <Jeff@argamantech.com>

Jeff:

I completed the wire transaction a few moments ago - 12:40 local time.  Shortly, I will receive the confirmation.  When I receive it, I will forward it to you.

Let me know if you have questions or need other information.

Thank you.

Bernard G. Conaway, Esquire
Conaway-Legal LLC

Sent from a remote location.

**From:** Jeff Gabbay <Jeff@argamantech.com>
**Sent:** Tuesday, July 16, 2019 12:33:09 PM
**To:** Bernard Conaway
**Subject:** Re: Gabbay v Cupron - Settlement Proceeds

Bernie,

Hope all is well,

Did you follow up with your bank today to confirm maybe you can process the wire transfer. Just checking

Thanks
Jeff

**From:** Bernard Conaway <bgc@conaway-legal.com>
**Sent:** Thursday, July 11, 2019 7:54 PM
**To:** Jeff Gabbay
**Subject:** Re: Gabbay v Cupron - Settlement Proceeds

Jeff:

I spoke to my bank's counsel.  The recall was initiated.  He tells me that the Hong Kong bank likely did not "receive/process" the funds until yesterday at the earliest.  The recall can take up to two weeks.  He

Page 1 of 10

**Subject:** Fwd: WSFS Bank
**Date:** Tuesday, July 16, 2019 at 2:28:15 PM Eastern Daylight Time
**From:** Bernard Conaway <bgc@conaway-legal.com>
**To:** Jeff Gabbay <Jeff@argamantech.com>
**Attachments:** Wire Summary.pdf

Jeff:

Attached is the wire confirmation.

As always, thank you.

Bernard G. Conaway, Esquire
Conaway-Legal LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

Confidentiality Note: This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of Conaway-Legal LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.

Circular 230 Disclosure: To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**From:** Reese, Aaliyah <AReese@wsfsbank.com>
**Sent:** Tuesday, July 16, 2019 2:13:45 PM
**To:** Bernard Conaway
**Subject:** WSFS Bank

Please see the attached Wire summary report.

Please let us know if you need anything else!

07/16/2019        **WSFS BANK**        11:10 PT

Wire Journal Report

Page 1

| DB | ACCOUNT: | 211173919 | $ 426,058.55 |
|----|----------|-----------|--------------|
| | CREATE DATE/TIME: | 07/16/2019 / 09:35:10 | |
| | MSG TYPE: | 1000 | |
| | ORIG NAME: | CONAWAY LEGAL LLC | |
| | ORIG ADDR: | 1007 N ORANGE ST SUITE 400 | |
| | OBI: | - | |
| | RFB: | - | |
| | BNF ACCT: | 01287820093306 | |
| | BNF NAME: | KANGMING TRADE LIMITED | |
| | BNF ADDR: | 28 QUEEN'S ROAD | |
| | MSG Ref #: | 20191970045100 | |
| | STATUS: | COMPLETED | |

| TOTAL FOR | 211173919 | |
|-----------|-----------|---|
| TOTAL DEBITS: | | $ 426,058.55 |
| TOTAL CREDITS: | | $ 0.00 |
| TOTAL REJECTED: | | $ 0.00 |
| NET AMOUNT: | | -$ 426,058.55 |

| TOTAL FOR ALL ACCOUNTS: | |
|-------------------------|---|
| TOTAL DEBITS: | $ 426,058.55 |
| TOTAL CREDITS: | $ 0.00 |
| TOTAL REJECTED: | $ 0.00 |
| NET AMOUNT: | -$ 426,058.55 |

Copyright © 2019, D+H Global Transaction Banking Solutions. All Rights Reserved

**Subject:** Wire instructions
**Date:** Thursday, July 18, 2019 at 6:29:26 AM Eastern Daylight Time
**From:** Jeff Gabbay <Jeff@argamantech.com>
**To:** Bernard Conaway <bgc@conaway-legal.com>
**CC:** Cliff Rieders <crieders@riederstravis.com>, Shoshana Gabbay <shoshanagabbay@gmail.com>
**Attachments:** Gabbay wire instructions 07092019 (1).docx

Hi Bernie,

We finally got the wire instructions for the account. Kindly transfer all of the money in the account to the attached account. Obviously the transfer charges should be reduced from what is being sent. Please confirm back to us the exact amount of the transfer.

Thanks and best regards,
Jeff



PR⊘FILE
INVESTMENT SERVICES

| | |
|---|---|
| Date: | 1/5/20 |
| To: | **Jeff and Shoshana Gabbay** |
| From: | Profile Investment Services |

Subject:    **NEW** Wiring funds or sending checks to your account in the U.S.

WIRING FUNDS•:

These are the directions to give your bank or brokerage firm in order to wire **US dollars only** into your trading account at Pershing, a Bank of New York Company. Please notify my office of the amount that you will be wiring to your account, so we can confirm its receipt.

Bank:                   THE BANK OF NEW YORK MELLON
ABA:                    021000018
Address:               1 Wall Street, New York, NY
Account name:       Pershing LLC
Account number:    890-051238-5
For further credit to account name: **Jeffrey S. Gabbay and Shoshana Gabbay**
For further credit to account #:    **INR715237**

If your bank uses the SWIFT system they will need the following SWIFT code: **IRVTUS3N**

MAILING CHECKS•:

Or, if you would like, you may mail a check directly to Portfolio Resources.  Make the check payable to the name on your account, **"Jeffrey S. Gabbay and Shoshana Gabbay."** WE ARE UNABLE TO ACCEPT THIRD PARTY CHECKS, SO THE CHECK MUST BE MADE PAYABLE TO THE NAME ON YOUR ACCOUNT.  CHECKS MUST BE U.S. DOLLAR CHECKS DRAWN OFF A U.S. BANK.  Write your account number in the memo section of the check, or else write on the back "for deposit only in account **INR715237**"

Portfolio Resources Group, Inc.
Attn: Operations
800 Brickell Avenue, Suite 903
Miami, FL  33131

If you have any questions, please call my office, or you may have your banker call with inquiries about transferring the money by wire.

• These instructions are subject to change. Please call the Profile office to confirm the details before sending money.

**Subject:** Re: Wire instructions
**Date:** Thursday, July 18, 2019 at 7:15:51 AM Eastern Daylight Time
**From:** Bernard Conaway <bgc@conaway-legal.com>
**To:** Jeff Gabbay <Jeff@argamantech.com>
**CC:** Cliff Rieders <crieders@riederstravis.com>

Jeff:

Am confused. The settlement proceeds were wired on Tuesday as you directed.

As always, thank you.

Bernard G. Conaway, Esquire
CONAWAY-LEGAL LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

**Confidentiality Note:** This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of CONAWAY-LEGAL LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.

**Circular 230 Disclosure:** To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**From:** Jeff Gabbay <Jeff@argamantech.com>
**Date:** Thursday, July 18, 2019 at 6:29 AM
**To:** Bernard G Conaway <bgc@conaway-legal.com>
**Cc:** Cliff Rieders <crieders@riederstravis.com>, Shoshana Gabbay <shoshanagabbay@gmail.com>
**Subject:** Wire instructions

Hi Bernie,

We finally got the wire instructions for the account. Kindly transfer all of the money in the account to the

**Subject:** Re: Wire instructions
**Date:** Thursday, July 18, 2019 at 8:34:37 AM Eastern Daylight Time
**From:** Jeff Gabbay <Jeff@argamantech.com>
**To:** Bernard Conaway <bgc@conaway-legal.com>
**CC:** Cliff Rieders <crieders@riederstravis.com>

Bernie,

Sorry once again, I got the wrong Bernie, I think I need some vacations to settle down my head, too much thinking lately. So sorry for the confussion.

Thanks and best regards,
Jeff

**From:** Bernard Conaway <bgc@conaway-legal.com>
**Sent:** Thursday, July 18, 2019 2:15:51 PM
**To:** Jeff Gabbay
**Cc:** Cliff Rieders
**Subject:** Re: Wire instructions

Jeff:

Am confused.  The settlement proceeds were wired on Tuesday as you directed.

As always, thank you.

Bernard G. Conaway, Esquire
CONAWAY-LEGAL LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

**Confidentiality Note**: This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521.  It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of CONAWAY-LEGAL LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.

**Circular 230 Disclosure**: To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or

**Subject:** Please review this document
**Date:** Tuesday, July 23, 2019 at 9:40:11 AM Eastern Daylight Time
**From:** Jeff Gabbay <Jeff@argamantech.com>
**To:** Bernard Conaway <bgc@conaway-legal.com>



Jeff Gabbay sent you a document to review and sign.

REVIEW DOCUMENT

Bernie,

This is an Important document which I sent to you, Please review and sign in to access.

It's been secured.

Thanks
Jeff

**Subject:** Re: Please review this document
**Date:** Tuesday, July 23, 2019 at 5:56:38 PM Eastern Daylight Time
**From:** Bernard Conaway <bgc@conaway-legal.com>
**To:** Jeff Gabbay <Jeff@argamantech.com>

Jeff:

I received this document from you but cannot open it.  Please advise.

As always, thank you.

Bernard G. Conaway, Esquire
CONAWAY-LEGAL LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

**Confidentiality Note**:  This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521.  It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of CONAWAY-LEGAL LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.

**Circular 230 Disclosure:**  To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**From:** Jeff Gabbay <Jeff@argamantech.com>
**Date:** Tuesday, July 23, 2019 at 9:40 AM
**To:** Bernard G Conaway <bgc@conaway-legal.com>
**Subject:** Please review this document

**Subject:** Was the transfer made yet?

**Date:** Tuesday, July 23, 2019 at 4:13:16 PM Eastern Daylight Time

**From:** Jeff Gabbay <Jeff@argamantech.com>

**To:** Bernard Conaway <bgc@conaway-legal.com>

**CC:** Cliff Rieders <crieders@riederstravis.com>

**Subject:** RE: Was the transfer made yet?
**Date:**    Tuesday, July 23, 2019 at 5:23:58 PM Eastern Daylight Time
**From:**    Cliff Rieders <crieders@riederstravis.com>
**To:**      Jeff Gabbay <Jeff@argamantech.com>, Bernard Conaway <bgc@conaway-legal.com>
**CC:**      Kim Paulhamus <kpaulhamus@riederstravis.com>

I thought it was done a while ago

**From:** Jeff Gabbay [mailto:Jeff@argamantech.com]
**Sent:** Tuesday, July 23, 2019 4:13 PM
**To:** Bernard Conaway <bgc@conaway-legal.com>
**Cc:** Cliff Rieders <crieders@riederstravis.com>
**Subject:** Was the transfer made yet?

**Subject:** Transfer
**Date:**   Thursday, July 25, 2019 at 1:24:11 AM Eastern Daylight Time
**From:**   Jeffrey Gabbay <jeffgabbay@gmail.com>
**To:**     Bernard Conaway <bgc@conaway-legal.com>
**CC:**     Cliff Rieders <crieders@riederstravis.com>

Hi Bernard,

You will receive instructions for transfer via fax this morning with my signature as authorisation.

No files that can't be opened.

Thanks,
Jeff
Sent from my iPhone

FAX: 001 844 364 0137

July 26, 2019

Dear Bernard,

I hereby authorize you to disperse the funds you are holding in escrow from the Cupron settlement as the instructions below. You will note there are two transfers, both domestic. The first one of $15,000 is for a repayment of a loan for legal fees. The second transfer is for the final settlement money. Please make sure that the $15,000 is net to Mr. Edell and reduce the cost of the transfer from the Cupron settlement money.

I am sending this to you via fax and not email to assure computer security. The signature below will be recognized as my signature.

Please disperse the funds as follows:

Please transfer $15,000 to:


FOR DOMESTIC (USA) TRANSFERS:
**Destination bank: Citibank N.A.**
**Bank Address:** 111 Wall Street, New York, NY 10005, USA
**Citibank ABA: 021000089**
**For Account: Charles Schwab & Co., Inc.**
**Account Number: 4055-3953**
**For Further Credit to: Simcha David Edell, account # 7187-4290**


Please transfer the balance of the funds you are holding to:

| | |
|---|---|
| Bank: | The Bank of New York Mellon |
| ABA: | 021000018 |
| Address: | 1 Wall Street, New York, NY |
| Account name: | Pershing LLC |
| Account number: | 890-051238-5 |

For further credit to account name: Jeffrey S. Gabbay and Shoshana Gabbay
For further credit to account #: INR715237

If you bank uses the SWIFT system they will need the following SWIFT code: IRVTUS3N

Best regards,
Jeff Gabbay
14 Jabotinsky Street
Apartment 21
Jerusalem, Israel

FAX: 001 844 364 0137

July 26, 2019

Dear Bernard,

I hereby authorize you to disperse the funds you are holding in escrow from the Cupron settlement as the instructions below. You will note there are two transfers, both domestic. The first one of $15,000 is for a repayment of a loan for legal fees. The second transfer is for the final settlement money. Please make sure that the $15,000 is net to Mr. Edell and reduce the cost of the transfer from the Cupron settlement money.

I am sending this to you via fax and not email to assure computer security. The signature below will be recognized as my signature.

Please disperse the funds as follows:

Please transfer $15,000 to:

FOR DOMESTIC (USA) TRANSFERS:
**Destination bank: Citibank N.A.**
**Bank Address: 111 Wall Street, New York, NY 10005, USA**
**Citibank ABA: 021000089**
**For Account: Charles Schwab & Co., Inc.**
**Account Number: 4055-3953**
**For Further Credit to: Simcha David Edell, account # 7187-4290**

Please transfer the balance of the funds you are holding to:

| | |
|---|---|
| Bank: | The Bank of New York Mellon |
| ABA: | 021000018 |
| Address: | 1 Wall Street, New York, NY |
| Account name: | Pershing LLC |
| Account number: | 890-051238-5 |

For further credit to account name: Jeffrey S. Gabbay and Shoshana Gabbay
For further credit to account #: INR715237

If you bank uses the SWIFT system they will need the following SWIFT code: IRVTUS3N

Best regards,
Jeff Gabbay
14 Jabotinsky Street
Apartment 21
Jerusalem, Israel

2019-07-26 16:44                    Gabbay 025619019 >> SFAX01                    P 1/1

B. Conway: FAX: 001 844 364 0137
001
Cliff Reiders: 570 323 4192

July 26, 2019

Dear Bernard,

I hereby authorize you to disperse the funds you are holding in escrow from the Cupron settlement as the instructions below. You will note there are two transfers, both domestic. The first one of $15,000 is for a repayment of a loan for legal fees. The second transfer is for the final settlement money. Please make sure that the $15,000 is net to Mr. Edell and reduce the cost of the transfer from the Cupron settlement money.

I am sending this to you via fax and not email to assure computer security. The signature below will be recognized as my signature.

Please disperse the funds as follows:

Please transfer $15,000 to:

FOR DOMESTIC (USA) TRANSFERS:
**Destination bank: Citibank N.A.**
**Bank Address:** 111 Wall Street, New York, NY 10005, USA
**Citibank ABA:** 021000089
**For Account: Charles Schwab & Co., Inc.**
**Account Number:** 4055-3953
**For Further Credit to: Simcha David Edell,** account # 7187-4290

Please transfer the balance of the funds you are holding to:

Bank:            The Bank of New York Mellon
ABA:             021000018
Address:         1 Wall Street, New York, NY
Account name:    Pershing LLC
Account number:  890-051238-5
For further credit to account name:  Jeffrey S. Gabbay and Shoshana Gabbay
For further credit to account #:  INR715237

If you bank uses the SWIFT system they will need the following SWIFT code:  IRVTUS3N

Best regards,
Jeff Gabbay
14 Jabotinsky Street
Apartment 21
Jerusalem, Israel

**Subject:** Transfers

**Date:** Friday, July 26, 2019 at 9:31:06 AM Eastern Daylight Time

**From:** Jeffrey Gabbay <jeffgabbay@gmail.com>

**To:** Bernard Conaway <bgc@conaway-legal.com>

**CC:** Cliff Rieders <crieders@riederstravis.com>

Hi Bernie,

For security reasons I am sending you the transfer details via fax and not email.  Please acknowledge when you have received the fax with my signature.

Regards,

Jeff

**Subject:** Re: Transfers
**Date:** Saturday, July 27, 2019 at 11:28:25 AM Eastern Daylight Time
**From:** Bernard Conaway <bgc@conaway-legal.com>
**To:** Jeffrey Gabbay <jeffgabbay@gmail.com>
**CC:** Cliff Rieders <crieders@riederstravis.com>

Jeff:

I received your fax; however, I am confused by it. Upon your instructions, I previously wired all of the remaining settlement proceeds to your Hong Kong bank. Hence, I have nothing to wire. Please help me understand what you need me to do.

As always, thank you.

Bernard G. Conaway, Esquire
CONAWAY-LEGAL LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

**Confidentiality Note:** This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of CONAWAY-LEGAL LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.

**Circular 230 Disclosure:** To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**From:** Jeffrey Gabbay <jeffgabbay@gmail.com>
**Date:** Friday, July 26, 2019 at 9:31 AM
**To:** Bernard G Conaway <bgc@conaway-legal.com>
**Cc:** Cliff Rieders <crieders@riederstravis.com>
**Subject:** Transfers

Hi Bernie,

For security reasons I am sending you the transfer details via fax and not email. Please acknowledge when

**Subject:** Re: Transfers
**Date:**    Saturday, July 27, 2019 at 1:46:17 PM Eastern Daylight Time
**From:**    Jeffrey Gabbay <jeffgabbay@gmail.com>
**To:**      Bernard Conaway <bgc@conaway-legal.com>
**CC:**      Cliff Rieders <crieders@riederstravis.com>

What Hong Kong bank???

Sent from my iPhone

On 27 Jul 2019, at 18:28, Bernard Conaway <bgc@conaway-legal.com> wrote:

Jeff:

I received your fax; however, I am confused by it.  Upon your instructions, I previously wired all of the remaining settlement proceeds to your Hong Kong bank.  Hence, I have nothing to wire.  Please help me understand what you need me to do.

As always, thank you.

Bernard G. Conaway, Esquire
CONAWAY-LEGAL LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com

**Confidentiality Note**:  This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521.  It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of CONAWAY-LEGAL LLC. Unauthorized use, disclosure or copying of this communication, or any part thereof, is strictly prohibited and may be unlawful. If you received this communication in error, please (i) notify us immediately by return e-mail, and (ii) destroy this communication and all copies thereof, including all attachments.

**Circular 230 Disclosure**:  To ensure compliance with IRS Circular 230, this is to inform you that any tax advice contained in this Message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**From:** Jeffrey Gabbay <jeffgabbay@gmail.com>
**Date:** Friday, July 26, 2019 at 9:31 AM
**To:** Bernard G Conaway <bgc@conaway-legal.com>

**Subject:** Re: Bank transfer
**Date:** Saturday, July 22, 2017 at 2:12:01 PM Eastern Daylight Time
**From:** Jeffrey Gabbay
**To:** Bernard Conaway
**CC:** Cliff Rieders

Just thought of something: The bank called me late in the day on Thursday to say they were sending the money. If it didn't go out before 4PM on Thursday our time then you won't see the money in your bank until Monday morning. No transfers of foreign currency are made on Fridays or Sundays. It's bad enough they treat me like a drug dealer in sending money out of the country but the real robbers here are the banks who hold money and use it. I'll call the bank in the morning.

jsg

On 21 Jul 2017, at 18:24, Bernard Conaway <bgc@conaway-legal.com> wrote:

Jeff:

I checked my account again this morning. Your wire was not received. If you have confirming wire information forward it to me and I'll have my bank investigate on this end.

You should do the same on your end.

As always, thank you.

*Please note new address and contact information.*

Bernard G. Conaway, Esquire
CONAWAY-LEGAL LLC
1007 North Orange Street, Suite 400
Wilmington, DE 19801
(302) 428-9350
(302) 528-8687 (c)
(844) 364-0137 (f)
bgc@conaway-legal.com
www.conaway-legal.com (*under construction*)

**Confidentiality Note:** This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It is a legally privileged communication. The information contained in this communication is confidential, is subject to the attorney-client privilege, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of CONAWAY-LEGAL LLC.

CL 269

**EXHIBIT C**

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JEFFREY GABBAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No.1:20-cv-00743-LPS |
| v. | ) | |
| | ) | |
| BERNARD G. CONAWAY, | ) | |
| ESQUIRE, and CONAWAY-LEGAL | ) | JURY TRIAL DEMANDED |
| LLC | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSES TO DEFENDANT'S
## FIRST REQUEST FOR ADMISSIONS

1.     For the time period June 1, 2019, to August 1, 2019, admit or deny that You did not communicate to the Defendants that the jeff@argamantech.com email was hacked.

**Response: Admitted.**

2.     For the time period June 1, 2019, to August 1, 2019, admit or deny that You did not communicate to Clifford A. Rieders that the jeff@argamantech.com email was hacked.

**Response: Admitted.**

3.     For the time period June 1, 2019, to August 1, 2019, admit or deny that You were the Chief Executive Officer to Argaman.

**Response: Denied.**

Page 1 of 2

**THE POLIQUIN FIRM, LLC.**

*/s/ Ronald G. Poliquin*
Ronald G. Poliquin, Esquire
I.D. No. 4447
1475 S. Governors Ave.
Dover, DE 19904
(302) 702-5501
*Attorney for Jeffrey Gabbay*

May 14, 2024

**EXHIBIT D**

Page 1

1          THE UNITED STATES DISTRICT COURT FOR
                 THE DISTRICT OF DELAWARE
2          C.A. NO.:  1:20-cv-00743-VAC-MPT
3     JEFFREY GABBAY          |
                              |
4          Plaintiff          |
                              |
5          vs.                |
                              |
6     BERNARD G. CONAWAY,     |
      ESQUIRE, and CONAWAY    |
7     LEGAL, LLC              |
                              |
8          Defendants         |
      _____|
9
10              A videoconference deposition of
11    BERNARD G. CONAWAY, ESQUIRE, was taken
12    remotely via ZOOM VIDEOCONFERENCING, with
13    the Witness appearing from Wilmington,
14    Delaware, pursuant to notice before Christy
15    A. Traina, Court Reporter and Notary Public
16    in and for the State of Delaware, on Friday,
17    August 5, 2022, beginning at approximately
18    10:00 a.m.:
19                     * * *
20
21
22
23              VERITEXT LEGAL SOLUTIONS
              300 Delaware Avenue - Suite 815
                Wilmington, Delaware  19801
24                   302.571.0510

Page 2

1    APPEARANCES:

2        THE POLIQUIN FIRM, L.L.C.
         BY:  RONALD G. POLIQUIN, ESQUIRE
3        155 S. Bradford Street, Suite 203
         Dover, Delaware  19904
4        302.702.5501
         ronpoliquin@gmail.com
5        Representing the Plaintiff

6

7        MARGOLIS EDELSTEIN
         BY:  LOREN R. BARRON, ESQUIRE
8        300 Delaware Avenue - Suite 800
         Wilmington, Delaware  19801
9        302.888.1112
         lbarron@margolisedelstein.com
10       Representing the Defendants

11

12

13

14

15

16

17

18

19

20

21

22

23

24       (All parties appearing remotely via Zoom.)

1                    I N D E X

2    Testimony of:   BERNARD G. CONAWAY, ESQUIRE

3    By Mr. Poliquin . . . . . . . . . . . 4

4    By Ms. Barron . . . . . . . . . . . 145

5

6

7

8

9                      - - -

10                  E X H I B I T S

11                     - - -

12   EXHIBIT NO.   DESCRIPTION              PAGE

13                   * None

14

15

16

17                     - - -

18            INSTRUCTION NOT TO ANSWER:

19                     - - -

20                  Page      Line

21                   123        13

22

23

24

BERNARD G. CONAWAY, ESQUIRE

Page 4

1    P R O C E E D I N G S:

2              THE COURT REPORTER:  The

3    attorneys participating in this deposition

4    acknowledge that I am not physically present

5    in the deposition room, and that I will be

6    reporting this deposition remotely.

7              They further acknowledge that, in

8    lieu of an oath administered in person, I

9    will administer the oath remotely.

10             If any party has an objection to

11   this manner of reporting, please state so

12   now.

13             Hearing none, we can proceed.

14                     - - -

15             BERNARD G. CONAWAY, ESQUIRE, after

16        having been first duly sworn, was

17        examined and testified as follows:

18                     - - -

19                  EXAMINATION

20                     - - -

21   BY MR. POLIQUIN:

22        Q.   Mr. Conaway, Ron Poliquin.  I know

23   we know each other.  And I know you're an

24   attorney, so I'm not going to go through all

BERNARD G. CONAWAY, ESQUIRE

Page 5

1      the instructions that normally go with a

2      deposition.  I'm just going to ask you a few

3      questions.

4              What did you do to prepare for the

5      deposition?

6          A.    Spoke with counsel, reviewed some

7      emails, reviewed a timeline.  That's really

8      it.

9          Q.    Now, most of the documents I'm

10     going to go through today are documents that

11     you produced, because they were the clearest

12     form.  When I do my screen share, they'll be

13     based on those documents.

14              How did you come about being

15     counsel for Jeff Gabbay?

16         A.    I was contacted in, I'm going to

17     say, July of 2017 by Cliff Rieders.  I don't

18     know how Cliff Rieders got my name.  I know

19     somebody in the Delaware Bar referred him to

20     me, but as I sit here, I can't remember who

21     that was.  At that point, from July of 2017

22     until the matter settled, I worked for Mr.

23     Gabbay.

24         Q.    And you're a licensed attorney in

BERNARD G. CONAWAY, ESQUIRE

Page 6

1    the State of Delaware?

2        A.    I am.

3        Q.    And how long have you been

4    licensed in the State of Delaware?

5        A.    I was admitted in 1990.  So what's

6    that?  Thirty-two years or thereabouts.

7        Q.    And what does your practice

8    primarily consist of?

9        A.    Mostly Chancery Court matters,

10   bankruptcy matters, and ADR.  I do some

11   commercial work in Superior Court and

12   District Court, but it's a very small

13   percent of what I do.

14       Q.    And has that been consistent

15   throughout your career?

16       A.    In general, yes.  The percentages

17   of what I'm doing, no.  There was a time

18   where I was doing a lot more litigation.

19   I've been trying to do more ADR work.  But,

20   in general, the topic areas have been

21   consistent.  And just to be clear, that's

22   while I was in private practice.  When I was

23   with the court, it was all civil litigation

24   in the Superior Court.

BERNARD G. CONAWAY, ESQUIRE

Page 7

1          Q.    At the time of 2019, what was your

2      experience, and I apologize, I'm not trying

3      -- this might be a little awkward wording --

4      as far as handling client funds and the

5      transferring of client funds, how much --

6      you know, sometimes we do contingency work

7      and sometimes we have retainer funds.  What

8      was the percentages in your practice, if you

9      understand what I'm saying?

10         A.    I think I understand.  The bulk of

11     my practice was hourly rate work.  I

12     maintained retainers occasionally.  Most --

13     I shouldn't say "most."  Many clients are

14     repeat client.  I don't necessarily need a

15     retainer.  I don't -- I mean, it's a rare

16     case that I take on a contingent fee.  It's

17     a commercial case usually if I do.  I'm not

18     sure I've answered your question, but...

19         Q.    Yes, I think that answers it.

20               Who handles the finances at your

21     office?

22         A.    When you say, "who handles," can

23     you be more clearer, please?

24         Q.    Who's writing the checks, who's

BERNARD G. CONAWAY, ESQUIRE

Page 8

1    signing the checks, who's making decisions

2    regarding funds, I'm going to say regarding

3    the trust account?

4         A.    That would be me.

5         Q.    What was the scope of your

6    services with Mr. Gabbay?

7         A.    He retained me to pursue claims

8    against Cupron.  At the time, Mr. Gabbay was

9    one of the more substantial shareholders of

10   that company.  He had received -- he had

11   owned the company at some point.  So had a

12   very good knowledge of how the company

13   operated, what its finances should look

14   like, things of that nature.  Over a period

15   of time, he was receiving financials, and

16   they just weren't making sense to him.

17            At some point prior to my

18   involvement, he had some options that he was

19   able to exercise with Cupron.  And Cupron

20   valued those options at a number that just

21   seemed off the charts.  So between that

22   valuation and between the other financial

23   information that Mr. Gabbay was receiving,

24   he decided he needed to look into the

BERNARD G. CONAWAY, ESQUIRE

Page 9

```
 1      company's finances.
 2              To that end, I was retained to
 3      pursue what's called a 220 action under
 4      Delaware Corporate Law.  Essentially what
 5      you do is you ask for the books and records
 6      of the company so that you can evaluate, you
 7      know, any number of things.  In this
 8      instance, it was the financial valuations
 9      and the financial performance of the
10      company.
11          Q.   How did you get paid by Mr.
12      Gabbay?
13          A.    Hourly.
14          Q.    And how exactly would that work?
15      Did he pay an ongoing retainer, or did you
16      just send him bills and he paid them?
17          A.    I don't remember if I requested a
18      retainer up front or not.
19              Give me one second.  I'm sorry.
20          Q.    Excuse me for a second.  Let me
21      turn down my air conditioning.
22              Thank you.
23              So you don't recall whether or not
24      you requested an initial retainer?
```

BERNARD G. CONAWAY, ESQUIRE

Page 10

1          A.    I do not.

2          Q.    When did you first talk to Mr.

3     Gabbay about representing him?

4          A.    I'm going to say it was in July of

5     2017.  It could, however, have been August.

6     My initial contacts with this matter were

7     with Cliff Rieders.  And candidly, I don't

8     remember when it was I talked -- first

9     talked to Mr. Gabbay.

10          Q.    You said your initial contact with

11     Rieders was with Cliff Rieders.  And Rieders

12     was Mr. Gabbay's attorney?

13          A.    That's my understanding.  And

14     personal friends.  They've been friends

15     forever.

16          Q.    Okay.  And did your communications

17     throughout this litigation also include

18     Cliff Rieders in most communications with

19     Mr. Gabbay?

20          A.    I think that's a fair statement,

21     yeah.

22          Q.    So did you talk to Cliff Rieders

23     more often about the litigation or Mr.

24     Gabbay?

BERNARD G. CONAWAY, ESQUIRE

Page 11

1            A.    Absolutely much more often to

2      Cliff Rieders than Mr. Gabbay.  In terms of

3      actually speaking with the client, I might

4      have spoken to Mr. Gabbay eight, ten times

5      over the course of two years, three years.

6            Q.    Would that be reflected in your

7      invoices?

8            A.    I don't know the answer to that

9      question.  I assume it would be, but I don't

10     know that.

11           Q.    Okay.  So there's some phone calls

12     which you might make with the client and not

13     actually bill for; is that fair to say?

14           A.    I'm sorry.  I didn't hear you.

15           Q.    They need a little cough button

16     like they have in TV studios, I think.

17                 Would it be fair to say that

18     there's sometimes when you talk to a client

19     -- there are times when you talk to a client

20     and you don't actually bill for it or make a

21     note of it?

22                 MS. BARRON:  Objection as to form.

23                 THE WITNESS:  I would say as a

24     matter of practice, yes.  Whether I did here

BERNARD G. CONAWAY, ESQUIRE

Page 12

1        or not, I couldn't specifically tell you,

2        Ron.  I don't bill for every time I sneeze.

3        BY MR. POLIQUIN:

4            Q.    Understood.

5                  And when you say, "sneeze," you

6        mean maybe talk to or have any kind of

7        interaction with the case?

8            A.    Yeah, I just don't think it's good

9        conduct to nickel and dime clients.

10           Q.    Prior to this case, did you have

11       any experience with Cliff Rieders?

12           A.    No.

13           Q.    Prior to this case, did you have

14       any experience with Mr. Gabbay?

15           A.    No.

16           Q.    And how often did you speak to Mr.

17       Rieders about this case?

18           A.    It depended on what was going on.

19       You know, there were times, like in any

20       litigation, where things are hot and heavy

21       and times where there was a lull.  When

22       there was a lull, you know, not very often.

23       When things were hot and heavy, especially

24       towards the end when the case was settling,

BERNARD G. CONAWAY, ESQUIRE

Page 13

1    I was talking with him daily.

2        Q.    Did Mr. Rieders memorialize those

3    communications in a letter many times?

4        A.    He did.  I don't know about many

5    times but he definitely memorialized

6    communications by way of letter that he

7    would attach to an email.

8        Q.    And did you find that his -- those

9    letters accurately memorialized your

10   conversations with him?

11       A.    I'm not sure I can answer that

12   clearly.  I don't have any recollection of

13   reading any of those letters though and

14   saying to myself, where was he at or where

15   did this come from.  I don't remember that.

16   Specifically, I can't tell you that they

17   were accurate or inaccurate, but I will tell

18   you I have no memory of them being

19   inaccurate or off the mark, so to speak.

20       Q.    If they were inaccurate, would you

21   have made some kind of -- would you have

22   communicated to Mr. Rieders?

23       A.    I presume I would.  Mr. Rieders

24   and I had a very good rapport.  He used a

BERNARD G. CONAWAY, ESQUIRE

Page 14

1    lot of yiddish in our communications.  So

2    there were times when he would write

3    something or say something that compelled me

4    to ask, what did you mean by that.  I'm not

5    sure -- again, Ron, I'm not sure that I ever

6    wrote him back and said, we didn't talk

7    about this or I don't remember that.

8        Q.   Now, was Mr. Gabbay copied on

9    these communications?

10       A.   Again, I can't answer that

11   specifically, but I believe he was copied on

12   many of them.  I'm also certain he was not

13   copied on all.

14       Q.   As far as phone calls, did you

15   have phone calls where Mr. Rieders and Mr.

16   Gabbay were both on the line?

17       A.   Yes.

18       Q.   Was that common when you talked to

19   Jeff Gabbay?

20       A.    I believe so, but I'm not certain.

21   I'm trying to remember if there was ever a

22   time that I spoke to him without Cliff on

23   the phone, and there may have been once or

24   twice, but I can't say that with certainty.

BERNARD G. CONAWAY, ESQUIRE

Page 15

1          Q.    From my understanding, it's your
2     representation that most of your
3     communications were done with Mr. Gabbay --
4     were done by email; is that correct?
5          A.    Yes.
6          Q.    And was it the common practice
7     that Cliff Rieders would be copied on those
8     emails?
9          A.    Again, I don't know, but it was my
10    practice and is my practice to the extent
11    that there is another out-of-state attorney
12    involved to keep them in the communication
13    loop if I can or need to.
14         Q.    Did you have a chance to review
15    your emails in this case with Gabbay?
16         A.    I'm not sure I follow you.
17         Q.    Prior to this deposition, did you
18    review the emails that you had with Mr.
19    Gabbay regarding this case?
20         A.    All of them, no.  Some, yes.
21         Q.    Okay.  And in those emails, was
22    Cliff Rieders usually copied on them?
23         A.    I don't recall the answer to that.
24         Q.    Now, in your practice, how many

BERNARD G. CONAWAY, ESQUIRE

Page 16

1    times have you wired funds to a client out

2    of the country?

3         A.    Over the course of, at that time,

4    20-some years, probably twice.

5         Q.    And did you have any -- so it's

6    not common that that happens; would that be

7    fair?

8         A.    I think that's fair.

9         Q.    And did you have some -- when was

10   the first time you did it?  I assume it

11   wasn't this.  This was the second time?

12        A.    It was the second time.  If there

13   -- yes.

14        Q.    When was the first --

15        A.    I'm not even certain -- I'm sorry.

16   I don't mean to interrupt you.

17              I'm not certain it was two.  I'm

18   not certain it was three.  I'm not certain

19   it was one.  All I know it wasn't often.

20        Q.    So the only one you specifically

21   remember is the one with Jeff Gabbay?

22        A.    Sure.

23        Q.    Did you do any research -- let me

24   withdraw that question and let me provide

BERNARD G. CONAWAY, ESQUIRE

Page 17

1      more foundation.
2              Would you agree that the amount
3      involved in this case was a large amount in
4      comparative to other cases that you've
5      handled?
6          A.   No.
7          Q.   So it's not unusual for you to
8      handle settlements in the six figures?
9          A.   It's not unusual, no.
10         Q.   Did you have a standard practice
11     on what you did prior to the distribution of
12     funds?
13         A.   I'm not sure I follow you.
14         Q.   Okay.  Did you have some kind of
15     checklist that you underwent prior to
16     distributing settlement funds to a client?
17         A.   Checklist, mental, yes.  You know,
18     like most lawyers do, a settlement summary.
19         Q.   Anything else other than a
20     settlement summary?
21         A.   You know, that involves looking
22     into numbers, final invoices, expert fees,
23     you know, things of that nature.
24         Q.   Prior to the distribution of Mr.

BERNARD G. CONAWAY, ESQUIRE

Page 18

1      Gabbay's funds, did you do any research into

2      the wiring of client funds to a foreign

3      country, a bank in a foreign country, I

4      should say?

5          A.   Do research, no.  Have some

6      understanding of the process, yes.

7          Q.   What is your -- I'm sorry.

8          A.   If you're asking did I actually go

9      out and do research at that point in time

10     when I received Mr. Gabbay's funds, no.  But

11     like most lawyers, I read up on practice

12     issues and things like that.

13         Q.   And what was your recollection at

14     the time that you distributed Mr. Gabbay's

15     funds about any specific precautions you

16     should take prior to the distribution of

17     funds to a foreign bank?

18         A.   I don't have a specific

19     recollection other than I knew I needed

20     written wire instructions.  I knew I needed

21     some confirmations from the client.  That's

22     about the best I can remember.

23         Q.   Okay.  I'm going to show you some

24     documents, and most of these documents --

BERNARD G. CONAWAY, ESQUIRE

Page 19

```
 1      like I said, most of these documents are
 2      documents that you provided, so they should
 3      be in the order that you provided them.  I
 4      don't know if that helps at all, or if you
 5      have hard copies in front of you, but I'll
 6      share my screen with you.
 7              (Screen sharing.)
 8      BY MR. POLIQUIN:
 9          Q.   I'm going to go to this email and,
10      like, if you need me to position it a
11      certain way, you need me to magnify it or
12      demagnify it or whatever, you let me know,
13      or you need time to review it.
14              This looks to be -- the subject
15      matter is -- let's see.  Excuse me.
16              The subject matter is, reply
17      Gabbay Cupron executed documents/funding.
18      The date is May 31, 2019, 5:54 a.m.  That's
19      from you to a Stephen Brauerman at the
20      Bayard Firm.  And I believe it's Bates
21      stamped CL-0002.
22              Who's Steve Brauerman?
23          A.   He was Cupron's counsel, Delaware
24      counsel.
```

BERNARD G. CONAWAY, ESQUIRE

Page 20

1      Q.   Okay.  And was he handling

2   transferring the settlement funds for the

3   Gabbay settlement?

4      A.   I don't believe that he was.  I

5   believe they came from another fellow, Mr.

6   Moore.  I believe his name is.  Jay Moore.

7   There he is down the bottom, or down.

8      Q.   So one -- excuse me.

9           What discussions took place --

10   excuse me.

11           How was the decision made that the

12   settlement funds would be transferred into

13   your trust account?

14      A.   There was a problem getting Cupron

15   to comply with the terms of the settlement.

16   There were some pre-funding obligations.

17   And our position was that Cupron was either

18   not doing them or we had done what we needed

19   to do in order to cause funding.  At some

20   point, there was a discussion with Cupron

21   that we were going to pull the plug on the

22   settlement because our thought was they were

23   screwing around.  And the fix for that was

24   to wire the funds to my account.  And I

BERNARD G. CONAWAY, ESQUIRE

Page 21

1    think somewhere in this email chain, you'll

2    see where I had agreed to hold them and

3    release them only under certain

4    circumstances.

5         Q.   Are these actual settlement funds

6    -- in this email, are you discussing the

7    actual settlement funds that would be later

8    transferred into the Hong Kong account?

9         A.   Yeah, if I'm not mistaken, the

10   date of this is around the time when Jay

11   Moore wired to my account the entire

12   settlement amount, which I think was just

13   short of $450,000 or 460,000.

14        Q.   And this is you emailing Steve

15   Brauerman confirming receipt of Cupron's

16   wire into my firm's escrow account.

17             Was there any discussion between

18   yourself and Cliff Rieders as to where those

19   funds should be wired into?

20        A.   I don't recall.  I know that at

21   the time we were at -- our side was at its

22   wits' end because it seemed like our

23   adversary was doing whatever they could to

24   postpone payment to slow down the process.

BERNARD G. CONAWAY, ESQUIRE

Page 22

1          So I don't know the answer to your

2     specific question.  I only know in the

3     context of what was going on.

4          Q.   Did you have any discussions with

5     Cliff Rieders regarding wiring the funds

6     into the Monte Bank & Trust Company?

7          A.   No, that's an unfamiliar -- a name

8     unfamiliar to me.

9          Q.   Cliff Rieders never talked with

10    you regarding wiring those funds into that

11    company because he was counsel for them?

12         A.   None of that is ringing a bell.

13         Q.   Do you recall of there being any

14    discussion as to whether or not the funds

15    should be wired into your trust account?

16         A.   I presume there was.  I can't say

17    with specificity.  And I presume my trust

18    account was amenable to the defendants

19    because I was the Delaware lawyer and I was

20    willing to make the commitment to hold it

21    until certain circumstances were met.

22         Q.   Did Cliff Rieders and Jeff Gabbay

23    agree to that?

24         A.   I believe they did.

BERNARD G. CONAWAY, ESQUIRE

Page 23

1          Q.   And do you recall what the issues
2     were that was holding up the settlement
3     funds being transferred?
4          A.   I have a vague recollection.
5     There was -- in a general sense, it seemed
6     like Cupron was pulling a different rabbit
7     out of their hat every day.  And at one
8     point, they were asking for stock
9     certificates.  And I remember that Mr.
10    Gabbay had stocks in two forms; some were
11    issued, some were not.  So it was easy to
12    turn over the certificated stocks to Cupron
13    or to Stephen Gabbay -- or Stephen
14    Brauerman.  I'm sorry.  And I had asked
15    early on in the process how they wanted to
16    address the turn over of the uncertificated
17    shares.  And at the time, I asked that
18    question, either Mr. Moore or Mr. Brauerman
19    or both told me not to worry about it.  And
20    I know right around this time, although I'm
21    not exactly sure when, all of a sudden, they
22    raised the issue of, well, we need indemnity
23    on the unissued, uncertificated stocks in
24    case you, you know, lien them, in case you

BERNARD G. CONAWAY, ESQUIRE

Page 24

1    burn them with some obligation.  And I

2    remember being angry about it.  I know Cliff

3    was angry about it.  I don't recall Mr.

4    Gabbay's reaction, if any, to it.  But I

5    know that was one of the things that was

6    going on at the time.  And it was part of a

7    ongoing process of dragging this settlement

8    out.

9            And I believe, but I'm not certain

10   of this, the case settled sometime either in

11   early February or mid March, somewhere in

12   that time frame.  And it took us from that

13   time, from whatever that settlement was, to

14   the end of May to document it.  And in my

15   mind, it should have never taken anywhere

16   near that long.  There was nothing

17   complicated about this.  We were not

18   inventing a wheel here, you know.  We were

19   releasing claims, transferring shares and

20   everybody was going to go their separate

21   ways.

22       Q.   Now, in the email, you say:

23            All things considered, I like to

24   hand deliver the documents to you.

BERNARD G. CONAWAY, ESQUIRE

Page 25

```
 1          When you say, "all things
 2     considered," what did you mean by that?
 3          A.   That I didn't want to take one
 4     more risk that something got lost.  I wanted
 5     to make sure that I handed these pieces of
 6     paper.  They were -- ultimately what
 7     happened is, I issued a letter under the UCC
 8     effectively indemnifying Cupron that the
 9     shares were not encumbered or anything like
10     that.  And those had to be executed in
11     Israel.  I needed to have them notarized in
12     Israel.  And the last thing that I wanted to
13     happen was stick them in the mail and find
14     out they never got there.  You know, and
15     Wilmington is small enough.  It's not such a
16     big deal to walk, you know, from your office
17     to mine.  Maybe your office, Ron.  But, you
18     know, I just thought for safety sake and to
19     get this over with, I was going to make sure
20     the documents got where they needed to go.
21          Q.   And ultimately, those funds were
22     transferred to your trust account?
23          A.   Yes.
24          Q.   Did you, as an attorney owe Jeff
```

BERNARD G. CONAWAY, ESQUIRE

Page 26

```
 1        Gabbay a fiduciary duty on how you handled
 2        those funds once they were delivered in your
 3        trust account?
 4                    MS. BARRON:  Objection.
 5                    THE WITNESS:  I owed a fiduciary
 6        duty for the handling of any of Mr. Gabbay's
 7        property, including funds.
 8        BY MR. POLIQUIN:
 9           Q.    And including those funds that
10        were transferred as settlement in this case;
11        is that correct?
12                    MS. BARRON:  Objection.
13                    THE WITNESS:  When you say,
14        "transferred as settlement," you mean coming
15        in from the folks at Cupron?
16        BY MR. POLIQUIN:
17           Q.    Correct.
18           A.    Yes.
19           Q.    This looks to be an email on June
20        3, 2019.  Subject:  Cupron instruction
21        requested from yourself to Jeff Gabbay at
22        his Argaman Tech account.  Cliff Rieders is
23        copied on the account, correct?
24           A.    That's what it says.
```

 1        Q.    And CL-0003 is a Bates stamp.

 2              And was this part of your common

 3    practice to copy Cliff Rieders on all the

 4    emails to Mr. Gabbay?

 5        A.    No, I didn't -- no.

 6        Q.    You didn't copy Cliff Rieders on

 7    your emails to Mr. Gabbay throughout this

 8    litigation?

 9        A.    Common practice, I'm not sure

10    that's accurate.  But often, yes.

11        Q.    And in this email, you talk about

12    the holding of the settlement funds in your

13    firm's escrow account with instructions on

14    how they need to be delivered.  You talk

15    about, also, some other issues with Cupron,

16    correct?

17        A.    That's what the email says, yes.

18        Q.    And you actually used a term

19    pulling rabbits out of their, and I believe

20    you used ass, but that's what you were

21    referring to before, in having these ongoing

22    issues?

23        A.    The vocabulary was more colorful

24    than you've described, but yes, this is a

BERNARD G. CONAWAY, ESQUIRE

Page 28

```
 1    reference to the stock and uncertificated
 2    stock problems I was referring to earlier.
 3         Q.    Why did you copy Mr. Rieders on
 4    this email?
 5         A.    I don't remember why.
 6         Q.    Was there any rhyme or reason on
 7    why you would copy Mr. Rieders on an email
 8    and why you would leave him out?
 9         A.    I think on occasion, Mr. Gabbay
10    would email me directly and I would respond
11    to him directly, and if I didn't think that
12    Mr. Rieders needed to know or he told me he
13    didn't need to know, then I wouldn't copy
14    him.  Because he was a billing event as
15    well.  I mean, we were both billing Mr.
16    Gabbay.  I didn't need to waste Mr. Gabbay's
17    money by involving Mr. Rieders on something
18    that, you know, was outside the litigation
19    or that he had told me that he didn't need
20    to know about.
21         Q.    I believe you testified -- excuse
22    me.  I don't know if you testified to this.
23              There's been representations that
24    there was no rhyme or reason between whether
```

BERNARD G. CONAWAY, ESQUIRE

Page 29

1    or not Mr. Gabbay emailed you from the
2    Argaman address or from the Gmail address.
3    Is that your understanding, there was no
4    system on why that happened?
5         A.   Yeah, I have no idea why on Monday
6    I got an email from Gmail, and on Tuesday I
7    got one from Argaman.
8         Q.   Did you ever consider just copying
9    Mr. Gabbay on both emails?
10        A.   I don't know the answer to that.
11   I don't know that I ever gave that an ounce
12   of thought during the course of the
13   litigation.
14        Q.   Did you ever talk to Mr. Gabbay
15   about communications with -- you know,
16   communications with Cliff Rieders and what
17   you should communicate and what you
18   shouldn't communicate?
19        A.   I think early on, yes.  I'm not
20   sure that there were any discussions about
21   that after the first month or two of
22   representing Mr. Gabbay.
23        Q.   I'm going to a June 6, 2019 email
24   from yourself to Mr. Gabbay's Gmail address

BERNARD G. CONAWAY, ESQUIRE

Page 30

1        with Cliff Rieders being copied on it, and

2        it was an invoice for your services.

3                Is that your understanding what

4        this email is?

5             A.   It appears to be what it says.

6             Q.   And it's Bates stamped CL-0004.

7                And on the next page is the actual

8        billing.

9                Does this represent -- this

10       wouldn't represent all of your fees that you

11       collected on Mr. Gabbay's case, correct?

12            A.   That's correct.

13            Q.   And were these paid -- were these

14       fees specifically paid out of the settlement

15       funds that you received from Cupron?

16            A.   I believe they were.

17            Q.   Do you have any idea how much you

18       collected in fees from Mr. Gabbay?

19            A.   Ballpark somewhere between 55 and

20       60 thousand dollars.

21            Q.   After Mr. Gabbay's settlement

22       funds were transferred to Hong Kong, did you

23       ever offer to return those fees or return

24       those fees because of what -- the mistakes

BERNARD G. CONAWAY, ESQUIRE

Page 31

1      that happened -- excuse me -- because of the

2      transfer to the Hong Kong bank and the fact

3      that he never got his settlement from this

4      case?

5          A.   I'm not sure I follow you, but I

6      think if you're asking me when it became

7      clear the funds were wired to an account not

8      belonging to Mr. Gabbay, did I offer to

9      return my -- the fee that I earned?  The

10     answer is no.

11         Q.   And why not?

12         A.   Because I earned that fee.

13         Q.   I'm going to stop the share for a

14     second, if it will let me.

15              What is your understanding of what

16     Mr. Gabbay's mistakes were in the handling

17     of the distribution of the funds to the Hong

18     Kong account?

19         A.   I don't know that I have a clear

20     handle of all of that.

21              Do you have documents on the

22     screen, Ron, because all of a sudden, my

23     screen went to a Veritext?  All I'm looking

24     at is the intro screen.

BERNARD G. CONAWAY, ESQUIRE

Page 32

1          Q.   I've been trying to stop my --
2          A.   Okay.  I'm not missing anything is
3     what I'm trying to ask.
4          Q.   No, I don't have documents on the
5     screen.
6          A.   Okay.
7          Q.   I was just having a hard time
8     stopping the screen share.
9               MS. BARRON:  You do have documents
10    on the screen.
11              MR. POLIQUIN:  Okay.  Hold on one
12    second.  Can we take a quick break?
13              (Break held.)
14              (Screen sharing ceased.)
15    BY MR. POLIQUIN:
16         Q.   Now, Mr. Conaway, is it your
17    position that Jeff Gabbay had some -- excuse
18    me -- made some kind of mistake which helped
19    lead to this mistaken transfer of funds to a
20    hacker account in Hong Kong?
21         A.   Is it my position that Mr. Gabbay
22    made some sort of mistake that lead to the
23    funds being transferred to a hacker in Hong
24    Kong; is that your question?

BERNARD G. CONAWAY, ESQUIRE

Page 33

1          Q.    Yes.

2          A.    The one that I'm aware of is that

3      he never disclosed to either Mr. Rieders or

4      I that his email account, his Argaman

5      account had been compromised.

6          Q.    What is your understanding of when

7      it was compromised?

8          A.    Mr. Rieders told me at some point

9      after we learned that there was a problem,

10     that Mr. Gabbay's email account had been

11     hacked in early June and then again either

12     in late June or early July.  He told me that

13     Mr. Gabbay had retained a consultant to

14     address the problem.  But my best

15     recollection is at the time that Mr. Rieders

16     told me that, he had only himself just

17     learned about the problem.  And, again, this

18     was, I'm going to say, mid to late July of

19     that year.

20         Q.    When you say -- this is the

21     conversation you had with Mr. Rieders, or

22     this is when Mr. Gabbay's account was

23     hacked?

24         A.    I'm not sure of the distinction

BERNARD G. CONAWAY, ESQUIRE

Page 34

1      you're drawing.

2              What I was trying to relay was

3      that I had a conversation with Cliff Rieders

4      after we learned the money that was wired to

5      Hong Kong was in error.  And it was during

6      that conversation or thereafter, shortly

7      thereafter, that Mr. Rieders conveyed to me

8      that Mr. Gabbay's email account, his Argaman

9      email account had been hacked twice since

10     June 1st.

11         Q.   So this would have been --

12         A.   I'm say June 1st.  I'm not sure my

13     recollection is that specific, but it was

14     sometime in very early June.

15         Q.   So it's your recollection from

16     your conversation with Cliff Rieders that

17     Mr. Gabbay's Argaman Tech account was hacked

18     in June of 2019?

19         A.   Correct.

20         Q.   And your basis for that is only

21     your conversation with Mr. Rieders?

22         A.   At the time, yes.

23         Q.   Did you ever communicate that

24     issue with Jeff Gabbay individually?

Page 35

```
 1        A.   When you say, "that issue," you

 2   mean email account hacking?  Is that what

 3   you're referring to?

 4        Q.   Yeah, the fact that his -- did you

 5   ever email Jeff Gabbay after the transfer of

 6   funds and ask him why he didn't alert you

 7   that his email account was hacked in June of

 8   2019?

 9        A.   I don't recall.  As I sit here, I

10   don't think I did.  I know I spoke to his

11   son, Mr. Gabbay's son at Mr. Gabbay's

12   direction.  And I, obviously, spoke with Mr.

13   Rieders.  I don't know that I actually ever

14   spoke to Mr. Gabbay directly after it became

15   clear the money was inadvertently wired.  I

16   may have, but I can't remember if it

17   happened.

18        Q.   And I believe you've represented

19   in your responses to discovery that you

20   apologized to Cliff Rieders for what

21   happened, correct?

22        A.   Can you be a little more specific?

23   When you say apologize --

24        Q.   You apologized the fact you
```

BERNARD G. CONAWAY, ESQUIRE

1    transferred the funds to the hacker in Hong

2    Kong?

3         A.    What I apologized for was the

4    outcome and any part that I played in it.  I

5    don't know any lawyer who would have been

6    involved in this kind of transaction with

7    this kind of result who would not have had

8    some regret for how it turned out.  It was

9    -- I liked Mr. Gabbay.  He's a great guy.

10   He's a brilliant man.  You know, if every

11   one of my clients were like him, it would be

12   a lot easier day at work.  I never ever

13   would have wished this on him.  And to the

14   extent that I was involved, I wish I hadn't

15   been.

16        Q.    Did you ever make that

17   representation to Mr. Gabbay himself?

18        A.    Which representation?

19        Q.    The statement that you just made

20   regarding the fact that you felt bad for the

21   outcome and what you just explained there.

22   I can't go word for word what you just said,

23   but basically that you -- for whatever part

24   you played in it and the outcome -- I'm not

BERNARD G. CONAWAY, ESQUIRE

Page 37

1      trying to rephrase what you just said.  I'm

2      just kind of paraphrasing.  All of that is

3      on the record, what you said.  I'm not

4      trying to be tricky here.  Did you ever

5      communicate that type of statement to Mr.

6      Gabbay himself

7                 MS. BARRON:  Objection to form.

8                 THE WITNESS:  I know that I

9      communicated that sentiment I think directly

10     to Mr. Gabbay by way of email, but it might

11     have been to Mr. Rieders, and he may have

12     passed it on.  I just don't remember the

13     sequence of how that happened.

14     BY MR. POLIQUIN:

15          Q.   I know you filed a police report

16     later on and filed a report to the FBI,

17     correct?

18          A.   Yes.

19          Q.   Was it ever conversed to them that

20     Mr. Gabbay's account was hacked in June of

21     2019?

22          A.   I don't know.  I did not look at

23     the IC3, which was filed with the FBI, or

24     the report that I filed with the Hong Kong

BERNARD G. CONAWAY, ESQUIRE

Page 38

1     Police in relation to this.

2          Q.   Are you aware if these were two

3     different hacks or the same hacker -- wait.

4     Let me finish my question.  I see you

5     shaking your head.

6          A.   I'm sorry.

7          Q.   Are you aware whether this

8     individual that hacked into Mr. Gabbay's

9     account in June of 2019 was the individual

10    who hacked into the account and had the

11    money transferred to him in Hong Kong?

12         A.   I have no idea.  All I know about

13    the hackings is what Cliff Rieders told me.

14    He did tell me the vendor's name.  I can't

15    recall that.

16         Q.   I'm going to do a share screen

17    again.

18              (Screen sharing.)

19    BY MR. POLIQUIN:

20         Q.   I'm going to go to document Bates

21    stamped CL-00014.  This is an email dated

22    June 7, 2019 from Mr. Gabbay to yourself

23    with Cliff Rieders copied on it, where Mr.

24    Rieders expresses that he's completely

BERNARD G. CONAWAY, ESQUIRE

Page 39

1    satisfied with your service and it says,

2    it's been a real pleasure working with you

3    and Cliff.  He also found it a very

4    intellectually simulating event.  Do you

5    know what he was referring to?

6         A.    I don't specifically know what he

7    was referring to here.  There were -- I can

8    only tell you that there were some very

9    unique challenges that occurred as a result

10   of the valuation that Cupron had placed on

11   his options.  And that made the process of

12   settling more complicated.  It required us

13   to drag in a tax person to help me navigate

14   the -- you know, some of the tax issues that

15   might be associated with the valuation and

16   the settlement.  And, honestly, I thought

17   that was an interesting -- I had never dealt

18   with that issue before.  I've dealt with

19   options many times.  I've not dealt with the

20   kind of valuation issue that popped up here

21   in this case.  And the fact of the matter

22   is, and I said this earlier, I enjoyed

23   working with Mr. Gabbay.  He's a bright,

24   bright guy, personable.  Cliff, the same

BERNARD G. CONAWAY, ESQUIRE

Page 40

1    way.

2         Q.    Now, it says, I would also like

3    all outstanding invoices to be paid to

4    Cliff.

5             Did that occur, where Cliff was

6    paid any outstanding invoices?

7         A.    I believe he was.

8         Q.    And the sole purpose of you

9    receiving the settlement funds disbursement

10   was to eventually transfer it to Mr. Gabbay

11   after taking out your fees and Cliff

12   Rieders' fees; is that correct?

13        A.    No.

14        Q.    Can you clarify then?

15        A.    The sole -- not sole purpose.  One

16   of the purposes for the money being wired to

17   me was to force Gabbay (sic) to make a good

18   faith showing that they were actually going

19   to complete and comply with the settlement

20   terms.

21        Q.    Would it be a correct statement to

22   essentially say you were holding the funds

23   for Gabbay until those conditions occurred?

24        A.    I think that's safe to say, yes.

BERNARD G. CONAWAY, ESQUIRE

Page 41

1    I agree.

2         Q.    I'm looking at a document, and

3    there's a couple of emails here.  It's Bates

4    stamped CL-0019.  And on the bottom of this

5    page, it's an email from yourself to Cliff

6    Rieders with -- Kim Polhemus is copied.

7              Who is Kim Paulhamus?

8         A.    My recollection is that she works

9    in Cliff Rieders' office.  I'm not sure in

10   what capacity.

11        Q.    And this looks like an email where

12   you're telling Cliff that Jeff still hasn't

13   given you the instructions on how to

14   transfer the settlement proceeds.

15        A.    That's what it says, correct.

16        Q.    And this is Bates stamped CL-0021,

17   where you email Cliff regarding anything

18   from Jeff on disbursing settlement funds.

19              It looks like Cliff says, I will

20   call him soon and let you know.

21              You were basically trying to get

22   instructions for what to do with the

23   settlement funds, correct?

24        A.    Yes.

BERNARD G. CONAWAY, ESQUIRE

Page 42

1      Q.   And I'm looking at Bates stamped

2    CL-0023.  It's an email, July 1, 2019, from

3    yourself to Jeff Gabbay at his Argaman Tech

4    account, copied Cliff Rieders asking for

5    instructions for the settlement funds.

6            At this point in time, how long

7    had you had the settlement funds?

8      A.   I don't know exactly when I

9    received them, but I think it was somewhere

10   around May 30th.  So whatever that time

11   frame is to July 1st; 30 days, 35 days,

12   somewhere in there.

13     Q.   So basically by rule -- when you

14   say, by rule I have 60 days to disburse the

15   funds.  What rule are you referring to?

16     A.   Professional rules of conduct.  We

17   have an obligation, as I understand it, to

18   disburse client fund promptly.  In my head,

19   that's always meant within 60 days.  I don't

20   know that the rule says that, but there is

21   an obligation to turnover client --

22   distribute client funds promptly.

23     Q.   So that would be about July 31,

24   2019?

BERNARD G. CONAWAY, ESQUIRE

Page 43

1           A.    I think so.

2           Q.    It looks like Jeff emails you on

3      that same day, copies Cliff.  He emails you

4      from the Argaman Tech account, we're meeting

5      with Altar -- I believe it's supposed to be

6      our financial advisor, get back to you then.

7      And he copies -- Cliff is copied on that.

8                Do you know if the hacker, every

9      time the hacker had -- the actual hacker

10      that received the disbursement of funds, was

11      Cliff Rieders copied on any of those emails

12      from the actual hacker, or do you know?

13           A.    I know in the early -- and I'm

14      assuming that the emails that I got in early

15      July were from the hacker.  I can't tell by

16      looking at this one whether it was.  But Mr.

17      Rieders was copied on those early July email

18      communications.  And I know that during the

19      course of July, I had been in contact with

20      Mr. Rieders about, you know, what was going

21      on with the money, things of that nature.

22           Q.    Did you have any communications

23      with Cliff Rieders prior, after receiving

24      instructions to send it -- send the funds to

BERNARD G. CONAWAY, ESQUIRE

Page 44

1      a Hong Kong bank?

2                MS. BARRON:  Objection as to form.

3                THE WITNESS:  I'm not sure I

4      follow you, Ron.  I'm sorry.

5      BY MR. POLIQUIN:

6          Q.   Okay.  Well, at some point in

7      time, I believe it was around July 5, 2019,

8      you received funds (sic) from the hacker to

9      transfer the funds to a Hong Kong bank,

10     correct?

11         A.   No, I think you got your wording

12     screwed up.  I received instructions.

13         Q.   Instructions.  I'm sorry.

14         A.   That's okay.  I just want to make

15     sure we're on the same page.

16              I received wire instructions in

17     the very early part of July.  I don't

18     remember exactly when.  I know I was out of

19     town when they came in.  I believe it was

20     before July 4th, because I wasn't going to

21     get back in town till after that day or

22     maybe before that day.  I forget which.

23         Q.   Now, after receiving the

24     instructions but before actually

BERNARD G. CONAWAY, ESQUIRE

Page 45

1      transferring the funds, did you ever talk to

2      Cliff Rieders about this?

3            A.    Talk by telephone, if that's what

4      you're asking, I don't know.  I may have.  I

5      may not have.  I know I communicated with

6      him by email, though.

7            Q.    And all those emails should be

8      provided as part of your response to our

9      request for documents?

10           A.    I believe so.

11           Q.    This is Bates stamped CL-0025

12     where it's from Jeff's Gmail account to

13     yourself with Cliff Rieders copied and also

14     Shoshana Gabbay copied.

15                 Who is Shoshana Gabbay?

16           A.    My understanding is that is Mr.

17     Gabbay's wife.

18           Q.    Was this the first time she was

19     copied on emails, or has she been copied

20     before?

21           A.    I couldn't tell you that.

22           Q.    And do you have any doubt that

23     this was a legitimate email from Jeff

24     Gabbay?

Page 46

```
 1        A.   I never gave it thought.  I will
 2    tell you it was consistent with what Cliff
 3    Rieders had told me about when I would hear
 4    from Jeff, but I don't know that I looked at
 5    this before or after and thought I wasn't
 6    sure where this one came from.
 7        Q.   And what does Mr. Gabbay instruct
 8    you regarding the transfer of funds?
 9        A.   Well, the email says what it says.
10    They signed forms, and I'll be receiving
11    them next week.
12        Q.   And he --
13        A.   Transfer funds to the U.S.
14        Q.   When he says in the U.S.A., is
15    that significant in any way to you?
16        A.   No.
17        Q.   Do you know if Mr. Gabbay had any
18    businesses in Hong Kong?
19        A.   I know that Argaman Technologies
20    had Chinese investors or Hong Kong
21    investors.
22        Q.   And this is your email to Mr.
23    Gabbay.  It's Bates stamped CL-0026, July
24    2nd, where you're responding, thanks for the
```

BERNARD G. CONAWAY, ESQUIRE

Page 47

1  update.  And you say, I have the love of a

2  good woman, so I want for nothing.  I'm

3  assume you're joking there.  As always, take

4  care.

5           So you're just confirming that you

6  received the email, correct?

7      A.   Yeah, in the email prior, and I

8  assume these were sequential, one of the

9  things that's asked is whether I need

10  anything else.  And you're right, as a

11  matter of levity, I thought it would be

12  appropriate to throw a joke in.  And I'm not

13  going to have the love of a good woman,

14  so...

15      Q.   And that -- let's see.  Just

16  looking at the date.  You sent this email

17  8:44 a.m., July 2nd.  That's about 30

18  minutes or so after Mr. Gabbay gives you

19  instructions regarding transferring the

20  funds to the U.S. where his wife and Cliff

21  are copied.

22           And then you get this email on

23  July -- the same day, July 2nd, which is

24  from Jeff's Argaman Tech account where

BERNARD G. CONAWAY, ESQUIRE

Page 48

1        Cliff's copied on it but Shoshana isn't,

2        where:

3                    After meeting with our financial

4        advisor today, we agreed to wire transfer

5        the remaining settlement funds to our

6        affiliated company bank account in Hong

7        Kong.  I will forward you the perfect

8        banking details to you soon.

9                    Did you see any red flags or

10       issues with receiving just an email so short

11       after receiving the other email from Mr.

12       Gabbay?

13            A.   I did see a conflict.  That said,

14       Mr. Gabbay -- how do I say this?  I don't

15       want to insult him in any way.  Sometimes

16       his directions to me weren't clear.

17                    MS. BARRON:  What's the number of

18       that, Ron?

19                    MR. POLIQUIN:  That's CL-0027 --

20       00027.  Excuse me.

21       BY MR. POLIQUIN:

22            Q.   Now, do you agree that sometimes

23       emails can be confusing as far as receiving

24       instructions from a client?

BERNARD G. CONAWAY, ESQUIRE

Page 49

1        A.    Sure, anything can be confusing.

2        Q.    And would you agree that

3    confirming something with a phone call could

4    clarify that confusion?

5        A.    It might have, but this email took

6    place in the context of a running

7    conversation of which Mr. Gabbay, Mr.

8    Rieders, myself and, apparently, the hacker

9    were all part of.

10       Q.    You agree that this email is part

11   of a different email chain, though, correct,

12   than that prior email that you got on the

13   same date from Mr. Gabbay's Gmail account

14   where his wife is also copied?

15       A.    I'm not sure I agree that it's

16   part of a different chain.  The subject

17   matter is consistent with what we had been

18   discussing, albeit as you point out, there

19   is an inconsistency, but I wouldn't agree

20   that's a different chain or different

21   thread, whatever you call it.

22       Q.    And then that same day -- excuse

23   me.  Or the next day -- I'm sorry.  It's a

24   little confusing because that July 1st

BERNARD G. CONAWAY, ESQUIRE

Page 50

1      email.

2              And then we go to July 2nd.  So

3      that's Gabbay's Argaman Tech account, July

4      2nd at 9:49 a.m.  Then on that same day at

5      10:09 a.m., you have an email regarding

6      settlement proceeds from Mr. Gabbay's

7      Argaman Tech account where you're the sole

8      recipient and Cliff Rieders is not copied

9      nor is Shoshana.

10             Did you find that strange at all?

11         A.   No, I don't recall giving it a

12     moment's thought.

13         Q.   And that email is Bates stamped

14     CL-0028 -- 00028.  Excuse me.

15             And then on this email, it's July

16     2, 2019.  The time is 11:57 a.m. and 47

17     seconds.  It's just an email from yourself

18     to Mr. Gabbay at the Argaman Tech account.

19     This is Bates stamped CL-00030.  And you

20     say:

21             Jeff, today I received three

22     emails from you.  The first telling me that

23     you spoke to your financial advisor.  There

24     was -- it says the, but I believe you meant

BERNARD G. CONAWAY, ESQUIRE

Page 51

1      there was a response to my remark about my

2      wife.  And the third asking if I received an

3      email from you about the banking details.  I

4      did not receive specific directions about

5      your bank.

6                 Were you confused at this point

7      about the instructions because of the

8      bearing emails that were being -- coming

9      from Mr. Gabbay's different accounts?

10          A.   No.  I think this email was the

11     response -- don't hold me to this, but I

12     think it was a response to a question about

13     whether I had received something.  And I

14     responded back, you know, I received three

15     emails from you.  I think what that second

16     or is supposed to say -- the second response

17     -- the second was a response to my remark

18     about my wife.

19          Q.   Is there a reason why you didn't

20     copy Cliff Rieders on this email?

21          A.   I assumed it was because Cliff was

22     not included in the email that came to me in

23     the first -- you know, that asked for

24     confirmation.

BERNARD G. CONAWAY, ESQUIRE

Page 52

1           Q.    I think the email you're talking

2       about is the bottom, this bottom email from

3       Jeff, just solely from Jeff Gabbay's Argaman

4       Tech account?

5           A.    I presume that's the correct

6       email, Ron.  I don't -- it looks it.  I

7       can't tell you without looking at the entire

8       pack of them.

9           Q.    Okay.  And we get to this July 2,

10      2019.  There's two emails on the sheet.

11      This is Bates stamped CL-00031.  July 2,

12      2019, 12:22 with 19 seconds p.m. from Jeff

13      Gabbay's Argaman Tech account to yourself.

14      And it says:

15              Jeff, affiliated company banking

16      details.

17              And it says:

18              As agreed with my financial

19      advisor, please process the remaining

20      settlement funds to my affiliated company

21      account in Hong Kong.  Attached to the

22      wiring instruction.  And also tell me know

23      once the funds have been transferred so I

24      can follow up on my end.

BERNARD G. CONAWAY, ESQUIRE

Page 53

```
 1            At this point in time, did you
 2      take any steps to confirm the information
 3      contained on this email?
 4            A.    What I can tell you is that this
 5      email was part of an ongoing conversation on
 6      that day.  At various points in time, Mr.
 7      Rieders was involved.  Whoever was operating
 8      the Argaman account was involved.  Whoever
 9      was operating the Gmail account, Mr.
10      Gabbay's Gmail account, was involved.  I
11      know that there was participation of all of
12      four of those people, if there were four,
13      throughout the course of the day or the
14      conversation.  And some of the things that
15      were said during that conversation were
16      indicative of remarks that had been made in
17      the past.  So, for example, there was an
18      expression about the Hong Kong bank and the
19      Hong Kong monies that Mr. Gabbay referred to
20      as having to establish where the funds came
21      from because there's some sense in the
22      international banking community that all the
23      wire that gets money to Hong Kong is drug
24      money.  Mr. Gabbay had expressed that
```

BERNARD G. CONAWAY, ESQUIRE

Page 54

1    sentiment to me or at least by way of email
2    on more than one occasion.
3         Q.   Now, did you confirm that the
4    banking details provided by Jeff Gabbay was,
5    in fact, a bank that was affiliated with
6    Jeff Gabbay, or did you take any steps to
7    confirm it?
8         A.   I took no steps to confirm this
9    beyond the conversations that were unfolding
10   during that day.
11        Q.   So the beginning part of the
12   conversation came from Mr. Gabbay's Gmail
13   address where Cliff Rieders and his wife
14   Shoshana were copied, and now these other
15   conversations regarding the Hong Kong bank
16   are solely from Mr. Gabbay from the Argaman
17   Tech account; is that correct?
18        A.   In the context that you just
19   described, yes, but it is not the full
20   context of the conversations that were
21   occurring that morning.
22        Q.   Did you call -- I take it that you
23   didn't call Cliff Rieders and ask him
24   whether or not this banking information or

BERNARD G. CONAWAY, ESQUIRE

Page 55

1      the bank that was requesting the wire or the

2      company was affiliated with Mr. Gabbay, did

3      you?

4          A.   No, I did not call Cliff Rieders

5      on July 2nd.

6          Q.   And this was the wiring

7      instruction that you received from the

8      Argaman Tech account?  And this is CL-00032.

9          A.   I believe it is.

10         Q.   Prior to seeing these wiring

11     instructions, did you ever hear of HK Bliss

12     Traded Limited?

13         A.   I did not.

14         Q.   I'm going to an email from

15     yourself to Mr. Gabbay -- or to the Argaman

16     Tech account affiliated with Mr. Gabbay on

17     July 3rd at 11:49:33 seconds a.m., on

18     Wednesday.  The Bates stamp is CL-00033.

19     And you talk about your bank requiring the

20     international wires be completed in person.

21         A.   That's what it says, yes.

22         Q.   So at this point in time, you

23     hadn't taken any action to transfer the

24     funds?

BERNARD G. CONAWAY, ESQUIRE

Page 56

1          A.    I'm not -- I'm not sure that's

2     correct or incorrect.  I know that I had

3     looked into the transfer process.  My firm

4     bank accounts are with WSFS.  I was not in

5     Delaware on the day that I wrote this email,

6     and there are -- to my knowledge, there are

7     no WSFS branches in D.C.  I must have called

8     them to find out that.  But the long-short

9     of it was I couldn't do anything on that --

10    on the day of this email because I was not

11    in town and WSFS did not have a branch in

12    the location that I was at.  So I had to

13    wait until I got back to Wilmington,  And my

14    best recollection is I must have gotten back

15    the 3rd or the 4th.  I couldn't do anything

16    on the 4th because of the holiday.  And I

17    think my first opportunity to do anything

18    was on the 5th.

19          Q.    So on July 3rd, it seems like, you

20    made -- you got information regarding the

21    transfer of funds and learned that for an

22    international wire, you had to be -- it had

23    to be done in person at your local bank,

24    which was in Delaware where you were not at;

BERNARD G. CONAWAY, ESQUIRE

Page 57

1      is that correct?

2          A.    That's correct is.

3          Q.    I'm looking at an email, July 2,

4      2019.  CL-00034 is the Bates stamp.  It

5      looks to be at 1:12 p.m.  It's from Mr.

6      Gabbay's Argaman account to yourself, and

7      Cliff Rieders is copied on it.

8              Anticipation of question that will

9      be asked concerning the source of the Lupron

10     -- but I guess it's Cupron funds -- we will

11     need to present proof of the origin of the

12     funds.  Can you send me documentation that

13     demonstrates the source of the funds, i.e.

14     Cupron's purchase on our sale or our sale.

15             Now, what kind of company is

16     Cupron?

17         A.    They manufacture copper-embedded

18     materials.

19         Q.    And are they American company?

20         A.    Yes, they are a Delaware company.

21     That's how this ended up in Delaware, the

22     litigation in Delaware.

23         Q.    Do you believe that this email

24     came from Mr. Gabbay or it came from the

BERNARD G. CONAWAY, ESQUIRE

Page 58

```
 1       hacker?
 2           A.    I'm not sure, and I say that
 3       because as I mentioned earlier, there were
 4       prior references by Mr. Gabbay about proving
 5       the origin of funds.  And his, you know,
 6       observation that the international banking
 7       banks believed that wired funds are all drug
 8       money.
 9           Q.    I'm trying to understand, at some
10       point Mr. Gabbay said he wanted it wired
11       into a U.S. account, correct?
12           A.    Yes.
13           Q.    And ultimately, when the actual
14       Jeff Gabbay gave you instructions, it was to
15       U.S. accounts, correct?
16           A.    Yes.
17           Q.    So where did these conversations
18       occur regarding the, you know, origin of
19       funds and wiring into an international bank?
20       When did they occur?
21           A.    I think all of them occurred in
22       the sequence, some of the emails you showed,
23       most of which occurred on July 2nd.
24           Q.    Okay.  All right.  So that, when
```

BERNARD G. CONAWAY, ESQUIRE

Page 59

1       you say references, you're talking about

2       only within these emails, not on some other

3       date or time?

4            A.   I wouldn't be so specific as to

5       say the date.  My best recollection is that

6       much of the conversation about the wiring,

7       where to go occurred on July 2nd.  There was

8       some follow-up conversations I know all the

9       way up to the 5th.  As I sit here, I don't

10      recall what they were or the substance of

11      then.  I know at various points in time, Mr.

12      Rieders was involved.  At other points, he

13      was not.  At some points in time, Mr. Gabbay

14      by way of Gmail was involved.  At other

15      points, he was not.

16           Q.   I assume this is going to be a no,

17      but have you ever gone through these emails

18      with Mr. Gabbay or Mr. Rieders to determine

19      which ones were actually from the hacker and

20      which ones were from Mr. Gabbay?

21           A.   I have not.

22           Q.   This is a document Bates stamped

23      CL-00035.  It's an email from Cliff Rieders

24      to Mr. Gabbay's Argaman Tech account where

BERNARD G. CONAWAY, ESQUIRE

Page 60

1    you're copied where he says, tax authorities

2    won't care where Cupron got the funds from.

3         A.   I see that.

4         Q.   Did you find this question strange

5    at all coming from Mr. Gabbay?

6         A.   Actually, this question did not,

7    as I read this email, did not -- or this

8    remark did not come --

9         Q.   I'm not saying it came from Mr.

10   Gabbay.  I'm saying the issue came from Mr.

11   Gabbay originally as far as needing

12   documentations regarding the source of the

13   funds.

14        A.   No, as I said previously, I don't

15   know how it came up, but there had been at

16   least one prior discussion about wiring

17   money to an international bank account, to

18   which Mr. Gabbay remarked he had to prove

19   that it was not drug money.

20        Q.   This is a document.  The Bate

21   stamp is CL-00036.  I believe the -- this

22   email is actually dated July 2, 2019, at

23   2:02 p.m. from Cliff Rieders to yourself

24   where Mr. Gabbay's Gmail account is copied

BERNARD G. CONAWAY, ESQUIRE

Page 61

1      along with his wife Shoshana and it says,

2      U.S. or Hong Kong.

3              Does this -- after reading this,

4      what was your impression of what Mr.

5      Rieders' confusion was?

6          A.   I'm not sure I got an impression

7      of confusion.  You know, we started the day

8      off wiring to a U.S. bank.  Next thing,

9      we're wiring to a Hong Kong bank.  And I'm

10     assuming, without knowing, that Mr. Rieders

11     is clarifying U.S. or Hong Kong bank.

12         Q.   Okay.  This document is Bates

13     stamped CL-00037.  It's from Mr. Gabbay's

14     Argaman Tech account to yourself, no one

15     else is copied, July 5, 2019 at 2:55 p.m.

16     and 5 seconds.  And it says:

17             Bernie, happy 4th of July to you.

18     Sorry it's coming late.  Just checking.

19     Maybe you were able to complete the wire

20     transfer today.  Kindly drop me an email as

21     soon as you can.

22             In your communications -- at this

23     point in time, you had completed the wire

24     transfer?

BERNARD G. CONAWAY, ESQUIRE

Page 62

1      A.    That's what the email says, yes.

2      Q.    Did you let Mr. Rieders know that

3  the wire transfer was completed?

4      A.    I did do that.  Whether I did it

5  on this day or shortly thereafter, I'm not

6  sure.

7      Q.    And this is an email from yourself

8  to Mr. Gabbay's Argaman Tech account,

9  CL-00038, where you send the wire

10  confirmation to Mr. Gabbay's Argaman Tech

11  account.

12         This is Bates document CL-00039.

13  It lists that you actually did transfer the

14  funds.

15      A.    Yeah.  Yes, I believe this is the

16  wire confirmation that WSFS Bank gave to me

17  upon proof of completion of the wire.

18      Q.    Now, I'm going to stop the share

19  for a second here.

20         (Screen sharing ceased.)

21  BY MR. POLIQUIN:

22      Q.    There was a time -- the monies

23  were returned to your account for some

24  reason.  Do you know why?

BERNARD G. CONAWAY, ESQUIRE

Page 63

1          A.    My best recollection is that there
2     was an audit on the Hong Kong bank account
3     that the monies were wired to.  The
4     explanation I received was that as a result,
5     the bank would not accept incoming funds.
6          Q.    Okay.  At that point in time, the
7     funds were returned to you minus a return
8     fee in the amount of $42.14.
9             At that point in time, did you
10    feel the need to pick up the phone to Mr.
11    Gabbay and let him know what happened?
12         A.    No.
13         Q.    Did you let Mr. Rieders know that
14    the monies had been returned?
15         A.    Yes, again, though, I'm not sure
16    on what day I did that.  Whether it was this
17    day or a day later or two days later, I
18    don't know.
19         Q.    Did you let Mr. Rieders know
20    before or after you wired the funds the
21    second time?
22         A.    I believe it was before the second
23    wire.
24         Q.    And how did you communicate that

BERNARD G. CONAWAY, ESQUIRE

Page 64

1    to Mr. Rieders?

2          A.    I would presume email.  I have a

3    faint recollection that Mr. Rieders may have

4    been on vacation at some point during this

5    time period.

6          Q.    I'm going to go back to the screen

7    share to see your emails and see if that's

8    reflected.

9                (Screen sharing.)

10   BY MR. POLIQUIN:

11         Q.    This looks like an old email where

12   you were talking about U.S.A. thinks we are

13   all drug dealers working with undeclared

14   cash, we have to prove we are not.

15               Is that the reference you made

16   regarding showing the source of the funds?

17         A.    Yes.

18         Q.    That's Bates stamped CL-00040.

19               Now, that was the end of July 2nd

20   -- or excuse me.

21               That's at 3:49 p.m. on July 2,

22   2019.

23               In between this time where now you

24   have an email from Mr. Gabbay's Gmail

BERNARD G. CONAWAY, ESQUIRE

Page 65

1     account where Cliff Rieders is copied, where

2     you're CC -- excuse me.  It actually is sent

3     to Cliff Rieders, where you're CC'd and

4     Shoshana is copied, in between that time you

5     had several emails with Mr. Gabbay's Argaman

6     Tech account where it was just between you

7     and him, correct?

8          A.   Correct.

9          Q.   Did you find that confusing at all

10    that you had these two -- I'm trying to

11    think.  Is it email chains or email -- what

12    is the term you used -- you just used a

13    second ago?  Email?

14         A.   Email threads.

15         Q.   Threads, yeah.

16              Did that send up any red flags

17    that this was -- these two threads were

18    happening on the same day?

19         A.   No, it didn't.  Mr. Gabbay had

20    communicated with me using his Argaman

21    account many, many times in the past.  The

22    fact that he was using both in one day

23    didn't surprise me.  I mean, I do it

24    sometimes myself.  I have a laptop, that's

BERNARD G. CONAWAY, ESQUIRE

Page 66

```
 1        how I do my work.  That is how I search the
 2        internet for stuff when I'm not working.  I
 3        could send you an email from a Yahoo or
 4        Gmail account just as quickly as I could
 5        send you one from my Conaway Legal account.
 6        This was not inconsistent with my own
 7        experience with email.  I'll put it that
 8        way.
 9            Q.   Did you find it strange that in
10        the beginning of the day he said that he sat
11        with his financial advisor, and after
12        meeting with him, he says, we're going to
13        transfer the funds to a U.S.A.; then
14        subsequently, in another email, he says,
15        after meeting with our financial advisor, we
16        decided to send the funds to a Hong Kong
17        account?
18            A.   Yeah, I'll agree with you that
19        there appears to be an inconsistency there.
20        My sense of that inconsistency, though, was
21        ameliorated by the ongoing conversations
22        occurring between the Argaman account, the
23        Gmail account and Mr. Rieders.
24            Q.   It's your belief --
```

BERNARD G. CONAWAY, ESQUIRE

Page 67

```
 1          A.   Hold on.  Give me a second.
 2          Q.   It's your belief that you had told
 3     Mr. Rieders, and you believe by email, that
 4     the funds were returned because of the
 5     audit?
 6               MS. BARRON:  Objection to form.
 7               THE WITNESS:  I didn't hear you,
 8     Ron.  I'm sorry.
 9     BY MR. POLIQUIN:
10          Q.   Okay.  It's your belief that you
11     had informed Mr. Rieders that the funds were
12     returned from the Hong Kong account because
13     of an audit?
14          A.   I'm not sure that I told him an
15     audit, but I'm certain that I told him that
16     they had been returned from Hong Kong the
17     first -- you know, the first wire had been
18     returned.  Again, I don't know that I was
19     specific about why.
20               (Screen sharing ceased.)
21     BY MR. POLIQUIN:
22          Q.   When dealing with this amount of
23     funds, did you do any due diligence other
24     than the emails?
```

Page 68

1          A.    I'm not sure I'm following you.

2     Do due diligence?

3          Q.    Did you make any other -- did you

4     do any follow-up communications to the

5     emails you received from Mr. Gabbay before

6     either the first transfer or the second

7     transfer?

8          A.    In my mind, the process was

9     confirmed by communications that I received

10    from Cliff Rieders in late June where Cliff

11    told me that Mr. Gabbay and his wife would

12    be meeting with a financial consultant and

13    that I would hear from them on some day in

14    the future, and I believe Mr. Rieders said I

15    would hear from them Tuesday, and I believe

16    that happened to be July 2nd.  So what I'm

17    reading, what I'm seeing is that Mr. Rieders

18    is providing me information that is

19    subsequently validated by actions taken by

20    Mr. Gabbay.

21             The fact that there was confusion

22    on July 2nd or at least different

23    instructions on July 2nd was obvious to me,

24    but then the ongoing conversations of that

BERNARD G. CONAWAY, ESQUIRE

Page 69

1      day and the fact that Mr. Gabbay was using

2      terminology that -- words and phrases that I

3      heard him use before was the confirmation

4      that I relied upon.

5          Q.   Other than the email

6      communication, did you take any other

7      actions to confirm the wiring instructions?

8          A.   I did not call Mr. Gabbay.  I do

9      not believe I spoke to Mr. Rieders that day.

10         Q.   Did you do any research on the two

11     companies that you were wiring funds to?

12         A.   No, not then.

13         Q.   Give me one second.

14             (Screen sharing.)

15     BY MR. POLIQUIN:

16         Q.   Is this Bates stamped CL-00051.

17     This appears to be a wired journal report

18     from WSFS Bank.

19             Can you confirm this is the second

20     wire that sent the settlement funds to a

21     Cagmean Trade Limited company in Hong Kong?

22         A.   This appears to be the wire

23     confirmation.  I think your pronunciation is

24     a little off, but I'll give it to you.

BERNARD G. CONAWAY, ESQUIRE

Page 70

1       Q.   Well, you can correct me.  I'm --
2       I don't take any --
3           A.   I'm just kidding.
4           Q.   All right.  It always translates
5       well in a deposition transcript.
6           A.   Right.
7           Q.   So this is a second wire journal
8       report.  That was on 7/16/2019.
9               Did you have any communications
10      either via phone -- excuse me.
11              Did you have any communications
12      via phone after you transferred the funds to
13      Mr. Gabbay?
14          A.   After the first time, I do not
15      believe so.  At some point after the second
16      time, I may have.  I don't recall.
17          Q.   When I say -- let's say before you
18      realized there was a mistake in the transfer
19      of funds, did you have any conversation with
20      Bill Meedley (sic) after you transferred the
21      funds or wire the funds?
22          A.   At some point, Mr. Gabbay emailed
23      me some -- what were described as wire
24      instructions.  And they were encrypted.  And

BERNARD G. CONAWAY, ESQUIRE

Page 71

1       I believe, but I'm not certain, those

2       instructions came from his Gmail account.  I

3       wrote back to him and told him that I could

4       not open the document, but I never heard

5       from him about that until days later, if at

6       all.  I think that that email, the Gmail

7       account email came right around the time

8       that this wire happened.

9            Q.   When you couldn't open up the

10      encrypted document, did you call Cliff

11      Rieders?

12           A.   No.

13           Q.   Did you try to call Jeff Gabbay

14      regarding it?

15           A.   No.

16           Q.   I believe this is the document

17      you're referring to, which is Bates stamped

18      CL-00052, where it's from -- excuse me.

19      It's, actually, from Mr. Gabbay's Argaman

20      Tech account to yourself, copied Cliff

21      Rieders and Shoshana Gabbay, dated July 18,

22      2019 at 6:29 a.m.  The subject, wire

23      instructions.  It appears that the wire

24      instructions are in some kind of a Word

BERNARD G. CONAWAY, ESQUIRE

Page 72

1    document.

2              Hi Bernie.  We finally got the

3    wire instructions for the account.  Kindly

4    transfer all the money in the account to

5    attached account.  Obviously the transfer

6    charges should be reduced from what is being

7    sent.  Please confirm back with the exact

8    amount of the transfer.  Thanks and best

9    regards - Jeff.

10             This was July 18th where your

11   transfer of the wire funds to the Hong Kong

12   bank happened two days earlier.

13             When you received this Gmail --

14   when you received this email -- excuse me --

15   did it raise any red flags for you that

16   there was some confusion or issues with the

17   prior wire instructions?

18        A.   Yes.

19        Q.   And what action did you take after

20   receiving this email on July 18th?

21        A.   I believe I responded shortly

22   thereafter and told Mr. Gabbay that I was

23   unsure what he was referring to, that the

24   monies had already been wired to a -- I

BERNARD G. CONAWAY, ESQUIRE

Page 73

1        don't know if I said a Hong Kong bank, but I
2        said they've been wired out.
3                At that point, I emailed Mr.
4        Rieders told him about the conversation -- I
5        think it was at that point -- about what had
6        gone on.  And at that point, it seemed to me
7        that there was a problem.
8                I read this email, and as I read
9        it again, it looks to be from Mr. Gabbay
10       himself inasmuch as he does not seem to
11       understand or know that the monies were
12       wired.  And even though it comes from his
13       Argaman account, as the other emails did,
14       this one it seems to me he didn't know what
15       had happened to the money at that point in
16       time.  There was the trip wire for me.
17           Q.   Did you take any immediate --
18           A.   I'm sorry.  I didn't mean to
19       interrupt you.
20               When I was referring to an email
21       that was sent to me encrypted, this is not
22       it.
23           Q.   So you actually received the wire
24       instructions on July 18th?

BERNARD G. CONAWAY, ESQUIRE

Page 74

1        A.    These were the wire instructions
2    that I received that set off the alarm
3    bells.
4        Q.    Did you take any steps to reverse
5    the wire transfer to the Hong Kong bank?
6        A.    Yes.
7        Q.    And did you take any steps on July
8    18th?
9        A.    I don't know with certainty.  I
10   know at some point in time that I contacted
11   WSFS to have those monies returned back.
12   And don't hold me to this, my recollection
13   was that they were told by the Hong Kong
14   bank that the only way we could get them
15   back was by way of some legal process.  What
16   I subsequently learned, though, was that at
17   this point in time, the money was gone, out
18   of the account.
19       Q.    You mean at the point in time you
20   got email, or the time you tried to reverse
21   the wire?
22       A.    At the time I got the email, this
23   email, what I've subsequently learned is
24   that on July 16th or whatever day the money

BERNARD G. CONAWAY, ESQUIRE

Page 75

1        hit the Hong Kong account, it was pulled
2        almost instantaneously out of that account.
3            Q.    Did you make any phone calls on
4        July 18th to Mr. Gabbay?
5            A.    I don't think I called Mr. Gabbay.
6                  I know at some point I
7        communicated with Mr. Rieders.  I sent him
8        an email, told him I think there's a
9        problem, words to that effect.  I believe he
10       called me or maybe I called him.  Somehow or
11       another, Mr. Rieders and I spoke.  You know,
12       that's when we both agreed we needed to get
13       the police involved.  He may have given me
14       the name of the FBI field agent who handled
15       this sort of stuff at this call.  But at
16       some point in this time frame, I did speak
17       with Mr. Rieders.  I do not believe I spoke
18       to Mr. Gabbay, although, it's possible that
19       Mr. Gabbay and Mr. Rieders and I were on a
20       phone call.  I can't rule that out to you.
21       But that would have occurred after it became
22       clear there was a problem.
23           Q.    I'm going to go to a document
24       Bates stamped CL-00053.  This appears to be

BERNARD G. CONAWAY, ESQUIRE

Page 76

1          the wiring instructions.

2               A.   Yes.

3               Q.   I'm looking at it.  For some

4          reason, it's dated 1/5/20.  Do you know why

5          that is?

6               A.   No, I didn't notice that before.

7               Q.   And this is --

8               A.   It might be a date that's buried

9          in the document when it's printed, that's

10          the date that shows up.  I'm guessing.

11               Q.   Right.

12                    And this is wiring instructions

13          from Jeff and Shoshana Gabbay to the Bank of

14          New York Mellon.

15                    Did you ever discuss with Mr.

16          Gabbay actually just sending him a check?

17               A.   I don't know.  I asked for

18          instructions on what to do with the money.

19          I got instructions.  I followed the

20          instructions.  Whether that, you know, as

21          we're sitting here today, you may be second

22          guessing my decision to do that, but this is

23          what I did.

24                    Yeah, this is the email -- never

BERNARD G. CONAWAY, ESQUIRE

Page 77

1    mind.

2        Q.    Let me just make a record of it.

3              Bates stamped CL-00054, this is

4    the email, July 18, 2019 at -- very shortly

5    after they sent you the wiring instructions

6    -- just give me a moment here.

7              It's a reply to the wire

8    instructions, July 18, 2019 at 7:15 and 51

9    seconds a.m. from Bernie Conaway to Jeff

10   Gabbay, Cliff Rieders is copied.  Where you

11   say:

12             Jeff, I am confused.  The

13   settlement proceeds were wired on Tuesday as

14   you directed.  As always, thank you.

15             Is there a reason why you didn't

16   keep Shoshana Gabbay on the email chain or

17   the email -- I keep on forgetting the term.

18       A.    Thread.

19       Q.    Email thread.  I will get that

20   right at the end of this deposition.  Email

21   thread.

22       A.    Ron, I'm just going to give you a

23   preview of what happens as you get older:

24   Words like that just start disappearing.

BERNARD G. CONAWAY, ESQUIRE

Page 78

1          I don't know why I did not include

2     her.  I don't know if it was intentional or

3     unintentional.  I just don't know.

4          Q.    Then there's a CL-00055 document,

5     Bates stamped.  Appears to be a response by

6     Jeff Gabbay to yourself with Cliff Rieders

7     copied, and it says:

8          Bernie.  Sorry.  Once again, I got

9     the wrong Bernie.  I think I need some

10    vacation to settle down my head.  Too much

11    thinking lately.  Sorry.  So sorry for the

12    confusion.  Thanks and best regards, Jeff.

13         What was your impression of this

14    email from Mr. Gabbay's Argaman Tech

15    account?

16         A.    I believe this email followed a

17    prior email from Argaman Tech account where

18    there was some directions to, I'm going to

19    say an investment person, but I could be

20    wrong, about what to do with money.  I may

21    have written back and said I didn't

22    understand why I was getting these.  And I

23    think this is the response that -- this July

24    18th, 8:34 email is the response I got back.

BERNARD G. CONAWAY, ESQUIRE

Page 79

1          Q.    Did you think this email was

2     actually coming from Mr. Gabbay?

3          A.    Sure.

4               MR. POLIQUIN:  Can we take a short

5     five-minute break, please?

6               (Break held.)

7     BY MR. POLIQUIN:

8          Q.    Just going back to some of these

9     documents we were reviewing.

10              (Screen sharing.)

11    BY MR. POLIQUIN:

12         Q.    This is the Bates stamp CL-00055.

13              Sorry, I got the wrong Bernie.

14              Did it find you a tad askew that

15    he said he got the wrong Bernie?

16         A.    So my name is -- Bernie is not a

17    common name, but since 2016 when Bernie

18    Sanders ran for president, it seems like

19    there's more of us running around these

20    days.

21              So I can tell that the email that

22    prompted this -- or was the predecessor to

23    this was not directed to me just by the

24    subject matter of it.

BERNARD G. CONAWAY, ESQUIRE

Page 80

1         Q.    When you say -- what prompted this
2     then?  I'm confused, because I thought what
3     prompted this was the prior email giving you
4     the wire instructions to the Mellon Bank.
5         A.    No.  There was an email from, I
6     assume now, the Argaman account and there
7     was some reference about dealing with a
8     financial person, I believe.  And whatever
9     the message was was not relevant to me.  And
10    I think I might have written back and
11    expressed some concern about I didn't know
12    what he was talking about.
13        Q.    Because of the time chain here.
14    We have a July 18, 2019 email from Gabbay's
15    Argaman Tech account to you, Cliff Rieders,
16    Shoshana's copied, 6:29.  This is where the
17    wire instructions come in for the Mellon
18    Bank, right?  Correct?
19        A.    If you can just bear with me a
20    second so I can get my glasses.
21        Q.    Sure.
22        A.    Correct.
23        Q.    And in response to that, we have
24    an email from yourself to Jeff at 7:15 a.m.

1      saying you're confused, correct?

2          A.   Correct.  And on that same day,

3      your confused one comes in at 7:15 a.m.  And

4      this email with the same subject line, wire

5      instructions, comes in at 8:34 a.m. not that

6      long after your confused email.

7               I'm trying to figure out you're

8      saying there was another email before this?

9          A.   Yes.  There was -- again, I'm

10     talking from memory, but my best

11     recollection is that what prompted this July

12     18, 2019, 8:34 email was an email from

13     either a day or two prior that was from the

14     -- I believe the Argaman account that I

15     could tell was not meant for me, and I must

16     have said something to the effect of that I

17     was confused.  And then I got the 8:34

18     response that you're referring to.

19         Q.   Well, it looks like you're

20     confused because you had already transferred

21     -- wired the funds to the Hong Kong account.

22         A.   I think you're -- I think you're

23     twisting two threads together, Ron.

24         Q.   Okay.  I'm looking at a July 18,

BERNARD G. CONAWAY, ESQUIRE

Page 82

1    2019 email, the subject line is, wire

2    instructions, instructions with a small i.

3    From Mr. Gabbay to yourself, with Cliff

4    Rieders and Shoshana Gabbay copied with the

5    wire instructions, and we believe this is

6    actually from Mr. Gabbay, to the Mellon

7    Bank, correct?

8         A.    Correct.

9         Q.    Shortly after that, on the same

10   day, a little more than a half-hour

11   afterwards, you respond:

12              Am confused, the settlement

13   proceeds were wired on Tuesday.

14              You're responding -- just want to

15   make clear on these two emails.  You're

16   responding to those wire instructions,

17   right?

18        A.    I'm responding to the email that

19   you just had up.

20        Q.    Right.  Okay.

21        A.    Yes.

22        Q.    We're on the same page there.

23              Then that happens at 7:15 a.m. on

24   July 18th.

BERNARD G. CONAWAY, ESQUIRE

Page 83

1          Then on the same day, July 18th,

2      right, at 8:34 a.m. shortly after you're

3      saying you're confused, you get an email

4      from Mr. Gabbay's Argaman Tech account

5      saying:

6          Bernie, sorry.  Once again I got

7      the wrong Bernie.

8          This is in the same email thread,

9      wire instructions with the i that is not

10     capitalized.  I got the wrong Bernie, I

11     think I need some vacation sun on my head.

12         You don't think this is in

13     response to your confused email?

14     A.    No.  I think -- my best

15     recollection is that predating July 18th, I

16     had received an email from either the

17     Argaman or the Gmail account, I don't know

18     which, that was clearly not meant for me.  I

19     must have responded to it.  And I guess

20     coincidently on the 18th, whoever is writing

21     this email at 8:34, responded back.

22     Q.    You see that your confused email

23     is right underneath this email, right?

24     A.    I do.  I do.

BERNARD G. CONAWAY, ESQUIRE

Page 84

1          Q.   Do you see why it looks like he's

2     responding to this?

3          A.   Sure, I do.  I also -- yes.

4          Q.   All right.  I just for my own

5     sanity, I want to make sure I'm, you know --

6               This looks like to be --

7               All right.  So this all happens

8     July 18th.  So this is the day that you know

9     it looks to be some kind of a mix up,

10    correct?

11         A.   I believe so, yes.

12         Q.   And I'm sorry if I asked you this

13    before.  Did you take any action on July

14    18th and contact the bank to hold off on the

15    wire, to see if the wire could get reserved?

16         A.   I contacted the bank, I'm not sure

17    when.  I know at some point I learned from

18    the bank that there was legal process that

19    we were going to have to go through, which

20    was a difference from what had happened in

21    the first wire.  At some point thereafter, I

22    had learned, and I don't recall when, that

23    the monies that were wired the second time

24    essentially bounced in and out of the

BERNARD G. CONAWAY, ESQUIRE

Page 85

1    account, the Hong Kong account.  So I wired

2    them.  Shortly thereafter whoever had

3    control of that account, pulled them out.

4        Q.   Do you know what the difference

5    was where the other -- well, in the first

6    wire transfer, you didn't actual request a

7    withdrawal to reverse the funds, it just

8    bounced back?

9        A.   I did actually request a

10   withdrawal.  I had -- there's a series of

11   emails between myself and Argaman where I

12   had tried -- I had reached out to WSFS to

13   find out what I could do to, you know,

14   recall the wire transfer.  I spoke to

15   somebody at the bank, I'm going to say a

16   branch manager or a branch employee.  They

17   told me they could not do it, but my --

18       Q.   Okay.  Just to make -- just to

19   clarify the record.

20            For the first -- when the first

21   transfer got reversed, you did not make that

22   request, correct?  It just got reversed

23   because of some kind of audit from what your

24   belief is?

BERNARD G. CONAWAY, ESQUIRE

Page 86

1          A.    I'm not sure why it got reversed.

2    I understood -- I was told that it was

3    reversed because of an audit of the account.

4    But I will tell you that I had also formally

5    requested that the money that was wired be

6    returned.  I had talked to the woman at

7    WSFS, a branch person.  I didn't -- my

8    conclusion at the end of that conversation

9    was they were not well informed.  I

10   contacted WSFS legal department a couple of

11   times.  I finally got a hold of somebody

12   there, and I was told I couldn't get the

13   money back.  So I initiated the process.

14          Now, at some point, the money came

15   back.  I don't know whether it came back

16   because of what I was told by either was an

17   audit, and therefore, the money could not be

18   deposited, or the money came back because I

19   had requested it.  All I know is I got it

20   back.

21          Q.    Understood.

22          And just for the clarity of the

23   record, you can't tell me whether you took

24   any actions with the bank on July 18th to

BERNARD G. CONAWAY, ESQUIRE

Page 87

1      reverse the wire transfer?

2           A.   I can't -- I can neither confirm

3      or deny.  How is that?  I know I did at some

4      point.  Whether that happened on the 18th or

5      19th, which I think was a Friday, I don't

6      know as I sit here.  I know I --

7           Q.   Would you agree -- I'm sorry.

8           A.   I walked over.  At that point in

9      time, I think I was in my Wilmington office.

10     And I walked down the street to WSFS and I

11     spoke to the branch manager there.  I don't

12     remember when that conversation -- when I

13     walked down, whether it was that day or the

14     day after, but I did have that conversation

15     with WSFS.

16          Q.   Did you --

17          A.   Somebody from WSFS -- I'm sorry,

18     Ron.

19          Q.   I need to let you finish your

20     answers.

21          A.   Somebody from WSFS's wire

22     department called me, and I think they may

23     have been the ones that told me the money

24     bounced in and out of the account.  I'm

BERNARD G. CONAWAY, ESQUIRE

Page 88

1    certain they were the ones that told me that

2    legal process was my resort at this point.

3        Q.    So July 18th, you don't know

4    whether -- it could have happened July 18th,

5    you don't know whether it did happen July

6    18th?

7        A.    Correct.

8        Q.    Do you know, would it have

9    happened then by July 19th?

10        A.    I'm fairly confident that I would

11    have acted before the end of the workweek.

12    Which, if I'm correct, the 18th was a

13    Thursday, the 19th was a Friday.  Again, I

14    can't say with absolute certainty, but I

15    would be surprised that I would let this

16    problem fester over a weekend.

17        Q.    Would you agree that time is of

18    the essence when an issue -- this kind of

19    issue comes up?

20        A.    I agree.

21        Q.    Did you fill out any forms at

22    WSFS?

23        A.    I do not believe so, for neither

24    wire recall.

BERNARD G. CONAWAY, ESQUIRE

Page 89

1          Q.    Would there be any kind of a

2     record which would demonstrate when you

3     actually made efforts to reverse the wire at

4     WSFS after the second transfer?

5          A.    I think, but I am not certain that

6     I received an email from somebody in their

7     wire department.  I'm not sure the timing

8     and nor am I even certain it's directly

9     related to what was going on on the

10    18th/19th.  I remember -- I have a vague

11    recollection of some email communication

12    with somebody at WSFS.  I know it was after

13    the second wire.  What I don't know recall,

14    you know, is the precise nature of that

15    conversation or that email.

16         Q.    Looking at document Bates stamped

17    CL-00056.  It's an email from Mr. Gabbay's

18    Argaman Tech account to yourself, July 23,

19    2019.  Do you recall what this document was?

20         A.    No.

21              I was sent two things by Mr.

22    Gabbay.  One was the encrypted -- or three

23    things.  Excuse me.

24              One was the encrypted wire

BERNARD G. CONAWAY, ESQUIRE

Page 90

```
 1        instructions or encrypted message, whatever
 2        it was.  The other was a fax, which I had
 3        never received from him before.  And then
 4        the last or the third was the actual wire
 5        instructions that we've already looked at.
 6                I don't recall what this is, to be
 7        honest with you.
 8            Q.   It looks like you sent him an
 9        email, CL-00057, in response to the document
10        that you can't open.  You say:
11                I received this email from you but
12        cannot open it.  Please advise.
13            A.   Okay.
14            Q.   Did you make a phone call to Mr.
15        Gabbay at that point?
16            A.   No, I believe this email was my
17        response.
18            Q.   This looks to be an email.  Let me
19        go to it.  I think the next page will show
20        the whole email.
21                This is Bates stamped CL-00059.
22        It looks like there was an email from Mr.
23        Gabbay to yourself from the Argaman Tech
24        account with Cliff Rieders copied on it,
```

BERNARD G. CONAWAY, ESQUIRE

Page 91

1      July 23, 2019, 4:13.  Where this is the

2      subject line.  There was no actual substance

3      in the actual email.  And Cliff Rieders is

4      responding:

5              I thought it was done a while ago.

6              So if July 18th happens and that's

7      when you kind of get notice that there's a

8      problem with this wire transfer.  And now

9      we're on the Tuesday the next week, July

10     23rd, it appears that both Mr. Gabbay --

11     neither Mr. Gabbay nor Cliff Rieders knows

12     that there was a problem with the wire

13     transfer based on these two emails.

14             Did you have any communications

15     with them between the 18th and the 23rd

16     that, hey, we have a problem?

17         A.   I don't know.

18             And let me step back for a second,

19     Ron.  I don't -- I'd have to be looking at

20     the entire package of emails to make sure I

21     have my dates correct.  I think what Cliff

22     Rieders is saying here is he understood that

23     the wire transfer was done some time ago.

24     And I'm certain I told him about it.  I

BERNARD G. CONAWAY, ESQUIRE

Page 92

1    think, again, he had been on vacation either

2    while the wire transfer happened or shortly

3    after.  I need to be clear.  I'm only -- on

4    the dates, I'm only as good as what the

5    emails reflect.

6         Q.   Okay.  And I'm trying to go -- it

7    looks like most of your emails go in some

8    type of sequential order with some times

9    there a little altogether, but for the most

10   part, they're following a sequential order.

11             In your production of documents, I

12   assume you just gave us all the emails that

13   you had?

14        A.   I believe I did.  I will, you

15   know, just for clarify sake, I'll go back

16   and make sure I didn't leave anything out.

17   Loren is likely going to kill me for doing

18   it or offering to do it, but I'll go back

19   and make sure I didn't leave anything out.

20        Q.   Understood.

21             MS. BARRON:  That's fine.  We can

22   do that, but that's a discussion maybe for

23   off the record, Ron.

24             MR. POLIQUIN:  That's fine.  And

BERNARD G. CONAWAY, ESQUIRE

Page 93

1      I'm just trying to get to the heart of it,

2      the timing of these emails.

3      BY MR. POLIQUIN:

4           Q.   Would you agree that this email

5      appears that Jeff Gabbay is asking, you know

6      -- he's asking if the transfer was made?

7           A.   So between the first wire --

8                MS. BARRON:   I'm going to object,

9      and ask for that to be repeated because I

10     didn't understand the question there and --

11     BY MR. POLIQUIN:

12          Q.   Okay.  Now, I'm just going by

13     there's a Tuesday, July 23rd email from Jeff

14     Gabbay's Argaman Tech account to yourself

15     and Cliff Rieders, and the only content of

16     the email is the subject line, was the

17     transfer made yet.

18               Does that indicate to you that he

19     knows that there was an issue that -- does

20     that -- did you -- excuse me.  Let me

21     rephrase the question.

22               Based on that question, is it your

23     impression that Mr. Gabbay knew that the

24     money was transferred to a wrong account as

BERNARD G. CONAWAY, ESQUIRE

Page 94

1        of this date?

2            A.    I don't know what I thought on

3        that date, but I will tell you that between

4        the first wire transfer and whenever it all

5        hit the fan, I had responded back to Mr.

6        Gabbay, likely to the Argaman account, to

7        tell him the monies that been transferred.

8        I had received some email communications

9        from him, I believe, through his Gmail

10       account.  And I told him in those emails

11       that the money had been transferred.  And,

12       for example, I knew the email contained the

13       document that I couldn't open up.  I never

14       received his response back.

15           Q.    Okay.  Did Mr. Rieders know that

16       the funds were sent to an incorrect account

17       as of Tuesday, July 23rd?

18           A.    I couldn't tell you what Mr.

19       Rieders knew.

20           Q.    Did you communicate that to Mr.

21       Rieders?

22           A.    At some point when it became clear

23       that there was a problem, I emailed him

24       promptly.

BERNARD G. CONAWAY, ESQUIRE

Page 95

1          Q.    I believe your --

2          A.    I don't remember the date.  And,

3     again, I've got -- in order to be accurate

4     with you, I need to have that entire package

5     of documents in front.

6          Q.    I believe it was your testimony

7     that July 18th was the date where there was

8     the red flags as far as that the money was

9     transferred to an incorrect account based on

10    Mr. Gabbay's email with instructions.

11         A.    What I did --

12              MS. BARRON:  Objection.

13              THE WITNESS:  I'm sorry.

14    BY MR. POLIQUIN:

15         Q.    You can answer the question.

16         A.    I think my lawyer is supposed to

17    tell me I can do that.

18         Q.    I'm sorry.

19              MS. BARRON:  You're asking the

20    same question you asked prior.  Is there

21    something new there, Ron?

22    BY MR. POLIQUIN:

23         Q.    Well, I'm just -- I believe that

24    you stated -- I'm just kind of restating

BERNARD G. CONAWAY, ESQUIRE

Page 96

1    what your testimony was, trying to make sure

2    I get it accurate is that on July 18, 2019

3    is the first time you believed there was an

4    issue regarding the wiring of the money to

5    the Hong Kong bank account.

6         A.   I do not believe that Mr. Gabbay

7    ever responded to that July 18th email.  So

8    while I might have had some concern, I never

9    heard back from Mr. Gabbay to confirm my own

10   concern.  I'm starting to think that July

11   18th was not the day when we all learned

12   that there was a problem.  It was likely the

13   following week.

14            At some point, Mr. Gabbay got back

15   to me.  At some point, I told him that the

16   money had been wired.  At some point, he

17   emailed me and said, you know, you sent it

18   to the wrong place.  At some point, I told

19   Mr. -- I brought Mr. Rieders into the

20   conversation.  And from there, the rest of

21   this mess unfolded.

22        Q.   Is there any reason why Mr. Gabbay

23   -- that you can think of, Mr. Gabbay would

24   send you wiring instructions to send the

BERNARD G. CONAWAY, ESQUIRE

Page 97

1      funds to a bank when the bank -- you had

2      already previously sent funds to another

3      bank?

4          A.    I can't tell you what Mr. Gabbay

5      was thinking.  I know that when I saw that

6      email on July 18th, I was scratching my

7      head, to which I responded, you know, I

8      wired the monies, whatever, several days

9      ago.

10         Q.    Looking at an email Bates stamped

11     CL-00060, July 25, 2019, that's a Thursday

12     of the next week, 1:24 a.m.  You guys all

13     keep late hours, I think.  From Mr. Gabbay

14     to Bernie Conaway, yourself with Cliff

15     Rieders copied.  It says:

16             Hi, Bernard.  You received

17     instructions to transfer via fax this

18     morning with my signature as authorization.

19     No files that can't be open.  Thanks, Jeff.

20             When you received this email, were

21     you -- what was your mindset?

22         A.    I'm speculating to some extent,

23     but I know it was -- I was concerned.  I'd

24     never received a fax.  I think this was the

BERNARD G. CONAWAY, ESQUIRE

Page 98

1     only response I received in response to my

2     July 18th email telling Mr. Gabbay that the

3     money had already been transferred.

4         Q.   At this point in time, why don't

5     you make a phone call to either Mr. Gabbay

6     or Mr. Rieders regarding this confusion?

7            MS. BARRON:  Objection to form.

8            THE WITNESS:  I don't know that I

9     didn't.  I don't believe I spoke to Mr.

10    Gabbay then.  I know with certainty I spoken

11    to Mr. Rieders at some point around this

12    time frame.

13    BY MR. POLIQUIN:

14        Q.   This is a Bates stamped, CL-00061.

15    It appears to be a fax.

16          Is that -- you received this fax?

17        A.   I presume so, yes.

18        Q.   It says, Dear Bernard.

19          Did Mr. Gabbay refer to you as

20    Bernard ever?

21        A.   You know, I don't remember.

22        Q.   Okay.  And it talks about

23    disbursing funds holding in escrow from the

24    Cupron settlement instructions.  And it's to

BERNARD G. CONAWAY, ESQUIRE

Page 99

1          a Citi Bank address.

2                   A.    Correct.

3                   Q.    Is that Mr. Gabbay's address?

4                   A.    The bank address?

5                   Q.    No.  His address on the bottom.

6          Excuse me.

7                   A.    Oh, I have no idea.  I may have

8          known his address at sometime.  To sit here

9          and look at it right now, I have no idea.

10                  Q.    To a -- I'm sorry.

11                  A.    I know he's in Israel.  That's the

12         best I can say.

13                  Q.    What steps did you take after

14         receiving this fax?

15                  A.    I imagined that I responded back

16         to Mr. Gabbay, but I don't have a specific

17         recollection of that.

18                        Are these instructions all the

19         same?

20                  Q.    I believe so.  These are kind of

21         copies of copies.

22                  A.    Okay.

23                  Q.    And it talks about $15,000 for

24         repayment of a loan for legal fees.

BERNARD G. CONAWAY, ESQUIRE

Page 100

1          Do you have any idea what that
2     $15,000 is for?
3          A.   I can only go based on what the
4     document says to Sinka Adele (ph).  I don't
5     know anything about a loan for legal fees or
6     didn't.
7          Q.   Did you take -- did you actually
8     take any of these actions regarding the
9     transfer of funds?
10          A.   At this point, the funds were
11     gone.  They had been transferred.  There was
12     nothing to transfer on this day.
13          Q.   Subsequently did you verify
14     whether the fax was legitimately from Mr.
15     Gabbay or not?
16          A.   I don't recall.  Again, I'd have
17     to see the email strings.
18          Q.   I believe these are the same
19     documents.  This is a July 26th -- Friday,
20     July 26, 2019 email.  The Bates stamp is
21     CL-00064, from Mr. Gabbay's Gmail account to
22     yourself with Cliff Rieders copied.  And it
23     says:
24          For security reasons, I'm sending

BERNARD G. CONAWAY, ESQUIRE

Page 101

1    you the transfer details via fax and not

2    email.  Please acknowledge when you have

3    received the fax with my signature.

4    Regards, Jeff.

5            What actions did you take after

6    receiving this email?

7        A.   Again, I do not specifically

8    recall, but my practice would have been to

9    respond.

10       Q.   Okay.  We're looking a document

11   Bates stamped CL-00065.  This is an email

12   responding to that transfer subject email on

13   July 27th, Saturday, at 11:28 a.m., Cliff

14   Rieders is copied on it to Mr. Gabbay's

15   Gmail account.

16           I received your fax; however, I am

17   confused by it.  Upon instructions, I

18   previously wired all of the remaining

19   settlement proceeds to your Hong Kong bank.

20   Hence, I have nothing to wire.  Please help

21   me understand what you need me to do.

22           Then I'm going to say the Bates

23   stamp CL-00066, Mr. Gabbay sends you an

24   email from his Gmail account with Cliff

BERNARD G. CONAWAY, ESQUIRE

Page 102

1    Rieders copied, what Hong Kong bank, three

2    question marks.

3              At this point in time, did you

4    know there was something wrong with the

5    previous wire transfer?

6         A.   Yes -- well, it was first and

7    foremost in my mind that there was a

8    problem.

9         Q.   Now, based on the fact that you

10   have -- it appears that you have these

11   conflicting emails that are communications,

12   did you think that you should schedule a

13   phone call with Mr. Gabbay at that time

14   because the emails have been compromised?

15        A.   I did not at that point in time, I

16   don't think, understand that his email had

17   been compromised.  I learned that in a

18   subsequent conversation with Mr. Rieders.

19        Q.   I want to look at a document

20   that's Bates stamped CL-00067.  This is an

21   email from Mr. Gabbay to yourself with Cliff

22   Rieders copied on it, Saturday, July 27,

23   2019, at 1:47:09 seconds p.m. where it says:

24              You received a false email from a

BERNARD G. CONAWAY, ESQUIRE

Page 103

1          hacker.

2                    At that point in time, what steps

3          did you take -- did you call Mr. Gabbay at

4          that time?

5               A.   I don't believe I did.  I believe

6          that I emailed Mr. Rieders and put him on

7          alert or notice that there appeared to be a

8          problem.

9                    And I believe, this email sequence

10         refreshes my recollection to some extent,

11         this is when it was clear to me that things

12         had gone south.  This is when I emailed Mr.

13         Rieders to tell him about the problem.  And

14         it was probably this weekend, you know,

15         around the day of this email that I spoke to

16         Mr. Rieders.  I think it was -- I believe

17         that conversation was on a Saturday or a

18         Sunday.

19              Q.   I did not see any responses to

20         this email -- excuse me -- from yourself to

21         Mr. Gabbay with Cliff Rieders on it.

22                   Do you recall responding to this

23         email when he says you received a false

24         email from a hacker, or did you cut off

BERNARD G. CONAWAY, ESQUIRE

Page 104

1    communication at that time?

2           A.    No, I never cut off --

3              MS. BARRON:    Objection.

4    BY MR. POLIQUIN:

5           Q.    Or did you -- excuse me.

6              Do you remember -- I'm sorry.

7              After this, do you know why you

8    didn't respond to this email from Mr.

9    Gabbay?

10          A.    I do not know that I did not

11   respond.

12          Q.    Okay.

13          A.    I realize there was a double

14   negative in there, but...

15          Q.    I'm looking at a copy of a

16   complaint referral from Internet Crime

17   Complaint Center.    The Bates stamp is

18   CL-00068.    It appears that the date is

19   7/30/19.

20              Was this complaint filed by you?

21          A.    It was filed by me.

22          Q.    And what complaint -- what's an

23   IC3 Complaint?

24          A.    My understanding of it is that it

BERNARD G. CONAWAY, ESQUIRE

Page 105

1      is a report that you are directed to file

2      with the FBI in the event that you have been

3      the victim of fraud by international wire.

4          Q.   And what prompted you to file the

5      complaint?

6          A.   I don't know if it was a

7      conversation with Cliff Rieders.  I don't

8      know if I did it on my own.  I'm kind of

9      inclined to believe it was Cliff Rieders'

10     suggestion, because I know Cliff did give me

11     the name of an FBI agent with whom I spoke

12     before this form was filed about what to do

13     and, you know, what to expect and things of

14     that nature.

15         Q.   And on Bates stamped CL-00069, it

16     appears this is the information you provided

17     to the FBI.

18         A.   I believe so.

19         Q.   Did you fill this out on the

20     internet or somewhere else?

21         A.   Yes, it's an online form.

22         Q.   And looking at Bates stamped

23     CL-00070, this is your description of the

24     incident to the FBI?

BERNARD G. CONAWAY, ESQUIRE

Page 106

1          A.    It looks to be.

2          Q.    Do you recall filling this out?

3          A.    In a general sort of way, yes.

4          Q.    When you say, "general sort of

5     way," did you actually type this, or did you

6     report it to somebody else and they gave you

7     a description, or how does that work?

8          A.    I did it myself.

9          Q.    What interactions did you have

10    with the FBI after filing this complaint?

11         A.    I spoke to the special agent after

12    filing it, and -- yeah, I think his name is

13    Chris something or other.

14         Q.    After speaking you him, any other

15    actions that took place?

16         A.    With the FBI?

17         Q.    Yes.

18         A.    I don't think any further.  I'll

19    be candid with you, what I got out of my

20    conversation thereafter was that the FBI

21    didn't do much about these IC3 reports.

22         Q.    Looking at something Bates stamped

23    CL-00073, it looks like -- it says, eReport

24    Center Hong Kong Police Force.  And the date

BERNARD G. CONAWAY, ESQUIRE

Page 107

1    is I believe August 7, 2019.

2                What promised you to file -- is

3    this a -- this is a cyber crime report to

4    the Hong Kong Police, I assume?

5        A.    I believe it is.

6        Q.    And what prompted you to file this

7    report?

8        A.    I know Mr. Rieders and I spoke

9    about doing it.  I think he was going to

10   file it at first, and then he had some other

11   engagements or issues.  I ended up doing it.

12   That's my best recollection.

13       Q.    Any other interactions with the

14   Hong Kong Police?

15       A.    Oh, yeah.  I spoke to them on

16   several occasions.  They had asked for more

17   documentation.  I believe I sent it to them.

18   I had engaged the services of a corporate

19   researcher in Hong Kong.  Yeah, this is the

20   report.

21       Q.    What is the status of the

22   investigation at this point?

23       A.    I do not know.  At some point, Mr.

24   Gabbay and/or Rieders hired Hong Kong

BERNARD G. CONAWAY, ESQUIRE

Page 108

1    counsel, and they asked me not to speak to

2    the Hong Kong folks anymore.

3         Q.    How did they ask you not to speak

4    to the Hong Kong Police?

5         A.    I'm going to say it was an email

6    in February of 2020, maybe January of 2020.

7    What happened was, their Hong Kong counsel,

8    Mr. Gabbay's Hong Kong counsel sent an email

9    to Mr. Gabbay, Mr. Rieders and myself and

10   asked for something.  I don't recall what.

11   I responded back.  At which point, the Hong

12   Kong counsel told me that I was contacted in

13   error, to take no further action.

14        Q.    What is the status of the FBI

15   investigation?

16        A.    I'm unaware of any status.  And,

17   again, when I spoke to the agent after

18   filing the report, my conclusion was this

19   was a jaywalking ticket, as far as they were

20   concerned.

21             (Screen sharing ceased.)

22   BY MR. POLIQUIN:

23        Q.    What other interactions did you

24   have with Mr. Gabbay after realizing --

BERNARD G. CONAWAY, ESQUIRE

Page 109

```
 1        other than emails that been presented, did
 2        you have any other interactions with Mr.
 3        Gabbay regarding the wiring of funds to the
 4        Hong Kong account?
 5             A.   I know at some point after it
 6        became clear there was a problem, Mr.
 7        Gabbay, Mr. Rieders and I were on the phone.
 8        I know we talked about it.  There were a
 9        series of emails going back and forth
10        between the three of us.  At some point, Mr.
11        Gabbay got his son who I think his name is
12        Zvi involved.  Zvi is a -- I think he's a
13        U.S. lawyer.  He might be an Israeli lawyer.
14        Or at least he works for a U.S. firm.  I
15        spoke to Zvi about what had happened.  I
16        don't know if I talked to him once or twice,
17        but I did talk to him.  I did talk to Cliff,
18        you know, on and off during the time period
19        up until about October-ish.
20             Q.   What communications did you have
21        with the son regarding the funds?  What were
22        the substance of those communications?
23             A.   He just wanted to know what
24        happened.  So I relayed to him the story as
```

BERNARD G. CONAWAY, ESQUIRE

Page 110

```
 1    best as I could.  I may have sent him -- I
 2    sent him some documents, too, I believe, by
 3    email.
 4        Q.   And when you communicated, what
 5    was it, by telephone?
 6        A.   We did have at least one phone
 7    conversation, maybe two.  I did communicate
 8    with him by email.  We were -- between his
 9    schedule and mine, we kept missing each
10    other.  So, you know, there's email
11    correspondence back and forth, hey, I can't
12    make it, can we do this a little later.
13    Just things of that sort.
14        Q.   Now, regarding when you actually
15    received the funds from Cupron, you
16    segregated those settlement proceeds in a
17    trust account pursuant to the rules of trust
18    and responsibility, correct?
19        A.   I segregated those funds according
20    to what I understand the rules of
21    professional conduct to require.
22        Q.   What was your process and
23    procedure in regard to your fiduciary
24    responsibilities regarding Mr. Gabbay's
```

BERNARD G. CONAWAY, ESQUIRE

Page 111

1      funds in your trust account?

2            A.    I understood my responsibility --

3      fiduciary responsibility to pay attention to

4      my client's direction.

5            Q.    Did you conduct any sort of

6      Patriot Act search as required by law when

7      transferring money out of the U.S.?

8            A.    I did not.

9            Q.    Are you familiar with the Bank

10     Secrecy Act and Anti-Money Laundering Rules

11     and Regulations?

12           A.    Only in the most general terms.

13           Q.    And what is your understanding?

14           A.    That there are reporting

15     requirements associated with those kinds of

16     transfers.  I presume that they were imposed

17     upon the bank, not me, though.

18           Q.    Did you do any research into that

19     before transferring the funds?

20           A.    I did not.

21           Q.    Regarding any continuing legal

22     education, have you had any regarding

23     spotting the classic red flags (audio

24     distortion) --

BERNARD G. CONAWAY, ESQUIRE

Page 112

```
 1            THE COURT REPORTER:  I'm sorry,
 2    Counsel.  You broke up there.
 3            MR. POLIQUIN:  I'll repeat the
 4    question.
 5    BY MR. POLIQUIN:
 6        Q.   Have you had any continuing legal
 7    education in spotting (audio distortion) --
 8            THE COURT REPORTER:  I'm sorry,
 9    Counsel.  You broke up there.  Sorry.
10            MR. POLIQUIN:  Sorry.  That's all
11    right.  I can say it again.
12    BY MR. POLIQUIN:
13        Q.   Have you had any continuing legal
14    education in spotting the classic red flags
15    of fraud?
16        A.   Prior to this incident, I don't
17    believe so.
18        Q.   Do you recall meeting with Cliff
19    Rieders after this incident happened?
20        A.   I do.
21        Q.   And can you -- when did you meet
22    with Cliff Rieders?
23        A.   I'm going to say it was either
24    September or October in Philadelphia.  He
```

BERNARD G. CONAWAY, ESQUIRE

Page 113

1      had a hearing.  I needed to speak to him

2      personally.  So the fact that he was coming

3      from Williamsport down to Philadelphia was a

4      convenient time for us to meet, both of us

5      to meet.

6                MR. POLIQUIN:  Hold on one second.

7      Let me turn down this fan here.

8                (Break held.)

9      BY MR. POLIQUIN:

10          Q.   So you believe it either happened

11     September, October?

12          A.   Yes.

13          Q.   And did you say you had to meet

14     with him personally or he had to meet with

15     you personally?  I didn't --

16          A.    I'm not sure -- I'm not sure the

17     answer to that question.  I know that I had

18     a need to talk to him.  I expect he had the

19     need to talk to me.  But who pushed the

20     meeting or who wanted to make sure it happen

21     as between the two of us, I don't know.

22     Both of us agreed to do it.  That's all I

23     could tell you.

24          Q.    And what was your need to meet

BERNARD G. CONAWAY, ESQUIRE

Page 114

1     with him about?

2          A.   I had told Cliff that I had

3     insurance, which was not true.  And I felt

4     the need to clear that up.  I thought it was

5     important to do it in person as opposed to

6     on the phone.  I made a mistake.  And, you

7     know, I felt like I needed to do more than

8     just send an email or pick up the phone and

9     call.

10         Q.   Did you ever have any other

11    discussions with Cliff Rieders regarding

12    your role and with respect to the transfer

13    of Mr. Gabbay's funds?

14         A.   Yeah, I'm not sure I understand

15    your question, in terms of timing.

16              So, yes, did I ever speak to Cliff

17    Rieders about, yes --

18         Q.   I'm going to ask you prior to this

19    lunch.  You stated that you had a

20    communication with him where you

21    misrepresented that you had legal

22    malpractice insurance.

23              Did you ever have a conversation

24    with him prior to this lunch taking any kind

BERNARD G. CONAWAY, ESQUIRE

Page 115

1        of responsibility regarding your role in the

2        transfer of Mr. Gabbay's funds?

3            A.    I don't believe I took

4        responsibility for the outcome.  I did

5        express regret at the outcome.  As I said

6        early on, this is not a result that anybody

7        wants to be associated with.  And I surely

8        didn't want to, you know.  I felt bad for

9        Mr. Gabbay.  I still do.  But I don't know

10       that I've ever said that this was my fault.

11       And I, you know --

12           Q.    Do you accept any kind of

13       responsibility in the result?

14               MS. BARRON:  Objection.

15               THE WITNESS:  At the time, what I

16       knew, what was validated to me by

17       communications and other things, I don't

18       think I did anything wrong, and I still

19       don't think I did anything wrong.  If you

20       told me this was going to happen or if you

21       told me that the email account wasn't safe,

22       I'm certain I would have done, interacted

23       differently.

24       BY MR. POLIQUIN:

BERNARD G. CONAWAY, ESQUIRE

Page 116

1        Q.    Did you feel like you had any
2    obligations to do any further due diligence
3    outside of email confirmations before you
4    transferred the funds either the first or
5    the second time?
6        A.    Things that I learned or were told
7    were validated by, for example,
8    communications with Cliff Rieders, you know.
9    He's telling me in late June that they're
10    going to a financial advisor.  You know,
11    days later, I see that they're going to the
12    financial advisor on the day I believe that
13    Cliff said they were going.  There were
14    email communications where the language that
15    Mr. Gabbay used was identical to the
16    language that he had used in the past.  I
17    had responded to Mr. Gabbay during the
18    course at least in between the first and
19    second, and then thereafter the second
20    transfer to which he never responded.  And I
21    don't know whether those communications were
22    entirely to the Argaman account.  My
23    inclination is they -- or recollection is
24    that they were not.  But I never received a

Page 117

1    response.  So it was -- I didn't see

2    anywhere where I had run into a situation

3    where there was a risk that I needed to

4    account for.

5           Again, my relationship with Mr.

6    Gabbay was largely through Mr. Rieders.  I

7    continued that point of relationship.  At

8    the point in time when the wire transfer

9    occurred, it was limited to Mr. Gabbay.

10   But, again, that wouldn't have been unusual

11   because there was no need to involve Mr.

12   Rieders in wire fund transfer issues because

13   I didn't need to set up another billing

14   event for Mr. Gabbay.  I had stopped billing

15   Mr. Gabbay in February because of the mess

16   that Cupron had created.  I felt bad for

17   him.  I still, again, you know --

18           So the answer to your question is

19   no.

20      Q.   Thank you.

21           So you had this lunch with Cliff

22   Rieders in September, October.  What was

23   discussed -- excuse me.

24           What did you tell Cliff Rieders at

BERNARD G. CONAWAY, ESQUIRE

Page 118

1      this lunch?

2           A.   My best recollection is that I

3      told him I would write to Jeff Gabbay and

4      express my concern for the outcome.  And I

5      think I may have agreed to make some sort of

6      effort to compensate him for his loss.

7           Q.   What does that -- when you say,

8      "compensate him for his loss," what does

9      that mean?

10          A.   I'm not sure I could make that any

11     clearer.  Pay him money.

12          Q.   Okay.  So his loss was the

13     400,000-plus, basically.  And you said you

14     would make some kind of effort to compensate

15     him for his loss is what your representation

16     was to Mr. Rieders?

17          A.   I believe that's correct, yes.

18          Q.   Anything else that was said that

19     you recall?

20          A.   I'd have to look at the -- there

21     was an email that I sent to, I don't know if

22     it was both Mr. Gabbay and Mr. Rieders or

23     just Mr. Gabbay where I laid out some

24     things.  I don't recall all the sum and

BERNARD G. CONAWAY, ESQUIRE

Page 119

1    substance of what was in that email other

2    than what I've already said.  So could there

3    have been other things?  Yes, there could

4    have been.

5         Q.   What did Mr. Rieders say to you in

6    that lunch?

7         A.   He was disappointed, rightfully

8    so, that I had not been truthful with him.

9         Q.   When you say, "truthful" you're

10   regarding the insurance coverage?

11        A.   Yeah.

12        Q.   Anything else he was disappointed

13   in?

14        A.   Not that I recall.  I know we

15   talked about how to move forward.  I think

16   it's at that point that there was some

17   discussion about, you know, trying to do

18   something for Mr. Gabbay.  There may have

19   been other things discussed, Ron.  I just

20   don't recall.

21        Q.   I'm going to show you a document.

22             (Screen sharing.)

23   BY MR. POLIQUIN:

24        Q.   If you want to take a minute to

BERNARD G. CONAWAY, ESQUIRE

Page 120

```
 1        read this.  What I'll represent to you, it
 2        looks like a letter being emailed to
 3        yourself after that luncheon meeting which
 4        he says happened on October 2nd.  And then I
 5        can ask you some questions about it.  Maybe
 6        it will help you just to read it before I
 7        ask questions rather me just --
 8                MS. BARRON:  I need to read
 9        it.
10                THE WITNESS:  You've got to stop
11        scrolling, Ron.
12                MS. BARRON:  Can you make it a
13        little larger?  Thank you.
14                MR. POLIQUIN:  Let me know how
15        large it needs to be.
16                MS. BARRON:  I don't believe the
17        second page said much, did it?
18                MR. POLIQUIN:  Well just --
19                MS. BARRON:  Okay.
20        BY MR. POLIQUIN:
21            Q.   Does this look like an email that
22        you received from Mr. Rieders after the
23        lunch?
24                A.   It is.
```

BERNARD G. CONAWAY, ESQUIRE

Page 121

1      Q.   Does this accurately represent the
2   discussions at the lunch between you and Mr.
3   Rieders?
4      A.   No.
5      Q.   Okay.  And what do you disagree
6   with?
7      A.   The third paragraph even more
8   importantly.
9      Q.   What do you disagree about the
10   third paragraph ?  Excuse me.
11          What do you disagree about the
12   third paragraph?
13      A.   I did not take responsibility, nor
14   did I acknowledge neglect.
15          I want to put this email in
16   context.  Cliff was slowly morphing into a
17   litigation position, and I could see that.
18   I was careful when I spoke to him.  And when
19   I got this letter from him, I was much more
20   caution dealing with him thereafter.
21      Q.   Did he morph into litigation
22   position prior to the lunch or during the
23   lunch or right after the lunch?
24      A.   No, I could just see a change in

BERNARD G. CONAWAY, ESQUIRE

Page 122

1    his attitude as we were moving forward.

2    After the lunch I was convinced especially

3    by some of the emails he sent me that this

4    was more of a litigation prep than anything

5    else.  I think the follow-up email that I

6    eventually sent to Jeff was gouged in terms

7    of a settlement offer under 408.

8         Q.   Anything other than the third

9    paragraph that you disagree with?

10         A.   I'm not sure that I understood or

11    agreed with the next paragraph.  My

12    recollection is that Cliff had a bigger view

13    or a broader view of whatever it was we had

14    discussed about settlement or paying Jeff.

15    I never ever -- well, I don't recall there

16    being any discussion about me retaining a

17    Hong Kong attorney.  I didn't see that as

18    the critical point, though.

19         Q.   When you talked to him, talked to

20    Mr. Rieders about compensation to Mr.

21    Gabbay, what was your -- what was the

22    discussion with Mr. Rieders regarding how

23    you would compensate Mr. Gabbay?  I mean, we

24    know money.  That's a broad -- that's a

BERNARD G. CONAWAY, ESQUIRE

Page 123

1    pretty broad term, money.  What was your

2    notion of what Mr. Gabbay -- how you would

3    compensate Mr. Gabbay?

4         A.    That was set out in a settlement

5    communication.  I think able to refuse to

6    answer that question on the record.

7         Q.    Okay.  If you were not -- if

8    you're not responsible or didn't do anything

9    incorrectly, why would you make that offer

10   to compensate Mr. Gabbay?

11              MS. BARRON:  Objection.

12              THE WITNESS:  Because I --

13              MS. BARRON:  Don't answer that.

14              THE WITNESS:  I -- I felt bad then

15   about what happened.  I still feel bad about

16   what happened.  And it is -- you know, I

17   felt that if I could help him, I would.  It

18   was -- believe me, if I could have rounded

19   up $426,000 and given it back to him, I

20   surely would have, regardless of fault.  I

21   do not like being associated with this kind

22   of a mess.  I do not like clients ending up

23   in this sort of position.  I would have done

24   what I could to try and fix it.

BERNARD G. CONAWAY, ESQUIRE

Page 124

1    BY MR. POLIQUIN:

2        Q.    And when you -- I take it that you

3    made what you consider a privilege

4    settlement offer subsequently after this

5    email; is this what your representation is?

6        A.    Yes.

7            (Screen sharing ceased.)

8    BY MR. POLIQUIN:

9        Q.    Regarding the structure of your

10   LLC, you are the only member of the LLC?

11       A.    I am.

12       Q.    You're a hundred percent owner?

13       A.    Yes.

14       Q.    Now, would you agree that it would

15   have been simple and prudent to speak to the

16   client prior to transferring this amount of

17   money in a wire transfer to a foreign bank?

18       A.    I never saw it as necessary.  My

19   relationship was -- in dealings with Mr.

20   Gabbay were most entirely by email over the

21   course of two years.  The communications and

22   the things that I was hearing, reading were

23   confirmed by other events or other people.

24   I think in retrospect we can always look

BERNARD G. CONAWAY, ESQUIRE

Page 125

```
 1      back and think we would have done something
 2      differently.  But given what I knew then and
 3      what was happening then, I didn't think it
 4      was necessary.
 5          Q.   I'm going to show you another
 6      document.  I'll give you time, both you and
 7      your attorney to read over this.
 8              (Screen sharing.)
 9      BY MR. POLIQUIN:
10          Q.   And I'll make it bigger and slide
11      it down.
12              It was a memo that Cliff Rieders
13      drafted regarding his meeting with you.
14      I'll bring it down here and I want you --
15          A.   A little portly?  You know what?
16      I'm done.
17          Q.   You took it better than I would
18      take it.
19          A.   I know the truth of the matter
20      here.
21          Q.   If you want to read through this.
22      I'll have you read through the first four
23      paragraphs.  I know it's a little lengthy.
24      And let your attorney read through it also
```

BERNARD G. CONAWAY, ESQUIRE

Page 126

1    before I ask you some questions about it

2    because I know you haven't seen it before.

3         A.    I have not seen this before and do

4    not believe it's been produced.

5              (Document being read.)

6    BY MR. POLIQUIN:

7         Q.    I'm going to ask you a few

8    question about this.

9              MS. BARRON:  First of all, I'm

10   going to object to the introduction of the

11   entire letter --

12             MR. POLIQUIN:  Okay.

13             MS. BARRON:  -- on several

14   grounds.  First of all, we've never seen it.

15

16             Number two, it's a confidential

17   settlement discussion.

18             And number three, it references

19   ODC matters, which are not permitted in this

20   litigation.

21             MR. POLIQUIN:  Okay.  I mean, I

22   understand that.  I still would like to ask

23   a few questions regarding it --

24             MS. BARRON:  You may ask.

BERNARD G. CONAWAY, ESQUIRE

Page 127

1           MR. POLIQUIN:  -- with your

2      objections noted.

3      BY MR. POLIQUIN:

4           Q.   Did you meet at the -- I'm just

5      going to go through a few factual matters in

6      the document as far as, did you meet at the

7      restaurant LaScala?

8           A.   Yes.

9           Q.   I believe the third paragraph --

10     excuse me.  Not the third paragraph.

11           The fifth paragraph references the

12     insurance coverage issue which you have

13     acknowledged that you misrepresented, and

14     one of the reasons why you wanted to have

15     this lunch was to tell him that that was

16     untrue?

17           A.   Correct.

18           Q.   Is anything incorrect as far as

19     the two paragraphs, the paragraphs about the

20     insurance incorrect?

21           MS. BARRON:  Objection.  Mr.

22     Conaway did not write those paragraphs.

23           MR. POLIQUIN:  I understand that.

24     I'm just asking if they're factually

BERNARD G. CONAWAY, ESQUIRE

Page 128

1    incorrect.

2                THE WITNESS:  I'm not sure I

3    understand what he's referring to when --

4    you see the sentence, it's about midway

5    down, it has "He then" it starts out?  I'm

6    not sure what he's referring to there.

7    BY MR. POLIQUIN:

8        Q.   Okay.  Without going through the

9    veracity of the actual contents of the

10   document, there was a discussion regarding

11   your insurance coverage?

12       A.   Yes, I told him I did not have it

13   and that I had been untruthful with him.  I

14   was wrong.

15       Q.   Going to the second page, it looks

16   like in the fourth paragraph he talks about

17   a copyright case regarding images.  Is that

18   correct; did you discuss with him about that

19   case -- discuss that case with him?

20               MS. BARRON:  Objection.

21               THE WITNESS:  I don't know that I

22   should be answering this question in as much

23   as it clearly relates to settlement

24   discussions.

BERNARD G. CONAWAY, ESQUIRE

Page 129

1          I'll leave it at this:  There was
2     discussion about a copyright case.
3     BY MR. POLIQUIN:
4          Q.   Okay.  Did either of you take
5     notes during this lunch meeting?
6          A.   I know I did not.  I didn't see
7     Mr. Rieders doing so.
8               (Screen sharing ceased.)
9               MR. POLIQUIN:  If we could take a
10     short break, maybe a ten-minute break.
11               (Break held.)
12     BY MR. POLIQUIN:
13          Q.   Mr. Conaway, your firm did not
14     have any policy on wire transfers, did it?
15          A.    Specific wire transfers, no.  But
16     handling client funds and things like that,
17     sure.
18          Q.    Okay.  How many times have you
19     transferred -- had done wire transfers in
20     your practice?  Is it numerous times or a
21     handful of times?
22          A.   I want to make sure I understand
23     your question.  Are you asking me how many
24     times I've had either coming in or going

BERNARD G. CONAWAY, ESQUIRE

Page 130

1    out?

2        Q.    Yes.

3        A.    Coming in, I would say frequently.

4    Many of my clients are overseas.  A lot of

5    my casework is in the Court of Chancery.  It

6    happens very quickly.  And, you know I

7    require -- usually require a retainer before

8    I get even involved in a case.  And

9    typically the only way to make that happen

10   as quickly as the Chancery Court's schedule

11   works is to have the funds wired, so...

12       Q.    To actually transfer funds out via

13   a wire transfer, does that happen often?

14       A.    No.  I can tell you with certainty

15   it hasn't happened since Mr. Gabbay's

16   incident.  And going forward, if I can avoid

17   it, I will.

18       Q.    What about prior to Mr. Gabbay's

19   incident?

20       A.    You know, I can't give you a very

21   good answer because I don't recall.  Were

22   there transfers out, yes.  Were there many,

23   no.  Internationally, even less.

24       Q.    Have you received any training on

BERNARD G. CONAWAY, ESQUIRE

Page 131

1      spotting wire transfer fraud?

2          A.    Before this incident, no.

3      Afterwards, yes.

4          Q.    Were you the only individual at

5      your firm that was involved in the

6      transferring of the -- the wiring of funds

7      for Mr. Gabbay?

8          A.    Yes.

9          Q.    How many staff members do you

10     have?

11         A.    You're looking at all of them.

12         Q.    Okay.  Do you have any policy

13     regarding the mandating -- mandate the

14     verification of contact information from all

15     parties involved in a wire transfer?

16         A.    I apologize, Ron.  I'm not sure I

17     understand what you're asking me.

18         Q.    Does your firm have any policy

19     and/or practice regarding the verification

20     of information for all parties involved in a

21     wire transfer?

22         A.    It does not.  The monies that were

23     wired into my account from Cupron came to me

24     almost without warning.  I mean, I knew they

BERNARD G. CONAWAY, ESQUIRE

Page 132

1    were going to come.  Nobody ever called to

2    verify anything.  Most of my clients who are

3    out of the country sending me -- sending me

4    retainers, you know, I send them that

5    information by email.

6        Q.    Have you ever received any

7    education or training that fraud is more

8    likely to occur via email?

9        A.    As a general principle?

10            MS. BARRON:  I'm going to object

11    to the question.  I think you need to lay a

12    foundation for that.

13    BY MR. POLIQUIN:

14        Q.    Now, there's different type of

15    communication, right?  There's phone call

16    communication, there's email communication,

17    there's in-person conversations with

18    clients; would you agree?

19        A.    Yes.

20        Q.    And have you ever received any

21    education or training regarding that email

22    communication specifically is more

23    susceptible to fraud?

24        A.    I don't know that I would say I

BERNARD G. CONAWAY, ESQUIRE

Page 133

1    received specific training.  Did I know that

2    there were problems associated with email

3    communications, yes.  Did I know that before

4    I dealt with Mr. Gabbay, yes.  Since dealing

5    with him and this problem, have I gotten --

6    have I educated myself, yes.

7            My entire relationship, though,

8    with Mr. Gabbay and Mr. Rieders was premised

9    on email communication.  I think I estimated

10   I may have spoken to Mr. Gabbay on the phone

11   eight to ten times over two years.  He was

12   in the country for his deposition.  I did

13   talk to him then.  But, you know, outside

14   something unusual like a deposition, it was

15   the rarity that I spoke to him.

16       Q.   I'm assuming that the case, your

17   case where you represented Mr. Gabbay was

18   settled, right?

19       A.   Yes, it was.

20       Q.   And how did you receive

21   verification of settlement from Mr. Gabbay?

22       A.   I'm not -- so --

23       Q.   How -- excuse me.  Maybe I can

24   rephrase the question.

BERNARD G. CONAWAY, ESQUIRE

Page 134

1          How did you get -- how did he

2    communicate his authority to settle the

3    case?

4          A.    I don't recall specifically, but I

5    know as a matter of course, I would never

6    settle a case without client's input and the

7    client's confirmation.

8          I can tell you that this was a --

9    trying to think of the right word here.  The

10   settlement discussions here were

11   inordinately prolonged.  They were

12   inordinately frustrating.  And I was on the

13   phone or in email communication with Cliff

14   Rieders almost daily.  I know Mr. Gabbay was

15   involved in some of those conversations,

16   some of those email communications, but I

17   know intrinsic inherently that I do not have

18   the authority to settle a case on my own.

19         Q.    I wasn't questioning that.

20         What I was asking was how did you

21   get -- how did he say, yes, you can settle

22   this case?

23         A.    I imagine it was by email.

24         Q.    Did he also have to sign something

BERNARD G. CONAWAY, ESQUIRE

Page 135

1      to settle, like a signed settlement
2      agreement?
3          A.    I believe he did.
4          Q.    Did you have any conversations
5      with Cliff Rieders via phone prior to
6      settling the case in terms of settling --
7      regarding the terms of settlement?
8          A.    So here's where I'm having a
9      little difficulty with your question.  The
10     case actually settled late February, early
11     March.  It then took from that period of
12     time till the end of May to actually
13     document the thing.
14             So in the period leading up to
15     when we settled, there was communication
16     back and forth.  Cliff Rieders and I were
17     frequently on the phone with Cupron's
18     Delaware counsel and Cupron's director, Jay,
19     whatever his name was, in settlement
20     discussions and trying to work through
21     issues.  I know that those discussions were
22     relayed to Mr. Gabbay either by myself
23     and/or by Mr. Rieders.  You know, the
24     specific terms of the settlement agreement,

BERNARD G. CONAWAY, ESQUIRE

Page 136

1    I'm certain as we were hitting road bumps,

2    we were communicating, at least I was

3    communicating that with Mr. Gabbay.  I'm

4    fairly certain Mr. Rieders was doing it as

5    well.

6         Q.   Now, I think I know the answer to

7    this question, but you had no policy or

8    practice to if wiring instructions come via

9    email to confirm those instructions through

10   a previously verified phone number?

11        A.   I did not confirm them by phone.

12   I confirmed them through other

13   communications with others and

14   communications with the client.

15        Q.   Okay.  I'm talking about regarding

16   the wiring of funds.  When you say further

17   communications, you're talking about

18   exclusively via email, correct?

19        A.   I am.

20        Q.   So at no point did you -- your

21   firm at that time during this incident had

22   no policy or practice to confirm wiring

23   instructions initially coming through via

24   email with a verified phone call to a

BERNARD G. CONAWAY, ESQUIRE

Page 137

1    verified number?
2        A.    So I knew well enough that I
3    needed to confirm what I was doing.  I
4    received that confirmation by way of
5    communications, email communications.  I was
6    satisfied that I was on the right track.
7    Did I call Mr. Gabbay, did I feel the need
8    to call him before the wire transfer
9    occurred, no.
10        Q.    So you, your firm did not have a
11    policy or practice to confirm wiring
12    instructions that were initially sent
13    through email through a call to a verified
14    -- a previously verified phone number?
15        A.    If I had not had some confirmation
16    of third-party-type confirmation about what
17    was happening and when it was supposed to
18    happen and how it was supposed to happen, I
19    would have done more than relied upon email
20    communications.  But as I've said, you know,
21    Cliff Rieders is telling me they're going to
22    meet with their financial advisors.  Lo and
23    behold, they do.  Conversations I'm having
24    with the client are familiar to me.  If none

BERNARD G. CONAWAY, ESQUIRE

Page 138

1     of that happened, would I have made a phone

2     call?  I'd like to think I would, but, you

3     know, I'm second guessing myself.

4          Q.   I'm not --

5          A.   Something to confirm.  I would

6     have done something to confirm my

7     instructions.  What that was, yeah, I can't

8     -- I get your point.

9          Q.   I understand.

10              I'm just confirming that your firm

11    did not have a policy and practice to

12    confirm the wiring instructions sent via

13    email through a phone call by a previously

14    verified phone number; that wasn't going to

15    be done on every wire instruction?

16         A.   First, I do very few international

17    wires.

18              Secondly, I had a policy of

19    confirming.  In this instance, a telephone

20    call did not seem to be needed based on my

21    interactions with the client and his

22    Pennsylvania attorney.

23         Q.   Okay.  I don't mean to belabor the

24    point.  I just feel like you're not exactly

BERNARD G. CONAWAY, ESQUIRE

Page 139

1    answering the question.

2            What I'm asking you is, I'm just

3    confirming that your firm did not have the

4    policy and practice to confirm every wire

5    transfer that came via email with a phone

6    call by a verified phone number.

7        A.   I think the answer to your

8    question is, you were correct; however,

9    there is always -- there was a policy

10   consistent with what I think our

11   professional obligations are to confirm the

12   client's instructions.  In this instance, I

13   met that obligation in my mind by, you know,

14   third-party conversations, by other facts.

15   But did I pick up the phone and call Mr.

16   Gabbay, no, I did --

17       Q.   All of that --

18       A.   -- not to confirm the wire.

19       Q.   I'm sorry.  I didn't mean to

20   interrupt you.

21            All those other facts are related

22   to communication via email; is that correct?

23       A.   I'm sorry?

24       Q.   All those other facts that you're

BERNARD G. CONAWAY, ESQUIRE

Page 140

1    referring to related to communications you
2    received via emails?
3         A.   That's correct, so too did my
4    relationship two years prior, was almost
5    entirely by email.
6         Q.   Did you ever communicate via the
7    WhatsApp?
8         A.   Yes.
9         Q.   How I'm not completely familiar
10   with WhatsApp.  What is it exactly?
11        A.   I am not very familiar with it as
12   well.  It was a process of communicating
13   that either Mr. Gabbay or Mr. Rieders asked
14   to use after we, you know, found out there
15   was a problem.  I had to download an app.  I
16   didn't know how to use it at the time.
17        Q.   How many --
18        A.   Apparently --
19        Q.   How many times did you communicate
20   with Mr. Gabbay through WhatsApp?
21        A.   Oh, I don't know the answer to
22   that.  More than once, I'm certain.  How
23   much more, I don't recall.
24        Q.   What about Facetime

BERNARD G. CONAWAY, ESQUIRE

Page 141

1      communications?

2          A.    No.   That was never --

3          Q.    You never had a Facetime

4      communication with Mr. Gabbay?

5          A.    No.   I don't think I knew much

6      about Facetime communications before the

7      pandemic.

8              MR. POLIQUIN:   I don't have any

9      other further questions.   I don't know if

10     Ms. Barron does or not.

11             MS. BARRON:   I do, and I'll be

12     brief.

13                    - - -

14                 EXAMINATION

15                    - - -

16     BY MS. BARRON:

17         Q.    Mr. Conaway, considering your

18     previous discussions with Mr. Gabbay about

19     his interests in Asia, his connections to

20     Hong Kong businesses and banks, did it come

21     to -- was it unusual or did it seem

22     surprising at all that he asked for the

23     money to be transferred to a Hong Kong bank?

24         A.    No.   I had spoke to Mr. Gabbay on

BERNARD G. CONAWAY, ESQUIRE

Page 142

```
 1        any number of occasions about his company.
 2        The reason I had to speak to him about it
 3        was because the litigation got bogged down
 4        because his company Argaman was viewed as a
 5        competitor to Cupron.  And that is important
 6        because in the context of a books and
 7        records request, the court will go out of
 8        its way to protect a company from a
 9        competitor.  So understanding Argaman's
10        setup and the technology and what they did
11        was a part of conversation that I had had
12        over the course of, you know, six to eight
13        months with Mr. Gabbay.
14             Q.   And regarding the email, were you
15        ever informed prior to the transfer of funds
16        that Mr. Gabbay's email was compromised?
17             A.   I was not.
18                  MS. BARRON:  That's all I have.
19                  MR. POLIQUIN:  I don't have any
20        follow-up questions at this time.
21                  THE COURT REPORTER:  Ms. Barron,
22        did you need to purchase a copy of the
23        deposition transcript?
24                  MS. BARRON:  Yes, please.
```

BERNARD G. CONAWAY, ESQUIRE

Page 143

1      Electronic.

2                THE WITNESS:  Christy, I would

3      like to read.

4                        - - -

5                  (Witness excused.)

6                        - - -

7                  (Deposition concluded at 1:55

8      p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

BERNARD G. CONAWAY, ESQUIRE

Page 144

1            C E R T I F I C A T E

2

            I do hereby certify that I am
3    a Notary Public in good standing, that the
     aforesaid testimony was taken before me,
4    pursuant to notice, at the time and place
     indicated; that said deponent was duly sworn
5    to tell the truth, the whole truth, and
     nothing but the truth; that the testimony of
6    said deponent was correctly recorded in
     machine shorthand by me and thereafter
7    transcribed under my supervision with
     computer-aided transcription; that the
8    deposition is a true and correct record of
     the testimony given by the witness; and that
9    I am neither of counsel nor kin to any party
     in said action, nor interested in the
10   outcome thereof.

11

12            WITNESS my hand this 16th day of
     August 2022.

13

14

15

16

17            *Christy A. Traina* (signature)

18

19            Christy A. Traina
              Notary Public

20

21

22

23

24   ASSIGNMENT NO.:  5298373

Page 145

BERNARD G. CONAWAY, ESQUIRE

1    Loren R. Barron, Esquire

2    lbarron@margolisedelstein.com

3                        August 19, 2022

4    RE:  Gabbay, Jeffrey  v. Conaway Esquire, Bernard G Et Al

5         8/5/2022, Bernard G. Conaway, Esq. (#5298373)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   (division email).

16

17    Return completed errata within 30 days from

18   receipt of transcript.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Page 146 (A)

1  Gabbay, Jeffrey  v. Conaway Esquire, Bernard G Et Al

2  Bernard G. Conaway, Esq. (#5298373)

3                E R R A T A   S H E E T

4  PAGE 101  LINE  17  CHANGE Word Missing. Add "your"
5       between "upon" and "instructions"

6  REASON Word missing

7  PAGE 121  LINE  18  CHANGE "Caution" shold be "Cautious"

8

9  REASON Error

10 PAGE 122  LINE  6  CHANGE Error. "Gouged" should be
11      "couched"

12 REASON  Wrong word.

13 PAGE____ LINE____ CHANGE

14

15 REASON

16 PAGE____ LINE____ CHANGE

17

18 REASON

19 PAGE____ LINE____ CHANGE

20

21 REASON

22

23 _____        August 22, 2022

24 Bernard G. Conaway, Esq.          Date

25

Page 146

1     Gabbay, Jeffrey  v. Conaway Esquire, Bernard G Et Al

2     Bernard G. Conaway, Esq. (#5298373)

3           E R R A T A  S H E E T

4     PAGE__13__ LINE__4__ CHANGE Add "How" between "about

5        and "many"

6     REASON_ Word missing

7     PAGE 34__ LINE__12__ CHANGE_ Change "say" to "saying"

8

9     REASON_ Incorrect word

10    PAGE__40__ LINE__17__ CHANGE Correction change "Gabbay to

11       "Cupron"

12    REASON_ Wrong word used.

13    PAGE_53__ LINE__23__ CHANGE_ Word is missing - unsure

14

15    REASON

16    PAGE_57__ LINE__9__ CHANGE_ Correct "Lupron" to Cupron"

17

18    REASON_ Misspelled

19    PAGE_100_ LINE__4__ CHANGE_ Correction "Sinka Adele" to

20       "Simcha Edell"

21    REASON_ Misspelled

22

23    _____    August 22, 2022

24    Bernard G. Conaway, Esq.      Date

25

Page 147

1    Gabbay, Jeffrey  v. Conaway Esquire, Bernard G Et Al

2    Bernard G. Conaway, Esq. (#5298373)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Bernard G. Conaway, Esq., do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Bernard G. Conaway, Esq.           Date

13   *If notary is required

14                       SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                       _____ DAY OF _____, 20___.

16

17

18                       _____

19                       NOTARY PUBLIC

20

21

22

23

24

25

**EXHIBIT E**

**In the Matter Of:**

*JEFFREY GABBAY V.*

*BERNARD G. CONAWAY, ESQ.,*

*CLIFF A. RIEDERS, ESQUIRE*

*August 17, 2023*



1

TO THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JEFFREY GABBAY,                    )
            Claimant,              )
                                   )
        V.                         )
                                   )C.A. No. 1:20-cv-00743-GBW
BERNARD G. CONAWAY, ESQUIRE        )
and CONAWAY-LEGAL, LLC,            )
            Defendants.            )

---

TRANSCRIPT OF REMOTE DEPOSITION PROCEEDINGS:

    DEPOSITION OF CLIFF A RIEDERS, Esquire, taken

remotely via Zoom Web Conferencing in Allentown,

Pennsylvania on Thursday, August 17, 2023, commencing at

9:00 a.m., before Cynetha Jade Harrison, RPR, CRR.

LEXITAS
999 Old Eagle Road
Suite 118
Wayne, PA 19087
(888)267-1200

Cliff A. Rieders, Esquire - August 17, 2023

**2**

APPEARANCES:

On Behalf of the Plaintiff:

    RONALD POLIQUIN, Esquire

    THE POLIQUIN FIRM, LLC

    1475 South Governors Avenue

    Dover, DE 19904

    Ph: (302) 702-5501

    Email: Ron@poliquinfirm.com

On Behalf of the Defendants:

    R. KARL HILL, ESQUIRE

    SEITZ, VAN OGTROP & GREEN, P.A.

    222 Delaware Avenue, Suite 1500

    Wilmington, DE 19801

    Ph: 302-888-7604

    Email: KHill@SVGLaw.com

On Behalf of Cliff Rieders:

    PAUL TROY, Esquire

    Kane, Pugh, Knoell, Troy & Kramer, LLP

    4 Sentry Parkway

    Blue Bell, PA 19422

    Ph: (610) 275-2000

    Email: PTroy@kanepugh.com

**3**

INDEX TO WITNESSES

WITNESS                                        PAGE

CLIFF A. RIEDERS

Direct Examination

        By Mr. Hill                              05

Cross-Examination

        By Mr. Poliquin                         n/a

Cross-Examination

        By Mr. Troy                             n/a

                    * * *

INDEX TO EXHIBITS

NO.              DESCRIPTION              MARKED

Rieders-1        email (7-30-19)            04

Rieders-2        email  (8-2-19)            04

Rieders-3     follow-up email (8-2-19)      04

Rieders-4            draft                   04

**4**

1    (Whereupon, an email (7-30-19) was marked as

2    Exhibit No. 1, an email (8-2-19) was marked as Exhibit

3    No. 2, a follow-up email (8-2-19) was marked as Exhibit

4    No. 3, and a draft was marked as Exhibit No. 4, and the

5    following occurred on the record:)

6          THE COURT REPORTER:  The attorneys participating

7    in this deposition acknowledge that I am not physically

8    present in the deposition room and that I will be

9    reporting this deposition remotely.  They further

10   acknowledge that, in lieu of an oath administered in

11   person, I will administer the oath remotely.  The

12   parties and their counsel consent to this arrangement

13   and waive any objections to this manner of reporting.

14          Please indicate your consent by stating your

15   name and agreement on the record.  Please also state any

16   orders for transcription.  Thank you, Counsel.

17          MR. HILL:  Hi.  Karl Hill --

18          MR. POLIQUIN:  This is Ronald --

19          MR. HILL:  And agreed.  And we would just like

20   the mini script of the deposition, please.

21          MR. POLIQUIN:  Ronald Poliquin for the

22   Plaintiff.  We agree, and please send the e-file

23   e-delivery.

24          MR. TROY:  And Paul Troy, and I agree.  I will

25   take a copy of the transcript.  Thank you.

**5**

1          (Whereupon, CLIFF RIEDERS, having been called as

2    a witness, was duly remotely sworn by the court

3    reporter, and the following occurred on the record:)

4          MR. HILL:  Okay.

5

6               DIRECT EXAMINATION

7    BY MR. HILL:

8    Q.      Okay.  Good morning, Cliff.  And thanks for

9    letting me call you by your first name.  And, certainly,

10   you can do that with me, for sure.  I know you've been

11   through this before, maybe even more times than me, but

12   I -- I just want to give you a couple quick ground rules

13   just to remind everyone that, if you could, just please

14   provide only verbal answers to my questions.  And let's

15   try not to talk over one another in the group.  And if

16   you could, wait until I finish my question before

17   answering -- before you answer, that would be very

18   helpful to the court reporter.  I don't think we're

19   going to be terribly long today, but if you need a break

20   for any reason, just let me know.

21          And I'm sure Mr. Poliquin has reminded you that

22   we have a Local Rule 30.6, and that Rule says that

23   during breaks at a deposition, you're not permitted to

24   speak about the substance of your testimony already

25   given or to be anticipated with your counsel, okay?

Cliff A. Rieders, Esquire - August 17, 2023

6

1  A.      Yes.
2  Q.      What did you do to prepare for today's
3  deposition?
4  A.      I talked to Mr. Troy. I very briefly paged
5  through some documents I think you may have sent.
6  That's all I can remember.
7  Q.      Okay. Did you read Mr. Gabbay -- and I'll
8  probably refer to him as Jeff every once in awhile. But
9  did you read Mr. Gabbay's deposition?
10 A.      You know, I just paged through it, umm, and --
11 just to give you an idea, I probably didn't spend more
12 than five minutes doing that. So, I'd have to say no,
13 but -- but I did look at some pages.
14 Q.      Okay. And any other depositions reviewed?
15 A.      No. I'm not actually aware of any others, no.
16 Q.      Okay. And other than the screen that you're
17 using right now, are there any other screens open in
18 front of you?
19 A.      Yes. My email screen. I have two screens on my
20 desk.
21 Q.      Okay. Nothing in particular about this
22 deposition, though; correct?
23 A.      No, just email. Just the email.
24 Q.      Okay. And I've introduced myself. And we met
25 Mr. Troy; he's representing you today for purposes of

7

1  this deposition?
2  A.      Yes.
3  Q.      And you know we're taking the deposition in the
4  Gabbay versus Conaway case pending in the Federal
5  District Court. You're aware of that; right?
6  A.      Yes.
7  Q.      And as I look at the docket this morning, please
8  confirm that you have not entered an appearance in this
9  case.
10 A.      I have not.
11 Q.      And are you formally representing Jeff in
12 connection with this Federal case?
13 A.      I am not.
14 Q.      Is it fair to say that you are potentially a
15 fact witness?
16 A.      I -- I'm not comfortable giving a legal opinion.
17 I don't know what I am. I'm here to tell -- tell --
18 answer your questions.
19 Q.      Okay. I checked your bio out on the -- on your
20 website. Quite impressive. So, I have all this
21 information. But could you just briefly for the record
22 trace for us your professional work history, Cliff?
23 A.      Umm, okay. Briefly, let me think. I worked in
24 Washington, D.C. for a couple of government agencies and
25 private law firms when I graduated from law school. I,

8

1  then, came to Central Pennsylvania where I clerked in
2  the Federal Court System. And I've been practicing in
3  this same law firm from the time that I left the
4  clerkship in the present.
5  Q.      And when approximately did you leave your
6  Federal clerkship?
7  A.      1975.
8  Q.      And did you form the firm at that time after you
9  left the Federal clerkship?
10 A.      No. This firm has been in existence since 1838.
11 And over the years, you know, as partners came and went,
12 the name changed. And at some point, it was given this
13 name -- actually, not by me, but by -- other partners
14 suggested it. So, no, I did not form the firm.
15 Q.      And that firm, as its presently constituted or
16 named, is Rieders, Travis, Humphreys, Waters & Dohrmann?
17 A.      I think that's the correct -- I'm hesitant. I'm
18 sorry.
19 Q.      That's okay.
20 A.      I'm embarrassed to tell you that, you know, they
21 changed the name when Mr. Humphrey and Mr. Waters became
22 emeritus. So, you know, retired. So, that's a recent
23 change. So, yes, you've got the current name correct.
24 Q.      And is the -- is the firm -- well, strike that.
25 What -- what corporate form, if any, does the firm use

9

1  as far as its entity status?
2  A.      Partnership.
3  Q.      Is that a Pennsylvania partnership?
4  A.      Yeah.
5  Q.      I'm not familiar with Pennsylvania law, but it
6  -- is there a -- is there a partnership act that
7  provides the source for the formation of a Pennsylvania
8  partnership?
9  A.      I don't know. It's not my field.
10 Q.      Okay. That's a good segue to my next question:
11 What type of work do you concentrate in?
12 A.      So, I do mainly personal injury work, products
13 liability, medical malpractice, medical devices,
14 pharmaceutical, would be the major part of what I do,
15 but I do, do some commercial work. I have -- I do
16 represent a bank, and I have for many years, different
17 banks. So, I do some work for construction company --
18 construction company litigation. So, I -- I -- and I do
19 some civil rights work. And I always have a case or two
20 pending in the civil rights field. So, it's a bit
21 eclectic.
22 Q.      Okay. And let me just ask you a couple more
23 specific questions. The personal injury work you
24 described, including the products liability malpractice,
25 is that, typically, on a Plaintiff's side?

Cliff A. Rieders, Esquire - August 17, 2023

10

1   A.      Typically, although, we have occasionally done
2   some work for insurance carriers, and we have been on
3   the defense side now and again.  It's a -- more of the
4   minority most of the time.
5   Q.      What about you personally?  Is it a plaintiff's
6   -- would you call yourself a plaintiff's lawyer?
7   A.      Yes.  Generally.
8   Q.      And the bank that you said or banks that you
9   represented, do you remember the names of those banks?
10  A.      Well, currently, I -- you know, I don't know if
11  I'm permitted under Pennsylvania Rules of Ethics to give
12  the name of clients.  It just dawned on me.  I remember
13  reading that one time, umm, and telling a partner they
14  should not do that.  So, I'm -- I'm not sure -- I mean,
15  I don't have any objection to it, personally, but I just
16  don't -- want to make sure I'm being the right thing,
17  you know, the ethical thing.  I mean, they hold me out
18  as their general counsel.
19  Q.      Okay.
20  A.      So --
21          MR. TROY:  Karl, do you really need to know
22  that?  I'd like to stay free of --
23          MR. HILL:  No.  It's okay.
24          MR. TROY:  Yeah.
25          MR. HILL:  The -- just one follow-up that I

11

1   don't think will trigger any issue is that --
2   BY MR. HILL:
3   Q.      Where is that bank presently located?
4   A.      Pennsylvania.
5   Q.      Okay.  All right.  I'm going to switch now to
6   Mr. Gabbay.  What's your connection to him?
7   A.      So, I know Jeff from a town we grew up in, Great
8   Neck, and we have been friends probably since when we
9   were 13, 14, 15 years old.  And then, we lost touch
10  after that.
11  Q.      And how old are you, Cliff?
12  A.      I'm 75.
13  Q.      So, you -- you've known him since you were about
14  13?
15  A.      Yes.  There was a long hiatus in our
16  relationship between age 15 and probably -- what -- we
17  were in our 40's.
18  Q.      Okay.  And is it fair to say you reconnected
19  somehow?
20  A.      Yes.
21  Q.      Is he a friend of yours?
22  A.      I consider him a friend, yes.
23  Q.      And as I understand it, and I know you only
24  skimmed Mr. Gabbay's deposition, but Jeff worked as a
25  CEO of a company named Argaman between 2013 to October

12

1   '21; were you aware of that?
2   A.      Not the years.  And I didn't know his title.
3   But I knew that he was connected with the company, yes.
4   Q.      Okay.  And did you know that the Argaman was an
5   Israeli company that he had formed?
6   A.      I don't know if I knew that.  I may have assumed
7   that it was an Israeli company, but I didn't know who
8   formed it.
9   Q.      Do you --
10  A.      I still don't know.
11          I'm sorry.  I just violated one of my ground
12  rules.
13  A.      Maybe I did.
14  Q.      And did you know that, umm -- strike that.
15          Did -- have you, personally, or anyone at your
16  firm performed legal services for Argaman?
17  A.      No.
18  Q.      Did you know or do you know that Argaman
19  supplied raw material to various companies worldwide?
20  A.      I think Jeff told me that.  The answer would be
21  generally, yes.  I don't know what materials or -- that
22  would be an assumption on my part.
23  Q.      Were you aware that Tal, T-A-L, Apparel, a Hong
24  Kong-based company, was a shareholder of Argaman?
25  A.      I never heard that name.  I do not know anything

13

1   about his investors or shareholders.
2   Q.      If you don't know the name, I think I know the
3   answer, but, Were you aware at any time that Argaman
4   provided raw material to Tal Apparel in Hong Kong?
5   A.      No.  But to make a plea to my answer, I did ask
6   Jeff after this whole episode transpired concerning
7   sending the money to Hong Kong, I could remember asking
8   the Jeff if he had investors in Hong Kong, and I believe
9   he told me yes.
10  Q.      Okay.
11  A.      I don't know the name, though.  But that was
12  after the fact.
13  Q.      I got ya.  And I'm just going to throw this out:
14  Do you know of a company by the name of Pershing,
15  P-E-R-S-H-I-N-G, LLC?
16  A.      Never heard of them.
17  Q.      Okay.  I'm going to transition now to the Cupron
18  -- I'm going to call it the Cupron litigation, Cliff.
19  And I understand that to be a case that was filed in the
20  Court of Chancery, here in Delaware.  Is it okay if I
21  just refer that --
22  A.      Yes.
23  Q.      -- refer to that as the Cupron litigation?
24  A.      Yes.
25  Q.      And correct me if I'm wrong, but my basic

Cliff A. Rieders, Esquire - August 17, 2023

---

**14**

1  understanding is that this was a Books and Records
2  action brought by Mr. Gabbay as a shareholder of Cupron?
3  A.      So, I really don't exactly know what you would
4  call it.  I referred to -- to Bernard Conaway, because
5  it was way out of my field.
6  Q.      Um-hmm.
7  A.      And when I referred to -- to Mr. Conaway, I'm
8  not even sure at the time that I knew what I was
9  referring for, other than the fact that, you know, Jeff
10  had some issues concerning the company, and he wanted
11  some legal counsel.  So, I -- I'm trying to, again,
12  answer you in a very complete way.  So, I'm not sure
13  what the -- when I referred to Bernie what the cause of
14  action was likely to be.
15  Q.      And had -- let me rephrase that.  How is it that
16  you connected with Bernie in connection with the Cupron
17  litigation?
18  A.      Yeah.  I -- great question.  I knew you'd ask me
19  that, and I really don't know.  I can -- I can give you
20  an educated guess, if that's okay.
21  Q.      Okay.
22  A.      I'm thinking -- and I really -- I don't have a
23  specific recollection of this -- I'm thinking I called
24  some firms in the Philly area, thinking that, you know,
25  someone that would have Delaware connections.  And I

**15**

1  have a friend at Fox Rothchild.  And I think that he may
2  have -- that friend may have given me Bernie Conaway's
3  name.  But I'm not positive if that's where it came
4  from.
5  Q.      Okay.  That's fair enough.  And ultimately,
6  Bernie Conaway and his firm was hired to represent Mr.
7  Gabbay in the Cupron litigation?
8  A.      That's my understanding.  I didn't hire them,
9  but I understand that to be the case.
10  Q.      Okay.  That was originated -- the connection
11  between Mr. Gabbay and Mr. Conaway was originated by
12  you, for lack of a better word?
13  A.      I believe so, yes.
14  Q.      Had you worked with Mr. Conaway prior to this
15  litigation?
16  A.      No.  I might have talked to him about some other
17  case afterwards.  I'm not really sure that was before or
18  afterwards.
19  Q.      Okay.
20  A.      But I think the answer is no to that.
21  Q.      Okay.  And the -- it's fair to say, based on
22  what I know, that the Cupron litigation settled, and
23  that resulted in a settlement fund for the benefit of
24  Mr. Gabbay; is that fair?
25  A.      Yes.

**16**

1  Q.      And it's the remainder of that fund which allows
2  us to meet each other today; right?
3  A.      I'm sorry.  The what?
4  Q.      The remainder of the settlement funds is what
5  brings us here today; right?
6  A.      I apologize.  I'm not trying to be a wise guy.
7  I'm not quite sure what you mean by remainder.
8  Q.      Well, the -- we can get into it, but the
9  settlement was paid into Mr. Conaway's trust account.
10  So far so good?
11  A.      I believe so.
12  Q.      And ultimately, funds were taken out of that
13  settlement fund to pay Mr. Conaway's outstanding fees
14  and yours?
15  A.      That's my understanding, yes.
16  Q.      And then, what was left is the amount that I
17  think we all can agree was sent to Hong Kong through a
18  hack; agreed?
19  A.      That's my understanding, yes.
20  Q.      Okay.  And just briefly can you describe sort of
21  the division of responsibility between you and Bernie in
22  connection with the Cupron Chancery case?
23  A.      Yeah.  Good question.  I felt -- I did not have
24  any responsibility, because, as I told Jeff and Bernie,
25  I had little or no Delaware law experience.  And I

**17**

1  remember saying to them both -- it's real weird stuff
2  down there, and it's way out of my league.  So, the only
3  thing I did is I acted as a -- helping out a friend, I
4  think, would be the right term.  Jeff had questions and
5  wanted to talk to me generally, not about the law, of
6  course.  But, you know, I -- I, of course, would take
7  and entertain his phone calls, but I had no
8  responsibility.  You know, Bernie would you call me,
9  talk to me, tell me what's going on, and, you know, he
10  was the expert.  So, I just, kind of, listened to him.
11  And he would, you know, do the reporting to me what was
12  going on.  And so, I -- I can't say I didn't have any
13  responsibilities.
14      In fairness, before Jeffrey's deposition, Bernie
15  did ask me to talk with Jeff and maybe do, like, a trial
16  run with him, which I did, 'cause I happened to be in
17  Israel visiting one of my kids who lives there.  It was
18  very difficult for me, 'cause I didn't really know what
19  Jeff would be asked about.  I really knew nothing about
20  the case.
21      So, it was more generalities, as you've covered
22  here with me, you know, before listening to the question
23  and being responsive, that kind of thing.  So, I did do
24  that at Bernie's request.  But other than that, I don't
25  remember having any responsibility.

---

Cliff A. Rieders, Esquire - August 17, 2023

18

1  Q.    Okay.  Did you ever formally enter an appearance
2  in the Chancery case?
3  A.    No.
4  Q.    Did you consider yourself co-counsel with
5  Conaway-Legal on this?
6  A.    No.
7  Q.    And had you represented Jeff Gabbay prior to the
8  institution of the Chancery case filed by Conaway-Legal?
9  A.    Another great question.  I was wracking my brain
10  to think about that.  I think not.  Again, over the
11  years, you know, Jeff may have asked me about --
12  generally about legal -- you know, become friends at
13  dinner, and somebody brings up a legal question.  But,
14  no, I don't call recall any representation of him in any
15  matter.
16  Q.    Were you, Cliff, the -- the primary conduit, for
17  lack of a better word, between Conaway-Legal and Mr.
18  Gabbay?
19  A.    I didn't think so, no.  I mean, I was happy to
20  talk with either one of them, if I got, you know,
21  contacted.  But I never saw myself as a conduit, because
22  I didn't really know anything about the cause of action,
23  the -- and in Delaware, what that cause of action
24  consisted of.
25  Q.    Was it you, Cliff, that typically reached out to

19

1  Mr. Gabbay for any decisions that needed to be made on
2  the case?
3  A.    Never.
4  Q.    I apologize for the phone.
5  A.    That's okay.  I figured mine would ring first.
6  So, you win.
7  Q.    Did you -- Cliff, did you or the firm maintain a
8  file in connection with the Cupron case?
9  A.    No.
10  Q.    Did you open a file or a matter for that
11  purpose?
12  A.    No.  But, again, to be clear in my answer, the
13  staff here, you know, keeps everything we do, including
14  emails, on a database.  So, I don't know if they did
15  with this or not.
16  Q.    I'll get to that in a second.  But do you have
17  any physical documents relating to the Cupron
18  litigation?
19  A.    Just things that I, you know, download that had
20  people sent to me, like things, umm, sent or if Mr.
21  Poliquin sent me anything or Mr. Troy, you know, I
22  printed out hard copies to look at.
23  Q.    Do you still have those?
24  A.    Yeah.  They're around somewhere.
25  Q.    And how about the emails on the server; do you

20

1  know if they've been maintained?
2  A.    Yeah, I'm sorry, I don't know that.  I try to
3  stay away from that kind of stuff.
4  Q.    Is that something you'd be willing to check on
5  and get -- get back to Mr. Poliquin on?
6  A.    Well, I think I would tell Mr. Troy; right?
7  Q.    Okay.
8  A.    If -- you know, if he thinks that's appropriate
9  and wants me to do that, I'll do it, of course.
10  Q.    Okay.  And just -- just to close the loop on
11  this, as I understand it, you did bill for some of your
12  time in connection with the Cupron case; do I have that
13  right?
14  A.    You know, I'm not sure.  Another one I was
15  trying to rack my brain on.  I think that -- that there
16  was some funds that were received here sent by Bernie
17  Conaway, but I think those were used in subsequent --
18  for example, I talked with a lawyer in Hong Kong after
19  all of this happened, and I paid him from that money
20  that Bernie sent to me.  So --
21  Q.    I understand.
22  A.    -- I don't know that I actually ever had any
23  fee.  But, yes, Bernie did send me some money in
24  connection with my time, yes.
25  Q.    And that was time that you put on to the Cupron

21

1  Chancery case; is that fair?
2  A.    Well, it's fair to say it's time I put into talk
3  with Jeff or Bernie, presumably in connection with that
4  case, yes.
5  Q.    And the money that was billed by you in
6  connection with the services you rendered in the Cupron
7  case that you just described, was that money received
8  before the hacking occurred?
9  A.    Yes.
10  Q.    And do you know if you created a bill for that
11  time?
12  A.    I don't remember anything about that.  I'm not
13  sure actually when it was received.  Obviously, Bernie
14  took his fee, sent me whatever he sent to me, and I -- I
15  -- I really don't know the answer to that, I'm sorry.
16  You asked another question.  I apologize.
17  Q.    That's okay.  Did you create a bill to reflect
18  the time that you spent on the Cupron file that was
19  billed?
20  A.    I don't remember if it was a bill or I just told
21  Bernie the -- or Jeff the amount of time I had in up to
22  that point.  So, I don't remember that.
23  Q.    Okay.
24  A.    I can't answer that, sorry.
25  Q.    And Mr. Gabbay approved the payment of Bernie's

Cliff A. Rieders, Esquire - August 17, 2023

22

```
1   final bill, if you will, and your time; is that fair?
2   A.      Yeah.  Yes.
3   Q.      And, Cliff, what email address were you using
4   during the Cupron case and through the -- through the
5   first half of 2019?
6   A.      The firm email, CRieders@RiedersTravis.com.
7   Q.      Okay.  I may have been a little loose in my
8   language referring to Bernie as Bernie, because he is
9   Bernie, but you're aware that Bernie acted through his
10  company, Bernard Legal, LLC; is that fair?
11  A.      No, I never knew that, actually, until I saw
12  something that he -- somebody sent to me in the matter
13  of the Poliquin file.  I did not -- either I didn't know
14  that or I didn't remember that.
15  Q.      Okay.  My question was before that, What email
16  address did you use during the Cupron case and the
17  aftermath in up to through, let's say, July of 2019?
18  A.      Same one.  The firm, CRieders@RiedersTravis.com.
19  Q.      And you know the -- I think you'll agree that
20  the critical time frame we're going to be talking about
21  is, essentially, June and July as it relates to the
22  hack.  You understand that, don't you?
23  A.      I believe that's right, yeah.
24  Q.      Prior to June of 2019, had your firm ever
25  experienced a cyber attack or a hacking event?
```

23

```
1   A.      The firm experienced a -- an attempted -- I want
2   to get the right term here.  The firm experienced a --
3   an attempt to breach the firewall and demand money in
4   return for giving us our server back in return for that.
5   But I don't remember.  But it never happened, 'cause we
6   caught it.  We had -- you know, our firewall caught it,
7   and our tech person here caught it.  So, we never paid,
8   and we never lost any -- any data -- data.
9   Q.      Did you have --
10  A.      We did experience --
11  Q.      I'm sorry.
12  A.      I'm sorry, I interrupted you.  But we did
13  experience that attempt.
14  Q.      Okay.  And when did that occur?
15  A.      I don't remember.  Several years ago.  Four,
16  five years ago.  I don't remember when that happened.
17  Q.      Did it happen during the time frame the Cupron
18  litigation was pending in Delaware?
19  A.      I don't know.
20  Q.      Did you ever have to use an alternate server or
21  exchange for purposes of business emails during the time
22  frame that this attack or attempted attack was
23  occurring?
24  A.      Well, time frame was only like a very short time
25  frame.  It was on some Sunday evening, as I recall.  I
```

24

```
1   don't remember that ever happening, but I don't deal
2   with the computer stuff here.  We have somebody on the
3   staff who does that.  So, I'm kind -- you're, kind of,
4   out of my league a little bit.  I'm really guessing.
5   Q.      Okay.  And do you -- does the firm provide you
6   with an iPhone or an iPad?
7   A.      No -- well, they don't provide me.  I have -- I
8   have those things.
9   Q.      Do you, from time to time, send and respond to
10  emails with your iPhone?
11  A.      Yes.
12  Q.      And how about your iPad?
13  A.      Yes.
14  Q.      Okay.  I'm going to start to show you some
15  documents now, Cliff.  Do you --
16          MR. HILL:  Does everyone have all of the
17  documents that I wanted to bring to him, hopefully, so I
18  don't have to figure out sharescreen?
19          MR. TROY:  That's fine.
20  BY MR. HILL:
21  Q.      Cliff, do you have those?
22  A.      Yeah.  I printed them out -- or somebody had
23  printed them out.  Yeah, I -- I think I have those, yes.
24  Q.      Okay.  Let's start with the, umm, Gabbay Exhibit
25  No. 1.
```

25

```
1   A.      Yes.
2   Q.      Which is Exhibit No. 1 that I marked to Mr.
3   Gabbay's deposition.
4   A.      Okay.
5   Q.      And just -- I want to make sure everyone has
6   that in front of them before I get started.
7   A.      I have it.
8   Q.      Okay.
9           MR. HILL:  Paul?
10          MR. TROY:  Yep.  I got it.
11          MR. HILL:  Okay.  Ron?
12          MR. POLIQUIN:  Yes.
13  BY MR. HILL:
14  Q.      All right.  You'll see -- have you looked
15  through this before now, Cliff?
16  A.      Again, very briefly, when -- when it was sent.
17  It was sent, I guess, to me by Mr. Troy.
18  Q.      Okay.
19  A.      I didn't study it or look at it in any detail,
20  no.
21  Q.      All right.  So, just to orient you and, perhaps,
22  for the record, this is a -- this exhibit, Gabbay-1, is
23  a combination of documents that Bernie -- I'm sorry,
24  Conaway-Legal had produced, and they have the Bates
25  numbers on the bottom; CL, for Conaway-Legal, starting
```

Cliff A. Rieders, Esquire - August 17, 2023

26

1  with, 001; do you see that?
2  A.      Yeah, 0001, yes.
3  Q.      Okay, 0001.  And then, I think that goes
4  sequentially through CL0068, and then, they pick up with
5  CL00262 through 268; that's the exhibit.  And I --
6  you've been through this before.  I'll orient you to the
7  page on the bottom so that we're literally on the same
8  page when I ask the questions, okay?
9  A.      Okay.
10  Q.      And, similarly, if you need time to review it --
11  I would prefer you take the time to review it before you
12  answer my questions so that it becomes a cleaner
13  exchange between us, okay?
14  A.      Yes.
15  Q.      Okay.  So, let's go to CL003.
16  A.      Okay.
17  Q.      All right.  And this is an email on Monday, June
18  3rd, 2019, at 11:28 p.m. Eastern Time.  Do you see that?
19  A.      Yes.
20  Q.      And you're copied on this email?  That's your
21  email address?
22  A.      That's what it says.
23  Q.      And it's sent to Jeff Gabbay,
24  Jeff@Argamantech.com.  Did you understand that to be
25  Jeffrey's business email account?

27

1  A.      I have no idea.  And I did not know.  I mean, I
2  wouldn't know that.  I mean, I -- I'm assuming it,
3  because you're showing it to me, and I see it, but I
4  normally heard from Jeff from a Gmail account.  So, I --
5  I just can't answer that.  I'm not saying it's not so, I
6  just don't know.
7  Q.      Okay.  You may have answered, I apologize, but
8  do you remember Jeff using the -- I'll call it the
9  business account, the Argaman tech account, during the
10  Cupron litigation?
11  A.      Not -- not really.  I -- my memory -- again, it
12  could be defective -- it was really the Gmail account.
13  Umm, is it possible that he did use this account and I
14  saw it?  Yes, it's certainly possible.  But to try to be
15  really accurate with you, all I remember is the Gmail
16  account.
17  Q.      Would it surprise you if I told you that over
18  200 emails were sent on the Argaman account during the
19  Cupron litigation?
20  A.      I just don't know.  I can't say I'd be surprised
21  or not surprised, I just -- I never counted.
22  Q.      Okay.
23  A.      And I probably never looked.
24  Q.      And I'm just focusing on the first sentence, and
25  I won't take too much time on some of these.

28

1          MR. HILL:  And, Cliff, and, Paul, please tell me
2  to slow down, because we tend to move quicker when we
3  have documents.
4  BY MR. HILL:
5  Q.      But I'm looking -- this is a June 3rd, 2019
6  email from Bernie Conaway, BGC@ConawayLegal:  Jeff, I am
7  currently holding settlement funds paid by Cupron in my
8  firm's escrow account.  My question to you, Cliff --
9  this is as of June 3 -- were you aware prior to this
10  time that the funds were going to be wired into
11  Conaway-Legal's escrow account?
12  A.      Yes.  The only reason why I remember that,
13  because I offered to Bernie that he use -- they do this
14  through the bank I represented, because, in the past,
15  when Jeff paid him, I remember there was always some --
16  there were always some kind of snafus.  Bernie would be
17  worried about getting paid or having the expert paid,
18  and, I guess, you know, the international transactions
19  were complex for him, maybe for Jeff, too.  I don't
20  know.  But I remember hearing about that, and I remember
21  saying to Bernie at one point, Why don't you just do it
22  through my bank; I mean, they're experienced in this.
23  And he declined to do that.  And so, that's why I
24  remember that, because he said he would -- it would go
25  to his escrow account.

29

1  Q.      And when did you have this discussion with Mr.
2  Conaway?
3  A.      I can't tell you when.  You know, in the days
4  and weeks prior to this, you know, after the case was
5  settled.
6  Q.      But at some point you were okay with
7  Conaway-Legal's escrow account receiving the funds?
8  A.      Oh, yeah.  I figured, listen, he's a lawyer,
9  he's admitted there, he's handled this case through all
10  the way through.  If he was insistent in that, I didn't
11  feel I had standing to say otherwise.
12  Q.      Okay.  Let's flip to CL0015.
13  A.      Okay.
14  Q.      Now we're at -- in case you didn't already
15  figure this out, I'm taking you through the chronology,
16  hopefully, as it fell on the calendar, okay?
17  A.      Sure.
18  Q.      June 11, 2009 -- this is the in the center of
19  this page.  Mr. Conaway writes to Jeff, After deducting
20  fees and expenses due Cliff and I, the remaining balance
21  is 426,169.
22          Let me stop right there.  That's the amount
23  that's in dispute and in the case brings us together;
24  fair.
25  A.      Think that's approximately the amount.  I can't

Cliff A. Rieders, Esquire - August 17, 2023

30

1  tell you the exact amount, I'm sorry.
2  Q.    Okay. And the, umm -- Mr. Conaway, then,
3  writes, Please let me know how you want to receive this.
4  Would you agree with me, Cliff, that Bernie -- Mr.
5  Conaway is still seeking instructions on how to disburse
6  the settlement funds that were left?
7  A.    Sounds that way.
8  Q.    Okay. And then, Mr. Gabbay, up top, writes on
9  the same day at 4:34 p.m., Please pay Cliff's opened
10 invoice.
11       Does that refresh -- refresh your recollection
12 that you actually submitted an invoice for the services
13 you provided in this case?
14 A.    No, it does not. And I don't know that I did.
15 I just don't know.
16       MR. POLIQUIN: Hey, Karl, this is Ronald
17 Poliquin. The documents you're review -- you're looking
18 at, were they attached to exhibits that you said you
19 were going to used to or are these different documents,
20 because --
21       MR. HILL: This is Gabbay-1, the deposition
22 Exhibit No. 1 to Mr. Gabbay's deposition.
23       MR. POLIQUIN: So, these are different
24 documents to the ones that -- I thought were you using
25 ones that you, umm -- these are just Gabbay -- these are

31

1  documents to the Gabbay deposition, basically?
2        MR. HILL: Yeah. I'm starting with that, yes.
3        MR. POLIQUIN: Okay.
4        MR. HILL: Okay.
5        MR. POLIQUIN: Thank you.
6  BY MR. HILL:
7  Q.    And -- are you back with me, Cliff?
8  A.    Yeah. No problem.
9  Q.    The next sentence is, I will get back to you on
10 disbursal of -- I'm assuming that should be of -- funds.
11 So, Jeff, would you agree, still has not decided on how
12 those funds would be disbursed; is that -- is that
13 accurate?
14 A.    I don't know, but it looks that way to me.
15 Q.    Do you remember how much your -- I'll just say
16 bill, for lack of a better word -- was that was
17 ultimately paid out of settlement provides?
18 A.    Payment to us? No, I do not remember that.
19 Q.    Okay. Let's go to CL0019.
20 A.    Got it.
21 Q.    Okay. And I'm going to start at the bottom.
22 It's an email of a June 19, 2019 from Bernard Conaway.
23 And you're copied on this email. Do you see that?
24 A.    Yes.
25 Q.    And I also see a Kim Paulhamus.

32

1  A.    Correct.
2  Q.    Paulhamus. And who is she, Cliff?
3  A.    She's the business manager here.
4  Q.    Okay. Did I read on your bio somewhere that
5  she's also your wife?
6  A.    I don't know if you read it or not, but --
7  Q.    Is it true?
8  A.    -- she is.
9  Q.    Okay. And what's her --
10 A.    And my boss.
11 Q.    Okay. What's -- what's her function at the
12 firm?
13 A.    She runs the firm. She manages the firm.
14 Q.    Office manager, I guess? I don't want to
15 belittle it. I know how that goes.
16 A.    You know, she's the equivalent of a managing
17 partner; let's put it that way. She manages the firm
18 and the employees. And, you know, she's in charge of
19 the bookkeeper and the tech people.
20 Q.    Okay. And on this email, Bernie addresses it to
21 you, Cliff, unless I missed it, Jeff hasn't given me
22 instructions on how to transfer the settlement proceeds;
23 please let me know if I missed something. So, would you
24 agree here, Cliff, that as of June 19, 3 :02 p.m. Mr.
25 Conaway's still seeking instructions on disbursal from

33

1  Jeff?
2  A.    That's what he said. He asked me to contact
3  Jeff. He was in contact with Jeff and had the usual
4  contact with Jeff, but I think on this one, he asked me
5  to try to find out also.
6  Q.    Okay. And then we can go to the next email
7  above that, and that is your email, is it not, on
8  Wednesday, June 19 --
9  A.    Oh.
10 Q.    -- 2019?
11 A.    Right. I see that. Okay. So, that -- that's
12 consistent with my memory.
13 Q.    Okay. And that's the same day, just a couple
14 hours later, if I have the time right?
15 A.    Right. Right.
16 Q.    And then, it says, We talked -- let me stop
17 right there. Did you talk to Jeff -- well, I guess I'll
18 lay a foundation. When you say we, are you referring to
19 you and Jeff talking?
20 A.    I don't remember.
21 Q.    Do you remember talking to Jeff Gabbay about how
22 to handle the disbursal at this time?
23 A.    No. I really don't. I -- I'm speculating that
24 -- I might have said to Jeff, You gotta tell Bernie
25 where you want this money sent. It sounds like

Cliff A. Rieders, Esquire - August 17, 2023

34

1  something -- I mean, it's consistent with that, but I
2  don't really remember the conversation.
3  Q.    Okay.  And then, you wrote, I want to give Jeff
4  a bit of boot.  What did you mean by that?
5  A.    To encourage him to get back to Bernie with the
6  information.
7  Q.    And then, you wrote at the end of this email, I
8  don't like to hold money for clients for more than 10
9  days.
10 A.    Correct.
11 Q.    That's -- that's your practice?
12 A.    Yeah.  That's my -- absolutely.  I don't even
13 like to hold it for that long.
14       Sorry about that.  I can't control the city fire
15 department.
16 Q.    No worries.  Let's move to No. 21.
17 A.    Okay.
18 Q.    And here we are on June 25 at 10:05 a.m.  Bernie
19 Conaway writes, Cliff, anything from Jeff disbursing
20 settlement funds?
21 A.    I remember that, yes.
22 Q.    Okay.  So, you agree Bernie's still seeking
23 instructions from the client on disbursal; fair?
24 A.    Yes.
25 Q.    And then, you wrote, did you not, No, I will

35

1  call him soon and let you know?
2  A.    I set that.  And I'm sure if I said that, I did.
3  Q.    Okay.  You don't have any reason to contest
4  these emails, do you?
5  A.    No, no, absolutely not.
6  Q.    And it says, Sent from my iPad.  This would have
7  been one where you used your iPad to convey it?
8  A.    I don't see that, but if it says it --
9  Q.    It --
10 A.    Oh, I sent from my iPad.  I presume that's
11 correct.
12 Q.    Okay.  It wouldn't be uncommon for you to pull
13 out the iPad and send an email, would it?
14 A.    Well, yeah.  I -- I don't use the iPad when I'm
15 at the office here in Williamsport.  So, that tells me I
16 was either in Philadelphia where we have a -- a room set
17 aside as an office or somewhere also on occasion.  So,
18 what that tells me, if it's from an iPad, is it was not
19 sent from my office.
20 Q.    Probably a remote location?
21 A.    Right.
22 Q.    Okay.  And then, you wrote, I will call him
23 soon.  Do you remember calling him?
24 A.    If I said it, I did.  I don't remember the call,
25 no.

36

1  Q.    Okay.  And so, we're -- that -- you're email
2  was June 25 at 10:26 a.m.; right?
3  A.    That's what it says.
4  Q.    And then, if you turn the page, the next page,
5  to CL0022 --
6  A.    Yeah.
7  Q.    Would you agree, Cliff, this is your email on
8  that same day, June 25, just -- just short of two hours
9  later; right?
10 A.    I remember this, yeah.
11 Q.    Okay.  And then, He told me -- that's Jeff,
12 right?
13 A.    Right.
14 Q.    That he is meeting with whomever he needs to
15 meet with on Tuesday.
16 A.    That -- I think that -- I think I remember that.
17 Q.    Okay.  Do you -- do you remember any details
18 about the discussion you had with him about --
19 A.    No.
20 Q.    -- this meeting on Tuesday?
21 A.    No.  Unfortunately not.
22 Q.    Let's --
23 A.    I don't remember giving details, you know.
24 Q.    Other than he's meeting with someone next
25 Tuesday?

37

1  A.    Yeah.  Correct.
2  Q.    Okay.  No other specific recollection of
3  anything else, other than what's captured in words you
4  used?
5  A.    I don't think he gave me any more information
6  than that.  I don't remember anything he -- his concern
7  that he raised with me was that he wanted to talk to
8  Bernie about other shareholders who had not been bought
9  out.  And I remember saying to him, Well, gee, I don't
10 think he took a case for anyone else.  Bernie doesn't
11 represent anyone else.  So, I don't know.  He wanted to
12 talk to Bernie with that.  So, I think that -- that's
13 more the substance of the conversation than who I was
14 meeting with and when.
15 Q.    Okay.  So, did you -- did you, Cliff, expect,
16 based on your phone call and what you've captured in
17 this email, to receive instructions from Mr. Gabbay as
18 to the disbursal of funds on a following Tuesday?
19 A.    No, I assumed that he would be in touch with
20 Bernie with that, since they decided it was going to go
21 through Bernie's account and not through our bank.
22 Q.    And let's go to 24, please.
23 A.    I got it.
24 Q.    All right.  And you'll agree, I hope, that on
25 July 1st, 2019, Bernie Conaway wrote to Jeff:  Hope all

Cliff A. Rieders, Esquire - August 17, 2023

**38**

1  is well with you; please let me know at your earliest
2  convenience what you would like to do with the remaining
3  settlement funds.
4        Right.
5  A.      I see that.  I don't -- I don't remember that,
6  but I see it.  And I have no reason to doubt it.
7  Q.      Based on the words, phrases and nouns used in
8  that language, would you agree that Bernie's still
9  waiting for instructions as of this time?
10 A.      It looked that way, yeah.  Looks that way.
11 Q.      And do you see how -- do you see on -- above
12 that, a response from Jeff?
13 A.      Yes.  I see that.
14 Q.      And that's that July 1, 2019 at 12:10?
15 A.      I see that.
16 Q.      And do you see that Jeff is using, on this one,
17 his Argaman Tech email exchange?
18 A.      I see that.
19 Q.      And here's -- Jeff is responding at that time,
20 We are meeting with out -- should be our -- financial
21 advisor tomorrow more -- I don't know what that means --
22 back to you, then, Jeff; right?  So, that -- would you
23 agree that this is confirming -- and I'm trying to take
24 this through the chronology correctly -- confirming what
25 Jeff had -- what you had conveyed in your email on June

**39**

1  25, that he was meeting with someone the following
2  Tuesday?
3  A.      Well, I -- I don't know if he was confirming
4  anything he said to me.  I mean, I see the words there.
5  Q.      Okay.  Fair enough.
6  A.      And I --
7        MR. TROY:  And --
8        THE WITNESS:  I don't remember this, but I see
9  the words.
10       MR. HILL:  Okay.
11       MR. TROY:  And --
12 BY MR. HILL:
13 Q.      Did you --
14       MR. TROY:  Karl, I'm sorry to interrupt.  I
15 haven't been objecting, but -- and I'll let you keep
16 going, and I don't want to get in the way of the
17 deposition, but some of your questions are speculative,
18 asking the witness what people intended.  He can read
19 the emails.  You know, I don't have objection to that,
20 but, umm -- but I may have to form objections going
21 forward if the questions asked are about what authors of
22 the emails are intending or thinking at the time.
23       MR. HILL:  Okay.  Fair enough.
24 BY MR. HILL:
25 Q.      The -- going back to Mr. Gabbay's email on this

**40**

1  page, July 1, 2019, would you agree that he's informing
2  you and Bernie Conaway that he was meeting with a
3  financial advisor on July 2?
4  A.      Well, he was informing Bernie Conaway.
5  According to this email, he copied me.
6  Q.      That he was meeting with a financial advisor on
7  July 2?
8  A.      That's what the email says.
9  Q.      Okay.
10 A.      Well, it doesn't say July 2, it says, Tomorrow.
11 Q.      Okay.
12 A.      It would have been July 2.  Look, I'm not trying
13 to be trivial with you, I'm just trying to be, you know,
14 accurate.
15 Q.      Very lawyerly response, okay.  Let's go to No.
16 26.
17 A.      Okay.  I see it.
18 Q.      On the bottom of this page is an email from
19 Jeffrey Gabbay on the Gmail account on July 2, 2019 at
20 8:16:39 a.m. to Mr. Conaway, copied to Cliff and
21 Shershana Gabbay [phonetic spelling].  And who is
22 Shershana Gabbay?
23 A.      His wife.
24 Q.      And here, Jeff is writing that Shershana and he
25 met with their financial advisor.  Do you see that?

**41**

1  A.      Yeah.
2  Q.      And then, he says that he will send instructions
3  for the transfer of our funds to an account in the USA?
4  A.      I see that.
5  Q.      And you remember receiving this email, Cliff?
6  A.      Yes.
7  Q.      And he, then, said, Other than the instructions
8  for transfer, is there anything else you need?  Right?
9  A.      Yes.  You -- again, I don't -- you know, I want
10 to answer the questions you ask.  I -- you know, at this
11 point, the case had already been settled.  I might have
12 even been on vacation during this time.  So, please
13 understand I was not, you know, looking at those
14 carefully, but I -- but this one I do recall seeing.
15 Q.      Okay.  But you say you may not have been
16 reviewing your emails carefully.  Did I get that right?
17 A.      I might not have been, because, you know, in my
18 mind, the case was settled, it was just a matter of
19 disbursement by Bernie.  And I -- I might even have been
20 on vacation, and when I'm on vacation, I do at least try
21 to look at emails.
22 Q.      Um-hmm.  But is it fair to say that if you -- if
23 we see emails that we've already been through and future
24 emails during this time frame, that if you sent it, you
25 sent it with a present understanding of the thread that

Cliff A. Rieders, Esquire - August 17, 2023

42

1  you were responding to?
2  A.     I apologize, I'm not sure I can understand that
3  question.
4  Q.     Well, if you sent an email, and with the email
5  -- with your email address, do you have any reason to
6  contest that you sent that email or received an email?
7  A.     Well, you'd have to show me the email.
8  Q.     Okay.
9  A.     I mean, if you're asking me, generally, do I
10  trust everything I see on a piece of paper -- you know,
11  as lawyers, sometimes we have to question things.  But I
12  don't -- I can't really answer that question.  Show me a
13  specific email, I'll tell you whatever I can remember.
14  Q.     Okay.  And then, Bernie responds with, The love
15  of good women, in the response above on July 2nd at 8:44
16  a.m.; right?
17  A.     I definitely remember --
18  Q.     And you're copied on that?
19  A.     Yeah.  I definitely remember that one.
20  Q.     Okay.  And you're copied on that along with
21  Shershana?
22  A.     Yes.
23  Q.     Let's go to next page, 27.
24  A.     Yeah.
25  Q.     So, just so -- and I'm not trying to trick you

43

1  at all.  The last email that we just looked at was 8:44
2  a.m. Eastern Time on July 2nd.
3         If we look at the email on this page, No. 27, do
4  you agree that that is an email sent on July 2nd, 2019
5  at 9:49 a.m.?
6  A.     The one at the top?
7  Q.     Yep.
8  A.     That's what it says.  I can't agree what's sent
9  or not sent, but those are the times and dates, yes.
10  Q.     And why do you say, you can't agree whether it
11  was sent or not sent?
12  A.     Well, I can't with any one.  I guess I should
13  say that with any email you send to me, I mean, I can
14  just read it, like you can.
15  Q.     Um-hmm.  And you're copied on this one; right?
16  A.     That's what it says.
17  Q.     Do you remember getting this email?
18  A.     I do, because I remember questioning the Hong
19  Kong.
20  Q.     Um-hmm.
21  A.     I remember sending an email back saying, you
22  know, I thought that was odd.  And I remember responding
23  to that and saying something about that -- asking what
24  that -- you know, I forget how I worded it, but I do
25  remember responding to that, yes.

44

1  Q.     And this email's sent from Jeff's
2  ArgamanTech.com account; agreed?
3  A.     That's what it says.
4  Q.     And I've looked at the production that Mr.
5  Poliquin has made in this case, and I don't see any
6  emails from you questioning this particular email
7  reflected on page 27.
8  A.     Well, I'm positive I sent one saying, umm, US or
9  Hong Kong, with a question mark.  I haven't seen it
10  either.  You know, I have a few days --
11  Q.     Let's not waste too much time.  We'll get that.
12  I did receive that email.
13  A.     Oh, to -- so -- okay.
14  Q.     That's the email you're talking about that
15  you --
16  A.     Yeah.
17  Q.     -- remember responding?  Okay.
18  A.     Right.
19  Q.     All right.  Fair enough.
20  A.     Sorry.  I was confused.
21  Q.     No, we're good.  And then, in this one, do you
22  agree that this is an email from the hacker and not
23  Jeff?
24  A.     I have no idea.
25  Q.     Okay.

45

1  A.     I mean, it is what it -- I just don't know.
2  Q.     And here --
3  A.     I mean, think we subsequently -- I think we all
4  subsequently came to believe that, but I don't know.
5  Q.     All right.
6  A.     Because I didn't necessarily know it at the
7  time.
8  Q.     Well, right.  I -- I was just going to say, you
9  didn't know at the time that this --
10  A.     Right.
11  Q.     Jeff's email had been hacked; correct?
12  A.     Correct.  Correct.
13  Q.     And here, did you understand that Jeff, again,
14  not questioning the legitimacy of it, had changed his
15  mind and was going -- instructing that the remaining
16  settlement funds be sent to an affiliated company bank
17  account in Hong Kong?
18         MR. TROY:  Objection.
19         You may answer.
20         THE WITNESS:  Yeah.  I didn't know what Jeff
21  meant.  I didn't know what was going on.
22  BY MR. HILL:
23  Q.     Well, just reading this email, did you conclude
24  that he was going -- he was now instructing that -- the
25  funds to be sent to an affiliated company bank account

Cliff A. Rieders, Esquire - August 17, 2023

46

1  in Hong Kong?
2  A.    No.
3  Q.    Why not?
4  A.    Because he had earlier said something about the
5  USA.
6  Q.    All right.  So, you didn't -- you didn't believe
7  the language that is reflected in this email?
8  A.    I was confused.
9  Q.    Okay.
10  A.    It seemed odd to me.
11  Q.    Did you -- at this time, if it did seem odd --
12  and did it seem odd to you when you got it and read it;
13  is that what you're saying?
14  A.    Yes.
15  Q.    Did you call Mr. Gabbay and say, What's up with
16  this?
17  A.    I don't know.  I don't recall.
18  Q.    Did you call Bernie Conaway and say, Hey, what's
19  -- what's up with this?
20  A.    I don't recall.  Again, I think I might have
21  been on vacation during this time.
22  Q.    Um-hmm.
23  A.    But I don't know for sure.  Again, keep in mind,
24  Bernie Conaway was counsel of record.  He wanted to
25  handle the money.  He declined efforts to do it through

47

1  a bank.  It was in his possession.  And I'm sure that,
2  as with everything else in this case, you know, I
3  deferred to him.
4  Q.    Okay.  Let's go to CL0035.
5  A.    Got it.
6  Q.    And you'll see that this is a string with you,
7  Jeff Gabbay using his, I'll call it, business email
8  account, and Mr. Conaway.  Right?
9  A.    Okay.  Yes.
10  Q.    And that's July 2nd -- we're still on July 2nd,
11  by the way.  I know you like to relive all of this, but
12  July 2nd at 1:17 p.m.  See that?
13  A.    Yeah.
14  Q.    And the top email is from you; right?
15  A.    Yeah.
16  Q.    And it's sent from your iPhone.  Does that mean
17  you may have been remote or do you recall?
18  A.    I -- I don't recall.
19  Q.    Okay.
20  A.    But on that note, I didn't have my iPhone in the
21  office.  So, I must have been somewhere else.
22  Q.    Do you remember sending this:  Tax authorities
23  won't care where Cupron got funds from?
24  A.    You know, I -- I don't really -- I -- my, sort
25  of, guess is that was a response to something Jeff had

48

1  said about, They all think we're criminals, or something
2  like that, umm, or --
3  Q.    Okay.
4  A.    -- something along those lines.  I don't really
5  call the details of that.
6  Q.    Yeah.  We'll get into that.  I think I know
7  where you're going with that.  It's a little later in
8  the chronology, but is it fair to say you're responding
9  to the email that Mr. Gabbay wrote at 1:12 p.m. asking
10  about -- or referencing a concern for --
11  A.    Yep.
12  Q.    -- the source of the Cupron funds?
13  A.    Okay.  I see that.  I think it probably was,
14  yeah, because -- again, this goes back to an earlier
15  answer I gave you.  Jeff would pay bills to Bernie.
16  Umm, I never billed Jeff during the litigation.  So,
17  when he would pay Bernie's bills or the bills of
18  experts, I recall there always being, you know, some
19  glitches when he transferred money internationally from
20  Israeli shekels to US dollars.  And Bernie was very
21  careful about making sure that he got paid on time, that
22  the expert was paid and paid on time.  And I remember
23  there being, you know, sometimes, sort of, glitches
24  about that and Jeff saying -- you know, I recall Jeff
25  saying something along the lines of, Well, you know,

49

1  Israel authorities, American authorities, they're very
2  -- he's trying to explain to Bernie why sometimes
3  payment would take time.  You know, they're very -- very
4  concerned about transferring money internationally.  I,
5  sort of, remember a conversation about that.  And, umm,
6  so, you know, that's just, sort of, a background on that
7  exchange.
8  Q.    Okay.  Let's -- let's go to CL0040, please.
9  A.    Okay.  Got it.
10  Q.    And let me just ask you this, 'cause I'm trying
11  to go through this carefully and -- and fairly with you,
12  Cliff, the -- the email towards the middle of that page
13  40, do you remember seeing that email earlier we just
14  went through where Bernie references the love of a good
15  woman?
16  A.    I remember you showing that to me before, yes.
17  Q.    Okay.  And then, do you see above that, on July
18  2nd, 2019, at 21:02, your email?
19  A.    At 20 -- no.  Oh, 21:02, yes, yes.  US or Hong
20  Kong?  I do see that.
21  Q.    Okay.  And you wrote that email?
22  A.    Correct.
23  Q.    And what do you -- what do you mean by that?
24  A.    Where is the money to go?  That -- I was
25  questioning, because I had seen the earlier email that

Cliff A. Rieders, Esquire - August 17, 2023

50

1  he wanted it sent to the US.  Then, I had seen the email
2  about -- the other email you had shown to me and, you
3  know, went to alert Bernie and Jeff to the fact that
4  there seemed to be an inconsistency to me.
5  Q.    Okay.
6  A.    And I wanted to alert them to that, both of
7  them.
8  Q.    Well, you're using US or Hong Kong, because you
9  had seen that earlier email that you and I went through
10 with a reference to sending it to Hong Kong?
11 A.    Correct.  And I referenced earlier for that
12 about sending it to the US.
13 Q.    Okay.  And then, the -- Mr. Gabbay on the top
14 responds to your email; would you agree with that?
15 A.    Well, I don't know who's responding, but I see
16 an email from somebody designated as Jeff Gabbay.  Now
17 as I sit here today, I don't know who that was really
18 from.
19 Q.    No, he's -- this is JeffGabbay@Gmail.com?
20 A.    I see that.  I don't know that that was really
21 Jeff Gabbay now, looking back at it.
22 Q.    Are you saying that you believe that potentially
23 Jeff Gabbay's Gmail account was hacked at this time?
24 A.    I'm saying, I don't know.
25 Q.    Okay.  And you didn't read Mr. Gabbay's

51

1  deposition testimony about this email?
2  A.    No.
3  Q.    Okay.  I'll -- I can make a representation --
4  you can accept it or not -- that he said that he had no
5  reason to contest this -- the email that he wrote, and
6  he remembers the reference to the -- the drug dealers,
7  okay?
8  A.    Okay.
9  Q.    And do you know -- and I know this may trigger
10 an objection by Mr. Troy, but do you have an
11 understanding of the concern that Mr. Gabbay had about
12 USA, thinking we are drug dealers?
13        MR. TROY:  And I do object.
14        And you can answer.
15        THE WITNESS:  Just knowing Jeff, I think he was
16 being, kind of, you know, a wise guy about that, because
17 this does tie in with what I told you earlier, that when
18 Jeff was paying bills to Bernie, there seem -- it seemed
19 to take time and be a lot of procedures.  And I remember
20 Bernie a few times being -- I don't know what the right
21 word is, maybe restive, about not getting paid quickly
22 enough or experts not getting paid quickly enough.  And,
23 you know, Jeff would attribute that, maybe Bernie also,
24 to, you know, the international nature of the
25 transactions and the diligence of the authorities in

52

1  both Countries.  So, this email would not have surprised
2  me in that context.
3  Q.    Do you know if -- this may be a tough question,
4  but do you know if Mr. Gabbay had used this phraseology
5  that USA thinks we're all drug dealers, prior to this
6  email?
7  A.    I have no idea.
8  Q.    Okay.  Let's take a look at -- we're going to
9  flip through to the back.  I apologize.  It's CL262 --
10 000262.  And let me know when you're there.
11 A.    262?
12 Q.    262, yeah.
13 A.    Oh.  Okay.  Yes, I have the page.
14 Q.    Okay.  And I'm just going to read this into the
15 record.  I'm looking at the top email.  This is from
16 July 22nd, 2017.  Let me stop you right there.  I -- and
17 I should have this in my memory, but I don't.  But do
18 you know when the litigation was commenced in Chancery
19 Court?
20 A.    No, no idea.
21 Q.    Okay.  And you'll see this email on July 22nd,
22 2017 from Jeff Gabbay to Bernie Conaway to Cliff
23 Rieders.  Do you see that?
24 A.    Copying me.  Yes, I see it.
25 Q.    Copying, yes.  Right.

53

1  A.    Yeah.
2  Q.    And here you'll see in the second-to-last
3  sentence, it's bad enough they treat me like a drug
4  dealer in spending money out of the Country.  Do you see
5  that?
6  A.    I see it.  I don't remember that email at all.
7  Q.    Okay.  I just want to do one more, and then,
8  we'll take a little break, if that's okay.
9  A.    Sure.
10 Q.    And I apologize, but I'm -- I need you now to go
11 to the third Amended Complaint.
12 A.    Okay.  Where -- where is that?  Okay.  Found it.
13 Got it.
14        MR. HILL:  And incidentally, Cliff and Paul,
15 thank you for printing these exhibits out.  It's been
16 much easier this way.
17        MR. TROY:  I'm -- I'm still a guy who prints,
18 you know, more than -- more than maybe I should admit.
19 So, no worries.
20        MR. HILL:  Oh, okay.  All right.
21 BY MR. HILL:
22 Q.    So, just briefly on this third Amended
23 Complaint, as I struggle with my paper... okay.  So,
24 this is the third Amended Complaint.  If you could, go
25 to Exhibit No. 2.

Cliff A. Rieders, Esquire - August 17, 2023

54

1  A.      Mine doesn't have any exhibits on it.
2  Q.      Oh, it doesn't?
3  A.      No.
4  Q.      Oh.
5        MR. TROY:  Yeah.  Mine does not either.
6        MR. HILL:  Well, I think we're going to need to
7  take a break now.  And what I can do is -- I think there
8  are about maybe 15 pages, total, those exhibits to the
9  Complaint.  I'll scan them, and if you guys don't mind
10  printing them again, it will just take a few minutes.
11        MR. TROY:  Okay.
12        MR. HILL:  So, why don't we take a 15-minute
13  break, and it will be our morning break, okay?  And I'll
14  scan them to Paul.
15        And, Cliff, is it okay if I just send it to you
16  directly so you can print it there?
17        MR. TROY:  Yeah.  You'll get an email, Cliff.
18  And all you have to do is print it.
19        (Whereupon, a recess in the proceedings occurred
20  at 10:07 a.m. after which the following occurred on the
21  record at 10:25 a.m.:)
22              DIRECT EXAMINATION (CONT'D)
23  BY MR. HILL:
24  Q.      Okay.  And maybe -- if it's not too much
25  trouble, just so we orient ourselves back into it, if

55

1  you could, go back to the email string we were just
2  looking at, the USA or Hong Kong; it's CL40.
3  A.      I have CL40.
4  Q.      Okay.  I just wanted you to keep that in mind as
5  I go to the next exhibit, which is a part of the
6  exhibits to the third Amended Complaint.
7  A.      Okay.
8  Q.      But before we get there, when you said US or
9  Hong Kong, I want to make sure I got your answer right.
10  What were you meaning by that?
11  A.      It was -- it was a question, because I saw an
12  inconsistency between two emails that I had received.
13  It was an alert, hopefully, to Bernie or to Jeff.  But,
14  again, this was something they were handling.  Bernie
15  wanted to run this through his account.  He wanted to
16  make disbursement.  He wanted to handle it.  So, it was
17  just, you know, a friendly alert to him, primarily, and
18  to Jeff, if he got it.
19  Q.      But the US or Hong Kong, did that mean those
20  were potential destinations for the disbursal of funds,
21  in your mind?
22  A.      I have no idea.  All I knew is, I had seen two
23  emails.  I knew that Bernie was handling this; he wanted
24  to handle this in his account, his escrow account.  And
25  I was just -- it was a friendly, you know, heads-up.  I

56

1  don't --
2  Q.      But --
3  A.      I can't tell you any more than that.
4  Q.      And -- let me ask, maybe, a more direct -- of a
5  direct question.  Was the US or Hong Kong, question
6  mark; did that relate to the disbursal of the settlement
7  funds?
8  A.      It had to, because that was all the prior
9  emails.  So, I'm assuming it was, yeah.
10  Q.      Okay.  Now, pardon me jumping around, but we're
11  going to do that a little bit now.  If we go to the
12  exhibits to the third Amended Complaint, okay, it's
13  Exhibit No. 2.  And if you look at the top of the pages,
14  you'll see there are page numbers on top.
15  A.      Well, the third exhibit here is Exhibit No. 4.
16  Q.      Exhibit No. 4.
17  A.      And I -- again, I just printed these as you sent
18  them to me.  And I don't actually see that.  I'll look
19  again.  Maybe I missed it.  Exhibit No. 2 -- so, the
20  first one is exhibit -- actually, it's Exhibit No. 5.
21  Then, it's the next page, says, Plaintiff's Exhibit No.
22  4, on the bottom.
23  Q.      All right.  Let's do it this way -- that's
24  probably my error.  I apologize, but --
25  A.      That's okay.

57

1  Q.      If you looked at the page ID numbers on the top
2  of each of those exhibits --
3  A.      Yeah.
4  Q.      -- you see how there's a number beginning with
5  No. 4?
6  A.      I do -- well, mine starts with No. 5 -- No. 511
7  on the upper right corner, and then, it goes backwards.
8  So, yeah, it goes back to No. 4.
9  Q.      Okay.  There's some No. 4 and some No. 5.  Let's
10  see if you can find page 485.
11  A.      Okay.  I have it.
12  Q.      Okay.  And would you agree that this is your
13  email at the top on July 2nd at 3:53 p.m. responding to
14  Mr. Gabbay's earlier email about, USA thinks are we are
15  all drug dealers?
16  A.      I don't remember it, but that's what it says.
17  Q.      Do you have any reason to contest it?
18  A.      I have no reason to contest it.
19  Q.      Do you have any reason to believe, up to this
20  point in time, that emails that Mr. Gabbay was sending,
21  either on the Gmail account or the Argaman account, were
22  not from Jeff, himself?
23  A.      I have no reason to doubt that.  I knew nothing
24  about it until, you know, after the fact, until I was
25  informed by -- by Bernie and by Jeff.

Cliff A. Rieders, Esquire - August 17, 2023

58

1  Q.      After the hack?
2  A.      Yeah.
3  Q.      Okay.  Okay.  Now, we're going to go back to
4  Gabbay No. 1.
5  A.      Jeffrey Gabbay No. 1.  Gabbay Exhibit No. 1.
6  Q.      Yeah, Gabbay Exhibit No. 1.
7  A.      Okay.
8  Q.      And we're going to go to the very last page,
9  CLO0268.
10 A.      Okay.  I have it.
11 Q.      Okay.  And let's start with the bottom email.
12 Is that your email, Cliff, on Wednesday, July 10, 2019,
13 at 6:54 a.m.?
14 A.      I see it.
15 Q.      And that was relating to a sailing trip you
16 took?
17 A.      Yeah.
18 Q.      Okay.
19 A.      That -- yeah.  I can see that.
20 Q.      And I just happened to notice -- and you may not
21 know, but I'll ask.  It says, CRieders@icloud.com.  Do
22 you know what that is?
23 A.      I do have an icloud account, which I never use.
24 So, I don't know why this was from -- so, I don't know.
25 Q.      Okay.  And then, you'll see Mr. Conaway's email

59

1  on July 10 at 9:11 p.m., and that's to you, Cliff.  Do
2  you see that?
3          Right in the center of this page.  What I see --
4  Sent from my iPhone?  Is that it?  No.  You're talking
5  about the one that says, On July 10, 2019 at 9:16 p.m.,
6  Bernie Conaway, blah-blah-blah --
7  Q.      Yeah.
8  A.      Oh, okay.  I see that.
9  Q.      That's addressed to you; right?
10 A.      Well, I don't see my email.  I mean, I don't
11 know if that would show.  But it says, Cliff.
12 Q.      All right.  And then -- well, how about above
13 it, July 10, 2019, 20 minutes later at 9:31 p.m.?  Is
14 that your email?
15 A.      Yes.
16 Q.      From --
17 A.      My email?
18 Q.      Well, it just says from Cliff Rieders wouldn't
19 you say?
20 A.      It just says from Cliff Rieders.  It doesn't
21 show email -- what email account.  That's --
22 Q.      Okay.  Do you contest that you did not -- did --
23 do you have any reason to contest that you did not send
24 this email?
25 A.      I just don't remember it at all.  I -- I just

60

1  can't tell you one way or the other.
2  Q.      Okay.  Do you believe that your email system at
3  Rieders, your firm, was hacked?
4  A.      No, I don't believe that.  I mean, I never heard
5  that.  Nobody ever told me that.
6  Q.      If you're using the icloud at this time, was
7  this the time frame in which your firm was experiencing
8  that attempted --
9  A.      No idea.
10 Q.      -- attack?
11 A.      I don't know.
12 Q.      No?
13 A.      I have no idea.
14 Q.      Okay.
15 A.      I just -- just, you know, to give you a little
16 bit more background, sometimes you send an email, and it
17 comes to your icloud and you don't realize it.  I know
18 that's happened once or twice.  So, I -- just to help
19 you out -- that's possible, but I don't know.
20 Q.      Well, could you at least agree with me, then,
21 that, based on what we're seeing here today, you sent
22 this email, saying, Oy vey; will you be sending us our
23 fee?
24 A.      I don't know.  I have no reason to contest it --
25 Q.      Okay.

61

1  A.      -- because I don't know.  I don't remember it.
2  Q.      I see --
3  A.      I'm not trying to be cute with you.  I just
4  really don't remember it.  But I have no reason to
5  contest it.
6  Q.      Okay.  That -- I -- I'll take that.
7  A.      Okay.
8  Q.      And that -- would that be similarly true that
9  you don't have any reason to contest that you received
10 Bernie's email that you'd responded to and is on this
11 page?
12 A.      Sounds like a good relaxing ride -- that one?
13 Q.      Yeah.
14 A.      Well, let me read it.  You know, I don't recall
15 that, seeing that.  But if it was sent to me, so be it.
16 I don't recall it.
17 Q.      Okay.
18 A.      That whole story about the audit and everything,
19 I -- I don't remember anything about that.
20 Q.      It just sitting here today, you don't have any
21 any reason to contest this thread --
22 A.      No.
23 Q.      -- as it appears; true?
24 A.      Well, I don't know.  This one's not from me.
25 This one's from Bernie.  And it just -- and it doesn't

Cliff A. Rieders, Esquire - August 17, 2023

<table>
<tr><td colspan="2" align="right">62</td></tr>
</table>

1  show where it was sent to. Again, I'm not trying to be
2  cute with you. I'm not, you know, a computer expert. I
3  mean, it says, Cliff. And I assume he sent it to me,
4  but I don't remember receiving it or reading it.
5  Q.    But just so the record's clear, you don't
   remember receiving it or not?
7  A.    I can't. I mean, I don't know.
8  Q.    Okay. I'll just let the record stand on that.
9  Was the -- was it the icloud exchange that was a part of
10 the prior attempted hack at your firm?
11 A.    I have no idea. I don't think so. I think, as
12 I recall, that they attempted to get into the system,
13 our database through a portal. I don't think it had
14 anything to do with icloud. But I'm not an expert, so,
15 you know, I'm out of my league there.
16 Q.    Okay. Let's go to CL0054.
17 A.    Okay. Got it.
18 Q.    And the top email's July 18, 2019. Do you see
19 that one, 7:15 a.m.?
20 A.    I see that.
21 Q.    It looks like it's a response to a
22 JeffGabbay@ArgamanTech email on July 18 at 6:29 a.m. Do
23 you agree that that's what it appears to be?
24 A.    I don't know what it's in response to, but I can
25 remember it.

63

1  Q.    Okay. And you do remember receiving the, umm --
2  both of these emails?
3  MR. POLIQUIN:  What number was that?
4  MR. HILL:  No. 54.
5  THE WITNESS:  Karl -- if I may call you that --
6  I only see this one. And I do recollect receiving it.
7  I'm only looking at one on this page. Is there another
8  one?
9  BY MR. HILL:
10 Q.    There might be another page.
11 A.    Well, now, wait a minute. I apologize, I may be
12 wrong there. There's one at the top -- am confused. I
13 do remember seeing that. And then --
14 Q.    I'm sorry, Cliff. I didn't hear you. You do
15 remember?
16 A.    I do remember that one, Jeff, I'm confused, the
17 one at Thursday July 18th at 7:15. That's the only one
18 on that page, but I see there's another one at the
19 bottom or a partial one, maybe, from Jeff on Thursday
20 July 18th at 6:29.
21 Q.    All right. Let me see if I can shed some light
22 on that. Let -- keep in mind that page -- you might
23 want to leave it open, because I want to now take you to
24 the exhibits again.
25 A.    Okay.

64

1  Q.    To the third Amended Complaint.
2  A.    Okay. Go ahead.
3  Q.    And if you go to page 503 on the top?
4  A.    Okay. Got it.
5  Q.    All right. And it looks like that's the full
6  email that was sent by Jeff that we just saw on the
7  bottom cutoff page that we looked at on Gabbay Exhibit
8  No. 1, okay? Have you seen that?
9  A.    I've seen it.
10 Q.    And do you remember getting this --
11 A.    I think so.
12 Q.    -- email?
13 A.    I'm sorry. I interrupted you. Yes, I think I
14 did.
15 Q.    Okay.
16 A.    I think I remember that. Um-hmm. Yeah.
17 Q.    And then, if you look at 504. Do you have that,
18 Cliff?
19 A.    I got it, yeah.
20 Q.    Okay. Does that appear to be the attachment
21 that was sent by Mr. Gabbay?
22 A.    Yeah, I --
23 Q.    On July 18 -- I'm sorry --
24 A.    I don't know.
25 Q.    -- July 18th --

65

1  A.    I just don't know. I -- I really don't know if
2  that was the attachment or not.
3  Q.    Okay. Do you remember looking at this document
4  before?
5  A.    I don't really remember.
6  Q.    Okay.
7  A.    I'm not sure. I'm not sure.
8  Q.    And incidentally, the -- these exhibits, did you
9  send these exhibits to Mr. Poliquin for purposes of
10 filing a third Amended Complaint?
11 A.    I don't know. Umm, I -- I really don't know if
12 he asked us for something that we sent to him or not. I
13 probably would not have dealt with that, myself. It
14 probably would have been a staff person, if that
15 happened. So, I don't remember that. But it's
16 possible. I don't want to deny it.
17 Q.    Okay. I'm just trying keep this chronology
18 right. If you go to 505 now, as a part of the exhibits
19 --
20 A.    Yeah. I see it. I'm looking at it, yeah.
21 Q.    Okay. I'm sorry, I was just looking at
22 something.
23 A.    That's okay.
24 Q.    So, you'll see that same email that we looked at
25 earlier as a part of Gabbay No. 1 where Bernie writes,

Cliff A. Rieders, Esquire - August 17, 2023

66

1   Jeff, am confused.  Do you see that on the bottom?
2   A.      I see that.
3   Q.      The settlement proceeds were wired on Tuesday,
4   as you directed.  That's July 18, 2019.
5   A.      I see it.
6   Q.      Right?
7   A.      I see that, yes.
8   Q.      And then, do you see the next email above that?
9   A.      I do.
10  Q.      Which is 8 -- 8:34 a.m. on the 18th?
11  A.      I see that.
12  Q.      And it reads, Bernie, sorry, once again, I got
13  the wrong Bernie.  I think I need some vacations to
14  settle down my head.  Too much thinking lately.  So
15  sorry for the confusion.  Thanks, and best regards.
16  A.      I -- I don't see -- I see that, yes.
17  Q.      And do you have any reason -- do you have any
18  reason to believe that this was a hack email or no?
19  A.      I have no idea either way.
20  Q.      And then you respond, did you not, Cliff, on --
21  Thursday, July 18 at 8:15 -- I'm sorry, 8:50 a.m.
22  A.      It looks like that.  I mean, I don't remember
23  this, but that's re --
24  Q.      And what did you write there?
25  A.      It says, Enjoy Norway.  Is that what you're

67

1   talking about?
2   Q.      Yeah.
3   A.      Yeah, I see that.
4   Q.      Do you remember Jeff being in Norway?
5   A.      I -- I -- yeah.  I have a vague recollection
6   that he was maybe going to nor way.  Now that I'm
7   reading it, I -- it does refresh my recollection that, I
8   think, Jeff was either going to Norway or in Norway or
9   something like that, yeah.
10  Q.      And -- and I'll note, just to be fair, Cliff,
11  this -- this -- I had to pull this from the exhibits,
12  because Bernie's not copied on your Norway email.  And
13  I'm just wondering if you might still have that on your
14  server or all the emails.
15  A.      I -- I doubt it.  I know that they -- you know,
16  I don't -- I don't really know what the protocol here
17  is, if they back it up or they scourge the server every
18  now and then, I just don't know.
19  Q.      But can you at least agree with me that by
20  responding, Enjoy Norway, you thought that the email
21  from Jeff@ArgamanTech was legitimate?
22  A.      You know, I wouldn't respond to an email, unless
23  I thoughts it was.  So, I think that inference is fair.
24  Q.      Okay.  I just want to make sure the record's
25  right.  But you would not respond to an email if you

68

1   thought it was illegitimate; right?
2   A.      Correct.
3   Q.      Okay.
4   A.      I thought I said that.  I apologize if I got it
5   backwards.
6   Q.      I may have got it wrong, too.  All right.
7   A.      Okay.
8   Q.      So, let's -- let's go to -- back to Gabbay No.
9   1.
10  A.      Now, what are we looking at?  I'm sorry.  I
11  apologize.  What are we looking at?
12  Q.      It's Gabbay Exhibit No. 1, CL0059.
13  A.      59.  509.
14  Q.      59.  Not on the exhibits?
15  A.      Oh.
16  Q.      It's on the --
17  A.      Okay.
18  Q.      Yeah.
19  A.      Sorry.  Tell me again.  I apologize.  I didn't
20  get that then.
21  Q.      CL00059?
22  A.      59.  I'm really starting to get confused here.
23  Okay.  I see that.  I got it.
24  Q.      Okay.  And is that your email on the top there
25  to Jeff Gabbay@ArgamanTech and Bernie Conaway with Kim

69

1   copied July 23, 2019?
2   A.      I don't recall it, but that's what it says.
3   Q.      And is that responding to Jeff Gabbay with his
4   email exchange, the business exchange, Argaman Tech?
5   A.      Responding to what?  I'm sorry.
6   Q.      Is your email in response to Mr. Gabbay's email
7   from Jeff@ArgamanTech?
8   A.      Yeah.  I don't know.  What -- you're talking
9   about the email that said -- was the -- I don't -- I
10  don't see an email from him.
11  Q.      Okay.
12  A.      I see emails with subject lines, but I don't see
13  an email with any substance.  So, I don't know what that
14  was a response to, if anything.
15  Q.      And the subject line is, Was the transfer made
16  yet?  Do you see that?
17  A.      I see that, yeah.
18  Q.      And then, this is your response:  I thought it
19  was done awhile ago.
20  A.      I -- I don't know.  But it looks that way,
21  doesn't it?
22  Q.      Yeah.  You don't know, meaning, you don't
23  remember; right?
24  A.      I do not remember.  I -- I just don't remember
25  these two emails.  I'm looking at it just like you are,

Cliff A. Rieders, Esquire - August 17, 2023

---

70

1  you know?
2  Q.    Looking at it now, does it refresh your
3  recollection as to what you meant when you said, I
4  thought it was done awhile ago?
5  A.    I can only presume what I meant. But I -- but
6  it doesn't -- does not refresh my recollection.
7  Q.    Okay.
8  A.    I can give a presumption.
9  Q.    What did you mean?
10  A.    I don't know what I meant, but I -- it looks
11  like I was referring to the transfer of money.
12  Q.    Okay. Let's go to No. 66. And I only have a
13  couple more on this stack, and we can put -- put it
14  away.
15  A.    Okay. No problem. I'll do my best. Go ahead.
16  Q.    All right. So, the -- No. 66. Do you see
17  Bernie's email on July 27, 2019?
18  A.    On July 26, at 18:28 Bernard Conaway wrote --
19  I'll see that.
20  Q.    Yeah. He said -- says, I've received your fax;
21  however, I'm confused by it. Upon your instructions, I
22  previously wired all of the remaining settlement
23  proceeds to your Hong Kong bank.
24  A.    I see that.
25  Q.    And then, do you see Mr. Gabbay's response?

---

71

1  A.    I see that.
2  Q.    He wrote, What Hong Kong bank?
3  A.    I see that.
4  Q.    The -- do you believe this to be a legitimate
5  email from Mr. Gabbay?
6  A.    I -- I really -- I don't want to speculate. I
7  have no idea.
8  Q.    Okay.
9  A.    I mean, I guess it looks like it is to me, if I
10  were guessing, but --
11  Q.    And you're -- you're copied on these; right?
12  A.    Yeah.
13  Q.    And did you -- when you got this, did you do
14  anything with -- with Mr. Gabbay, call him or talk to
15  him, after he wrote this email?
16  A.    I don't recall. I'm sorry.
17  Q.    And if you go to No. 67 --
18  A.    Yeah. I see it.
19  Q.    Email from the top from Mr. Gabbay, You received
20  a false email from a hacker. You're copied on that.
21  A.    I see that.
22  Q.    And that's on the same day, July 27, 2019, one
23  minute after the, What Hong Kong bank email. Right?
24  A.    That's what it showed, yeah.
25  Q.    And do you have any reason to believe that these

---

72

1  were not sent by the real Jeff Gabbay?
2  A.    I have no reason one way or the other. I do not
3  know.
4  Q.    Do you know how Mr. Gabbay found out that Bernie
5  received a false email from a hacker, now quoting from
6  his July 27 email?
7  A.    I have no idea to presume that --
8        MR. TROY:  Objection.
9        THE WITNESS:  -- the information -- I don't
10  know. I don't know what he knew.
11  BY MR. HILL:
12  Q.    When did you learn that the -- when did you
13  learn of the hacking? Let's put it that way.
14  A.    Well, I -- presumably when I got this email from
15  Jeff. When I was copied on this email from Jeff.
16  Q.    Do you remember --
17  A.    And --
18  Q.    Do you remember what you did after receiving
19  this email vis-à-vis communication with Mr. Gabbay?
20  A.    I only know generally what I did thereafter. If
21  you're asking me the very next thing I did, I couldn't
22  tell you. I mean, I can tell will you generally what
23  happened thereafter, but I can't answer it as precisely
24  as you're asking it.
25  Q.    Okay. And, Cliff, did you know at this time --

---

73

1  we're now in July 27, 2019 -- whether the email system
2  at Argaman had been infiltrated or hacked --
3  A.    I --
4  Q.    -- prior to this one?
5  A.    I don't think I -- no, I didn't know that 'til
6  much later.
7  Q.    You did learn it at some point?
8  A.    Some -- at some point, I was told, yeah.
9  Q.    And who told you?
10  A.    You know, I -- I knew you'd ask me that
11  question. I was trying to think about that last night,
12  and I'm not sure who told me. You know, it was either
13  -- either Jeff or somebody, you know, connected with
14  Jeff. But I don't really remember who told me that.
15  Q.    And what were you told?
16  A.    That in June, approximately a month before, the
17  Argaman account had been hacked -- but they thought they
18  brought in some company to address the problem, and they
19  thought it was taken care of.
20  Q.    That would have been June of 2019?
21  A.    Yeah.
22  Q.    Do you remember the name of the company they
23  brought in to address that, June 2019?
24  A.    I do. It was a really weird name. So, I do
25  remember that. It was named Kakadu.

---

Cliff A. Rieders, Esquire - August 17, 2023

74

1    Don't ask me how to spell it, Madam Reporter,
2 'cause I don't know.
3    Q.    Got ya.  What did you do when you found out that
4 there was a prior hack in June of 2019?
5    A.    I -- I don't know really what you're asking.
6 What did I do?  I don't think I did anything in
7 particular.  As things evolved, I -- at one point, much
8 later on, I talked to a lawyer in Israel in person to
9 see whether Jeff had a claim against either Argaman or
10 Kakadu.  And I told Jeff that's the fellow's name,
11 information, told Jeff that I want to talk with him.
12   Q.    Okay.  Did --
13   A.    I'm sorry.
14   Q.    Did you talk specifically with Mr. Gabbay about
15 the June cyber attack, for lack of a better phrase?
16   A.    I'm sure I did.  I don't remember the
17 conversation, but...
18   Q.    Do you remember telling Mr. Conaway that you
19 yelled at Mr. Gabbay for not telling him about the prior
20 hack?
21   A.    I never yelled at him.  I don't yell at people;
22 you can probably tell that.  But I think I have -- I
23 think I expressed some disappointment that we didn't
24 know about it.
25   Q.    When you say he didn't know about it, that

75

1 Bernie didn't know about it?
2    A.    None of us knew about it -- were told about it.
3    Q.    I'm sorry, what?
4    A.    That we -- me and Bernie were not told about it.
5    Q.    And that Mr. Gabbay knew but didn't tell you
6 guys; is that fair?
7    A.    That was my assumption at the time.
8    Q.    Okay.
9    A.    I don't know if that's correct, but that was my
10 assumption.
11   Q.    Has your assumption you just relayed changed
12 over time?
13   A.    I don't think so.  I don't believe.  So, now, if
14 you're confronting me with something, I might rethink
15 it, but I don't think so.
16   Q.    Do you think Mr. Gabbay should have told you and
17 Bernie with it when it happened?
18       MR. TROY:  Objection.
19       You can answer.
20       THE WITNESS:  Well, you know, again, I want to
21 be candid with you.  You know, I -- I guess that was my
22 view at the time.  On rethinking it, you know, I have
23 thought about that a lot, umm, that maybe, you know, I
24 -- Jeff thought it was taken care of.  They called in
25 his company, and they did whatever they did, and maybe

76

1 he thought it was of no consequence.  So, I mean, I did
2 think that, but also trying to be fair to him, I thought
3 maybe there was a reason why -- you know, a good reason
4 why he did not, and that is, he thought it was
5 addressed.
6 BY MR. HILL:
7    Q.    Do you think, just from your perspective, umm,
8 it would have been information that you would have liked
9 to have known at the time that it happened?
10   A.    Well, you know, umm, Karl, you know, hindsight
11 is 20/20; right?  And we're lawyers.  And, sure, we
12 always would like to know everything after the fact, but
13 -- so, I, again, want to be fair to all the parties
14 involved here, including Bernie, including Jeff.  So,
15 yeah, I would have liked to know, but I understand I can
16 -- I can comprehend why Jeff might not have thought that
17 it was relevant for us to know.  And I don't even know
18 how much everyone knew about it, 'cause he's working for
19 this company, Argaman.  They bring in their tech people.
20 So, you know, I'm not even sure how involved he was in
21 all of that.  I just don't know.  So, I'm trying to be
22 very fair to everybody.  My answer to you is, yes, I
23 would have liked to know.  What difference it would have
24 made, I don't know.
25   Q.    Well, in your discussions with him, did he ever

77

1 signal to you that he didn't know, because I thought you
2 said you called him, you didn't yell at him, but you
3 told him, well, why didn't you tell Bernie and me?
4    A.    I -- I've asked him that question, yes.
5       MR. POLIQUIN:  I'm going to object to form.
6 BY MR. HILL:
7    Q.    Go ahead.
8    A.    Did I answer your question?
9    Q.    You asked him the question why he knew and
10 didn't tell you guys of the prior exam?  You guys,
11 meaning you and Bernie.
12   A.    Right.
13   Q.    Okay.  We're going to switch to Gabbay No. 3,
14 which I think you'll be familiar with.
15   A.    Now, where I can find that -- is that in the
16 Complaint?
17   Q.    No, I had directed you guys to get Gabbay No. 1,
18 Gabbay Exhibit No. 3 --
19   A.    You know --
20   Q.    -- and a third Amended Complaint.
21   A.    Yeah.  That's what I'm looking at, Gabbay No. 3.
22 I apologize, is this on -- is this what you just sent,
23 like, an hour ago?
24       MR. TROY:  No, this was in the original
25 exhibits.

Cliff A. Rieders, Esquire - August 17, 2023

78

1      THE WITNESS:  Okay, okay, okay.  Let me --
2  separating paperwork.  I'm starting to get a little
3  confused.  Umm, Gabbay 3.  Does it have an exhibit
4  sticker on the bottom that's says, Gabbay?
5  BY MR. HILL:
6  Q.      I think it's on the top.
7          MR. TROY:  It's on the top left.
8          THE WITNESS:  Oh.
9          MR. TROY:  It's a memorandum from you.
10         THE WITNESS:  Okay.  Yeah, I think --
11         MR. TROY:  October 2019.
12         THE WITNESS:  I did see that in materials here,
13  but I'm not sure what happened to it, whether -- I
14  didn't remove anything.  Now I'm going into the fourth
15  pile.  I apologize.
16  BY MR. HILL:
17  Q.      Let me know when you're there.
18  A.      Okay.  Exhibit No. 1, the Complaint, Exhibit No.
19  3 -- I'm sorry, you said No. 5?
20         MR. TROY:  No. 3.
21         THE WITNESS:  No. 3, okay.  Hold on.  Okay.  I
22  see it.
23  BY MR. HILL:
24  Q.      Okay.
25  A.      Exhibit No. 3, yeah.

79

1  Q.      And for the record, this appears to be a
2  three-typed-page document, (as stated), entitled,
3  Memorandum.
4  A.      Oh, okay.  That's -- I'm looking at something
5  else.  My Plaintiff's Exhibit No. 3 -- Plaintiff's
6  Exhibit No. 3?  It's an email.
7  Q.      It's Gabbay No. 3.
8  A.      Yeah.  Exhibit No. 3.
9          MR. TROY:  This should be in the pile -- same
10  pile -- same pile from you which you took all the ones
11  that were CL-this-and-that.
12         THE WITNESS:  Yeah.  Yeah.  And it should be a
13  memo from you of October 2, 2019.
14         MR. HILL:  I'm sharing my screen now.  Can you
15  guys see it?
16         THE WITNESS:  Yeah.  No, I -- I know what it is.
17  I know what you're talking about.  I'm trying to find it
18  here in the materials.
19         MR. TROY:  Cliff, he pulled it up on the screen
20  there.  You can --
21         THE WITNESS:  All right.  You can ask me
22  question on that.
23  BY MR. HILL:
24  Q.      And no disrespect to you, Cliff, intended, but I
25  have to look on a different screen.  So, I'm not looking

80

1  at you directly when I'm asking you the questions.
2  A.      No, I get it.
3  Q.      All right.  So, I'm screensharing -- this is
4  marked as Gabbay Exhibit No. 3.  It doesn't have the tag
5  on it, but --
6  A.      I'll keep looking when you're talking.  Go
7  ahead.
8  Q.      Just to confirm -- will confirm for me that this
9  is a memo that you drafted?
10  A.      Yeah.  Well, I did not read the whole thing, but
11  I read the first paragraph.  Yes, I remember that.
12  Q.      You can ask me to scroll up and down any time
13  you want.
14  A.      I believe that you're showing me the right one.
15  Q.      And it was finalized on October 2019, and it was
16  after a meeting that you had with Mr. Conaway at LaScala
17  in -- I think that's Philadelphia; right?
18  A.      Yes.  Yes.
19  Q.      And do you remember that meeting?
20  A.      Very well.
21  Q.      And can you just tell me briefly what the
22  purpose of writing the memo was?
23  A.      It was just an astounding event in my career.  I
24  never before encountered anything like that.  I had a
25  long career, a wonderful career.  And, umm, greatly

81

1  enjoyed practicing law, and I love lawyers.  You know,
2  I'm the President of various Bar Associations, and I'm
3  still very active.  And I love lawyers, and I love what
4  they do.  And most of them that I've met I think are
5  great people.  So -- and I like Bernie.  And I -- you
6  know, obviously, we had -- we have a rapport.  So, I was
7  shocked and astounded that he had lied to me about
8  having insurance coverage, that -- and so, I thought the
9  best thing I can do is meet him in person and talk to
10  him about this.  So, I remember that meeting vividly.  I
11  just really remember it.  It was an amazing thing in my
12  life and career.  That's all I can tell you, to be
13  completely candid.  And when we were done talking, he
14  hugged me.  He told me he was legally and ethically
15  responsible, that he would make good on it, 'cause I
16  never had, had a situation like that.  I said, How do
17  you, you know, forgo something like that?  And he hugged
18  me, I hugged him.  We hugged either other, and I told
19  him I appreciated his integrity and his honesty and his
20  willingness to do it.  And I thought I should -- you
21  asked me why I did it, so I thought it was such an
22  amazing event that I wanted to, you know, put it in
23  writing.
24  Q.      Okay.
25  A.      That's why.

Cliff A. Rieders, Esquire - August 17, 2023

82

1  Q.    And it's -- it's to the Gabbay/Cupron file. My
2  cursor's there now, if you want to follow it. So, I'll
3  go back to a question I asked earlier: Is there a file
4  that you're maintaining, a physical file?
5  A.    No, no physical file.
6  Q.    So, where --
7  A.    I --
8  Q.    Where are you -- I'm sorry?
9  A.    I believe there's no physical file. We don't
10 keep physical files here.
11 Q.    Okay.
12 A.    I don't know if we did then or not. But go
13 ahead.
14 Q.    Okay. You can look for it.
15 A.    I'm looking while you're talking. But go ahead.
16 Q.    I'm going to go to page three 3. And by the
17 way, that highlighting there, (indicating), is my
18 highlighting.
19 A.    Okay.
20 Q.    Would this memo be an electronic file at your
21 firm somewhere?
22 A.    I don't know. I think so.
23 Q.    Okay. And here's reference to Kakadu; do you
24 see that?
25 A.    Yep. Yep.

83

1  Q.    And this is relating your -- your --
2  A.    Yeah.
3  Q.    -- recollection of the discussion you had about
4  that Kakadu with Bernie --
5  A.    Right.
6  Q.    -- is that right?
7  A.    Right. Yeah.
8  Q.    And here you talked about the prior exam in
9  early June; right?
10 A.    Yes.
11 Q.    Okay. And the -- and was that -- that exam, as
12 far as you understood it, was that at Argaman?
13 A.    Yes. That was my understanding -- that's my
14 understanding, yes.
15 Q.    And do you have an understanding, Cliff, as to
16 which accounts in this case were hacked?
17 A.    Oh. No idea, sorry.
18 Q.    How about which exchange, Argaman, Gmail,
19 Bernie, you?
20 A.    No idea. If I -- if I ever knew that, I don't
21 remember it today. I don't think I knew that.
22 Q.    And then, you wrote, I am not sure we have all
23 the information from that earlier exam and how that was
24 dealt with in early June, but we probably should.
25 A.    I see that. That was my thought at the time.

84

1  Q.    And who was that directed to?
2  A.    Well, it's a memo.
3  Q.    To who?
4  A.    That was my speculation in this memo.
5  Q.    Oh, I see. There wasn't -- I was trying to
6  figure out whether this was directed to a particular
7  person or not.
8  A.    No. No, I was just speculating -- thinking out
9  loud, you know.
10 Q.    I see. And when you say, But we probably
11 should, what do you mean by the word we on that?
12 A.    Me and Bernie.
13 Q.    Okay. Did you share this memo with Bernie after
14 you drafted it and finalized it?
15 A.    I don't know. I know I had corresponded with
16 him afterwards, but I don't know if I did. It was a
17 memo to file. So, I don't know --
18 Q.    I understand.
19 A.    -- that --
20 Q.    And did -- did you obtain all of the information
21 from that earlier exam? I just quoted your memo.
22 A.    I tried -- well, I did talk with Jeff's son,
23 Jeff's business partner. The name I think was
24 S-I-M-C-H-A and with a lawyer -- a man who reported to
25 be a lawyer for Argaman, and I didn't ask him about it.

85

1  I did not get any additional information.
2  Q.    Do you know if it was one particular exam or two
3  exams prior to July of 2019?
4  A.    I don't know.
5  Q.    And do you know when Kakadu was hired by
6  Argaman?
7  A.    No, I do not.
8  Q.    And Kakadu -- I think you described it as the
9  firm hired by Argaman to address the exam?
10 A.    That's what I was told.
11 Q.    In -- beginning in June of 2019?
12 A.    Yeah. I don't any exactly when. But I was told
13 that was the name of the firm.
14 Q.    Not exactly when, but in June of 2019?
15 A.    Yeah, I -- I don't know. I'm sorry, I don't
16 know the dates.
17 Q.    Well, let's go back to your memo. You say, But
18 he brought it up to me that Kakadu apparently dealt with
19 a prior scam in early June.
20 A.    Okay.
21 Q.    So --
22 A.    Okay. I didn't remember that.
23 Q.    Okay.
24     MR. HILL: Gents, do you mind if we take about a
25 10-minute break? I'm going to organize my notes. I'm

Cliff A. Rieders, Esquire - August 17, 2023

| 86 |
|---|
1  getting close to wrapping up, but I want to use -- use
2  the time efficiently. Can we take a 10-minute break?
3       MR. POLIQUIN: Okay.
4       MR. TROY: Sure.
5       MR. HILL: All right. Thanks.
6       (Whereupon, a recess occurred in the proceedings
7  at 11:09 a.m. after which the following occurred on the
8  record at 11:26 a.m.:)
9          DIRECT EXAMINATION (CONT'D)
10 BY MR. HILL:
11 Q.    Thanks for that little time out. I appreciate
12 it. And I wouldn't be too much longer. Thank you for
13 your time today, Cliff. I appreciate it.
14 A.    Um-hmm.
15 Q.    So, we just left the memo you did on October 2,
16 of 2019. And I'm going to share my screen. This is a
17 group of documents that I produced to Mr. Poliquin. And
18 I'm just going to ask about a couple pages of these.
19 Can everyone see the screen?
20 A.    It's very high. It's really hard for me to read
21 it.
22 Q.    Yeah, let me -- I can -- I can expand it. How's
23 that? Better?
24 A.    Yeah. I can see part of No. 1.
25 Q.    Okay. I'll -- I'll have to scroll down to

| 87 |
|---|
1  orient you, since I did not send this to you prior.
2  A.    Okay.
3  Q.    So, these have Bates numbers on the bottom.
4  You'll see C1 -- this one -- this one's 274,
5  (indicating).
6  A.    Okay.
7  Q.    And this is the first one I want to talk to you
8  about. This is on your letterhead, July 30, 2019,
9  Rieders, Travis, Humphrey, Waters & Dohrmann. And what
10 I think -- in fairness to you, Cliff, I can just scroll
11 down slowly, and you can tell me to slow down or speed
12 up when you're ready.
13 A.    Okay. Go ahead.
14 Q.    Okay. (Complies).
15 A.    Okay.
16 Q.    You're a fast reader.
17 A.    Yep. Well, I didn't see No. 2. Can you go
18 back?
19 Q.    Yep, (complies).
20 A.    Okay.
21     MR. HILL: And I'm going to mark this one --
22 this two-paged letter; it's base Bates No. CL274 and
23 275, July 30, 2019 letter, as Rieders No. 1.
24     MR. HILL: And, Miss Court Reporter, I'm happy
25 to get you these right after we finish our deposition

| 88 |
|---|
1  today.
2  BY MR. HILL:
3  Q.    So, this will be marked as Rieders No. 1. Do
4  you remember sending this email/letter?
5  A.    No.
6  Q.    And No. 2 I'm focusing on -- do you see my
7  cursor?
8  A.    Yes.
9  Q.    Contacting Jeff. The following two numbers are
10 fax numbers Jeff gave to me, and I will use those until
11 Jeff tells me that he has a secure email system. Did I
12 read that right?
13 A.    Yeah.
14 Q.    So, as of this time on in July 30th, did you
15 understand that this email system at Argaman was not
16 secure?
17 A.    I did not know that. I just didn't -- you know,
18 I -- I'm -- I'm speculating that maybe I was just
19 allotted some -- some original way of there being
20 contact.
21 Q.    Um-hmm.
22 A.    But I don't know why that is. I don't know if
23 it was because I didn't think it was secure or I felt we
24 should have an alternative. I really don't remember why
25 I said that.

| 89 |
|---|
1  Q.    Okay. Is it fair to conclude at this time,
2  based on this letter, that everyone, including yourself,
3  was aware of the hack at Argaman?
4  A.    Well, when you say everyone, I --
5  Q.    Let's just say you -- that you -- let's -- I'll
6  rephrase it. That you were aware of the Argaman hack?
7  A.    I would so deduce that from this letter, yes.
8  Q.    Okay. All right. Now, I'm going to go to No.
9  4. Jeff, you said that you have been in contact with
10 the company -- stop right there. Are you referring to
11 Kakadu right there?
12 A.    I don't remember, because I don't remember the
13 letter. But I would presume that, yes.
14 Q.    That fixed your hacking problem in connection
15 with Argaman previously. That's the June 2019 hack?
16 A.    I, again, would make that presumption.
17 Q.    Okay. And then, next sentence, I strongly urge
18 you to make a claim since you said they have insurance.
19 Do you know if Argaman ever made a claim against the
20 company that fixed the hacking problem previously?
21 A.    I do not know if they did.
22 Q.    Do you know who would be able to answer that
23 question for me?
24 A.    I do not know that.
25 Q.    Okay. I'm going to go to -- I'm scrolling down.

Cliff A. Rieders, Esquire - August 17, 2023

90

1  Okay. I'm going to identify it for the record, and
2  then, I'll slow down and let you read it, okay?
3  A.    Okay. Sure.
4  Q.    This looks like an email/letter, I guess, I'll
5  call it. Friday, August 2, 2019 at 10:29 a.m. And it's
6  Bates No. CL278 and 279. And this CL278-279, this
7  letter of August 2, we'll mark as Rieders No. 2.
8        MR. HILL:  And I'll provide it to the court
9  reporter and everyone --
10       THE WITNESS:  Okay.
11       MR. HILL:  -- after the deposition.
12 BY MR. HILL:
13 Q.    Okay. Now, I'll read it -- I'll scroll through
14 it. And you tell me when to move on.
15 A.    I don't remember the letter, but the content is
16 familiar to me.
17 Q.    Okay.
18 A.    I think all those things happened.
19 Q.    Um-hmm. The second paragraph, It is clear to
20 every -- at this point, you had -- I'm not trying to
21 describe it with any great degree of particularity, but
22 you had been involved in trying to figure out what to do
23 with respect to this issue; is that fair?
24 A.    I was trying to help Bernie and Jeff, yes.
25 Q.    Okay. Second -- second paragraph, It is clear

91

1  to everyone we have spoken to that somehow this
2  intrusion was through the Argaman portal. Is that your
3  understanding today as well?
4  A.    That's what I believe. I don't know that that's
5  true, and that's not a scientific, you know --
6  Q.    Yeah.
7  A.    -- conclusion, but that's -- that's what I
8  believe I've been told, yes.
9  Q.    And -- and who would have told you that?
10 A.    Well, I -- you asked me that earlier, and I -- I
11 believe Jeff told me. I believe that his son told me.
12 I believe that his business partner told me. And I
13 believe maybe even the lawyer for Argaman told me. But
14 that's just all very, sort of, vague.
15 Q.    Okay.
16 A.    I'm not certain about -- about -- if anyone
17 said, no, I didn't, I'd believe them, but that's my best
18 information I can give you.
19 Q.    Okay. Fair enough. And the second sentence,
20 There may be issues with the integrity of Bernie's
21 system as well.
22       Do you have an understanding today, as we sit
23 here, whether there was a problem with Bernie's system?
24 A.    I have no idea.
25 Q.    Okay. Next paragraph, The bottom line is that a

92

1  very good forensic examination needs to be done of both
2  computer systems -- let me stop you right there. Do you
3  know if a forensic examination has been done with
4  respect to the Argaman computer system?
5  A.    I do not know.
6  Q.    Okay. I'm going to go back to one more. Okay.
7  For the record, this is an email/letter August 2, 2019
8  with your letterhead. It's CL276 and 277. We'll mark
9  that as Rieders Exhibit No. 3, and I'll provide copies.
10 Do you remember this one?
11 A.    I do not remember the letter, but in fairness, I
12 have not seen these letters for, what, in 40 years. But
13 let me read it, because I can tell you --
14 Q.    I'm sorry. I'm sorry. I think that's the full
15 text of the --
16 A.    Okay.
17 Q.    -- content, (indicating).
18 A.    Okay. I -- I don't remember this, but, you
19 know, I -- I believe it.
20 Q.    Do you believe this is the first time that you
21 mentioned to Bernie Conaway that there was a potential
22 claim against him?
23 A.    I don't know. I know that it was a very hard
24 letter to write.
25 Q.    Okay.

93

1  A.    But --
2  Q.    Do you have an understanding, with all of your
3  years of experience in litigation, that when there's a
4  potential claim, a litigation claim, that there's a duty
5  to preserve evidence?
6  A.    Within the jurisdiction. I mean, we can talk
7  about that now 'til the cows come home. I don't want to
8  give you a legal opinion on this --
9  Q.    Okay.
10 A.    -- because it depends on a lot of factors.
11 Q.    How about in general? Are you aware of a duty
12 to preserve when you're notified of a potential claim
13 against you?
14 A.    Again, I -- I wouldn't feel comfortable giving
15 an opinion like that, because it depends upon a lot of
16 facts and circumstances which I don't have. So, I'm
17 just not comfortable giving that opinion.
18 Q.    Okay. Fair enough.
19 A.    I'm sorry. Again, I'm not trying to be coy with
20 you, I'm just trying to, you know, be direct and honest.
21 Q.    Appreciate that. Now, the last document I want
22 to show you is the -- I think I can pull it up. How
23 about in Pennsylvania? Is there -- do you understand
24 that there's a general duty to preserve when you're
25 notified of a claim against -- against yourself or your

Cliff A. Rieders, Esquire - August 17, 2023

94

1  company?
2  A.    Yeah.  Again, I -- I don't want to get into
3  giving opinions.  I'm just not comfortable.  I am asked
4  from time to time to give opinions.  People have tried
5  to hire me as an expert many times, and I always refrain
6  from doing that.  I don't know if it's undue modesty,
7  but I -- you know, when I -- when I teach a class, a
8  course, which I do a lot of, you know, I always study up
9  before I open my mouth.  So, I don't really feel
10  comfortable, Karl -- I hope you understand -- just
11  giving you an answer off the top of my head.
12  Q.    Okay.
13  A.    That's not how I do things.
14  Q.    I'll take that.  All right.  Here is the last
15  exhibit today.  You probably have a hard copy printed.
16  I know I sent this out probably this morning.  But I can
17  scroll through it, if you want, or you can tell me you
18  have it on your desk, and I can stop the share.
19  A.    Okay.
20        MR. TROY:  What's the number or exhibit, Karl?
21        MR. HILL:  This is going to be Exhibit No. 4,
22  which, for the record, is an April 6th, 2020 written
23  communication on Rieders' letterhead.  It contains a
24  two-paged letter, and then, a document entitled
25  complaint, which has 13 pages to it, the pleading,

95

1  itself, and then, exhibits.
2        THE WITNESS:  I recall that in what you've sent
3  to me.  I don't have it right in front of me, but go
4  ahead and ask your question.
5  BY MR. HILL:
6  Q.    Okay.  So, I'll share the screen.  If you need
7  me to --
8  A.    Yeah.
9  Q.    -- go in some direction beyond where I want to
10  go, just let me know.  Do you recognize the email in the
11  draft complaint?
12  A.    Well, you're not showing it.
13  Q.    Okay.  Let's start with the letter.
14  A.    It's a letter of April 6th, 2020.
15  Q.    Yes, sir.
16  A.    Okay.  I did find that.  This is to Bernie
17  Conaway.  Yes, I see that.  I -- I have it here.
18  Q.    Do you have the hard -- you have the hard copy?
19  A.    I do.  Thank you for sending it to me.  I do
20  have it.
21  Q.    I'm happy to keep the share up, but I can shut
22  it --
23  A.    Go ahead.  I'm looking at it.
24  Q.    I think I took the share down anyway.  So --
25  okay.  There we go.

96

1  A.    I got it.
2  Q.    All right.  Thank you for that.  All right.  Do
3  you recognize this as a letter that you sent?
4  A.    Again, I -- you know, I haven't looked at it
5  since 2020, but I do have a vague recollection of it,
6  yes.
7  Q.    Okay.  And are you the author of the attached
8  pleading entitled "Complaint?"
9  A.    That I don't know.  I don't remember that, if I
10  did it or -- I don't know the answer to that.
11  Q.    Do you know if it would have been someone within
12  your organization or someone else?
13  A.    Yeah.  If it -- if it came to this organization,
14  it presumably would have been me, but I'm not even a
15  hundred -- I'm 90 percent -- 99 percent sure of that.
16  I'm not actually certain, actually.
17  Q.    In your letter, I say, I am enclosing for your
18  perusal a Complaint which would be filed against you.
19  A.    Right.
20  Q.    Okay.  I'm just trying to get to the bottom of
21  who drafted the Complaint.
22  A.    Yeah, and I -- I cannot honestly tell you that.
23  Q.    And can you honestly tell me one way or the
24  other whether it was someone within your shop or not?
25  A.    I -- I don't know.  But I know that I determined

97

1  not to file it, since it had been filed in Delaware and
2  that I would have to have other counsel, and I was not
3  willing to take this on.  I do remember that.
4  Q.    Okay.  And ultimately, Mr. Poliquin filed the
5  case; right?
6  A.    I believe so, yeah.
7  Q.    Did he use this draft complaint or a draft
8  complaint that you prepared to --
9  A.    I have no idea --
10  Q.    -- file --
11  A.    -- because -- I'm sorry.  I have no idea what he
12  used, 'cause I never compared the two.
13  Q.    Okay.
14  A.    I never compared what he filed versus this.  So,
15  I don't know if he used any of this information or not.
16  Q.    Was there another attorney in your firm that was
17  working with or on behalf of Mr. Gabbay at this time?
18  A.    I don't think so, no.  I think so.  But keep in
19  mind, there are paralegals here, associates.  And I'm
20  just trying to answer to you that I'm not absolutely
21  certain no one else worked on it, but I don't think
22  anyone else did.
23  Q.    And I know I asked you whether you ever opened a
24  file in the Chancery case.  Did you open a file on this
25  one?

Cliff A. Rieders, Esquire - August 17, 2023

98

1  A.     I don't know why I would have.  I don't think
2  so.  I -- no.  I doubt it.
3  Q.     Just putting aside your firm, did you shop this
4  out to any other attorney prior to Mr. Poliquin to draft
5  this pleading that we're looking at?
6  A.     I did talk with other lawyers before Mr.
7  Poliquin, yes.
8  Q.     Okay.  I understand that.  What about in
9  connection with drafting the Complaint?  That's what I'm
10  getting at.
11  A.     Which Complaint, the one that you sent to me?
12  Q.     The one we're looking at, yes.
13  A.     I don't think anybody else is involved in that,
14  but I -- I don't know for certain.
15  Q.     Is there a way you could figure that out?
16  A.     I don't think so.  I've talked with other people
17  about this problem and what to do about it.  I've talked
18  about the fact that Bernie had made an absolute ironclad
19  promise to me and then reneged on it.  Umm, and so --
20  did I talk with other people about how to address this,
21  to me, unusual problem?  I might have, but I -- you
22  know, I just don't recall at this point specifically.
23  Q.     And I'm not trying to trick you, but let me,
24  umm, suggest -- and you can check me on this, but I
25  looked at this Complaint, which we're now marking as

99

1  Rieders Exhibit No. 4, which is attached to your letter
2  dated April 6th, 2020, with all the way to the third
3  Amended Complaint, which we looked at earlier, and
4  they're -- 90 percent of it, I would say -- I could be
5  off on the math.  Comes from the draft complaint that
6  you sent in April of 2020.  Did you know that?
7  A.     No.  I'd have no reason to know it, but I know
8  that lawyers all over the Country -- you know, I do
9  multi-district litigation where we have lawyers from all
10  over the Country.  I look at other people's work.  If
11  they like it, sometimes they use it, sometimes they
12  don't.  So, that's not -- wouldn't shock me.  We all do
13  it.  We all look at other people's work, and if we like
14  the work, we might utilize it.
15  Q.     2:11:04 F R sounds like I'm not going to be able
16  to figure out who the architect of this draft complaint
17  is; is that what you're saying?
18  A.     I -- I tell you everything I know.
19  Q.     Were you aware that the draft complaint, and
20  then, the three iterations of the Complaint actually
21  filed in Federal Court here request punitive damages?
22  A.     I -- I don't know what was filed in the other
23  one, I'm sorry.
24  Q.     I'm sorry?
25  A.     I do not know what was filed in Delaware.

100

1  Q.     Okay.  Do you want to take a look at the
2  Complaint that's attached to your letter on April 6th,
3  2020?
4  A.     Yeah.  I'll do whatever you ask me to do that my
5  attorney let's me read it.  You want me to read it?
6  Q.     Just --
7  A.     Again, I've never seen it -- I've never read it
8  before, so I'm not sure what you're asking me to do with
9  it.
10  Q.     I'm sorry, you never read the complaint that's
11  attached to your lawyer on April 6th --
12  A.     Oh, I --
13  Q.     -- 2020?
14  A.     I've read that Complaint, obviously.
15  Q.     What's that?
16  A.     I thought you were asking me about the Complaint
17  that was filed in Federal Court.
18  Q.     Oh, I'm sorry.  I may have been confusing on
19  that.  I'm focusing right now --
20  A.     Okay.
21  Q.     -- on this Complaint?
22  A.     So, that's --
23  Q.     That's attached to your letter?
24  A.     Okay.  What's your question?
25  Q.     Were you aware that this pleading requests

101

1  punitive damages in all of the -- all of the counts?
2  A.     I see that.  I didn't recall it, but I see it.
3  It's here, yes.
4  Q.     Okay.  And you -- you've been doing litigation
5  for a long time, including personal injury cases.  Do
6  you have a basis in your own mind to support punitive
7  damages against Conaway-Legal?
8  A.     Well, you're asking me a legal question, and I
9  don't know that it's appropriate for me to answer that.
10  But if you want me to, umm, what I'd say is at some
11  point, somebody misrepresents and says something that's
12  not the truth.  And on multiple occasions, there could
13  be a basis for it.  But again, that's a very
14  factually-intensive question.  And, you know, I would --
15  I would indicate to you that this was never filed
16  anyway, because I didn't think it was appropriate for me
17  to file the case in Delaware.  So, you're asking me to
18  tell you whether somebody else should have or should not
19  have included that language, and I don't know if they
20  did.  I don't know if it's in the Complaint filed in
21  Delaware.  I have no idea.  So, you know, in terms of a
22  draft, you know, which as you know -- I'm sure you've
23  done it, too.  You put things out in a draft that may or
24  may to come to fruition in the final prompt.  And I -- I
25  would add just like I trusted Bernie Conway to do the

Cliff A. Rieders, Esquire - August 17, 2023

102

1    job in Delaware, I trust Ron Poliquin to do his job.
2    Q.      And when you said that there was some behavior
3    that, in your experience, might enable the correct --
4    enable the Plaintiff to obtain punitive damages, are you
5    -- you referenced some misrepresentation.  Are you
6    talking about the discussion you had with Mr. Conaway
7    about malpractice insurance?
8    A.      About malpractice insurance, about him telling
9    me that he -- that he accepted moral and legal
10   responsibility and would be taking care of it, about him
11   making a proposal to me to pay it from some settlement
12   that he expected, and getting a completely different
13   proposal.  You know, maybe -- I thought about it.  I
14   could think about some other things, but I don't know
15   when this was drafted specifically what I was thinking
16   about, because this is a draft that was not filed by me
17   and would not be filed by me that was looked at and
18   vetted by other competent people in your jurisdiction.
19   Q.      All right.  We're going to just do one quick
20   exercise.  If could you, keep this Complaint out.  This
21   is going to be Exhibit No. 4, attached to your letter.
22   And you should have the third Amended Complaint.
23   Exhibits became a mess today, and I apologize, but you
24   have the third Amended Complaint, itself?
25   A.      I put them all back in the stack.  I thought we

103

1    were done.  I'll try to find it.
2    Q.      Yeah.  Take your time.
3    A.      So, you want me to compare the draft to the
4    third Amended Complaint?
5    Q.      I want you to pull the third Amended Complaint
6    out and have it next to the Complaint that is a part of
7    your letter of April 6, 2020.  And let me know when you
8    have both out.
9    A.      When you talk about the third Amended Complaint,
10   are you talking about something you sent to me?
11   Q.      It was -- it was one of the ones that I asked
12   you guys to pull and print before we started today.  And
13   I think you had earlier, because you said you had it but
14   not the exhibits.
15   A.      Okay.  I found the third Amended Complaint.
16   Q.      Okay.  Now, what I want you to do is flip to
17   page 3 of the Amended Complaint that's attached to your
18   letter.
19   A.      Okay.  Okay, (complies).
20   Q.      And then, I want you to flip to paragraph --
21   starting on paragraph 18 of the third Amended Complaint.
22   A.      Okay.
23   Q.      Okay.  And I want you to match up paragraph 11
24   on the Complaint attached to your letter.
25   A.      Well --

104

1    Q.      And --
2    A.      -- you said 11 before.  What do you want me to
3    do?
4    Q.      Paragraph 11 on page 3 of the Complaint that's
5    attached to your letter.
6    A.      Starting with, On multiple occasions?
7    Q.      Yep.
8    A.      Okay.
9    Q.      And then, take a look at -- look over to your
10   right or left to paragraph 18 of the filed third Amended
11   Complaint.
12   A.      Okay.
13   Q.      Do you see how they're identical?
14   A.      I haven't seen it word for word.  So, I don't
15   want to agree to anything without doing that.
16   Q.      Go ahead.
17   A.      Okay.  They're identical.
18   Q.      Okay.  And let's do the same exercise for
19   paragraph 12 and paragraph 19 in third Amended
20   Complaint.
21   A.      Twelve in the third amended complaint, and what?
22   Q.      No, 12 in the Complaint attached to your letter?
23   A.      Okay, subsequent.  Okay.
24   Q.      And 19 in the third Amended Complaint.
25   A.      Okay.  And you want me to compare every word in

105

1    here?
2    Q.      Yeah.
3    A.      They are not identical, no.
4    Q.      Okay.
5    A.      Did you read these carefully?  They're not
6    identical.
7    Q.      Okay.  Let me -- let me -- I didn't catch that.
8    Let's see it.
9    A.      I'm answering your question.  You asked me if
10   they're identical, and the answer is no.
11   Q.      And can you tell me where it's not identical?
12   A.      I'll have to go back.  Yeah, I can.
13   Q.      Okay.  Please tell me.
14   A.      Okay.  The drafted -- draft complaint -- I'm
15   sorry, the third Amended Complaint says in its first
16   language, First, without any relation.  The draft does
17   not say that.
18   Q.      The draft -- draft in paragraph 12 doesn't say
19   that?
20   A.      Not that I see.
21   Q.      How about the last four letters of paragraph 12?
22   A.      I see the word first there.  So, it's not
23   identical that it would be in different places, the
24   different -- you know, you're asking me to be precise,
25   and so, the word first is in a different place in the

Cliff A. Rieders, Esquire - August 17, 2023

**106**

1  third Amended Complaint, versus, the draft.
2  Q.     All right.  We can go through a whole bunch more
3  of these paragraphs, and people can read them for
4  themselves.
5  A.     Sure.
6  Q.     Was it you or your firm that was the architect
7  of this case that ultimately was filed against
8  Conaway-Legal and Bernie Conaway?
9        MR. TROY:  Objection.
10       MR. POLIQUIN:  Objection to the form.
11       MR. TROY:  You can -- you can answer.
12  Objection.
13       THE WITNESS:  What do you mean by architect?
14  BY MR. HILL:
15  Q.     That you -- you drafted the Complaint that later
16  -- in a later iteration became the Complaint that was
17  filed in District Court?
18  A.     I don't know that, because I haven't compared
19  the two.
20  Q.     Okay.
21  A.     Obviously, I did a draft, and I don't know what
22  counsel thought was appropriate to utilize from that or
23  not utilize.  But we do that -- we do that all the time;
24  right?
25  Q.     Are you saying -- I'm -- I'm sorry, I didn't

**107**

1  mean to interrupt you.
2  A.     What Mr. Poliquin might have done is what you
3  and I do and any lawyer does all the time.  You look at
4  forms.  There's form books; right?  They sell on the
5  internet, you know, Lexis and Westlaw.  We look at other
6  people's work all the time.  Sometimes we use it,
7  sometimes we don't.  I mean, it's garden variety stuff.
8  And, you know, I trust Ron to have done a good and
9  thorough job, to have looked at whatever he looked at
10  and to have checked it, whatever information he had
11  available.  And just as I trusted Bernie at one time, I
12  trusted Ron.  So, I can't tell you -- umm, I can't
13  answer your question in any way to tell you what -- you
14  know, what he followed and what he did not and why.
15  Q.     Here's a simple one, then, maybe:  Did you send
16  this draft to Mr. Poliquin?
17  A.     I don't know.  I have no way of knowing that.
18  Q.     Okay.
19       MR. HILL:  Can we just take a two-minute break?
20  I want to confirm with my client.  I think I should be
21  done.  I don't know if Mr. Poliquin or Mr. Troy will
22  have some questions, but let's just take a couple-minute
23  break, please.
24       MR. POLIQUIN:  Thank you.
25       (Whereupon, a recess in the proceedings occurred

**108**

1  at 11:58 a.m. after which the following occurred on the
2  record at 12:01 p.m.:)
3        MR. HILL:  Cliff, pleasure meeting you.  Thanks
4  for the time.  I don't have any other questions for you
5  right now.
6        THE WITNESS:  Thank you.  Thank you very much.
7  I appreciate the thoroughness of the questions.
8        MR. POLIQUIN:  I don't have any questions.
9        MR. TROY:  Nor do I.  Thank you.
10       MR. HILL:  So, the question now, Paul, is
11  whether you want to read and sign or waive the reading
12  and the signing.
13       MR. TROY:  We will read and sign.
14       THE WITNESS:  Am I free to go?
15       MR. POLIQUIN:  I think we're all free to go.
16       MR. HILL:  You're free to go.
17       THE WITNESS:  Thank you.
18       (The proceedings concluded at 12:03 p.m.)
19
20
21
22
23
24
25

**109**

CERTIFICATION

I hereby certify that this transcript of

proceedings is true and correct and meets the format

specifications established by the Supreme Court of

Pennsylvania in Rule 4010.

_____8/31/2023____

DATE          CYNETHA JADE HARRISON, RPR, CRR

Cliff A. Rieders, Esquire - August 17, 2023

110

ERRATA SHEET

    INSTRUCTIONS:  After reading the transcript of

testimony, please note any change, addition or deletion

on this sheet.  DO NOT make any marks or notations on

the actual transcript.  (Use additional paper if needed

and attach it to this sheet.]

    Please sign and date this Errata Sheet and

return it to the court reporter indicated below.

Case Name:    Jeff Gabbay v. Bernard G. Conaway,

    Esquire and Conaway-Legal, LLC,

    C.A. No. 1:20-cv-00743-GBW

Date/Time     August 17, 2023

Taken:        9:00 a.m.

Remote

Deposition of:  CLIFF RIEDERS, ESQ.

PAGE    LINE                CORRECTION

DATE: _____

SIGNATURE: _____

RETURN TO:  Cynetha Jade Harrison, RPR, CRR

CynethaJade@gmail.com            (570)417-3441

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JEFFREY GABBAY | : | |
| v. | : | No. 1:20-cv-00743-LPS |
| BERNARD G. CONWAY, ESQUIRE AND CONAWAY-LEGAL LLC | : | |

CLIFF A. RIEDERS, ESQUIRE'S ERRATA SHEET
<u>FOR AUGUST 17, 2023 DEPOSITION</u>

Page Line Correction

| | | |
|---|---|---|
| 8 | 4 | "in" should be "to" |
| 10 | 16 | "being" should be "doing" |
| 13 | 5 | "a plea to" should be "complete" |
| 13 | 8 | "the" should be deleted |
| 17 | 12 | "can't" should be "can" |
| 17 | 16 | "cause" should be "because" |
| 17 | 18 | "cause" should be "because" |
| 18 | 12 | "become" should be "because" |
| 19 | 19 | "had" should be deleted |
| 22 | 6 | "CRieders@RiedersTravis.com" should be "crieders@RiedersTravis.com" |
| 22 | 18 | "CRieders@RiedersTravis.com" should be "crieders@RiedersTravis.com" |
| 35 | 2 | "set" should be "said" |
| 37 | 13 | "I" should be "he" |
| 40 | 21 | "Shershana" should be "Shoshana" |
| 40 | 22 | "Shershana" should be "Shoshana" |
| 40 | 24 | "Shershana" should be "Shoshana" |
| 42 | 21 | "Shershana" should be "Shoshana" |
| 58 | 21 | "CRieders@icloud.com" should be "crieders@icloud.com" |
| 67 | 6 | "nor way" should be "Norway" |
| 67 | 23 | "thoughts" should be "thought" |
| 70 | 19 | "I'll" should be "I" |
| 72 | 22 | delete "will" |
| 73 | 5 | "til" should be "until" |

| 73 | 18 | "yeah" should be "yes" |
| 73 | 21 | "yeah" should be "yes" |
| 74 | 2 | "cause" should be "because" |
| 74 | 10 | delete "that's" |
| 75 | 13 | should read, "....I don't believe so.  Now, if..." |
| 75 | 23 | delete "umm" |
| 75 | 25 | "his" should be "this" |
| 76 | 10 | delete "umm" |
| 76 | 15 | "yeah" should be "yes" |
| 76 | 18 | "cause" should be "because" |
| 79 | 12 | "yeah" should be "yes" |
| 79 | 16 | "yeah" should be "yes" |
| 80 | 10 | "yeah" should be "yes" |
| 80 | 25 | delete "umm" |
| 81 | 15 | "cause" should be "because" |
| 81 | 17 | "forgo" should be "forgot" |
| 84 | 17 | "reported" should be "reputed" |
| 88 | 19 | the line has "allotted" and "original." Does not sound correct and I do not recall what it was now |
| 91 | 17 | "I didn't" should be "it didn't" |
| 92 | 12 | "40" should be "4" |
| 93 | 7 | "til" should be "until" |
| 97 | 18 | "I think so" should be "I don't think so." |
| 97 | 20 | delete "to" |
| 99 | 18 | "tell" should be "told" |
| 101 | 10 | delete "umm" |
| 101 | 24 | "prompt" should be "product" |
| 102 | 17 | should read "...me; that it was looked at..." |
| 105 | 23 | should read "... identical; that it..."; and "the" should be "there" |
| 107 | 12 | delete "umm" |

☐

I, CLIFF A. RIEDERS, ESQUIRE, have read the foregoing deposition prepared by Cynetha Harrison, R.P.R., C.R.R. and it is true and correct to the best of my knowledge and belief. I have so indicated in the above Errata Sheet changes, if any, that were necessary.

DATE: _____

**EXHIBIT F**

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE**

JEFFREY GABBAY,                              )
                                            )
          Plaintiff,                        )
                                            )      C.A. No.1:20-cv-00743-LPS
      v.                                )
                                            )
BERNARD G. CONAWAY,                          )
ESQUIRE, and CONAWAY-LEGAL                    )      JURY TRIAL DEMANDED
LLC                                          )
                                            )
          Defendants.                       )

**PLAINTIFF'S RESPONSES TO DEFENDANT'S
SECOND REQUEST FOR PRODUCTION OF DOCUMENTS**

**PRELIMINARY STATEMENT**

1.    Plaintiff's investigation and development of all facts and circumstances relating to this action is ongoing. These responses and objections are made without prejudice to, and are not a waiver of, Plaintiff's right to rely on other facts or documents at trial.

2.    By making the accompanying responses and these objections to Defendant's Interrogatories, Plaintiff does not waive, and hereby expressly reserves, her right to assert any and all objections as to the admissibility of such responses into evidence in this action, or in any other proceedings, on any and all grounds including, but not limited to, competency, relevancy, materiality and privilege. Further, Plaintiff makes the responses and objections herein without in any way implying that it considers

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JEFFREY GABBAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No.1:20-cv-00743-LPS |
| v. | ) | |
| | ) | |
| BERNARD G. CONAWAY, | ) | |
| ESQUIRE, and CONAWAY-LEGAL | ) | JURY TRIAL DEMANDED |
| LLC | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSES TO DEFENDANT'S
SECOND REQUEST FOR PRODUCTION OF DOCUMENTS**

**PRELIMINARY STATEMENT**

1.     Plaintiff's investigation and development of all facts and circumstances relating to this action is ongoing. These responses and objections are made without prejudice to, and are not a waiver of, Plaintiff's right to rely on other facts or documents at trial.

2.     By making the accompanying responses and these objections to Defendant's Interrogatories, Plaintiff does not waive, and hereby expressly reserves, her right to assert any and all objections as to the admissibility of such responses into evidence in this action, or in any other proceedings, on any and all grounds including, but not limited to, competency, relevancy, materiality and privilege. Further, Plaintiff makes the responses and objections herein without in any way implying that it considers

the requests or responses thereto to be relevant or material to the subject matter of this action.

3.    Plaintiff will produce responsive documents only to the extent that such documents are in the possession, custody, or control of the Plaintiff, as set forth.

4.    Plaintiff expressly reserves the right to supplement, clarify, revise or correct any or all the responses and objections herein, and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

5.    Publicly available documents including, but not limited to, newspaper clippings, court papers, and documents available on the internet, will not be produced.

6.    Plaintiff objects to each definition and request to the extent that it requires Plaintiff to produce information or documents from persons over whom Plaintiff has no control.

7.    Plaintiff objects to each definition and request to the extent that it seeks disclosure of privileged communications, attorney's work product, or trial preparation material.

8.    Plaintiff objects to each definition and request to the extent that it is vexatious or seeks information irrelevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

9.    Plaintiff objects to each definition and request to the extent that it seeks

information that is unduly burdensome to obtain and the extent that it is not reasonably calculated to lead to the discovery of admissible evidence, including the request for the identification of "all" documents or "each" and "every" document when all relevant facts can be obtained from fewer than "all" documents or "each" and "every" document.

10.    Plaintiff objects to each definition and request to the extent that it is ambiguous, vague, or otherwise incomprehensible.

11.    Plaintiff objects to each definition and request to the extent that it seeks a response which is duplicative of responses to one or more of Defendant's other requests.

12.    Plaintiff objects to each definition and request to the extent it seeks information beyond the scope of the Rules.

## GENERAL OBJECTIONS

13.    Plaintiff objects to each definition and request to the extent that it requires Plaintiff to produce information or documents from persons over whom Plaintiff has no control.

14.    Plaintiff objects to each definition and request to the extent that it seeks disclosure of privileged communications, attorney's work product, or trial preparation material.

15.    Plaintiff objects to each definition and request to the extent that it is vexatious

or seeks information irrelevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence.

16.    Plaintiff objects to each definition and request to the extent that it seeks information that is unduly burdensome to obtain and the extent that it is not reasonably calculated to lead to the discovery of admissible evidence, including the request for the identification of "all" documents or "each" and "every" document when all relevant facts can be obtained from fewer than "all" documents or "each" and "every" document.

17.    Plaintiff objects to each definition and request to the extent that it is ambiguous, vague, or otherwise incomprehensible.

18.    Plaintiff objects to each definition and request to the extent that it seeks a response which is duplicative of responses to one or more of plaintiffs' other requests.

19.    Plaintiff objects to each definition and request to the extent it seeks information beyond the scope of the Rules.

**RESPONSES:**

1.      Produce true, correct, and complete phone records of calls made to or from the telephone number 972-544-286287[1] during the time period May 1, 2019, to August 1, 2019.

**Response: Plaintiff objects to each definition and request to the extent that it seeks information which is unduly burdensome to obtain and the extent that it is not reasonably calculated to lead to the discovery of admissible evidence, including the request for the identification of "all" documents or "each" and "every" document when all relevant facts can be obtained from fewer than "all" documents or "each" and "every" document. Notwithstanding, Plaintiff is attempting to collect the records.**

2.      Produce true, correct, and complete copies of communications received or sent from jeff@argamantech.com during the period May 1, 2019, to August 1, 2019.

**Response: Plaintiff objects to the request to the extent that it seeks information which is unduly burdensome to obtain and the extent that it is not**

---

[1] On page 77, at line 13, of the Plaintiff's March 16, 2023, deposition he described this number as "my cellphone number." If the transcription of that number as it appears in the deposition is incorrect, then so indicate. In any event, this document requests records of calls made and received using the Plaintiff's correct cellphone number, whatever that number may be.

reasonably calculated to lead to the discovery of admissible evidence, including
the request for the identification of "all" communications. In addition, Plaintiff
objects to the request to the extent that it requires the Plaintiff to produce
information or documents from persons over whom Plaintiff has no control.
Plaintiff is no longer in possession of such information. Plaintiff has not had
access to this email since returning his computer to the company in November
2021. Notwithstanding, see attached and previously provided documents.

    3.    Produce true, correct, and complete copies of all communications
between You and/or Your Spouse and Profile Investment Services and the Bank of
New York Mellon for the time period April 1 to August 1, 2019.

**Response: Plaintiff objects to the request to the extent that it seeks
information which is unduly burdensome to obtain and the extent that it is not
reasonably calculated to lead to the discovery of admissible evidence, including
the request for the identification of "all" communications. In addition, Plaintiff
objects to the request to the extent that it requires the Plaintiff to produce
information or documents from persons over whom Plaintiff has no control.
Plaintiff is no longer in possession of such information. Notwithstanding, see
attached and previously provided documents.**

    4.    Produce true, correct, and complete copies of all communications
between You and Clifford A. Rieders, Esquire for the time period May 1, 2019, to

October 16, 2019, and that relate in any way to the events described in Your
Complaint(s) and Answer(s).

**Response: Plaintiff objects to the request to the extent that it seeks
information which is unduly burdensome to obtain and the extent that it is not
reasonably calculated to lead to the discovery of admissible evidence, including
the request for the identification of "all" communications. Notwithstanding, see
attached and previously provided documents.**

5.      Produce true, correct, and complete copies of all communications
between You, Argaman and Kakadu that relates in any way to the events described
in Your Complaint(s) and the Answer(s).

**Response: Plaintiff objects to the request to the extent that it seeks
information which is unduly burdensome to obtain and the extent that it is not
reasonably calculated to lead to the discovery of admissible evidence, including
the request for the identification of "all" communications. In addition, Plaintiff
objects to the request to the extent that it requires the Plaintiff to produce
information or documents from persons over whom Plaintiff has no control.
Plaintiff is no longer in possession of such information. Plaintiff has not had
access to this email since returning his computer to the company in November
2021. Notwithstanding, see attached and previously provided documents.**

6.      Produce true, correct, and complete copies of all communications

between You, Argaman and the Israel Police Security Department that relates in any way to the events described in Your Complaint(s) and the Answer(s).

**Response: Plaintiff objects to the request to the extent that it seeks information which is unduly burdensome to obtain and the extent that it is not reasonably calculated to lead to the discovery of admissible evidence, including the request for the identification of "all" communications. In addition, Plaintiff objects to the request to the extent that it requires the Plaintiff to produce information or documents from persons over whom Plaintiff has no control. Plaintiff is no longer in possession of such information. Notwithstanding, see attached and previously provided documents.**

**THE POLIQUIN FIRM, LLC.**

*/s/ Ronald G. Poliquin*
Ronald G. Poliquin, Esquire
I.D. No. 4447
1475 S. Governors Ave.
Dover, DE 19904
(302) 702-5501
*Attorney for Jeffrey Gabbay*

May 14, 2024