# APPENDIX

| Ex. 1 | 10/02/2019 Memorandum |
|-------|------------------------|
| Ex. 2 | 10/04/2019 Letter from Cliff Rieders to Bernie Conaway |
| Ex. 3 | Preliminary Expert Report of Peter W. Leibundgut, Esq. |

*Citations are also made to the Defendant's Appendix (D.I.#77)

Exhibit 1

# MEMORANDUM

**To:**      **Gabbay/Cupron File**

**From:**   **Clifford A. Rieders, Esquire**

**Date:**    **Wednesday, October 02, 2019**

**Re:**       **Meeting with Bernie Conaway**

---

I met Bernie Conaway at LaScala, about 3 blocks from the federal courthouse, at 11:30 a.m. on Wednesday, October 2, 2019.  He was a few minutes late, but he came in and he was wearing jeans, a white rumpled shirt and a blazer.  He is basically bald, a guy who looks to be in his 50s, mid-weight, a little portly but not particularly fat.

He shook my hand and sat down.

It did not seem too awkward in spite of the circumstances, but we did not talk about Gabbay right away and just exchanged pleasantries.

I then told him that I had talked with the Gabbays in Israel, but I did not meet with them.

I felt like we were dancing around the topic for a little bit, and I said to him that I had talked to somebody in New York, and he told me he had talked to a lawyer also, and I told him that he had told me that he had insurance but that there was an endorsement "excluding this kind of thing."  I asked him if that was true or not and he said, "I lied to you, and I'm sorry for that."  I told him that I was extremely disappointed in him, since he had a very good reputation in Delaware and I have worked with him and obviously recommended him, and it was very disturbing to me that he would like to me.  He then tried to say that the guy he talked to said some policies do have endorsements excluding this kind of thing, and that real estate lawyers actually have something in their contracts that they are not responsible for money they wire.  I told him that the person I talked to said he had never heard of an endorsement for this sort of thing, and this all he does is defense for insurance companies who write coverage for lawyers.

He then said the reason why he did not get coverage is because, for the kind of work that he does, the standard is very high and proving negligence is not enough but rather the plaintiffs have to prove malfeasance, kind of a gross negligence, very high standard.  I said to him, but isn't that as between the client, that is, the defendant corporation, and the people who sue them?  I said, "When it comes to between the lawyer and the client, the work you do for the client, aren't you judged by ordinary negligence?"  He admitted that was true.

I then asked him if he considered himself responsible, and he said that he considered himself morally and ethically responsible.  I said to him, "Do you feel you were negligent when you wired this money after getting an email from Gabbay that it would go to somewhere in New York?"  He said "yes."  He said, "I am responsible."

I told him that while the Gabbays are extremely nice people, they obviously, Jeff and his wife, are extremely upset about this and that if nothing happens here they are going to have to pursue something.

I told him that a plaintiff's lawyer would love this case and that it would really sully his reputation, and he acknowledged that was true.

He then told me that he had a case, a copyright case, and he told me what it was about, had to do with cat werewolves or something like that, and he apparently, the defendant, had used these images, these 70 images, after they were warned not to, and this big case, and he talked about how many millions it was worth and he said that he intended, if the case settled, to give his fee, which he thought would be substantial, to the Gabbays "as some measure of recompense."  He had said earlier that the fee would be adequate to cover this.

The case is ongoing, and he said it was recently transferred from Delaware to Baltimore, and while he is not still local counsel, "the fee agreement is still in place."

I told him I thought that whatever he was proposing should be in writing, and I thought he should show some good faith by giving them some money up-front.

He did tell me, by the way, that his wife is apparently some big-time person for the government, she works in Philadelphia, but apparently spends a lot of time in DC.  He told me her position, and it's a fairly high position, it sounded like.  So these are not poor people by any means.

What is important is that he acknowledges the following:

1. That he lied to me;
2. That his reputation is on the line;
3. That he is responsible ethically;
4. That he is responsible for negligence;
5. That he had to do something to make good on this.


He also said, towards the end of the conversation, that he liked my suggestion that he should follow-up with somebody in Singapore.  I asked him if he did that, since he was the one who filed the Complaint and in fact had to file the Complaint since he was the one who wired the money to the wrong place.  I told him I thought he should hire a lawyer in Singapore to check this out, because we know that the bank was legitimate

and this money was deposited in some bank and then went to a third party that might be in business there.  I told him I thought he should look into hiring a Singapore lawyer. He agreed that somebody with contacts in Singapore ought to run this down, and he said that he would do that.  He reminded me that at one time I had suggested a 3-way conversation with the Singapore authorities and I said yes I had; he had not done anything about that and I would be willing to be on that call, that I thought he should still do that.

When we left, we shook hands and I said to him, I looked right in his eyes and he looked right in my eyes (he has blue eyes), and I said to him, "Can I trust you this time? You know, a lot of lawyers would never give a lawyer a second chance after they had been lied to."  He said, "You can trust me."

I think that pretty well summarizes the conversation.

Neither one of us took notes.

I got the feeling Bernie really just wanted to hear what I had to say.  I think he did not know if I was coming in there to threaten him, demand something, just to schmooze about it to make some other suggestion how might Gabbay get the money back, but I think he realized that this was for real, the real deal, when we talked about responsibility.

He and I did discuss why he was negligent.  I told him flat out why he was negligent.

I did not get into the Kakadu matter, but he brought it up to me that Kakadu apparently dealt with a prior scam in early June, so he knows about that.  Jeff or Zvi apparently told him about that.  Certainly, I never told him about that.  I am not sure we have all the information from that earlier scam and how that was dealt with in early June, but we probably should.

I told him that the Delaware disciplinary authorities have been talked to, and even though Bernie has a very cool appearance and is in very good control of his emotions, I saw raised eyebrows about that and I told him that the Delaware authorities, in fact, had written me this very day, asking if a complaint was going to be pursued and wanted to know one way or the other.  I told him about that and that that was also on the table.

I am thinking and hoping that he gets that something is going to happen, and I told him flat-out that these folks, as nice as they are, they just cannot let this go obviously, and they are going to do something and I told him straight out that it is really going to be up to him as to whether he can postpone that or prevent  that by him taking the proper actions.

Exhibit 4

A PARTNERSHIP

# *Rieders, Travis, Humphrey, Waters & Dohrmann*

ATTORNEYS
CLIFFORD A. RIEDERS*
JEFFREY C. DOHRMANN
COREY J. MOWREY
SASHA B. COFFINER■
SEAN P. GINGERICH

* PA, NY & DC BARS
BOARD CERTIFIED IN CIVIL TRIAL
ADVOCACY, N.B.T.A.
■ PA & NY BARS

RONALD C. TRAVIS
1944-2017

161 WEST THIRD STREET
WILLIAMSPORT, PA 17701
Email:  lawoffices@riederstravis.com
www.riederstravis.com
PHONE: (570) 323-8711
FAX: (570) 323-4192

FIRM MANAGER
KIMBERLY A. PAULHAMUS

PARALEGALS
DEBBIE S. BUENO
BECKY BURROWS
LAURIE L. DEUEL

OF COUNSEL
JOHN M. HUMPHREY
PAMELA L. SHIPMAN
C. SCOTT WATERS

October 4, 2019

**Via email**

Bernie Conaway, Esquire

      Re:    Gabbay/Cupron

Dear Bernie:

I enjoyed having lunch with you in Philadelphia on Wednesday, October 2, 2019.

It was somewhat of a salve that you were willing to apologize for being dishonest with me with respect to your insurance coverage.  As you know, I work with many lawyers professionally and, to me, trust is the bottom line.

Even more importantly, I appreciate your taking responsibility and acknowledging neglect with respect to the transfer of the funds.

I urge you to put your commitment in writing to Jeff Gabbay to see if it is acceptable to him and to make some immediate payment.  While I am advising neither one of you, I would suggest you consider paying Jeff Gabbay now and to finance that, in anticipation of your future recovery.

I would reiterate my suggestion that you contact someone in Hong Kong, preferably an attorney, who can follow up with those authorities.  I believe that if you make payment to Jeff in a reasonable period of time, he certainly would be willing to give you an assignment of his relevant rights.

My concern for Jeff is to see him made whole.  My concern for you is to see your reputation and future kept safely intact.

Hopefully, achieving both goals is attainable without any more unnecessary distress.

Very truly yours,

RIEDERS, TRAVIS, HUMPHREY,
    WATERS & DOHRMANN

*Cliff Rieders*

Clifford A. Rieders, Esquire

CAR/jss

Exhibit 3

**PRELIMINARY EXPERT REPORT OF PETER W. LEIBUNDGUT, Esq.**

**ON BEHALF OF PLAINTIFF**

<u>**JEFFREY GABBAY v. BERNARD G. CONAWAY, ESQ.** *et al.*</u>

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**C. A. No.:  1:20-cv-00743-GBW**

December 29, 2022

## 1.  INTRODUCTION

Peter W. Leibundgut, Esq.,[1] was retained on behalf of the captioned plaintiff, Jeffrey Gabbay ("Mr. Gabbay") in the instant legal malpractice case against Bernard G. Conaway and his law firm, Conaway-Legal, LLC (collectively "Attorney Conaway").[2]

The action arises out of the manner in which Attorney Conaway handled the disbursement of settlement proceeds from a litigation he handled on Mr. Gabbay's behalf in the amount of Four Hundred Twenty-Six Thousand Fifty-Eight Dollars and Fifty-Five Cents (US $426,058.55) [3]received by Mr. Conaway on or about May 30, 2019[4] pursuant to a lawsuit settlement agreement negotiated by Attorney Conaway (the "Settlement Proceeds").  In short, Mr. Conaway failed to ensure that the Settlement Proceeds were wired to Mr. Gabbay as per his instructions by failing to ***verbally*** confirm, in real time with Mr. Gabbay, ***exactly*** where they should have been sent despite obvious confusion surrounding the email instructions pertaining to same.[5]  In failing to so confirm, Mr. Conaway wired the money to  unknown entities (solely owned by He Yanwen ["Yanwen"],

---

[1] Licensed to practice law in New Jersey.

[2] A sole practitioner. Conaway- Legal, LLC (the "Law Firm"). For purposes of this Report, I consider the Law Firm to be Attorney Conaway's alter ego.

[3] Which was the net amount due Mr. Gabbay after certain fees and deductions from the gross settlement amount of $449,990.00 received by Attorney Conaway on May 30, 2019.

[4] CL-0007.

[5] That confusion reflected in the Documents CL-0001- through CL-0004; CL-00015-00066 (the "Email Chain") which is addressed and discussed in more detail the body of this Report.

also unknown)  and their bank accounts in Hong Kong as directed by an individual or individuals (presumably Yanwen)  who had hacked Mr. Gabbay's business email account. (The transmittal of the Settlement Proceeds by Attorney Conaway is hereinafter referred to as the "Transaction").[6] The negligent way in which Mr. Conaway transmitted the Settlement Proceeds and handled the Transaction as Mr. Gabbay's attorney, fiduciary and agent was a clear breach of the legal standard of care and professional subject matter competence (collectively, the "Standard of Care") he should have demonstrated and adhered to in a transaction of this nature.

## 2.  SCOPE OF ENGAGEMENT

I was engaged by Mr. Gabbay to render an independent expert opinion regarding whether or not  Mr. Conaway: (i) breached the required legal Standard of Care and duty embodied therein that he owed Mr. Gabbay in connection with the professional services he rendered to him in connection with the Transaction; and, (ii) whether that breach of duty was a substantial factor in and the proximate cause of the damages and losses Mr. Gabbay suffered as a result. As an Expert in this litigation, I have familiarized myself with the applicable Standard of Care in the locality (State of Delaware)where the malpractice occurred.

## 3.  DOCUMENTS REVIEWED

This Report  focuses upon the Email Chain pertaining to the transmittal of the Settlement Funds exchanged between Mr. Gabbay and Attorney Conaway and the individual or individuals who misdirected those funds via the fallacious and illegal use of Mr. Gabbay's Agamantech.com email account (containing contradictory  directions to Mr. Gabbay's directives) commencing in early July of 2019 as produced in discovery, attached to certain pleadings, and/or produced and reviewed during Attorney Conaway's deposition on August 5, 2022. (Notwithstanding the foregoing, I may also cite other documents produced to the extent any such documents are pertinent to my Opinions.) I reviewed the Documents and data contained therein (as well as that derived from interviews with Mr. Gabbay)[7] listed on Schedule A hereto (collectively, the "Documents")

---

[6] Which Transaction occurred approximately between the end of May,2019 and approximately the end of July, 2019.

[7] December 7 and 28, 2022.  These discussions were conducted to confirm my understanding of the Transaction as reflected in the Documents and gain his perspective on my interpretation of same.

in connection with the preparation of this preliminary report ("Report"). This Report is based on the Documents I reviewed as of the date hereof. This is a preliminary report as discovery remains open and there is pending a Motion to Dismiss.[8]  Accordingly, if new or additional information becomes available (including, but not limited to, any expert report produced by Attorney Conaway) that may or does impact the Opinions expressed and conclusions reached herein, I reserve the right to amend, supplement or otherwise update this Report.

Citations are to Bates numbered documents or otherwise identified by specific reference to documents without Bates numbers and deposition testimony.

I have not been asked to opine on damages nor have I conducted any forensic accounting. I render no opinion regarding any tax or securities issues which may be involved.

## 4.  OPINIONS

Based upon: (i) my experience as a commercial transactional and finance attorney as more particularly describer below; (ii) my review of the data contained in the Documents; and (iii) the Background, Analysis and Discussion section of this Report which follows, I am, with a reasonable degree of professional certainty, of the following opinions (each an "Opinion" or, as the context requires, collectively, "Opinions") on the issues presented:

**A.**  An attorney-client relationship between Mr. Gabbay (as principal), and Attorney Conaway (as agent) existed whereby Attorney Conaway agreed to provide Mr. Gabbay with appropriate advice and guidance in connection with the Transaction and to take the necessary and appropriate legal steps to protect and safeguard the Settlement Proceeds and assure that they were transmitted properly to Mr. Gabbay. (The attorney-client relationship is not in dispute in this action);[9]

**B.**  Attorney Conaway breached the duty he owed Mr. Gabbay by failing to adhere to the Standard of Care an attorney owes a client in similar transactions as outlined in this Report by

---

[8] Which preserves the malpractice claim.

[9] See Attorney Conaway's engagement letter dated July 11, 2017 ("Engagement Letter"). It is important to note that Attorney Conaway's signature on the Engagement letter, albeit subscribed (presumably by his secretary) was in his individual capacity and not as an officer or member of Conaway-Legal, LLC.

failing to ensure that the Settlement Proceeds were properly transmitted to Mr. Gabbay as per legitimate ***and confirmed***[10] instructions from him in keeping with Professional Standards;

**C.** Attorney Conaway lied to Mr. Gabbay's other counsel and friend Clifford A. Rieders, Esq. (Attorney Rieders") regarding having legal malpractice insurance;[11]

**D.** Attorney Conaway breached the fiduciary duty he owed Mr. Gabbay in overseeing the transmittal of the Settlement Proceeds by failing to exercise the required due care pertaining to same and transmitting them to the wrong recipient despite clear confusion and basic "Red Flags" of fraud reflected in the Email Chain (Defined below) surrounding the wiring of the Settlement Proceeds;

**E.** By his own admission during the course of his deposition[12], Attorney Conaway testified that he: (i) had little or no experience wiring funds, especially internationally; (ii) took no steps to seek assistance from a professional who had experience and knowledge pertaining to wiring funds abroad; and (iii) took no steps to conduct due diligence or educate himself in the simple, well known and basic procedures attendant to wiring funds internationally despite such material being readily available online on legal, bank and government agency web sites;

**F.** Attorney Conaway did not investigate the unknown recipient Hong Kong entities the fallacious wiring instructions contained regarding the ultimate recipient of the Settlement Proceeds;

**G.** Attorney Conaway breached the direct contractual responsibility he had with Mr. Gabbay regarding the handling of the Settlement Proceeds;

**H.** Attorney Conaway breached the duty he owed Mr. Gabbay and Standard of Care applicable to an attorney as a fiduciary and disbursement agent by failing to simply call Mr. Gabbay to clarify the proper transmittal despite: (i) the glaring "Red Flags" of fraud; and (ii) the contradictory and confusing wiring instructions he received contained in the Email Chain; and

**I.** The breach of the duty Attorney Conaway owed Mr. Gabbay as set forth in Opinions A through H above and his abject failure to adhere to the basic Standards of Care applicable to his role as a fiduciary in the Transaction were a substantial factor in and the proximate cause of the losses and damages Mr. Gabbay suffered in the Transaction.

---

[10] Pursuant to customary due diligence and procedures in the ordinary course of a transaction of this nature.

[11] Attorney Rieders is prepared to testify to this and Attorney Conaway's admission regarding same.

[12] Deposition of Bernard G. Conaway dated August 5, 2022 ("Conaway Dep.").

## 5.  EXPERT CREDENTIALS

My credentials to render expert testimony and opinions in this matter are more particularly described on my *curriculum vitae* attached hereto as Exhibit A. I render my Opinions based on over thirty-nine (39) years of legal and consulting experience to and on behalf of national, regional, community, and foreign banking institutions;[13] Local, State and Federal government economic development agencies; Federal banking and finance Regulatory and Enforcement agencies;[14] mergers and acquisitions; purchases and sales of businesses and interests therein; finance companies; real estate finance and purchases and sales; and public financings (bonds).  Through the course of my career as a transactional and finance attorney I handled matters which involved transferring money (both domestically, cross-border[15] and internationally[16]) by wiring funds.  I am familiar with the guidance and utilization of the Society of Worldwide Interbank Financial Communication ("SWIFT"). While a principal in Precision Loan Solutions and a partner in Ardmore Banking Associates, I was lead counsel/consultant in that company to the FDIC, over twenty-five bank clients, the OCC and Justice department in creating regulatory compliant policies and procedures including sections in those new policies addressing international wiring of funds. I also have considerable expertise in financial fraud and crime detection and prevention.

I am acting as Mr. Gabbay's expert in this matter at the hourly rate of $400.00 plus out-of-pocket expenses. I have no financial interest in the outcome of this case. I am not working on the basis of any contingency fee.

## 6.  LEGAL AUTHORITY AS REGARDS THE LEGAL MALPRACTICE CLAIM

### 1.  Elements of Malpractice Applicable to this Case

In Delaware (as in all jurisdictions), an action for legal malpractice sounds both in contract and tort. The elements of a legal malpractice action (relatively uniform throughout all States), sounding in negligence, include: (i) employment of the attorney or other basis for a duty (proving

---

[13] For example, but not by way of limitation, The State Bank of India, Asian Bank, and the Bank of China, LTD.

[14] Including the Federal Deposit Insurance Corporation ("FDIC"); the Office of the Comptroller of the Currency ("OCC"); the Justice Department; the Financial Crimes Enforcement Network ("FinCEN"); and State Banking Regulators.

[15] Mexico and Canada.

[16] China, England, Japan, Poland, Switzerland, Germany, Greece, Cayman Islands, Panama, Bangladesh, and Russia.

that an attorney-client relationship was established); (ii) failure of the attorney to exercise ordinary professional skill and knowledge in the subject matter; (iii) a breach of that duty; and (iv) proving that the breach of that duty was a substantial factor in and the proximate cause of the harm to the plaintiff and resultant damages.

On a claim of legal malpractice, the plaintiff must establish the following elements: (i) the employment of the attorney; (ii) the attorney's neglect of a professional obligation; and (iii) resulting loss. *Flowers v. Ramunno*, 2011 WL 3592966, at *2 (Del. Aug. 16, 2011).

"In order to recover for an attorney's malpractice, the client must prove the employment of the attorney and the attorney's neglect of a reasonable duty, as well as the fact that such negligence resulted in and was the proximate cause of loss to the client." *Weaver v. Lukoff*, 1986 WL 17121, at *1 (Del. July 1, 1986) (citing *Pusey v. Reed*, 258 A.2d 460, 461 (Del. Super. 1969)).

Finally, it is well-established in Delaware that expert testimony is necessary to support a claim of legal malpractice. *Phillips v. Wilks, Lukoff & Bracegirdie*, LLC, 2014 WL 4930693, at *3 (Del. Oct. 7, 2014) (citing *Middlebrook v. Ayres*, 2004 WL 1284207, at *5 (Del. June 9, 2004)).

As regards proximate causation and Quoting Professor Prosser:

> *the question of "proximate" causation . . .becomes essentially a question of whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred. Quite often this has been stated, and properly so, as an issue of whether the defendant is under any duty to the plaintiff, or whether his duty includes protection against such consequences.* W. Prosser, [Law of Torts] § 42, at 244.

**2**.     **Attorney as a Fiduciary**:

Delaware law holds that an attorney is bound by a fiduciary duty in his/her dealings with his/her client. *Melson v. Michlin,* Del.Supr., <u>223 A.2d 338, 344</u> (1966); *In re Goldstein,* Del.Supr., <u>85 A.2d 361, 364</u> (1951); *Vredenburgh v. Jones,* Del. Ch. , <u>349 A.2d 22</u> (1975). As a fiduciary, "an attorney is bound to the highest degree of fidelity and good faith. Strict adherence to this rule of conduct is required by time honored, deeply rooted concepts of public policy." *Melson v. Michlin,*<u>223 A.2d at 344</u>. The attorney is a "trustee for his client." *In re Goldstein,* <u>85 A.2d at 364</u>. *In re Kennedy*, 442 A.2d 79, 89 (Del. 1982). A lawyer should hold

property of others with the care required of a professional fiduciary. *In re Beauregard,* 189 A.3d 1236 (Del. 2018).[17]

The hallmark of a fiduciary relationship is that one person has the power to exercise control over the property of another as if it were her own. See *Gelof v. Prickett, Jones Elliott*, C.A. No. 4930-VCS (Del. Ch. Feb. 19, 2010). The attorney is a 'trustee for his client.' *In re Kennedy*, 442 A.2d 79 (Del. 1982). It necessarily follows that an attorney acts as a fiduciary when he deals with the funds of his client." *In re Goldstein*, 46 Del. 450 (Del. 1951). Courts have previously decided that an attorney may be liable for claims involving breach of fiduciary duty in dealing with client trust funds. See *Gelof*.

See also the Restatement (third edition) of the Law Governing Lawyers at section 16(3).

**3.    Breach of Contract:**

It is well-established that three elements are necessary to plead and sustain a cause of action for breach of an express or implied contract: (i) the existence of a contract, including its essential terms; (ii) a breach of an obligation imposed by that contract; and (iii) resultant damages suffered by the plaintiff. Citing: *Edelstein v. Goldstein*, C.A. No. 09C-05-034 DCS, CONSOLIDATED (Del. Super. Ct. Mar. 1, 2011) (case involving breach of contract addressing attorney services) *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612.

**7.  BACKGROUND, ANALYSIS AND DISCUSSION**

**A.    Overview and Background of Dispute**

This action arises out of Attorney Conaway's representation of Mr. Gabbay throughout a litigation matter which was settled per agreement between the parties to that action, and on or about May 30, 2019. After conditions precedent to funding the agreed upon Settlement Proceeds were satisfied the Settlement Proceeds were transmitted by defendant's counsel to Attorney Conaway.[18] Thereafter, Attorney Conaway had a fiduciary duty,[19] as Mr. Gabbay's agent and

---

[17] For an exhaustive list of Delaware legal malpractice authority see the digest prepared by Drew Gustus, Esq., Professional Liability Group, International Society of Primerus Law Firms, Grand Rapids Michigan, 2016.

[18] CL-0007.

[19] For a concise dissertation on what that fiduciary duty requires, see Justice Cardozo's opinion in *Meinhard v. Salmon,* 164 N.E. 545 (N.Y. 1928) commonly referred to by the legal profession as the fiduciary "Punctilio of Honor" decision.

counsel, to ensure that the Settlement Proceeds were transmitted to his ***only principal and client: Mr. Gabbay or his authorized agent.***[20]    However, the Email Chain driving the Transaction, (including the legitimate pay proceeds facsimile, executed by Mr. Gabbay, dated July 23, 2019 ("Pay Proceeds Fax"))[21] contained contradictory and confusing directives, especially in light of Mr. Gabbay's original directives and advice set forth in his email dated July 2, 2019[22] (cc'd to both his wife Shoshana Gabbay ["Mrs. Gabbay"] and Attorney Rieders) instructing Attorney Conaway to transmit the Settlement Proceeds to a United States bank pursuant to instructions to follow ("US Bank Directive").  The customary written pay proceeds letters directing the disbursement of the Settlement Proceeds, signed by Mr. Gabbay and in form and substance in keeping with routine industry standards, followed on July 26, 2019.  These were the legitimate wiring instructions  directing Attorney Conaway to transmit the Settlement Proceeds to the Bank of New York Mellon ("BONYM")[23] in keeping with the US Bank Directive.

**B.    Discussion and Analysis**

This Report does not require a lengthy recitation of the facts. I am of the Opinion that the data contained and disclosed in the Documents and, specifically in the second and third amended complaints and Exhibits attached thereto (collectively, the "Complaint"), the deposition testimony of Attorney Conaway himself, the US Bank Directive, and the Pay Proceeds Fax make it abundantly clear that:

**1.    Attorney Client Relationship**

The Attorney client relationship has been clearly established and not at issue in this litigation. Accordingly, the first element of a malpractice claim is satisfied.

**2.    Professional Standards and an Attorney's Duty as a Fiduciary**

As Mr. Gabbay's attorney and recipient of the Settlement Proceeds, Attorney Conaway was clearly acting as a fiduciary in the Transaction and had a duty to Mr. Gabbay to ensure those proceeds were transmitted by him as per instructions provided by Mr. Gabbay. Attorney Conaway

---

[20] There was no third party or authorized agent ever communicated by Mr. Gabbay to Attorney Conaway.

[21] CL-00061.

[22] Email from Mr. Gabbay to Attorney Rieders dated July 2, 2019, Document 12-2, Filed 08/02/21, Page 7 of 9 Page ID #: 281

[23] And certain other professionals on account of fees outstanding.

admits he was acting in a fiduciary capacity on Mr. Gabbay's behalf.[24] Unfortunately, Attorney Conaway failed to adhere to the Standard of Care regarding the simple industry standard confirmation process in wiring funds internationally. Attorney Conaway testified that he was inexperienced in wiring funds, especially internationally, this Transaction being only the second time he had done so in twenty years.[25] He testified that he had no procedure or policy in place in order to identify and adhere to basic and fundamental safeguards when wiring funds internationally to detect fraud, Business Email Compromises ("BEC") and ensure transmission to the correct recipient.[26] He further testified that despite the obvious confusion and contradictions the Email Chain reflects,  and his acknowledgment of the obvious  "conflict" regarding the wiring instructions he was receiving, he again failed to call Mr. Gabbay testifying that a call "might have" clarified the confusion and confirmed which wiring instructions should be followed.[27] As further discussed below, Attorney Conaway had no business, by any stretch of the imagination, wiring the Settlement Proceeds to unknown foreign entities without speaking to his client. That is especially true in light of the confusion, contradictions and obvious "Red Flags" of potential fraud reflected in the Email Chain as further discussed below.  Since email began, the financial industry and the legal profession recognized the danger in relying thereon with respect to moving money electronically.  The "rule" quickly became:  No email confirmation when wires are being sent.

### 3.  Communication with Client

Attorney Conaway testified that he primarily dealt with and spoke to Attorney Rieder throughout the engagement saying he "…might have spoken with Mr. Gabbay eight, ten times over the course of two, three years."[28]   Mr. Gabbay adamantly contests this and also refutes Attorney Conaway's testimony that "Sometimes his [Mr. Gabbay's] instructions weren't clear."[29] Ironically, Mr. Gabbay's actual communications contained in the Email Chain are the only instructions that were crystal clear, well written displaying an obvious command of the English

---

[24] Conaway Dep. at p. 26.

[25] Conaway Dep. at p. 16.

[26] Conaway Dep. at pp. 137-139.

[27] Conaway Dep. at p. 48.

[28] Conaway Dep. at p. 11.

[29] Conaway Dep at p. 48.

language distinct from the hacker's emails.[30] The hacker's emails were distinctly different in grammar and reflect a poor command of the English language.[31]

Attorney Conaway testified that he never attempted to call Mr. Gabbay regarding the confusion in the Email Chain.[32] He did not call Attorney Rieders.[33] A simple call with Mr. Gabbay, regardless of how long it took to connect, would have prevented the successful fraud perpetrated in light of the confusion, and, in particular the "Red Flags" of fraud discussed immediately below. Another troublesome aspect of the communications between Attorney Conaway, Attorney Rieders and Mr. Gabbay is that sometimes the emails were between Attorney Rieders with copies to Mr. Gabbay, and other times Mr. Gabbay was not copied by Attorney Conaway. It is standard practice and in keeping with the Standard of Care (and simply good lawyering) to copy the client with all written communications.

### 4. Red Flags of Fraud

Any attorney acting in a fiduciary capacity on behalf of a client must be aware of basic and common "Red Flags" of financial fraud. This is particularly true in wiring funds internationally. Those Red Flags include, but are in no way limited to: (i) instructions to transmit funds to unknown entities, individuals and/or addresses; (ii) the communications reflect a commercially unreasonable sense of urgency;  (iii) the communications conflict with previous communications with a client (sender or recipient); (iv) and/or the language is noticeably different from the client's.  Critically important is that any of these Red Flags should put a hold on any transaction and warrant additional

---

[30] Mr. Gabbay is extremely well educated and intelligent. He speaks English, Hebrew, Arabic and Italian fluently, and can read, write and engage in basic conversation in German, French and Spanish.  He holds degrees in Biochemistry, Textile Engineering, Material Sciences, and advanced degrees in Pathology and Infectious diseases. He attended N.Y.U. School of Exact sciences, Polytechnical Institute of Milano, and the Medical School of Bologna. He holds a certificate in Financial Analysis from N. Y. U. The hacker's emails, rife with grammatical and poor word choices in no way shape or form reflect the manner in which Mr. Gabbay routinely communicated to Attorney Conaway over the course of the Engagement and during the Transaction. Furthermore, all of the hacker's emails are rushing the Transaction, another "Red Flag" of potential fraud.

[31] See for example:  CL-00049 ("Did you follow up with your bank today to confirm maybe you can process the wire transfer").

[32] Conaway Dep. at pp. 69, 70, 75, 90, and 103.

[33] Conaway Dep. at p. 55.

due diligence to ensure no fraud is in process.[34] he Email Chain contains glaring and obvious indicators and Red Flags that something was amiss warranting investigation. Among them are:

- The first contradictory[35] email and wiring instructions directing the Proceeds be wired to HK Bliss Trade Limited ("HK Bliss") to HSBC (Hong Kong) ("HSBC"). HK Bliss was an unknown entity as was it address. Its principal was unknown and there is no evidence that Mr. Gabbay had any interest whatsoever in this company.

- The refusal of HSBC to accept the wire and subsequent return of the funds allegedly because of an "audit" which is ridiculous.[36] At this juncture, Attorney Conaway should have called Mr. Gabbay to clarify and confirm the recipient. He should have stopped initiating any wires until he spoke with his client. He did not. Rather, he immediately again wired funds to yet another unknown entity.

- As noted, Attorney Conaway initiated a second wire to yet another unknown entity, Kangming Trade Limited ("Kangming") bearing the same address as HK Bliss, owned by the same principal and bearing the same address. Attorney Conaway again failed to pause, call Mr. Gabbay to clarify the issues and confirm the legitimacy of the proposed transmittal of the Settlement Proceeds to Kangming. He did not despite testifying that such a call "might" have clarified the confusion.[37] Of course it would have. A call would undoubtedly gone something like this: Attorney Conaway: "Mr. Gabbay, do you know or have any interest in these companies as I am being instructed to wire the Settlement proceeds to them in Honk Kong?" Mr.

---

[34] **_All_** of these most basic fraud flags were present during the Transaction: **_twice_**. Any one of them should have stopped the Transaction immediately and warranted a call to Mr. Gabbay.

[35] Contradicting Mr. Gabbay's July second advice that the Settlement Proceeds should be wired as per written instructions (signed by Mr. Gabbay) which would be forthcoming and did Via the US Fax on July 26, 2019.

[36] The only times a bank like HSBC refuses a SWIFT wire if fraud is suspected or a Cease and Desist Order from the governing regulators was issued (a matter of public record) which was not the case. I represented both China Bank and HSBC and the policies they have in place mirror those of the United States Regulators. An audit does not stop business in the ordinary course.

[37] Conaway Dep. at p. 49.

Gabbay: "I advised you on July 2, 2019 that the Settlement Proceeds were to be wired to a US bank and that written instructions would follow and they will. Please disregard any and all further fallacious instructions until you receive a written and executed standard pay proceeds document from me. I will advise and perhaps we should call the appropriate authorities?"

- The sense of urgency reflected in the hacker's emails.

- Unfortunately, despite ample and readily available guidance regarding Red Flags of Fraud and wiring money on the FDIC's, FinCEN's, FBI's, the Federal Trade Commission, and national banks websites,[38] Attorney Conaway simply ignoring (or being ignorant of) obvious Red Flags, failed to pause and conduct necessary due diligence and call the client. He should have ordered a routine Patriot Act search immediately. He did not.

- Despite overwhelming confusion, contradictions and facts, any one of which should have alerted him to the obvious potential fraud that occurred, evidenced by the Email Chain, the introduction of unknown entities and instructions to wire the Settlement funds twice to Hong Kong, Attorney Conaway went ahead and initiated the second wire without ever calling Mr. Gabbay or Attorney Rieders. Mr. Gabbay had no clue what was transpiring until Attorney Conaway advised him that the Settlement Proceeds had been wired to Kangming in Hong Kong at a Hong Kong bank. Upon receiving that notice from Attorney Conaway on July 27, 2019 he simply replied (***after he sent the legitimate pay proceeds letters)*** "What Hong Kong Bank??[39]   Attorney Conaway testified that he was not experienced or educated in international wire transfers, Red Flags of Fraud, or BEC.[40] He testified that he did not see

---

[38] See e.g.: https://firstbusiness.bank/resource-center/preventing-wire-transfer-fraud/; https://consumer.ftc.gov/articles/you-wire-money ; https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/business-email-compromise . I found these articles in ten minutes and warn against exactly what transpired in the Transaction.

[39] CL-00066.

[40] Conaway Dep. at pp. 132 and 133.

any indications or Red Flags that a fraud was being perpetrated.[41] His admissions warranted a higher level of due diligence and he conducted none.

5. **Standard of Care in International Wire Transactions**

The due diligence attendant to wiring money both domestically and internationally is actually quite simple and a matter of exercising common sense. The fiduciary need only confirm the amount and the intended recipient with the principal in real time. Typically, this is done by the fiduciary with a phone call and memorialized in a signed pay proceeds letter. If there is any confusion or problems, transmittal of funds is put on hold until T's are crossed and I's are dotted. Such was not the case here. Attorney Conaway testified that he conducted no due diligence.[42] Unfortunately, and to the detriment of Mr. Gabbay, despite ample reasons and time to attend to these most basic and fundamental elements of due diligence, Attorney Conaway conducted none. Despite admitting his lack of experience and knowledge, which warranted a higher level of due diligence and caution, he none-the-less wired the Settlement Proceeds ***twice*** to the wrong recipients. His ignorance effectively aided and abetted the fraud which was, by all counts, being perpetrated in front of him. It could have easily been avoided by asking for help from a professional with appropriate expertise and/or spending a little time educating himself. Most notable and importantly, the fraud could have been circumvented easily by a simple phone call to his client, Mr. Gabbay.

8. **CONCLUSION**

After Mr. Gabbay, Attorney Conaway and Attorney Rieders became aware of the fraud, Attorney Rieders met with Attorney Conaway for lunch on October 2, 2019. Attorney Rieders drafted a MEMORANDUM of even date therewith outlining the discussion which transpired with Attorney Conaway. Attorney Rieders will testify as to the admissions Attorney Conaway made

---

[41] Conaway Dep. at pp. 48, 65 and 112.

[42] The corporate status reports on Kangming and HK Bliss, which Attorney Conaway obtained after the fact, are readily available at:  https://www.gov.hk/en/business/registration/businesscompany/index.htm . Attorney Conaway should have obtained theses corporate reports ***before*** The fraud was perpetrated as a matter of basic due diligence if he continued to adhere to his "no need to call Mr. Gabbay" attitude.

during that luncheon.  It was supplied by Mr. Gabbay's counsel in discovery. At that lunch, Attorney Conaway admitted he had mishandled the Transaction, intimated he would compensate Mr. Gabbay, and further admitted that he had lied about having malpractice insurance.  When Attorney Conaway's deposition is reviewed in its entirety, he admits all elements sufficient to carry the burden of proof in this malpractice case. In light of his admissions, including lack of experience and knowledge in the subject matter, Attorney Conaway should have put a hold on the Transaction and sought guidance from a professional or conducted a few hours of research.

Preferably, he should have simply called Mr. Gabbay or Attorney Rieders, either of whom would have spotted and intercepted the fraud in progress, assuring that the Settlement Proceeds were distributed as per Mr. Gabbay's wishes thereby obviating the need to litigate and render this Report.


Respectfully Submitted,


Peter W. Leibundgut,
President and CEO of PD&J Associates, LLC


**Exhibit A**



## PETER W. LEIBUNDGUT, Esq.

Peter Leibundgut has over thirty-nine years of transactional, public and private commercial and real estate finance, legal and bank consulting experience. He currently provides a range of financial services to financial institutions, borrowers and domestic and foreign private and institutional investors in connection with risk management, structuring, placing and conducting due diligence in securities (public and private offerings, IPO's and M&A) commercial and real estate financing transactions. He serves as an expert witness and provides litigation support in cases involving contract disputes and complex public and commercial finance matters involving legal malpractice, credit facilities and debtor and creditor rights.

Based upon his experience representing banks, finance companies, borrowers, purchasers and sellers and public entities in conventional and innovative financings, Peter provides select litigation support and expert services in contract disputes, commercial and residential real estate and real estate development, land use, lender liability, legal malpractice, public finance, complex lending and credit facilities, and financial fraud cases. His experience spans over thirty-nine years of due diligence, structuring, closing and restructuring public and commercial financial transactions on behalf of lenders; county, state and federal authorities and issuers; underwriters; finance companies; private equity and hedge fund investors; and borrowers. Most recently, over the last twelve years, he has provided legal, advisory and consulting services to companies, financial institutions, state and federal banking regulators and the federal government in emerging credit risk management techniques, developing "best practice" underwriting and due diligence guidelines and oversight procedures, bank mergers and acquisitions, special assets and work-outs, and developing regulatory compliant commercial lending policies, processes and procedures to meet financial crisis concerns and emerging laws and regulations.

He has served as an expert in over fifty cases involving lender liability, legal malpractice, mergers and acquisitions, complex public and commercial lending and leasing transactions, Whole Bank Acquisitions and Shared-Loss matters, fraud and gross negligence,

creditor's rights, bankruptcy, and other matters requiring niche lending and contract expertise. Three of these cases were nationally recognized and several were cases of first impression. He has represented the FDIC in forensic commercial loan review and assisted bank and loan portfolio sales including under the Purchase and Assumption and Shared-Loss programs.

Peter has also acted as an interim executive of several companies involved in turn- arounds including a real estate development company founded in 1988. Peter has assisted a number of companies financing efforts off-shore and domestically including the capital raising efforts of approved EB5 Regional centers.   Previously, he was a Senior Vice President of Risk Management for Ardmore Banking Advisors, Inc., a Managing Director of Integrated Compliance Solutions, LLC, and a founding member and principal of one of its subsidiaries, Precision Loan Solutions, LLC. He has practiced law for over 39 years for a number of law firms including Blank Rome, LLP and Ballard Spahr, LLP.

A graduate of Dickinson College and Vermont Law School, Mr. Leibundgut was admitted to the New York and New Jersey State Bars. He is or has been a member of the National Association of Industrial and Office Parks, Turn Around Management Association, Association of Commercial Finance Attorneys, NAIOP Commercial Real Estate Development Association, Commercial Finance Association, Association of Corporate Growth, Risk Management Association, New Jersey Bankers Association, and Southern New Jersey Development Counsel.

Peter Leibundgut has lectured and taught on a variety of topics, including lender liability; cross-border transactions; Sarbanes Oxley/FASB; Equipment Leasing; Factoring; Asset Based Lending; Ship Mortgages and finance; real estate development, special assets and creditors' rights; commercial loan documentation; and credit risk management in commercial loan portfolios and shared-loss compliance.

Mr. Leibundgut is a Participant in TREWS, TASA, ALM Experts, SEAK Experts, Consolidated Consultants, Co., Laws On Line, and has been vetted and approved to represent the FDIC, SEC, OCC and Justice Department.

**Additional Credentials, Case Experience, Rate Schedule and References are available upon request**.

**PETER W. LEIBUNDGUT, Esq.**

**peterl@pdjassociatesllc.com**

**(856) 912-8470**

Since forming PD&J in 2008, Mr. Leibundgut acts as a general counsel to a number of clients and serves as expert witness in cases involving lender liability, legal malpractice, complex lending and credit facilities in the private and public sectors, fraud and debtor and creditor's rights cases. He provides select financial institution consulting through his company, PD&J Associates, LLC (PD&J). His expertise includes Governance, Risk Management and Compliance, Bank Mergers and Acquisitions and Special Asset engagements. He has niche expertise in the due diligence attendant to extending commercial and public credit including policies, procedures and processes. He is a due diligence expert. He previously developed niche expertise in the representing EB-5 Regional Centers and investors under the United States Foreign Investment Job Creation Program. Mr. Leibundgut continues to represent companies as a general counsel, borrowers, investors and lenders in connection with domestic and foreign private equity and debt investments in commercial real estate projects in both the private and public sectors. He has acted as an Expert in over fifty cases involving in excess of eight billion dollars in claims and potential liabilities.

In addition to serving as an expert witness and providing litigation support and consulting, through PD&J, Mr. Leibundgut served as Senior Vice President of Credit Risk Management and Chief Counsel for Ardmore Banking Advisors, Inc.; a Managing Director of Integrated Compliance Solutions, LLC ("ICS"); and founding member of Precision Loan Solutions, LLC, a subsidiary of ICS. In both advisory firms he was responsible for overseeing government and commercial compliance, risk management and due diligence engagement in the commercial lending and public finance sectors.

Over the last twelve years he has framed and conducted various risk and compliance assessments and advised Banks and clients in: mergers and acquisitions; special assets and TDRs; developing compliant and "best practice" strategic plans, risk appetite scenarios, credit policies, procedures and processes; due diligence "best practices" in underwriting commercial loans and public financings; and emerging regulatory and compliance best practices. He has also provided forensic and regulatory consulting services to the financial community, law firms, accounting firms, the FDIC, SEC and Justice Department. Mr. Leibundgut has been certified as an expert and provided litigation support in a number of lender liability, legal malpractice, fiduciary duty, fraud and creditor's rights cases. He has lead forensic loan review engagements for the FDIC in connection with Bank seizures and sales.

Mr. Leibundgut is a financial services attorney and expert witness involved in the consumer, public and commercial financial markets generally representing lenders, borrowers, investors and issuers.

**BALLARD SPAHR LLP,** *Of Counsel.* Philadelphia, PA, May, 2004 – April, 2008

- Public Private Partnerships and innovative public financial structures including Military Housing and Transportation Infrastructure (representing  TIFIA JPO), underwriters, issuers, lenders and borrowers;
- Complex commercial and public credit facilities including: project finance; syndications; revenue stream securitization; debt portfolio sales and purchases; tax lien securitization; and collateralized surety bonding programs; and
- Microfinance for CitiGroup and Grameen Foundation-Grameen's Chairman won Nobel Prize for first of its kind structure.

**PARKER MCCAY PA,** *Partner.*  Cherry Hill, NJ, June, 2001 – May 2004

- Hired as "in-house" counsel to Commerce Bank, NA;
- Developed policy, procedures and documentation for workout, public finance, healthcare, equipment leasing, asset based lending and letters of credit;
- Counseled  senior management and loan officers on and facilitated new product development including healthcare, equipment leasing and asset based lines of business; and
- Oversaw due diligence, documentation and closing of:  syndicated credit facilities; public finance and direct bond financings; equipment leasing; C&I and asset based lending.

**BLANK ROME LLP,** *Of Counsel.*   Philadelphia, PA, April 1997 – May 2001Asset-based financing, securitizations, secured and unsecured revolving credit and term loan financing;

- Debtor in possession financing, syndicated loans, equipment leasing, synthetic lease and sale-leaseback transactions, mergers and acquisitions and letter of credit enhanced financing;
- Public and municipal finance;
- Developed practice in bulk and forward flow bad credit card debt sales principally on behalf of money center banks; and
- Helped developed niche practice groups addressing emerging healthcare and telecommunications finance.

**LEITESS & ASSOCIATES, PC,** *Partner.* Voorhees, NJ, March 1996 – March 1997

- Started Delaware Valley office of Baltimore based firm;
- Bank, finance and equipment leasing company transactions; and
- Creditor's rights, workouts and bankruptcy matters.

**CLARK LADNER FORTENBAUGH & YOUNG,** *Partner.* Cherry Hill, NJ, Jan. 1986 – Feb. 1996

- Solicited to help start a New Jersey office with one Partner which grew to 32 attorneys;
- Real estate, banking, commercial and public finance;
- Residential Mortgage Lending and banking;
- Mergers and acquisitions;
- Lead counsel in restructuring and liquidating Mutual Benefit Life in Rehabilitation;
- New Jersey Advisory Board member-Chemical Bank.  Advisory Board member - Farm Credit; and
- Resolution Trust Corporation counsel.

**WACKS, HIRSH, RAMSEY & KIMMEL,** *Associate.* Morristown, NJ, Jan. 1984 – Dec. 1986

- Commercial real estate development, land use and finance; Economic and industrial development bond transactions; and Ethics opinions; and
- Residential real estate.

**ZOCK, PETRIE, REID & CURTIN,** *Summer Associate, Associate.* New York, NY, June 1982 – Dec. 1984

- Construction and financing agreements for 129 vessels for Sanko Kissen (USA); and
- Charter parties, bills of lading and arbitration of charter party disputes.

**ADMISSIONS: the States of New York (1984) and New Jersey (1985)**

**EDUCATION:**

- Vermont Law School – Juris Doctor, May 1983
  Summer Environmental Law Program
  Independent study with Professor Grant Gilmore:  Adjudication of Maritime Liens in bankruptcy

- Dickinson College – Bachelor of Arts, May 1980
  Majors:  Economics, Philosophy
  Nisbit Scholars Program

**MEMBERSHIPS:**

- The Association of Commercial Finance Attorneys ("ACFA") (past Officer and  Executive Board member) 1985-Present
- American Bar Association (Section on Business Law - Commercial Finance Committee) 1986-2001
- Turn Around Management Association 1990- 2013
- National Bond Lawyers Association 1998-2008
- Commercial Finance Association 1990- 2008
- Asset Based Securitization East National Conference 2003, 2004, 2005
- National Association of Industrial and Office Properties 1986-Present
- Equipment Lease Finance Association (1997-2007)
- Risk Management Association  2009-Present
- Association of Corporate Growth  2008- 2012
- New Jersey Bankers Association  2009-2013
- Southern New Jersey Development Council -  2012- Present

**PRESENTATIONS AND ARTICLES:**

- Lender Liability  1988 & 2011 – Forum for  Bank Credit and Loan Officers
- Financing Vessels, Trains and Planes – ACFA CLE 1999
- Demand Notes and Negotiable Instruments – ACFA CLE 2000
- Cross Border Transactions – ACFA CLE 2001
- Revised Article 9 – ACFA CLE 2003
- Sarbanes Oxley/FASB: Impact on Financial Covenants and Guaranties – ACFA CLE 2004
- Commercial Loan Documentation CLE - Lorman two day CLE Program 2004

- Health Care Receivable Lending (Private Seminar to Hospitals and Institutional Lenders) – 2006.
- Navigating Uncharted Financial Waters – Int'l Bank Auditors  2010
- Best Practices in Commercial Credit Risk Management  Article – PA Bankers Association 2010
- ALLL Best Practices- NJ Bankers Association Seminar  2012
- Special Assets and TDRs – Seminar for Delaware Valley Bankers 2012
- Holistic GRC Trends and Best Practices – 1 Day Presentation to State Bank Examiners Conference 2012

**CHARITABLE AND CIVIC ORGANIZATIONS:**

- Board of American Liver Foundation (Past Co-chairman and President of the Delaware Chapter of the American Liver Foundation)
- Board Member of the Philadelphia Orchestra, Chair of Corporate Council Committee
- Co-chairman of the Philadelphia Orchestra New Jersey Fund Raising Committee, Founder of Children's Outreach Program
- Past Trustee of Cooper Foundation, Cooper University Medical Center Camden
- Past Board Member of Hal Prince American Music Theatre Festival
- Fundraising Committee Moorestown Friends School
- Outreach Minister ("Good Financial Sense") for Fellowship Alliance Church

**EXPERT EXPERIENCE**

Mr. Leibundgut has provided expert testimony, litigation support and dispute resolution services in the matters set forth on Schedule C including the following cases since April of 2008:

- FDIC forensic commercial file review in connection with the seizure of Main Street Bank. Engagement focused on fraud and gross negligence of bank's senior management and board. Reports provided and deposition testimony rendered. Uncovered major fraud against Fannie Mae in which the Bank's senior lender participated.
- Represented borrowing entity in case against Compass Bank and parent BBVA for violation/abuse of Purchase and Assumption Agreement and Shared-Loss procedures. Facilitated amicable and successful settlement of case protecting borrowers' $33MM equity investment and release of principals' guaranties. Worked with FDIC legal/enforcement group in connection with case.
- Legal malpractice case against bankruptcy attorney/firm.
- Worked in conjunction with ICS Compliance (in which he was a Managing Director) and lead counsel, Conrad & Scherer (representing investors),  providing forensic analysis and due diligence in Rothstein Ponzi scheme case in Florida resulting in $175MM settlement with TD Bank (f/k/a Commerce Steinberg NA).
- Represented Stuart Title in case of first impression defending a claim by a judgment creditor against lender seeking equitable subordination of Lender's first liens on realty and personalty by virtue of extending a credit facility which clearly violated Steinberg's

lending policy.  Detailed report rendered and deposition taken.  Case resolved favorably on summary judgment.

- Approved by Trustee in Bankruptcy in a component of the Petter's Ponzi scheme case seeking recovery from Petter's family trust, third parties and certain banks. Case involves deviation from standards in the industry, good faith and fiduciary responsibilities in purchase order, asset based, bankruptcy remote trade receivable securitization and factoring structure.
- Certified as an expert and represented two other borrowing groups in FDIC shared-loss abuse cases resulting in amicable settlements after reports delivered and settlement meetings attended.
- Represented Co-Arranger, Co-Syndication Agent in actions brought by the Trustee of the Le-Nature's Liquidation trust in connection with the Le-Nature's Ponzi scheme case.
- Represented law firm and City of Burlington Vermont in defending an action by Citibank to recover deficiency under a defaulted tax-free non-appropriation municipal lease for high speed cable and internet system.
- Represented estate in suit against bank for failure to honor power of attorney.
- Represented residential real estate brokerage firm's underwriter (Lloyd's of London) in a consumer real estate case of first impression regarding re-classification of dams and impoundments in Pennsylvania.
- Represented OCWEN Loan Servicing LLC in mortgage enforcement proceeding. Case won at trial.
- Represented minister in fraud claim against partner in redevelopment of North Broad Street Opera House in Center City Philadelphia.
- Represented class of creditors holding $660MM in syndicated loan participations against Agent bank and law firm.
- Represented Estate in case against bank for breach of fiduciary duty.
- Represented Depositors in fraud claim and breach of fiduciary duty against Merrill Lynch.
- Represented defrauded investors in  Ponzi Schemes.

In addition to the above matters, Mr. Leibundgut has been deposed on many instances over the years principally in connection with lending issues in the private and public sectors, financial contracts and restructured loans in bankruptcy. He has also given testimony to various government agencies and committees involving the proposed revision to the bankruptcy Code, Revised Article 9 of the Uniform Commercial Code and the Rating Agencies on matters pertaining to public finance.

**<u>Schedule A:  Document Reviewed</u>**

1. Plaintiff's Second Amended Complaint and Exhibits
2. Plaintiff's Third Amended Complaint and Exhibits
3. Answer To Motion To Dismiss Counts 1-5 of Plaintiff's Third Amended Complaint and Exhibits
4. Defendants' Responses and Objections to the Plaintiff's First Set of
5. Interrogatories

6. Bates Numbered Documents CL-0001-000261
7. Deposition of Bernard G. Conaway Esq. Dated August 5, 2022 and Exhibits
8. Memorandum from Clifford A. Rieders to Mr. Gabbay dated October 2, 2019